CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-20007
Facsimile: (212) 225-3999
Attorneys for Defendant Goldman, Sachs & Co.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- X

In re:                                                          :

ENRON CREDITORS RECOVERY CORP., et al.,          :          Chapter 11

                       Reorganized Debtors.          :          Case No. 01-16034 (AJG)

                                               :          (Jointly Administered)

--------------------------------------------------------------------- X

ENRON CORP.,                                                :

                Plaintiff,          :

                              :

               v.          :          Adv. No. 03-92677 (AJG)

J.P. MORGAN SECURITIES, INC., et al.,          :

                Defendants.          :

--------------------------------------------------------------------- X

ENRON CORP.,                                                :

                Plaintiff,          :

                              :

               v.          :          Adv. No. 03-92682 (AJG)

MASS MUTUAL LIFE INSURANCE CO., et al.,          :

                Defendants.          :

--------------------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF GOLDMAN, SACHS & CO.'S**
**MOTION TO WITHDRAW THE REFERENCE OF THE ABOVE-**
**CAPTIONED ADVERSARY PROCEEDINGS TO THE BANKRUPTCY COURT**

TO THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK:

Petitioner Goldman, Sachs & Co. ("Goldman Sachs") respectfully submits this

Memorandum of Law in support of its motion to withdraw the reference to the Bankruptcy Court

for the Southern District of New York to the United States Federal District Court for the

Southern District of New York.

## Preliminary Statement

By statute and under settled case law, significant issues of first impression

involving novel or complicated theories concerning the federal securities laws must be addressed

by a federal district court rather than a bankruptcy court. See, e.g., Mishkin v. Ageloff, 220 B.R.

784, 796-97 (S.D.N.Y. 1998).  In this case, Enron has recently reversed its longstanding position

as to whether commercial paper ("CP") is a security in order to assert a brand new theory under

the federal securities laws.  As reflected in the report of Enron's expert, Professor Joseph Franco,

the vast bulk of Enron's claim against Goldman Sachs is now based on a novel theory of

recovery under the federal securities and bankruptcy laws, squarely triggering the mandatory

removal provisions of 28 U.S.C. § 157(d) (stating that district courts must, "on timely motion of

a party, [] withdraw a proceeding if the court determines that resolution of the proceeding

requires consideration of both title 11 and other laws of the United States regulating

organizations or activities affecting interstate commerce"), which Goldman Sachs now invokes.

This case involves Enron's attempt to recover as voidable preferences and

constructively fraudulent transfers the money it paid to purchase and retire about $1 billion of its

outstanding CP prior to filing for Chapter 11 in December 2001.  Enron seeks recourse not only

against the holders who sold CP back to Enron but also, under a "benefit theory," from Goldman

Sachs, on account of its assistance to Enron, as Enron's agent, in repurchasing certain of its CP

from other holders.[1] (As one of the three dealers for Enron's CP program, Goldman Sachs also had helped Enron sell CP to such holders.)

Enron's theory of liability against Goldman Sachs for the transactions as to which it acted as Enron's agent is that Goldman Sachs "benefited" from such CP repurchases and therefore is liable to Enron under 11 U.S.C. 550(1) (as the "entity for whose benefit" the voidable transfers were made). This claim is advanced even though Goldman Sachs received no compensation for its role in these agency transactions and the parties explicitly agreed that Goldman Sachs' actions were "completely ministerial" and that Enron would hold Goldman Sachs harmless against any losses resulting from its actions as Enron's agent.

Up until the filing of the Franco Report, Enron did not specifically identify what the basis for its "benefit theory" would be, but successfully argued that it should be able to complete discovery before having to commit to any particular theory of "benefit." See Moloney Decl. Ex. 1 (May 22, 2007 Defendants' Motion to Compel at 6-7 (joined by Enron in Enron's May 24, 2007 Motion to Compel); Moloney Decl. Ex. 2 (Hr'g Tr. 44:14-20, 52:12-53:9, June 21, 2007). Enron suggested, among other things, that there could be a practice or custom or usage of CP dealers voluntarily making their customers whole in the event of a CP dealer default.[2] See Moloney Decl. Ex. 2 at 52:15-16, 60:5-15.

Enron, however, consistently argued that CP was not a "security" under the federal securities laws and that it was not relying on the elimination of potential securities law liability as the basis for its "benefit" claim against Goldman Sachs. As set forth in detail below, Enron took very specific positions on these issues in response to various motions in the

---

[1]    Goldman Sachs assisted Enron pursuant to a written agency agreement in repurchasing $352 million in CP from institutional investor holders and also sold Enron $30 million of commercial paper it held in inventory, as a result of its secondary market making activity.

[2]    Enron uncovered no support for this theory during the course of fact discovery.

bankruptcy case, including Goldman Sachs' motion to dismiss the complaint on the grounds that

all of the challenged transfers were protected "settlement payments" under Section 546(e) of the

Bankruptcy Code as well as in response to Goldman Sachs' objections to certain proposed far

reaching discovery. But, on October 29, the only expert report Enron served in support of its

"benefit" theory was that of Professor Franco, and the only "benefit" to Goldman Sachs that

Professor Franco identifies in his Report is the potential elimination of contingent liability under

the federal securities laws. See Moloney Decl. Ex. 3 (Expert Report of Professor Franco).

      Flatly contradicting the position Enron has taken in this case since 2004,

Professor Franco categorically declares "commercial paper is a security under the Securities

Act." He then argues that Goldman Sachs benefited from the elimination of potential liability

under Section 12(a)(1) of the Securities Act that could have fallen on Goldman Sachs as a

statutory seller of unregistered securities if Enron had defaulted on the payment of its

outstanding CP. In support of this position, Professor Franco claims that a District Court faced

with this theoretical situation would ignore the prime ratings given to Enron's CP by S&P and

Moody's as well as the fact that almost all of Enron's CP was in fact repaid by a drawdown from

Enron's $3 billion unsecured backup CP revolver and would instead rely exclusively on a post

facto expert analysis of Enron's true financial condition to determine whether Enron's CP was

"prime" and it properly invoked the Section 3(a)(3) exemption. Additionally, Professor Franco,

without even discussing why a distribution to large institutional investors would even qualify as

a public offering, posits that no other exemption to registration was available.

      Professor Franco's report is essentially a legal opinion,[3] citing numerous

irrelevant cases and other legal authorities. Yet, he points to no controlling authority, and, in

fact, no case that has ever rejected reliance on rating agency determinations of the prime quality

---

[3] Goldman Sachs reserves all rights to object to Professor Franco's report on this basis and other grounds.

of CP as a basis for invoking a §3(a)(3) exemption under the Securities Act. Nor does he point to a single case that imposed §12(a)(1) liability on a CP dealer (or any other "statutory seller") who acted in reliance on such ratings. As a purely academic exercise, Professor Franco has accordingly introduced a brand new theory of securities law liability. If his theory were accepted, CP dealers would be transformed into guarantors of the CP they help to issue to the extent that, with hindsight, a court concludes that the issuer's ratings were unmerited. Unfortunately, this would have dramatic real world consequences as it would be contrary to the expectations and efficient operations of the trillion dollar CP market.[4]

The issue presented by Enron and Professor Franco is therefore one of first impression affecting a securities market that is hugely important to our economy, and it must be decided in the first instance by an Article III Court, as required by Congress. This case should be removed to the District Court forthwith.

## Relief Requested

Pursuant to 28 U.S.C. § 157(d), Bankruptcy Rule 5011, and Local Rule 5011-1, Goldman Sachs moves the District Court for mandatory withdrawal of the reference of the above captioned adversary proceedings to the bankruptcy court because Enron's newly revealed claims against Goldman Sachs require the Court to conduct a substantial and material consideration of federal securities laws, including Sections 3(a)(3), 5 and 12 of the Securities Act of 1933.

## Procedural History

### A.    Enron's Claims and Goldman Sachs' Defenses

By way of background: since 1993, Enron had operated a §3(a)(3) CP program to provide liquidity and financing for its general corporate purposes. Pursuant to its board

---

[4]     Obviously, if Dealers were to be assigned such responsibility they will price and/or limit their services accordingly, thereby undermining the current efficiencies of the market and the affordability and availability of §3(a)(3) financing for many potential issuers.

resolutions, Enron was authorized to issue §3(a)(3) CP equal to the amount of revolving credit

lines it had in place to back up the CP. Consistent with those resolutions and the requirement of

the rating agencies that all CP must be backed up with equal liquidity sources to be rated – a

necessity for any §3(a)(3) program – Enron had two revolving credit facilities totaling $3 billion.

During September and October 2001, Standard & Poor's ("S&P") and Moody's assigned

Enron's CP prime ratings of A2 and P2 respectively, with S&P reaffirming its rating on October

25, 2001. Both rating agencies based their ratings on public and non-public information that

Enron provided them.

     In the fall of 2001, Goldman Sachs was one of three dealers of Enron's CP

program. As such, Goldman Sachs helped place Enron's CP with institutional investors and

made a secondary market in the paper. Goldman Sachs was not an underwriter or a guarantor of

the commercial paper, nor did it provide investment advice regarding Enron's CP.

     On November 1, 2003, Enron sued Goldman Sachs and about 175 other parties in

an action stemming from its Chapter 11 filing on December 2, 2001, to avoid and recover certain

payments it made in the fall of 2001 allegedly as preferences and fraudulent conveyances. See

Amended Complaints, Moloney Decl. Exs. 4 and 5. Enron's suit arose out of its offer to the

market between October 26 and November 6, 2001 to repurchase its $1.8 billion outstanding

§3(a)(3) CP from holders who wished to sell their holdings before maturity.[5]

     On February 14, 2004, Goldman Sachs and nearly all other defendants[6] filed a

motion to dismiss the case on the grounds that the payments that Enron sought to avoid were

---

[5]     A significant number of CP holders declined to participate in Enron's repurchase program. Indeed, approximately $423M of CP matured and was paid in full between October 26, 2001 and the day Enron declared bankruptcy. These other payments are not challenged at all by Enron.

[6]     Enron sued its two other dealers, Lehman Commercial Paper Inc. and JP Morgan Securities Inc. as well as each end-holder of Enron commercial paper who chose to sell it back to Enron. Lehman and JP Morgan have since settled, as did certain other defendants who dealt through those dealers.

protected by the safe harbor provision of section 546(e) of the Bankruptcy Code, which protects

settlement payments of securities from avoidance.  Section 546(e) of the Bankruptcy Code states,

in relevant part:

> ... the trustee may not avoid a transfer that is a margin
> payment, as defined in section 101, 741, or 761 of this title,
> or settlement payment, as defined in section 101 or 741 of
> this title, made by or to (or for the benefit of) a commodity
> broker, forward contract merchant, stockbroker, financial
> institution, financial participant, or securities clearing
> agency ...

11 U.S.C. 546(e).  Section 741(8) of the Bankruptcy Code defines a "settlement payment" to

mean a "preliminary settlement payment, a partial settlement payment, an interim settlement

payment, a settlement payment on account, a final settlement payment, or any other similar

payment commonly used in the securities trade."  11 U.S.C. § 741(8).  Thus, any type of

settlement payment on a securities trade made by or to a stockbroker, financial institution or

securities clearing agency is protected by § 546(e) of the Bankruptcy Code.[7]

      Enron opposed the motion, arguing that the payments at issue were not settlement

payments for securities for a number of reasons, including because CP was not a security under

the federal securities laws (which Enron argued was the relevant standard, as opposed to the

Bankruptcy Code), and because the transactions were not "common."  Goldman Sachs responded

that the "safe harbor" feature of §546(e) would be undermined were the Court to adopt Enron's

---

[7]      The only way a settlement payment in a securities transaction can be recovered as a preference or
fraudulent conveyance is if actual fraudulent intent is alleged.  There is no such allegation in this case.  Congress
adopted this bright-line statutory standard to avoid uncertainty and instability in the securities markets.  See April 4,
2006 Memorandum of the Securities and Exchange Commission in Support of Defendants' Motions for Leave to
Bring Interlocutory Appeal, Moloney Decl. Ex. 8 at 37-38; Bankruptcy Act Amendments, House Report No. 97-
420, Jan 25, 1982 (to accompany H.R. 4935) ("[The] securities markets operate through a complex system of
accounts and guarantees.  Because of the structure of the clearing systems in these industries and the sometimes
volatile nature of the markets, certain protections are necessary to prevent the insolvency of one commodity or
security firm from spreading to other firms and possibly threatening the collapse of the affected market.")  During
the floor debate, Representative Robert McClory stated that the amendments were necessary to "minimize the
possibility that a bankruptcy in the securities or commodities industries will result in a chain reaction which could
spread rapidly, injure many innocent parties, and ultimately even threaten disruption of the entire market structure."
128 Cong. Rec. H1262 (1982) (statement of Rep. McClory).

unwarranted commonness test and that the Court did not need to reach the question whether CP

is a security under the federal securities laws because it clearly meets the Bankruptcy Code's

own definition of a security. See Reply Memorandum of Goldman Sachs In Support Of Its

Motion To Dismiss The Amended Complaints, Moloney Decl. Ex. 6, at 21-24. Accordingly, at

that point neither Goldman Sachs nor Enron took the position that this case presented any

complex issues under the federal securities laws. The bankruptcy court denied the motion to

dismiss, ruling, *inter alia*, that whether CP is a security and whether the transactions at issue

were sufficiently common to qualify as "settlement payments" are questions of fact that would

have to be addressed by the Court at a later date. (Goldman Sachs has sought review of that

ruling by this Court with the support of the Securities and Exchange Commission, among

others.)

On August 1, 2005, Goldman Sachs filed its Answer to Enron's complaints,

asserting several affirmative defenses in addition to the §546(e) safe harbor. Notably, Goldman

Sachs asserted that pursuant to an explicit agreement, Goldman Sachs acted solely as Enron's

agent and as a mere conduit for all transactions at issue involving the investors that transacted

with Enron through Goldman Sachs and as such, all claims against Goldman Sachs for those

transactions were completely barred. (The agency agreement between Enron and Goldman

Sachs was entered into on October 26, formalized in a written agreement on October 28, and

ratified on November 9, 2001, after the buybacks were completed.) The agency agreement

provided, *inter alia*:

> [t]his letter will serve as the agency agreement between Enron Corp. as principal
> ("Enron") and Goldman, Sachs & Co. as agent ('agent") with respect to Enron's
> 3(a)(3) Commercial Paper. Enron hereby appoints the agent to act on Enron's
> behalf to buy Enron's 3(a)(3) Commercial Paper from the holders of such paper,
> which tender such paper to Enron. Agent's duties in this regard are completely

8

> ministerial, and agent shall have no duties but to act as a conduit between Enron
> and the holders of Enron's 3(a)(3) Commercial Paper.

See Moloney Decl. Ex. 7. The transactions involving Goldman Sachs acting solely as Enron's

agent to repurchase Enron's CP from investors constitute $352 million of the $382 million that

Enron seeks to recover from Goldman Sachs.

Voluminous fact discovery commenced thereafter. Over 150 depositions were

taken, most at Enron's insistence. Hundreds of thousands of pages of documents were produced.

Throughout all this, not a single Enron or Goldman Sachs witness, nor a document from either

party, disputed that Goldman Sachs acted as Enron's agent in facilitating Enron's buybacks of its

CP.[8]

B.    Enron's Benefit Theory

In the spring of 2007, Enron filed a motion to compel discovery from Goldman

Sachs which was apparently directed, *inter alia*, as to whether a claim would have existed

against Goldman Sachs as a result of its role as one of Enron's CP dealers if Enron had defaulted

on paying its CP. Enron purported to justify this discovery on the grounds that it could help

prove that Goldman Sachs received a benefit from the buyback transactions. Enron argued that

under Section 550(a) of the Bankruptcy Code (which allows the trustee to recover preferential

payments or fraudulent conveyances from the "initial transferee of such transfer or the entity for

whose benefit such transfer was made"), Goldman Sachs could be liable, even as agent, if it

received a benefit. Counsel for Goldman Sachs opposed allowing Enron "fishing expedition"

discovery and also cautioned the Court during oral argument that if the theory Enron ultimately

---

[8]    Notably, the views of third parties such as those of the customers who sold back CP to Enron
through Goldman Sachs would not be relevant as to whether an agency relationship existed. Maung Ng We v.
Merrill Lynch & Co., Inc., 2000 WL 1159835, at *4 (S.D.N.Y. Aug. 15, 2000) ("whether . . . [actual] agency exists
depends upon the actual interactions of the putative agent and principal and not on the perception a third party may
have of the relationship.") (quoting Manchester Equip. Co., Inc. v. Am. Way and Moving Co., Inc ., 60 F. Supp. 2d
3, 8 (E.D.N.Y.1999)).

hoped to rely on depended on Goldman Sachs' potential elimination of contingent securities law

liability, the case would be subject to mandatory withdrawal. (Moloney Decl. Ex. 2 (Hr'g Tr.

40:22-41:5, June 21, 2007)). In response, counsel for Enron reiterated its understanding that this

case did not involve the federal securities laws: "<u>Judge, we have never conceded that they are

securities, and we don't believe that they are</u>, if you apply the Reeves [sic] test and all the

various other tests for whether they are securities or not. We don't think that the liability of

Goldman Sachs is dependent on whether they are securities or not. . . . <u>It is our position it wasn't

a security, Judge.</u>" (<u>Id.</u> at 52:6-53:8) (Emphasis added).

On September 21, 2007, fact discovery closed.  On October 29, 2007, the parties

submitted expert reports on issues on which they bore the burden of proof.  Enron submitted the

expert report of Professor Joseph A. Franco as its sole expert on its benefit theory.  In this report,

Enron completely reversed fields, maintaining for the first time that "[c]ommercial paper is a

security for purposes of the Securities Act." (Moloney Decl. Ex. 3 at p.10). Enron's benefit

theory, as articulated by Professor Franco, posits that even though Goldman Sachs received no

compensation from the buybacks in its role as an agent, it nonetheless received a "benefit" from

the transactions by having avoided potential lawsuits based on the private right of action under

Section 12(a)(1) of the Securities Act.

The alleged legal exposure under Section 12(a)(1) stems from an interplay

between Section 3(a)(3) and Section 5 of the Securities Act.  Enron alleges that based on an ex-

post review of the company completed years after the events at issue by one of its paid testifying

witnesses in a related insolvency proceeding, Enron was actually insolvent when it originally

issued the Section 3(a)(3) CP at issue.  Accordingly, Enron alleges its CP was not eligible for the

Section 3(a)(3) exemption from registration requirements of the Securities Act when Goldman

Sachs sold it to investors in the fall of 2001 because the paper was not actually "prime," even though it was rated "prime" by S&P and Moody's and was supported by a $3 billion unsecured CP backup facility, which Enron actually drew down and used to fund the challenged repurchases. Enron thus maintains that the original sales of Enron CP violated Section 5 of the Securities Act, which prohibits the sale of <u>securities</u> that do not comply with the Securities Act's registration requirements and are not subject to a valid exemption. (Moloney Decl. Ex. 3 at p. 12.) Enron also maintains that the sale of CP to large institutional investors is a public offering and was required to be registered and that no other applicable exemption from registration exists. Under Section 12(a)(1) of the Securities Act, Enron argues, the holders of Enron's CP that purchased it from Goldman Sachs had a private right of action against Goldman Sachs for that alleged violation and the fact that they did not assert this right is the benefit that Goldman Sachs received from the buybacks. <u>Id.</u> at 18.

Enron's new theory of potential liability under the federal securities laws is the only argument on which Enron has submitted expert testimony related to its "benefit" theory. Enron has the burden of proof on this issue and may not now submit other expert testimony in support of some other theory of benefit. If Enron's theory fails, it cannot recover anything from Goldman Sachs of the $352 million it is being sued for as a result of its actions as Enron's agent.

### <u>Legal Standard</u>

District courts must withdraw from bankruptcy courts all issues requiring "'significant interpretation, as opposed to simple application' of non-bankruptcy federal law." <u>E.g.</u>, <u>Mishkin v. Ageloff</u>, 220 B.R. 784, 795 (S.D.N.Y. 1998) (quoting <u>City of New York v. Exxon Corp.</u>, 932 F.2d 1020, 1026 (2d Cir. 1991)) (other citations omitted); <u>In re Cablevision S.A.</u>, 315 B.R. 818, 821 (S.D.N.Y. 2004). In considering 28 U.S.C. § 157(d), courts routinely recognize that issues arising under the federal securities laws raise important questions requiring

11

significant interpretation and are better suited to be decided by the district courts, therefore

meeting the standard for mandatory withdrawal from the bankruptcy courts. See, e.g., Mishkin

v. Ageloff, 220 B.R. 784, 796, 799 (S.D.N.Y. 1998); Bear, Stearns Secs. Corp. v. Gredd, 2001

WL 840187, at *2 (S.D.N.Y. Jul. 25, 2001).[9] "Section 157(d) reflects Congress's perception that

specialized courts should be limited in their control over matters outside their areas of expertise"

and also assures litigants that interpretation of non-bankruptcy federal law "will be considered

outside the narrow confines of a bankruptcy court proceeding by a district court, which considers

laws regulating interstate commerce on a daily basis and are 'better equipped to determine them

than are bankruptcy judges.'" AT&T Co. v. Chateaugay Corp., 88 B.R. 581, 583-84 (S.D.N.Y.

1988) (internal citations omitted). Moreover, it is particularly important that the district courts

hear and decide issues when they are matters of first impression in this Circuit, as are those

presented in this case. See Bear, Stearns Secs. Corp. v. Gredd, 2001 WL 840187, at *2

(S.D.N.Y. Jul, 25, 2001) ("'where matters of first impression are concerned, the burden of

establishing a right to mandatory withdrawal is more easily met'") (internal citations omitted).

While "[t]here is no specific time limit for applications under 28 U.S.C. § 157(d)

to withdraw a reference to the bankruptcy court . . . ," Drew v. WorldCom, Inc., 2006 WL

2129309 at *2 (S.D.N.Y. Jul. 26, 2006) (internal citation omitted), courts in this Circuit have

defined "timely" to mean "as soon as possible after the moving party has notice of the grounds

for withdrawing the reference." Id. (internal citation omitted).

---

[9]    See also In re Am. Solar King Corp., 92 B.R. 207, 210-11 (W.D. Tex. 1988) (concluding that mandatory withdrawal must be invoked for interpretation of SEC Rule 10b-5 and stating that both the legislative history of § 157(b) and "sufficient precedent . . . support the observation . . . that a claim which is based on federal securities statutes 'must be heard by the district court if any party so suggests.'") (citations omitted).

## **Argument**

### **A.    Enron's Claims Require Mandatory Withdrawal**

Enron's only "benefit" theory of recovery against Goldman Sachs depends entirely on a federal securities law argument that no Court has ever accepted.  Section 157(d) requires the district court to withdraw a proceeding when, as clearly appears here, the  resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.  See also Enron Power Marketing, Inc. v. California Power Exchange Corp., 2004 WL 2711101, *2 (S.D.N.Y. Nov. 23, 2004) (internal citations omitted) (holding that withdrawal is appropriate in "cases where substantial and material consideration of non-Bankruptcy Code federal [law] is necessary for the resolution of the proceeding").  Accordingly, this case is clearly subject to mandatory withdrawal.  See Bear, Stearns Secs. Corp. v. Gredd, 2001 WL 840187, at *4 (S.D.N.Y. Jul. 25, 2001) (in deciding the motion for withdrawal, the district court "need not evaluate the merits of the parties' positions . . .. It is sufficient to note that answering this question will require [the court] to interpret the various provisions of the federal securities laws relied upon.").

Enron's "benefit" theory also raises issues of first impression.  "Where matters of first impression are concerned, the burden of establishing a right to mandatory withdrawal is more easily met."  Mishkin v. Ageloff, 220 B.R. 784, 796-97 (S.D.N.Y. 1998).  Goldman Sachs is aware of no case imposing liability pursuant to Section 12(a)(1) on a CP dealer for its sale of §3(a)(3) CP when it relied on the issuer's A2/P2 ratings by S&P and Moody's as well as the existence of committed unsecured credit lines backstopping the CP program, nor presumably is Enron, as none are cited by Professor Franco.

13

Nor can Enron credibly argue that it is seeking here a simple application of well-established law. To support the point that CP's prime rating have no bearing on whether it is actually prime, Professor Franco's report merely states that in 1970, the SEC staff prepared a report that criticized the deficiencies of the then sole existing commercial rating service which had disseminated highly inaccurate ratings of Penn Central's CP. (Franco Report, p. 15.) Professor Franco then cites several cases, also mostly from the 1970's, which purport to hold that ratings do not constitute conclusive evidence of whether an issuer's CP is prime. Id.[10] These cases are inapposite and have no application to today's world. In the 1970's, when most of the cases that Enron relies on were decided, rating agencies had just begun rating CP and indeed, the CP of Penn Central – the subject of the only two Second Circuit cases cited by Professor Franco – was rated only by the National Credit Office, a branch of Dun & Bradstreet. Indeed, S&P had only started rating CP in 1969 and Moody's started to do so in the 1970's.[11] The breadth of these rating agencies and their influence on the market has greatly expanded in the past thirty years. An equally important development has been the availability of CP backup revolver lines. There has also been a number of relevant SEC no-action letters since that old caselaw,[12] as well as significant changes in the way that the Securities Act has been interpreted by the courts.[13]

---

[10]    The issue presented is clearly one that should be decided an Article III Court. Professor Franco is necessarily opining as to what an Article III court would decide (as the bankruptcy court would have no subject matter jurisdiction to adjudicate a federal securities law dispute between Goldman Sachs and its customers), and all the cases that Professor Franco cites for his argument that Enron commercial paper should not have qualified for the §3(a)(3) exemption were decided by the Article III courts rather than the bankruptcy courts. See Mishkin v. Ageloff, 220 B.R. at 798-99) (Where an "overwhelming majority of cases cited" were Article III decisions, it is "an indication that the issues addressed . . . are of a type which Article III courts have been frequently called upon to address.").

[11]    See http://www2.standardandpoors.com/spf/html/ media/SP_TimeLine_2006.html and http://www.moodys.com/moodys/cust/AboutMoodys /AboutMoodys.aspx?topic=history.

[12]    See e.g., Bank of Boston Corp., SEC No-Action Letter, 1989 WL 247327 (Aug. 28, 1989) (issuing no-action letter when "prime" quality of paper was established by ratings given by recognized rating services); The Peoples Gas Light and Coke Co., SEC No-Action Letter, 1989 WL 246386 (Sept. 28, 1989) (same).

[13]    Notably, the Securities Act does not say that CP has to be "prime" in order to qualify for a §3(a)(3) exemption from registration. There is no issue whether Enron's CP met the literal requirement of §3(a)(3) to qualify for the exemption.

The bankruptcy court is plainly not the proper arbiter of whether the unprecedented federal securities laws liability claimed here should be created.

**B.      The Motion Is Timely As Enron Has Only Now Revealed That Its Claims Against Goldman Sachs Are Based Upon The Federal Securities Laws**

In filing the report of Professor Franco on October 29, 2007, Enron for the first time revealed that its claims against Goldman Sachs are based upon a novel and complex securities law claim. Enron had not asserted this basis before; indeed, it had consistently taken the position that the federal securities laws had no application to this case. Upon learning Enron's theory of recovery now depends on novel securities law interpretations, Goldman Sachs timely filed this motion.

## CONCLUSION

For the foregoing reasons, Goldman Sachs respectfully requests that this Court grant its motion to withdraw the reference.

Dated:  November 21, 2007
        New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By _____
Max Gitter
Thomas J. Moloney
Lindsee P. Granfield
One Liberty Plaza
New York, New York 10006
(212) 225-2000
(212) 225-2999 (fax)

Attorneys for Goldman, Sachs & Co.