CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

Attorneys for Defendant Goldman, Sachs & Co.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- X

| | |
|---|---|
| In re: | : |
| | |
| ENRON CREDITORS RECOVERY CORP., et al., | : |
| | |
|                   Reorganized Debtors. | : |

Chapter 11

Case No. 01-16034 (AJG)

(Jointly Administered)

------------------------------------------------------------------- X

ENRON CORP.,

              Plaintiff,

              v.

J.P. MORGAN SECURITIES, INC., et al.,

              Defendants.

**1:07-cv-10527-SAS**

Adv. No. 03-92677 (AJG)

------------------------------------------------------------------- X

ENRON CORP.,

              Plaintiff,

              v.

MASS MUTUAL LIFE INSURANCE CO., et al.,

              Defendants.

**1:07-cv-10530**

Adv. No. 03-92682 (AJG)

------------------------------------------------------------------- X

**DECLARATION OF THOMAS J. MOLONEY IN SUPPORT OF DEFENDANT**
**GOLDMAN, SACHS & CO.'S MOTION TO WITHDRAW THE REFERENCE OF THE**
**ABOVE-CAPTIONED ADVERSARY PROCEEDINGS TO THE BANKRUPTCY**
<u>**COURT**</u>

EXHIBIT 3 CONTAINS CONFIDENTIAL INFORMATION AND, PURSUANT TO ¶ 18 OF THE AMENDED
CONFIDENTIALTIY ORDER, ENTERED DECEMBER 5, 2006, HAVE BEEN FILED WITH THE COURT
UNDER SEAL

I, THOMAS J. MOLONEY, declare as follows:

1.    I am a member of the bar of this Court and a member of Cleary Gottlieb Steen & Hamilton LLP, counsel for defendant Goldman, Sachs & Co. ("Goldman Sachs") in the above-captioned adversary proceeding. I respectfully submit this declaration in support of Goldman Sachs' Motion to Withdraw the Reference of the Above-Captioned Adversary Proceedings to the Bankruptcy Court (the "Motion").

2.    Annexed hereto, at the number tabs indicated, are true and correct copies of the following documents referred to in the Memorandum In Support of the Motion:

| | |
|---|---|
| **Exhibit 1** | Relevant excerpts from the May 22, 2007 Memorandum of Law in Support of Defendants' Motion to Compel Production of Documents to Continue the Depositions of Certain Witnesses And Request for Expedited Consideration, filed by Kelly Properties, Inc., Veritas Software Investment Corp., and the UBS Defendants and joined by Enron in Enron's May 24, 2007 Motion to Compel. (Adv. Proc. No . 03-92677 Docket No. 1529) |
| **Exhibit 2** | Relevant excerpts from the Transcript of June 21, 2007 Hearing |
| **Exhibit 3** | Expert Report of Professor Franco, submitted by Enron on October 29, 2007 |
| **Exhibit 4** | JP Morgan Second Amended Complaint (Adv. Proc. No. 03-92677, Docket No.1433) |
| **Exhibit 5** | Mass Mutual Amended Complaint (Adv. Proc. No, 03-92682, Docket No. 4) |
| **Exhibit 6** | Relevant excerpts from the Reply Memorandum of Goldman Sachs In Support Of Its Motion To Dismiss The Amended Complaints Adv. Proc. No, 03-92682, Docket No. 183; Adv. Proc. No. 03-92677, Docket No. 406) |
| **Exhibit 7** | Agency Agreements between Goldman Sachs and Enron, dated Oct. 28, 2001, bates pp. ECd029068282 - ECd029068283, and dated Nov. 9, 2001, bates p. GS ENRON-CP00234 |
| **Exhibit 8** | Memorandum of the Securities and Exchange Commission in Support of Defendants' Motions for Leave to Bring Interlocutory Appeal, dated April 4, 2006 |

3.    All facts stated in the Memorandum In Support of the Motion are true to the best of my knowledge.

4.    There has been no prior application for the relief requested herein.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 21, 2007.

_____
Thomas J. Moloney (TM-9775)

2

# EXHIBIT 1

Hearing Date: To Be Determined
Objection Deadline: 5/25/07 at 4 p.m.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ENRON CORP, et al., | Case No. 01-16034 (AJG)<br>Jointly Administered |
| Debtors | |

_____/

| | |
|---|---|
| ENRON CORP., | |
| Plaintiff, | Adversary Proceeding<br>No. 03-92677 (AJG) |
| v. | **(Oral Argument Requested)** |
| J.P. MORGAN SECURITIES, INC., et al., | |
| Defendants | |

_____/

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
TO COMPEL PRODUCTION OF DOCUMENTS AND
TO CONTINUE THE DEPOSITIONS OF CERTAIN WITNESSES**

The Moving Defendants,[1] through their undersigned attorneys, respectfully move

the Court for entry of an order pursuant to Fed. R. Civ. P. 37, (1) compelling Goldman, Sachs &

Co. ("Goldman") to produce all documents concerning Goldman's involvement, role and/or

participation in Project Truman that occurred between August 2001 and December 2001; and (2)

continuing the depositions of any Goldman witnesses, including but not limited to Robert Hurst

---

[1]    Kelly Properties, Inc. ("Kelly"), Veritas Software Investment Corp. ("Veritas") and the UBS Defendants
("UBS") are the Moving Defendants on this Motion. As discussed below, specific document requests were made by
the various Moving Defendants, with certain of the Moving Defendants then pursuing meet and confer conferences
and other correspondence with Goldman regarding this matter.

Page Intentionally Left Blank

Excerpt to Follow

(attached hereto as Exhibit K). The reasonable inference is that Mr. Hurst – who, through his involvement in Project Truman, appears to have been aware of Enron's true financial condition – discussed the concept, terms and conditions of the alleged agency agreement with Enron's CFO and/or Mr. Lay on the day that the CP prepayments commenced.

## III.    RELEVANCE OF PROJECT TRUMAN TO THE CP TRANSACTIONS

First, and most importantly, this Court has already determined that Project Truman is not only relevant to the CP litigation, but is relevant beyond the time frame previously agreed to by Goldman – that is, the week of October 22, 2001. See Exhibit A at p. 4.

In fact, the full scope of the Project Truman documents – which encompasses, at most, the four months from August 2001 through the petition date – is relevant. In the preference litigation, Goldman has claimed that it acted solely as an agent and conduit in the CP transactions. This could affect Enron's claims against Goldman under § 550 of the Bankruptcy Code, as well as Goldman's rights vis-à-vis other preference action defendants. The complete picture of the Enron CP buybacks cannot be understood without knowing the extent of Goldman's involvement in Enron's decision-making process and the behind-the-scenes role played by Goldman as a participant in Project Truman. Certainly, the Moving Defendants are entitled to understand the facts and circumstances leading up to Enron's decision to draw its revolvers and buy back its CP, and Goldman's alleged agency agreement with Enron.

Furthermore, the Project Truman documents are relevant to whether Goldman benefited from the CP prepayments. This Court has already acknowledged that discovery is appropriate about whether a defendant is liable as a beneficiary of the transfers at issue. In re Enron Corp., 2005 WL 3873891, at *2 (Bankr. S.D.N.Y. June 29, 2005) (attached hereto as Exhibit L). If Enron had defaulted on its CP, Goldman faced potential liability from its

-6-

customers, such as the Moving Defendants.  See, e.g., Franklin Savings Bank v. Levy, 406 F.

Supp. 40 (S.D.N.Y. 1975) (finding Goldman liable to its customers for the value of defaulted

Penn Central commercial paper).  Indeed, a policy manual produced by Goldman mentions the

Penn Central default, a subsequent settlement between Goldman and the SEC, and the resulting

"affirmative obligations" that were placed upon Goldman to "investigate the creditworthiness of

an issuer of commercial paper."  GS ENRON-CP00269-70 (attached hereto as Exhibit M).

Thus, what Goldman knew about Enron's financial condition when it sold Enron CP to the

Moving Defendants is as relevant and important as what Goldman knew at the time of the

buybacks.

   Even if, as Goldman claims, it acted merely as a conduit for funds flowing from

Enron to the Moving Defendants, it still may be liable to return those funds under § 550.  In

Gredd v. Bear, Stearns Secs. Corp., 359 B.R. 510 (Bankr. S.D.N.Y. 2007), the Court found Bear

Stearns  liable to return, to the bankruptcy estate of a hedge fund, over $125 million that had

flowed through the hedge fund's margin account with Bear Stearns.  The Court determined that

Bear Stearns benefited from those monies because they were used to cover open short positions

for which Bear Stearns would otherwise have been liable.  Id. at 521.  Similarly, the monies that

flowed through Goldman's accounts – if that is indeed what happened – were used to retired

commercial paper for which Goldman might otherwise have been liable.  In order to determine

whether Goldman would have had such liability, it is critical to discover *what* Goldman knew

about Enron's creditworthiness and *when* Goldman knew it – facts that can only be ascertained

from the full record of the Project Truman documents.

EXHIBIT 2

```
 1
 2   UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   -----------------------------x        Case No.
     In re                                 01-16034(AJG)
                                           (03-92677)(03-92682)
 4   ENRON CREDITORS RECOVERY CORP.,
     et al,                                New York, New York
 5                                         June 21, 2007
              Reorganized Debtors.         4:27 p.m.
 6   -----------------------------x
                        DIGITALLY RECORDED PROCEEDINGS
 7                   (Excerpt - Goldman, Sachs, et al)
     03-92677 and 03-92682 Enron Creditors Recovery Corp. v.
 8   Goldman, Sachs & Co., et al, and Enron Creditors Recovery
     Corp. v. Mass Mutual Life Insurance Company, et al:
 9
     Motion to compel production of documents.
10
     B E F O R E:
11
        THE HONORABLE ARTHUR J. GONZALEZ
12      United States Bankruptcy Judge
13   A P P E A R A N C E S:
14      VENABLE LLP
        Special Litigation Counsel for Reorganized Debtors
15         Two Hopkins Plaza, Suite 1800
           Baltimore, Maryland   21291
16
        BY:  MICHAEL SCHATZOW, ESQ.
17           RICHARD WASSERMAN, ESQ. (via telephone)
             ROBERT L. WILKINS, ESQ.  (via telephone)
18                -and-
             405 Lexington Avenue, 56th Floor
19           New York, New York   10017
20      BY:  MICHAEL K. MADDEN, ESQ.
```

21   (appearances continued on page 2)

```
22
23                  DEBORAH HUNTSMAN, Court Reporter
           (212) 608-9053   (718) 774-2551   (917) 723-9898
24         Proceedings Recorded by Electronic Sound Recording,
                 Transcript Produced by Court Reporter
25
```

Page Intentionally Left Blank

Excerpt to Follow

1   there is a guaranty, where a guarantor actually backstops the

2   obligation.  We cited you a bunch of cases that say that is

3   the paradigm, and courts have been very reluctant to move very

4   far off from that paradigm, with one other exception.  There

5   clearly are cases where someone got a tangible economic

6   benefit from a fraudulent transfer or a preference.

7           I think they cite one example, which is a pretty good

8   one, which is a circumstance where four guys owned a closely

9   held corporation.  The corporation is worth $2 million, but

10  they realize they are going to go out of business.  So they

11  say, "Gee, this is a bad deal selling the assets for

12  $2 million.  It will all go to our creditors.  We will sell it

13  to you for $800,000, and you, new company, you offer the four

14  of us long-term employment contracts that would be worth the

15  $1.2 million that should have gone to the creditors."

16          Under those circumstances, the Court says, "Okay.

17  There is a tangible, real economic benefit you got from this

18  transaction, and also parenthetically this transaction fits

19  within the meaning and the literal words of 550, because it

20  was really done for your benefit.  The reason why you did this

21  transaction for those people was for your benefit."

22          Nothing in the record possibly supports those theories

23  against us, and this Project Truman discovery exercise is a

24  trip to nowhere.  It is a frolic and a detour.  What are they

25  going to do?  They are going to show they could have had a

1    securities lawsuit against us?  What are you going to do then?

2    You are going to try that case?  Among other things, if we get

3    to that stage, this case would be subject to mandatory

4    removal, because it would involve a statute other than the

5    Bankruptcy Code.  There is no reason.  It is not like they

6    need this theory.  It is not like they don't have deep

7    pockets.  Who actually got the money were Defendants sitting

8    here -- UBS; and Kelly Properties a $5 billion revenue

9    company.  It is not like they need to come up with this wacky

10   theory, which no court has ever espoused, because they are

11   dealing with bankrupt people who got the money.

12        When Goldman entered into an Agency Agreement where

13   they said they would hold us harmless, when they go there and

14   say, "Please help us," and when they are going to get legal

15   advice so as exactly not to be here, to drag us in just

16   gratuitously is crazy.

17        Just as a last point I want to make, Your Honor, I

18   know early on in the case we moved to dismiss on 546(e)

19   grounds and safe harbor grounds.  You will recall that we

20   didn't convince you yet on that, but I want another shot at

21   that.  I wasn't around then.  I want another shot at that.

22   You probably already know that on the appeal -- you didn't get

23   the benefit of this, but the SEC and the Treasury Department

24   of the United States both agree with our position --

25        JUDGE GONZALEZ:  But you didn't get the benefit of

Page Intentionally Left Blank

Excerpt to Follow

Proceedings                                              44

1   Whether or not we fall under that protection under 546(e), as

2   I said, I would like another chance on my own to talk to you

3   about that at an appropriate time.  You cannot believe that

4   they believe that 550(a) was imposing this liability on every

5   single person in the securities industry for every single debt

6   security issued in the United States.

7          So this very (inaudible) doesn't technically make

8   sense, and no court in 30 years ever suggested anything like

9   it; but, also, it is contrary to the policy -- the clear

10  policy -- of the Congress in connection with the Bankruptcy

11  Code.

12         JUDGE GONZALEZ:  Thank you.

13         All right.  Enron?

14         MR. SCHATZOW:  Your Honor, if I might, let me just

15  start where he ended.  The case law says "a beneficiary is

16  someone who receives a tangible economic benefit."  That is

17  what it says.  There is no case that says "it doesn't apply to

18  tort liability"; and just because Mr. Moloney says "the only

19  way we could establish liability is through a securities

20  lawsuit," doesn't mean that that is the case.

21         There are so many red herrings that have been dragged

22  across the courtroom, Your Honor, it is hard to know where to

23  begin, so let me sort of start at the end and work up.

24         Your recollection is correct.  It was in this very

25  case that both Lehman and Goldman, and virtually all other

Page Intentionally Left Blank

Excerpt to Follow

Proceedings                                           52

1        So the notion that there is something fancifully or

2    made up or wacky or dishonest about the notion that there

3    could be liability there is just not so.

4        JUDGE GONZALEZ:  What about the issue about whether or

5    not the Commercial Paper are securities or is a security?

6        MR. SCHATZOW:  Judge, we have never conceded that they

7    are securities, and we don't believe that they are, if you

8    apply the Reeves test and all the various other tests for

9    whether they are securities or not.  We don't think that the

10   liability of Goldman Sachs is dependent on whether they are

11   securities or not.

12       The questions are going to be what were the duties

13   that Goldman Sachs had to its customers, based on the

14   relationship between the customers.  Were they tort duties?

15   Were they contractual duties?  Were they custom and usage

16   duties?  What were the duties?

17       Even if the Commercial Paper ultimately is determined

18   to be a security, Judge, then we get back to all of our common

19   in the trade?  What does it mean under the Bankruptcy Code?

20   Was this actually a purchase and sale or was this merely the

21   payoff of Enron's debt?  And we get back into all of those

22   questions.

23       It is not an either/or.  It is not, "Gee, if Goldman

24   has liability to its customers, because it had non-public

25   information and didn't make them aware of it, and they were

1  trying to protect against it."  They monitored that as

2  contingent risk, but the only basis to make a claim for that

3  is securities; therefore, Enron has to lose its case against

4  Goldman Sachs.

5          As you well know, Judge, from the thousands of pages

6  of briefing, there are a lot of issues and the case doesn't

7  rise or fall on that particular issue.  It is our position it

8  wasn't a security, Judge.  But the case doesn't rise or fall.

9  If it is a security, there is still liability out there.

10         The notion that we have been given full discovery --

11 we have had "full discovery of the credit department" -- we

12 have taken the discovery deposition of one person, Hilary

13 Ackermann.  We have another scheduled one coming up.  We have

14 other people who aren't even scheduled.  They say, "Well, we

15 have made Hurst available and we have made this one

16 available."  Judge, we had to have a pre-motion conference

17 with you to get Mr. Hurst's deposition.  That is what we had

18 to do, because they wouldn't make him available.  "You made

19 him available."  They didn't make him available.

20         We are entitled to get the relevant documents before

21 we question Mr. Hurst or anyone else, so that the depositions

22 will be a productive exercise, Judge, and not just a question

23 of I don't remember, I don't recall, or I don't know, when

24 there are documents that people have authored that you can use

25 to refresh their recollection or to jar their memory.

Page Intentionally Left Blank

Excerpt to Follow

Proceedings                        60

1   it said there were no facts for that in <u>Penn Central</u>, so they

2   vacated that portion of the opinion, but they found it to be a

3   security, to the extent he is going to argue that it is a

4   security.

5        Then he said he has "a custom and usage claim"?  I

6   haven't heard that one before, and what would the custom and

7   usage claim be against us on which he would like to take

8   discovery in order to pursue?

9        JUDGE GONZALEZ:  My recollection is that that goes

10  back to some of the original arguments that were made as to

11  all of these issues a number of years ago, and I think the

12  custom and usage is a reference to whether or not in the

13  industry the buyers of the Commercial Paper from institutions,

14  like Goldman, had some understanding in the industry that they

15  would make good, if the Commercial Paper failed.

16       MR. MOLONEY:  We have not objected to their taking

17  that discovery and they have pursued that discovery, and no

18  one has said that.  No witness has said that on the Goldman

19  side and I am unaware of any witness saying it on the

20  Defendants' side or pointing to any examples of where they are

21  actually made whole by a dealer, because the Commercial Paper

22  defaulted.

23       But in any event, if he wants to put that evidence on,

24  but that has nothing to do with taking this discovery as

25  Project Truman discovery.  Project Truman discovery would have

EXHIBIT 3

**Pursuant to the Amended Confidentiality Protective Order, Exhibit 3 has been filed under seal**

# EXHIBIT 4

VENABLE LLP
Special Litigation Counsel for Enron Corp., et al.
Reorganized Debtors
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (MS-3109)
Robert L. Wilkins (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Enron Corp., et al.
Reorganized Debtors
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| ENRON CORP., *et al.*, | Case No. 01-16034 (AJG) |
| Reorganized Debtors. | Jointly Administered Adversary Proceeding No. 03-92677 (AJG) |
| ENRON CORP., | |
| Plaintiff, | |
| v. | |
| GOLDMAN, SACHS & CO.; LEHMAN COMMERCIAL PAPER INC.; ALLSTATE LIFE INSURANCE COMPANY; DNB NOR ASSET MANAGEMENT (US), sued originally as DnB Asset Management (US), Inc., formerly known as Skandia Asset Management Inc.; UBS GLOBAL ASSET MANAGEMENT (AMERICAS) INC., formerly known as Brinson Partners, Inc.; UBS SHORT-TERM RELATIONSHIP FUND, also known as BRF SHORT TERM FUND; UBS GLOBAL ALLOCATION FUND, also known as GLOBAL FD SEC; GMDD; BANCO CENTROAMERICANO DE INTEGRACION ECONOMICA, also known as Central American Bank for Economic Integration and 148620 Cabie A; BANCO de GUATEMALA, also known as 148520 Banco Guatemala; | |

UBS GLOBAL SECURITIES RELATIONSHIP )
FUND, also known as BRF GSP SEC LENDING; )
UBS GLOBAL ASSET MANAGEMENT )
(NEW YORK) INC., also known as )
UBS BRINSON; )
SALTASH ENTERPRISES; )
HARALD AND JOANN MCPIKE; )
THE NORTHERN TRUST COMPANY; )
KAMILCHE COMPANY; )
COLLECTIVE SHORT TERM INVESTMENT )
FUND OF THE NORTHERN TRUST COMPANY;)
PIC REALTY COMPANY; )
PRUDENTIAL INSURANCE COMPANY )
OF AMERICA; )
PRUDENTIAL PLAN-FUTURES INVESTMENT )
FUND; )
PRU/GENERAL LENDING COLLATERAL )
ACCT. #PIC00006; )
PRUDENTIAL CAPITAL MANAGEMENT; )
PRUDENTIAL INTERNATIONAL )
INSURANCE ABS FUND; )
PRU/PHMCMM/PIC00183; )
PRUDENTIAL INTERNATIONAL )
INSURANCE HIGH YIELD FUND; )
PRUDENTIAL HOME MORTGAGE CO., INC.; )
PRUDENTIAL MERGED RETIREMENT PLAN; )
PIPER JAFFRAY & CO., successor in interest to )
US Bancorp Investments, Inc., f/k/a FBS )
Investment Services; )
ECHOSTAR COMMUNICATIONS )
CORPORATION; )
WINCO FOODS INC.; )
WILMINGTON TRUST COMPANY; )
NEW CASTLE COUNTY; )
THE BELO COMPANY; )
GMP COMPANIES, INC. )
CAPITAL ASSURANCE COMPANY, INC., also )
known as CAP Assur Co. )
MARLON INSURANCE COMPANY LTD., )
originally sued as Marlon Management )
Services, Inc.; )
BRAHMS FUNDING CORPORATION; )
MERRILL LYNCH INVESTMENT )
MANAGERS, L.P., formerly known as )
Merrill Lynch Asset Management; )

-2-

MITSUBISHI TRUST AND BANKING )
CORPORATION; )
MERRILL LYNCH TANCHUKI BOND OPEN )
MOTHER FUND; )
FREMONT GENERAL CORP.; )
ABERCROMBIE & FITCH CO., also known as )
Abercromble & Fifth; )
ABERCROMBIE & FITCH STORES, INC.; )
ABERCROMBIE & FITCH MANAGEMENT CO.;)
AIM FLOATING RATE FUND; )
INVERBAN S.A., also known as )
Inverbank S.A. HIC; )
SAN FAUSTIN N.V.; )
TECHINT FINANCIAL CORPORATION LTD; )
TECHINT CURACAO N.V.; )
TECHINT INVESTMENTS N.V.; )
TECHINT LIMITED; )
CASCADE INVESTMENTS LLC; )
CASCADE DRIVER ACCOUNT-LARSON; )
BANCO NATIONAL de MEXICO; )
KELLY PROPERTIES, INC.; )
AETNA INC.; )
HEALTHCARE-CAROLINAS; )
US HEALTH CARE (NY HEALTH CARE )
PLAN MID-ATLANTIC); )
AETNA SERVICES INC.; )
U.S. HEALTHCARE OF PA; )
HEALTHCARE OF CONNECTICUT; )
LION CONNECTICUT HOLDINGS INC., )
formerly known as Aetna Life & Casualty; )
HEALTH PLANS OF TEXAS; )
HEALTH PLANS OF FLORIDA; )
FRONTIER HEALTH PLANS; )
HEALTH PLANS OF ARIZONA; )
SHORT TERM POOL; )
HEALTH AND LIFE INSURANCE CO. )
INVESTMENT GROUP; )
BANCA SERFIN S.A.; )
CHARLES SCHWAB INVESTMENT )
MANAGEMENT, INC.; )
SCHWAB YIELDPLUS FUND, originally sued )
as Schwab Yield Plus Money Market Fund Dept.; )
BANCO PROVINCIAL OVERSEAS, N.V.; )
BANCO ESPIRITO SANTO, S.A., formerly )
known as Banco Espirito Santo & Commercial )
de Lisboa S.A., New York Branch; )

-3-

SCOTT & WHITE MEMORIAL HOSPITAL,              )
AND SCOTT, SHERWOOD AND BRINDLEY              )
FOUNDATION;                                    )
DELL COMPUTER PRODUCTS EUROPE LTD., )
also known as Dell Products Ireland;            )
MONY LIFE INSURANCE COMPANY, formerly )
known as The Mutual Life Insurance Company    )
of New York;                                   )
MONEY MARKET PORTFOLIO/FUND,                  )
originally sued as 31 Series Fund-Money Market; )
POOLED ACCOUNT #38, originally sued as         )
05 Div Govt/Corp Bond Port;                     )
INTERMEDIATE GOVERNMENT BOND                  )
PORTFOLIO, originally sued as 10 Div Intermed  )
Govt Port;                                     )
VALUE & INCOME PORTFOLIO, originally          )
sued as 06 Div Equity Income;                   )
MONY CLOSED BLOCK, originally sued as         )
76 MONY CB Acct.;                              )
US FINANCIAL LIFE INSURANCE CO.,              )
originally sued as 84 USFL Life Insurance Co.;    )
AXA FINANCIAL, INC., originally sued as The    )
MONY Group Inc.;                               )
POOLED ACCOUNT #7, originally sued as          )
07 Pooled Account #7;                           )
CITIBANK, N.A.;                                )
CITI INSTITUTIONAL US CORPORATE &             )
MORTGAGE BOND FUND;                           )
MONY CAPITAL MANAGEMENT, INC.;              )
INTERMEDIATE TERM BOND PORTFOLIO,            )
originally sued as Acct. #29;                    )
THE ENTERPRISE MONEY MARKET                  )
PORTFOLIO;                                     )
U.S. FINANCIAL LIFE INSURANCE                  )
COMPANY (USFL);                               )
ENTERPRISE CAPITAL MANAGEMENT, INC.; )
DIVERSIFIED INVESTMENT ADVISORS, INC.; )
TRUSCO CAPITAL MANAGEMENT, INC.;            )
AXA INVESTMENT MANAGERS, PARIS, SA,     )
originally sued as AXA Investment Managers, Inc.; )
AXA COURT TERME;                             )
AXA IM EURO LIQUIDITY;                        )
UBS AG;                                        )
BROWN FORMAN CORP.;                          )
LONGNORTH LTD;                                )
ALFA, S.A. de C.V. ;                          )

1740 ADVISORS INC. ;                              )
BLACKWELL DONALDSON & COMPANY;                    )
MERRILL LYNCH INVESTMENT                          )
MANAGERS, CO., LTD.;                              )
THE TOKYOTANSHI CO., LTD;                         )
MERRILL LYNCH TAN-CHUKI-SAI-FUND;                 )
SONY BANK INCORPORATED;                           )
MERRILL LYNCH JAPAN SECURITIES                    )
CO., LTD.;                                        )
NIPPON INVESTORS SECURITIES CO., LTD.;            )
SHIZUOKA BANK, LIMITED;                           )
SHIZUGIN TM SECURITIES CO., LTD.;                 )
EARTHLINK, INC.;                                  )
BELO INVESTMENTS II;                              )
DnB NOR ASSET MANAGEMENT (UK) Ltd.,               )
formerly known as Skandia Investment              )
Management Ltd.;                                  )
CITICORP INVESTMENT MANAGEMENT                    )
(LUXEMBOURG) S.A.;                                )
MONY SERIES FUND, INC.;                           )
MASSMUTUAL FUNDING LLC;                           )
MASSMUTUAL LIFE INS. CO.;                         )
MASSMUTUAL LIFE INS. CO-GIA                       )
POOLED SHORT TERM INVESTMENT;                     )
MASSMUTUAL SHORT TERM BOND FD;                    )
MASSMUTUAL DIVERSIFIED                            )
BOND FD (MMIFDB),                                 )
                                                  )
                    Defendants.                   )
_____ )

## SECOND AMENDED COMPLAINT TO AVOID AND RECOVER PREFERENTIAL AND OTHER AVOIDABLE TRANSFERS AND FOR OTHER RELIEF

Plaintiff Enron Corp. ("Enron"), a debtor and debtor in possession and plaintiff in this

adversary proceeding, by its undersigned counsel Venable LLP and Togut, Segal & Segal LLP,

for its second amended complaint against the defendants listed above, alleges the following facts

and claims:

## NATURE OF THE ACTION

1.      In the five weeks that immediately preceded its chapter 11 filing, Enron paid out more than one billion dollars to prepay and/or redeem certain commercial paper prior to its stated maturity. (As used herein, the terms "prepayments" and "redemptions" are used interchangeably.) These extraordinary prepayments followed, among other things, the following announcements in the second half of October 2001: Enron's announcement of a $1 billion charge against third quarter 2001 earnings, the announcement of an inquiry by the Securities and Exchange Commission into Enron's accounting practices, and announcements by rating agencies of the possible downgrading of Enron's debt ratings.

2.      Alarmed by these announcements, commercial paper holders urged Enron to prepay the commercial paper immediately, prior to maturity, at its "approximate accrued par value," i.e., the price originally paid for the Enron commercial paper plus accrued interest. Enron began making such payments during a 12-day period, commencing on October 26 and ending on November 6, 2001, to prepay certain previously issued commercial paper. Those prepayments, which totaled approximately $1.126 billion, were made irrespective of the paper's underlying stated maturity and the current market price.

3.      These early redemptions were directly contrary to the terms of the original issuing documents and depleted Enron's estate, unfairly preferring the holders of commercial paper at the expense of other general unsecured creditors in derogation of the fundamental Bankruptcy Code principle of equality of distribution.

4.     Of the total amount transferred by Enron between October 26 and November 6, 2001, Enron seeks to avoid and recover $870,108,723.68[1] in this Second Amended Complaint. For each of these transactions, Enron prepaid the commercial paper at approximate accrued par value, not market value, which was significantly less.

5.     Enron has commenced this adversary proceeding to recover the early redemptions so that such funds may be shared equally and ratably by all similarly situated creditors of its estate.

## JURISDICTION AND VENUE

6.     On December 2, 2001 (the "Petition Date"), Enron filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). Enron continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and (e). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The claims asserted include proceedings to determine, avoid and recover preferences and fraudulent transfers and/or conveyances. In addition, resolution of the claims asserted will have an effect upon Enron's reorganization, the value of its estate, and any distribution to its creditors.

8.     Pursuant to 28 U.S.C. §§ 157(a) and 157(b)(1) and the district court's reference of proceedings to the bankruptcy court, this Court may exercise subject matter jurisdiction. Venue in this district is proper in accordance with 28 U.S.C. § 1409(a).

---

[1]     This amount differs from the proposed Second Amended Complaint, previously submitted to the Court. On September 29, 2006, Enron reached a settlement with Bank of America, N.A., ADP Clearing & Outsourcing Services, Inc. and Analog Devices Inc., and Enron is no longer seeking to avoid and recover any of the $19,918,333.20 transferred to those entities in this Second Amended Complaint. Where Enron has not reached a settlement with all of the transferees and beneficiaries to a transfer, this Second Amended Complaint still seeks to avoid and recover the entire amount of the transfer, and the amount recovered from non-settling defendants can be

9.      Enron brings this adversary proceeding pursuant to and under Rule 7001 of the
Federal Rules of Bankruptcy Procedure and seeks relief under sections 502(d), 544, 547, 548 and
550 of the Bankruptcy Code and applicable provisions of state law.

### THE PARTIES

10.      Plaintiff Enron is a corporation organized under the laws of Oregon with its
principal place of business at 4 Houston Center, 1221 Lamar, Suite 1600, Houston, Texas.

11.      The defendants identified in paragraphs 12 through 131 were the initial
transferees of the early redemptions of Enron commercial paper that was prepaid on or after
October 26, 2001, prior to the stated maturity dates of such commercial paper, or were the
entities for whose benefit such prepayments were made, or were immediate or mediate
transferees of such prepayments.

12.      Defendant Goldman, Sachs & Co. ("Goldman") is a wholly owned subsidiary of
the Goldman Sachs Group, Inc., with a principal place of business at 85 Broad Street, New York,
New York 10004-0000.

13.      Defendant Lehman Commercial Paper Inc. ("Lehman") is a wholly owned
subsidiary of Lehman Brothers Holdings Inc.  Lehman's principal place of business is at Three
World Financial Center, New York, New York 10285.

14.      Defendant Allstate Life Insurance Company is an Illinois corporation, with a
principal place of business at 3100 Sanders Road, Northbrook, Illinois 60062-7154.

15.      Defendant DnB NOR Asset Management (US), originally sued as DnB Asset
Management (US) Inc., formerly known as Skandia Asset Management Inc., is a Delaware

---

adjusted as appropriate to account for any such settlement once there has been a final determination of the effect of
the settlement on the transfer.

BA2 #308936

corporation, with a principal place of business at 52 Vanderbilt Avenue, 12th Floor, New York, New York 10017.

16.    Defendant UBS Global Asset Management (Americas) Inc., formerly known as Brinson Partners, Inc., is a Delaware corporation, with a principal place of business at One North Wacker Drive, Chicago, Illinois 60606.

17.    Defendant UBS Short-Term Relationship Fund, also known as BRF Short Term Fund, is a fund affiliated with UBS Global Asset Management (Americas) Inc., formerly known as Brinson Partners, Inc., a Delaware corporation, with a principal place of business at One North Wacker Drive, Chicago, Illinois 60606.

18.    Defendant UBS Global Allocation Fund, also known as GLOBAL FD SEC, is, upon information and belief, a fund affiliated with UBS Global Asset Management (Americas) Inc., formerly known as Brinson Partners, Inc., a Delaware corporation, with a principal place of business at One North Wacker Drive, Chicago, Illinois 60606.

19.    Defendant GMDD is an entity, which may be an account, and is, upon information and belief, affiliated with UBS Global Asset Management (Americas) Inc., formerly known as Brinson Partners, Inc., a Delaware corporation, with a principal place of business at One North Wacker Drive, Chicago, Illinois 60606 or with UBS Global Asset Management (New York) Inc., formerly known as UBS Brinson, is, upon information and belief, a New York corporation, with a principal place of business at 51 West 52nd Street, New York, New York 10019-6114.

20.    Defendant Banco Centroamericano de Integracion Economica, also known as Central American Bank for Economic Integration and 148620 Cabei A, is, upon information and

belief, a development bank, with a principal place of business at Edificio Sede BCIE, Boulevard Suyapa, Tegucigalpa, Honduras.

21.     Defendant Banco de Guatemala, also known as 148520 Banco Guatemala, is, upon information and belief, a bank, with a principal place of business at 7A Avenida 02-01 Zona 1, Guatemala City, Guatemala.

22.     Defendant UBS Global Securities Relationship Fund, also known as BRF GSP SEC Lending, is, upon information and belief, an entity affiliated with UBS Global Asset Management (Americas) Inc., formerly known as Brinson Partners, Inc., a Delaware corporation, with a principal place of business at One North Wacker Drive, Chicago, Illinois 60606.

23.     Defendant UBS Global Asset Management (New York) Inc., formerly known as UBS Brinson, is, upon information and belief, a New York corporation, with a principal place of business at 51 West 52nd Street, New York, New York 10019-6114.

24.     Defendant Saltash Enterprises is, upon information and belief, an entity, with a principal place of business at Trident Chambers, Road Town, Tortola, B.V.I.

25.     Defendants Harald and Joann McPike are individuals who reside at Haven View 5, Cloister Drive, Paradise Island, Nassau BP Bahamas.

26.     Defendant The Northern Trust Company is a bank insured by the FDIC, with a principal place of business at 50 South LaSalle Street, Chicago, Illinois 60675.

27.     Defendant Kamilche Company is a Washington corporation, with a principal place of business at 1301 Fifth Avenue, Suite 2800, Seattle, Washington 98101.

28.     Defendant Collective Short Term Investment Fund of The Northern Trust Company is a fund of The Northern Trust Company, a bank insured by the FDIC, with a principal place of business at 50 South LaSalle Street, Chicago, Illinois 60675.

BA2 #308936

29.    Defendant PIC Realty Company is a Delaware corporation, with a principal place

of business at 751 Broad Street, Prudential Plaza, Newark, New Jersey 07102-3777.

30.    Defendant Prudential Insurance Company of America is a New Jersey

corporation, with a principal place of business at 751 Broad Street, Prudential Plaza, Newark,

New Jersey 07102-3777.

31.    Defendant Prudential Merged Retirement Plan is, upon information and belief, a

benefit pension plan affiliated with Prudential Insurance Company of America, a New Jersey

corporation, with a principal place of business at 751 Broad Street, Prudential Plaza, Newark,

New Jersey 07102-3777.

32.    Defendant Prudential Plan-Futures Investment Fund is a fund beneficially owned

by Prudential Merged Retirement Plan, which is, upon information and belief, affiliated with

Prudential Insurance Company of America, a New Jersey corporation, with a principal place of

business at 751 Broad Street, Prudential Plaza, Newark, New Jersey 07102-3777.

33.    Defendant PRU/General Lending Collateral Acct. #PIC00006 is an account

beneficially owned by Prudential Insurance Company of America, a New Jersey corporation,

with a principal place of business at 751 Broad Street, Prudential Plaza, Newark, New Jersey

07102-3777.

34.    Defendant Prudential Capital Management is, upon information and belief,

affiliated with Prudential Insurance Company of America, a New Jersey corporation, with a

principal place of business at 751 Broad Street, Prudential Plaza, Newark, New Jersey 07102-

3777.

35.    Defendant Prudential International Insurance ABS Fund is, upon information and

belief, a fund affiliated with Prudential Insurance Company of America, a New Jersey

-11-

corporation, with a principal place of business at 751 Broad Street, Prudential Plaza, Newark, New Jersey 07102-3777.

36.    Defendant Prudential Home Mortgage Co., Inc., a New Jersey corporation with a principal place of business at 213 Washington Street, Newark, New Jersey 07102-2992, is, upon information and belief, affiliated with Prudential Insurance Company of America.

37.    Defendant PRU/PHMCMM/PIC00183 is an account owned by Prudential Home Mortgage Co., Inc., a New Jersey corporation with a principal place of business at 213 Washington Street, Newark, New Jersey 07102-2992, which is, upon information and belief, affiliated with Prudential Insurance Company of America.

38.    Defendant Prudential International Insurance High Yield Fund is, upon information and belief, a fund affiliated with Prudential Insurance Company of America, a New Jersey corporation, with a principal place of business at 751 Broad Street, Prudential Plaza, Newark, New Jersey 07102-3777.

39.    Defendant Piper Jaffray & Co., successor in interest to US Bancorp Investments, Inc., f/k/a FBS Investment Services, Inc., is a Minnesota corporation, with a principal place of business at 60 Livingston Avenue, St. Paul, Minnesota  55107.

40.    Defendant EchoStar Communications Corporation is a Nevada corporation, with a principal place of business at 5701 S. Santa Fe Drive, Littleton, Colorado 80120.

41.    Defendant WinCo Foods, Inc. is an Idaho corporation, with a principal place of business at 650 N. Armstrong Place, Boise, Idaho 83704.

42.    Defendant Wilmington Trust Company is a Delaware corporation, with a principal place of business at 1100 North Market Street, Rodney Square North, Wilmington, Delaware 19890.

BA2 #308936

43.    Defendant New Castle County is, upon information and belief, a governmental entity, with a principal place of business at 87 Reads Way, New Castle, Delaware 19720.

44.    Defendant The Belo Company is a Delaware corporation, with a principal place of business at Silverside-Carr Executive Center, 501 Silverside Road, Suite 41, Wilmington, Delaware 19809.

45.    Defendant GMP Companies, Inc. is a Delaware corporation, with a principal place of business at One East Broward Boulevard, Suite 1701, Fort Lauderdale, FL 33301.

46.    Defendant Capital Assurance Company Inc., also known as CAP Assur. Co., is a Florida corporation, with a principal place of business at 2333 Ponce de Leon Boulevard, Coral Gables, FL 33134.

47.    Defendant Marlon Insurance Company Ltd., originally sued as Marlon Management Services Inc., is organized under the laws of the United Kingdom, with a principal place of business at Marlon House, 71-74 Mark Lane, London EC3R 7HS, England.

48.    Defendant Brahms Funding Corporation is a Delaware corporation, with a principal place of business at 114 West 47th Street, Suite 1715, New York, New York 10036.

49.    Defendant Merrill Lynch Investment Managers, L.P., formerly known as Merrill Lynch Asset Management, Inc., is a Delaware limited partnership, with a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

50.    Defendant Mitsubishi Trust and Banking Corporation is, upon information and belief, a corporation, with a principal place of business at 11-1, Nagatacho 2-chome, Chiyoda-ku, Tokyo 100-8212, Japan.

-13-

51.     Defendant Merrill Lynch Tanchuki Bond Open Mother Fund is, upon information and belief, a fund affiliated with Mitsubishi Trust and Banking Corporation, which has a principal place of business at 11-1, Nagatacho 2-chome, Chiyoda-ku, Tokyo 100-8212, Japan.

52.     Defendant Fremont General Corp. is a Nevada corporation, with a principal place of business at 2020 Santa Monica Boulevard, Suite 600, Santa Monica, California 90404.

53.     Defendant Abercrombie & Fitch Co., also known as Abercromble & Fifth, is a Delaware corporation, with a principal place of business at 6301 Fitch Path, New Albany, Ohio 43054.

54.     Defendant Abercrombie & Fitch Stores, Inc. is an Ohio corporation, with a principal place of business at 6301 Fitch Path, New Albany, Ohio 43054.

55.     Defendant Abercrombie & Fitch Management Co. is a Delaware corporation, with a principal place of business at 6301 Fitch Path, New Albany, Ohio 43054.

56.     Defendant AIM Floating Rate Fund is a Maryland corporation, with a principal place of business at 11 Greenway Plaza, Suite 100, Houston, Texas 77046.

57.     Defendant Inverban S.A., also known as Inverbank S.A. HIC, is, upon information and belief, an entity, with a principal place of business at Serrano 39, Madrid, 28001, Spain.

58.     Defendant San Faustin N.V. is organized under the laws of the Netherlands, with a principal place of business at Berg Arrarat 1, Curacao, Netherlands Antilles.

59.     Defendant Techint Financial Corporation Ltd. is, upon information and belief, a corporation with a principal place of business at Kleinwort Benson House, Wests Centre, St. Helier, Jersey.

60.   Defendant Techint Curacao N.V. is organized under the laws of the Netherlands, with a principal place of business at Berg Arrarat 1, Willemstad, Netherlands Antilles.

61.   Defendant Techint Investments N.V. is organized under the laws of the Netherlands, with a principal place of business at Berg Arrarat 1, Curacao, Netherlands Antilles.

62.   Defendant Techint Limited is, upon information and belief, an entity with a principal place of business at Kleinwort Benson House, Wests Centre, St. Helier, Jersey.

63.   Defendant Cascade Investments LLC is a Washington corporation, with a principal place of business at 2365 Carillon Point, Kirkland, Washington 98033.

64.   Defendant Cascade Driver Account-Larson is a fund affiliated with Cascade Investments LLC, a Washington corporation, with a principal place of business at 2365 Carillon Point, Kirkland, Washington 98033.

65.   Defendant Banco National de Mexico is a subsidiary of Citigroup, Inc., a Delaware corporation, with a principal place of business at 399 Park Avenue, New York, New York 10022.

66.   Defendant Kelly Properties Inc. is a Michigan corporation, with a principal place of business at 999 West Big Beaver Road, Suite 301A, Troy, Michigan 48084.

67.   Defendant Aetna Inc. is a Pennsylvania corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

68.   Defendant Healthcare-Carolinas is affiliated with Aetna Inc., a Pennsylvania corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

69.     Defendant US Health Care (NY Health Care Plan Mid-Atlantic) is affiliated with Aetna Inc., a Pennsylvania corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

70.     Defendant Aetna Services Inc. is affiliated with Aetna Inc., a Pennsylvania corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

71.     Defendant U.S. Healthcare of PA is affiliated with Aetna Inc., a Pennsylvania corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

72.     Defendant Healthcare of Connecticut is affiliated with Aetna Inc., a Pennsylvania corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

73.     Defendant Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, is a Connecticut corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

74.     Defendant Health Plans of Florida is affiliated with Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, a Connecticut corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

75.     Defendant Frontier Health Plans is affiliated with Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, a Connecticut corporation, with a principal place of at 151 Farmington Avenue, Hartford, Connecticut 06156.

76.     Defendant Health Plans of Texas is affiliated with Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, a Connecticut corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

77.     Defendant Health Plans of Arizona is affiliated with Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, a Connecticut corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

78.     Defendant Short Term Pool is, upon information and belief, affiliated with Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, a Connecticut corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

79.     Defendant Health and Life Insurance Co. Investment Group is, upon information and belief, affiliated with Lion Connecticut Holdings, Inc., a Connecticut corporation, with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156.

80.     Defendant Banca Serfin SA is organized under the laws of Mexico, with a principal place of business at Prolongacion Paseo de la Reforma, #500, Lomas De Santa Fe, Mexico DF, Mexico 01219.

81.     Defendant Charles Schwab Investment Management is a Delaware corporation, with a principal place of business at 101 Montgomery Street, San Francisco, California 94104.

82.     Defendant SchwabYieldPlus Fund, originally sued as Schwab Yield Plus Fund Money Market Fund Dept., is an entity affiliated with Charles Schwab Investment Management, a Delaware corporation, with a principal place of business at 101 Montgomery Street, San Francisco, California 94104.

83.     Defendant Banco Provincial Over Seas is organized in the Netherlands Antilles, with a principal place of business at Santa Rosaweg 51-53-55, Willemstad, P.O. Box 3512, Curacao, Netherlands Antilles.

84.     Defendant Banco Espirito Santo, S.A., formerly known as Banco Espirito Santo & Commercial de Lisboa, New York Branch, is organized under the laws of Portugal, with a principal place of business in Lisbon, Portugal, and an office at 320 Park Avenue, 29th Floor, New York, New York 10022-6815.

85.     Defendant Scott & White Memorial Hospital and Scott, Sherwood and Brindley Foundation is a non-profit entity with a principal place of business at 2401 South 31st Street, Temple, Texas 76508.

86.     Defendant Dell Computer Products Europe Ltd., also known as Dell Products Ireland, is a subsidiary of Dell Inc., a Delaware corporation, with a principal place of business at One Dell Way, Round Rock, Texas 78682-2244.

87.     Defendant MONY Life Insurance Company, formerly known as The Mutual Life Insurance Company of New York, is an affiliate of AXA Financial, Inc., originally sued as The MONY Group, Inc., a Delaware corporation with a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

88.     Defendant MONY Series Fund, Inc. is a Maryland corporation and a wholly owned subsidiary of MONY Life Insurance Company, which has a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

89.     Defendant Money Market Portfolio/Fund, originally sued as 31 Series Fund-Money Market, is a fund affiliated with MONY Series Fund, Inc., a Maryland corporation and a

-18-

wholly owned subsidiary of MONY Life Insurance Company, which has a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

90.     Defendant Pooled Account #38, originally sued as 05 Div Govt/Corp Bond Port, is an account affiliated with MONY Life Insurance Company, which has a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

91.     Defendant Intermediate Government Bond Portfolio, originally sued as10 Div Intermed Govt Port, is, upon information and belief, a fund affiliated with MONY Life Insurance Company, which has a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

92.     Defendant Value & Income Portfolio, originally sued as 06 Div Equity Income, is upon information and belief, a fund affiliated with MONY Life Insurance Company, which has a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

93.     Defendant MONY Closed Block, originally sued as 76 MONY CB Acct., is, upon information and belief, an account affiliated with MONY Life Insurance Company, which has a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

94.     Defendant US Financial Life Insurance Co., originally sued as 84 USFL Life Insurance Co., is an account affiliated with U.S. Financial Life Insurance Company, an Ohio corporation with a principal place of business at 10290 Alliance Road, Cincinnati, Ohio 45242. .

95.     Defendant AXA Financial, Inc., originally sued as The MONY Group Inc., is a Delaware corporation, with a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

96.     Defendant Pooled Account #7, originally sued as 07 Pooled Account #7, is an account affiliated with MONY Life Insurance Company, which has a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

97.     Defendant U.S. Financial Life Insurance Company is an Ohio corporation with a principal place of business at 10290 Alliance Road, Cincinnati, Ohio 45242.

98.     Defendant Enterprise Capital Management, Inc. is a Georgia corporation, with a principal place of business at 3343 Peachtree Road, NE, Suite 450, Atlanta, Georgia 30326.

99.     Defendant Diversified Investment Advisors, Inc. is a Delaware corporation, with a principal place of business at 4 Manhattanville Road, Purchase, New York 10577-2199.

100.    Defendant Citibank, N.A. is a New York bank with a principal place of business at 399 Park Avenue, New York, New York 10022.

101.    Defendant Citi Institutional US Corporate & Mortgage Bond Fund is a fund affiliated with Citibank, N.A., a New York bank with a principal place of business at 399 Park Avenue, New York, New York 10022.

102.    Defendant MONY Capital Management, Inc. is a Delaware corporation, with a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

103.    Defendant Intermediate Term Bond Portfolio, originally sued as Acct. #29, is, upon information and belief, a fund affiliated with MONY Series Fund, Inc., a Maryland corporation and wholly owned subsidiary of MONY Life Insurance Company, which has a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

104.    Defendant Enterprise Money Market Portfolio is a fund affiliated with MONY Capital Management, Inc., a Delaware corporation, with a principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

BA2 #308936

105.    Defendant Trusco Capital Management is a Georgia corporation, with a principal place of business at 50 Hurt Plaza SE, Suite 1400, Atlanta, Georgia 30303.

106.    Defendant AXA Investment Managers, Paris, SA, originally sued as AXA Investment Managers, Inc., is a French entity, with a principal place of business at Coeur Defense Tour B, La Defense 4-100, Esplanade du General de Gaulle, 92932 Paris, La Defense Cedex.

107.    Defendant AXA Court Terme is a fund with a principal place of business at Coeur Defense Tour B, La Defense 4-100, Esplanade du General de Gaulle, 92932 Paris, La Defense Cedex.

108.    Defendant AXA IM Euro Liquidity is a fund with a principal place of business at Coeur Defense Tour B, La Defense 4-100, Esplanade du General de Gaulle, 92932 Paris, La Defense Cedex.

109.    Defendant UBS AG is organized under the laws of Switzerland, with a principal place of business in Zurich, Switzerland and a business address at 677 Washington Blvd, Stamford, Connecticut 06901.

110.    Defendant Brown Forman Corp. is a Delaware corporation, with a principal place of business at 850 Dixie Highway, Louisville, Kentucky 40210.

111.    Defendant Longnorth Limited is organized under the laws of Ireland and is a subsidiary of Brown Forman Corp., a Delaware corporation, with a principal place of business at 850 Dixie Highway, Louisville, Kentucky 40210.

112.    Defendant ALFA S.A. de C.V. is organized under the laws of Mexico, with a principal place of business at Gomez Morin 1111 Sur, San Pedro Garza Garcia, Nuevo Leon, 66200, Mexico.

BA2 #308936

113.    Defendant 1740 Advisors Inc. is a New York corporation, with a principal place of business at 1740 Broadway, New York, New York 10019.

114.    Defendant Blackwell Donaldson & Company is an Oregon corporation, with a principal place of business at 610 S.W. Alder Street, Suite 810, Portland, Oregon 97205.

115.    Defendant Merrill Lynch Investment Managers Co., Ltd. is a Japanese entity, with a principal place of business at 1-4-1, Nihonbashi, Chuo-ku, Tokyo, Japan.

116.    Defendant The Tokyotanshi Co., Ltd. is a Japanese entity, with a principal place of business at 4-5-1 Nihonbashi-Muromachi, Chuo-ku, Tokyo, Japan.

117.    Defendant Merrill Lynch Tan-Chuki-Sai-Fund is a Japanese entity, with a principal place of business at 11-1 Nagatacho 2-chome, Chiyoda-ku, Tokyo 100-8212, Japan.

118.    Defendant Sony Bank Incorporated is a Japanese entity, with a principal place of business at 1-6-18, Minami-Azabu, Minato-ku, Tokyo, Japan.

119.    Defendant Merrill Lynch Japan Securities Co., Ltd. is a Japanese entity, with a principal place of business at 1-4-1, Nihonbashi, Chuo-ku, Tokyo, Japan.

120.    Defendant Nippon Investors Securities Co., Ltd. is a Japanese entity, with a principal place of business at 1-11-10, Azabudai, Minato-ku, Tokyo, Japan.

121.    Defendant Shizuoka Bank, Limited is a Japanese entity, with a principal place of business at 1-10, Gofukucho, , Shizuoka-shi, Shizuoka Pref., Japan.

122.    Defendant Shizugin TM Securities, Co., Ltd. is a Japanese entity, with a principal place of business at 1-13, Ottemachi, Shizuoka-shi, Shizuoka Perf., Japan.

123.    Defendant Earthlink, Inc. is a Delaware corporation, with a principal place of business at 1375 Peachtree Street, Atlanta, Georgia 30309.

-22-

124.    Defendant Belo Investments II is a Delaware corporation, with a principal place of business at 501 Silverside Road, Suite 41, Wilmington, Delaware 19809.

125.    Defendant DnB NOR Asset Management (UK) Ltd., formerly known as Skandia Investment Management Ltd., is an English entity, with a principal place of business at 20 St. Dunstans Hill, London EC3R 8HY, England.

126.    Defendant Citicorp Investment Management (Luxembourg) S.A. is, upon information and belief, a Luxembourg entity, with a principal place of business at Avenue Marie-Therese 16, Luxembourg 2132, Luxembourg.

127.    Defendant MassMutual Life Insurance Co. ("Mass Mutual Life Ins. Co.") is a corporation having its principal place of business at 1295 State Street, Springfield, MA 01111.

128.    Defendant MassMutual Funding LLC is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

129.    Defendant MassMutual Life Ins. Co-GIA Pooled Short Term Investment is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

130.    Defendant MassMutual Short Term Bond FD is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

131.    Defendant MassMutual Diversified Bond FD (MMIFDB) is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

## FACTUAL ALLEGATIONS

132.    Prior to the Petition Date, Enron issued and sold unsecured commercial paper to various entities.  This commercial paper was uncertificated and had maturities of up to 270 days.

133.    Pursuant to Issuing and Paying Agency Agreements between Enron and JP Morgan Chase Bank and its predecessors in interest (collectively the "Chase Paying Agent"), the Chase Paying Agent served as issuing and paying agent in connection with Enron's commercial paper.

134.    The purchase and sale of Enron's commercial paper, including each commercial paper note identified in this Second Amended Complaint, was made pursuant to terms as set forth in an Offering Memorandum dated September 14, 2001. The Offering Memorandum expressly provides as follows:

> The Notes are not redeemable or subject to voluntary
> prepayment by the Company [Enron] prior to maturity.

135.    In addition, the terms of the Enron commercial paper notes identified in this Second Amended Complaint contained no provisions allowing prepayment or early redemption of those commercial paper notes.

136.    In a series of transactions starting on October 26 and concluding on November 6, 2001, Enron, at the urging of some or all of the defendants, transferred over one billion dollars for the purpose of prepaying commercial paper notes that had been sold to J.P. Morgan Securities Inc. ("JPMSI"), Goldman, Lehman and other entities when issued. Of the total amount transferred by Enron to prepay Enron commercial paper, Enron seeks to avoid and recover $870,108,723.68 in this Second Amended Complaint. Each of the transfers comprising the aggregate $870,108,723.68 that Enron seeks to avoid and recover in this Second Amended Complaint was made by Enron to prepay individual Enron commercial paper notes prior to the maturity date of those commercial paper notes and in violation of the terms of the sale of those commercial paper notes. (The transfers referenced in this paragraph and paragraph 137 are

hereinafter referred to as the "Early Redemption Transfers.") The transfers that Enron seeks to avoid and recover from the defendants identified below are as follows:

(1)    $327,901,766.55 on October 26, 2001 to Lehman,

(2)    $30,653,374.86 on October 26, 2001 to Goldman,

(3)    $149,328,123.29 on October 29, 2001 to Goldman,

(4)    $97,404,385.56 on October 29, 2001 to JPMSI,[2]

(5)    $35,956,880.00 on October 29, 2001 to Lehman,

(6)    $77,655,601.39 on October 30, 2001 to Goldman,

(7)    $7,028,195.05 on October 30, 2001 to JPMSI,

(8)    $21,565,813.40 on October 30, 2001 to Lehman,

(9)    $32,891,141.91 on October 31, 2001 to Goldman,

(10)    $13,415,175.00 on November 1, 2001 to Goldman,

(11)    $998,891.67 on November 2, 2001 to Goldman,

(12)    $499,875.00 on November 2, 2001 to UBS AG, and

(13)    $74,809,500.00 on November 6, 2001 to Lehman.

137.    When the aggregate $870,108,723.68 in transfers is grouped by each individual early redemption, the initial transferees of each such Early Redemption Transfer, or the entities for whose benefit such transfers were made, or the immediate or mediate transferees, are as follows:[3]

---

[2]    Enron has settled with JPMSI and J.P. Morgan Securities of Texas, Inc., and they are no longer defendants. JPMSI is included here only to avoid confusion because the Second Amended Complaint still seeks to recover the appropriate portion of the $97,404,385.56 and the $7,028,195.05 transfers from the other transferees and beneficiaries who have not settled, as explained in footnote 1, *supra*.

[3]    The defendants who have settled with Enron have been removed from these subparagraphs. Further, where the Court denied Enron's motion to amend as to a particular proposed defendant, that proposed defendant has not been included in this Second Amended Complaint. The deletion of proposed new defendants from the final Second Amended Complaint is intended only to conform to the Court's rulings. The Second Amended Complaint should

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| (1) | 10/26/2001 | $24,945,833.33 | Goldman |
| (2) | 10/26/2001 | $17,292,671.53 | Lehman and Allstate Life Insurance Company |
| (3) | 10/26/2001 | $7,696,791.67 | Lehman and Allstate Life Insurance Company |
| (4) | 10/26/2001 | $5,707,541.53 | Goldman |
| (5) | 10/26/2001 | $1,499,466.67 | Lehman, UBS Global Asset Management (Americas) Inc., formerly known as Brinson Partners, Inc., and UBS Short-Term Relationship Fund, also known as BRF Short Term Fund. |
| (6) | 10/26/2001 | $224,925.00 | Lehman, The Northern Trust Company and Kamilche Company |
| (7) | 10/26/2001 | $49,975,916.67 | Lehman, The Northern Trust Company and Collective Short Term Investment Fund of The Northern Trust Company |
| (8) | 10/26/2001 | $46,977,361.67 | Lehman, The Northern Trust Company and Collective Short Term Investment Fund of The Northern Trust Company |
| (9) | 10/26/2001 | $49,972,000.00 | Lehman, The Northern Trust Company and Collective Short Term Investment Fund of The Northern Trust Company |
| (10) | 10/26/2001 | $14,976,083.33 | Lehman |
| (11) | 10/26/2001 | $4,991,111.11 | Lehman, UBS Global Asset Management (Americas) Inc., formerly known as Brinson Partners, Inc.,UBS Global Allocation Fund, also known as GLOBAL FD SEC, and UBS Global Securities Relationship Fund, also known as BRF GSP SEC Lending. |
| (12) | 10/26/2001 | $9,962,500.00 | Lehman, UBS Global Asset Management (Americas) Inc., formerly known as Brinson Partners, Inc., GMDD, and UBS Global Management (New York) Inc., formerly known as UBS Brinson. |

not be construed as acquiescing to those rulings in any way, and Enron reserves all of its rights to appeal the Court's decisions at the appropriate time.

BA2 #308936

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| (13) | 10/26/2001 | $49,733,055.56 | Lehman, PIC Realty Company, Prudential Insurance Company of America, Prudential Plan-Futures Investment Fund, PRU/General Lending Collateral Acct. #PIC00006, Prudential Capital Management, Prudential International Insurance ABS Fund, PRU/PHMCMM/PIC00183, Prudential International Insurance High Yield Fund, Prudential Home Mortgage Co., Inc. and Prudential Merged Retirement Plan |
| (14) | 10/26/2001 | $49,733,055.56 | Lehman, PIC Realty Company, Prudential Insurance Company of America, Prudential Plan-Futures Investment Fund, PRU/General Lending Collateral Acct. #PIC00006, Prudential Capital Management, Prudential International Insurance ABS Fund, PRU/PHMCMM/PIC00183, Prudential International Insurance High Yield Fund, Prudential Home Mortgage Co., Inc. and Prudential Merged Retirement Plan |
| (15) | 10/26/2001 | $24,866,827.78 | Lehman, PIC Realty Company, Prudential Insurance Company of America, Prudential Plan-Futures Investment Fund, PRU/General Lending Collateral Acct. #PIC00006, Prudential Capital Management, Prudential International Insurance ABS Fund, PRU/PHMCMM/PIC00183, Prudential International Insurance High Yield Fund, Prudential Home Mortgage Co., Inc. and Prudential Merged Retirement Plan |
| (16) | 10/29/2001 | $47,230,974.44 | ALFA S.A. de C.V., Piper Jaffray & Co., and EchoStar Communications Corporation |
| (17) | 10/29/2001 | $2,918,756.75 | Goldman, Wilmington Trust Company and New Castle County |
| (18) | 10/29/2001 | $6,498,916.67 | DnB NOR Asset Management (US), Capital Assurance Company Inc., also known as CAP Assur Co., Marlon Insurance Company Ltd., and DnB NOR Asset Management (UK) Ltd. |
| (19) | 10/29/2001 | $24,989,583.33 | Lehman and Brahms Funding Corp. |

-27-

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| (20) | 10/29/2001 | $25,426,521.66 | Goldman and Fremont General Corp. |
| (21) | 10/29/2001 | $3,995,250.00 | Goldman, Abercrombie & Fitch Stores, Inc. and Abercrombie & Fitch Management Co. |
| (22) | 10/29/2001 | $998,666.67 | Goldman, Wilmington Trust Company, Belo Investments II |
| (23) | 10/29/2001 | $9,986,666.67 | Goldman and AIM Floating Rate Fund |
| (24) | 10/29/2001 | $5,394,797.33 | Goldman, Inverban S.A., also known as Inverbank S.A. HIC (II), San Faustin N.V., Techint Financial Corporation Ltd., Techint Curacao, Techint Investments N.V., and Techint Limited |
| (25) | 10/29/2001 | $24,964,583.33 | Goldman, Cascade Investments LLC and Cascade Driver Account-Larson |
| (26) | 10/29/2001 | $7,972,622.22 | Goldman and Banco National de Mexico |
| (27) | 10/29/2001 | $4,983,011.11 | Goldman and Kelly Properties Inc. |
| (28) | 10/29/2001 | $3,985,000.00 | Goldman, Piper Jaffray & Co., and WinCo Foods Inc. |
| (29) | 10/29/2001 | $8,013,713.89 | Goldman, Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, and Health Plans of Florida |
| (30) | 10/29/2001 | $497,875.00 | Goldman, Wilmington Trust Company and GMP Companies, Inc. |
| (31) | 10/29/2001 | $1,354,605.33 | Goldman, Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, and Frontier Health Plans |
| (32) | 10/29/2001 | $1,244,980.56 | Goldman, Aetna Inc. and Healthcare-Carolinas |
| (33) | 10/29/2001 | $9,999,097.22 | Banca Serfin S.A. |
| (34) | 10/29/2001 | $1,998,891.67 | Abercrombie & Fitch Co., also known as Abercromble & Fifth, and Abercrombie & Fitch Management Co. |
| (35) | 10/29/2001 | $9,087,260.00 | Charles Schwab Investment Mgmt., Inc. and Schwab YieldPlus Fund |
| (36-1) | 10/29/2001 | $9,998,277.78 | Goldman and Piper Jaffray |
| (36-2) | 10/29/2001 | $3,989,368.25 | Goldman, MassMutual Funding LLC, and MassMutual Life Ins. Co.[4] |

---

[4]    Togut, Segal & Segal LLP shall have sole responsibility for prosecuting the claims associated with subparagraphs 36-2 through 36-5 of paragraph 137, and Venable LLP does not serve as co-counsel or as Special Litigation Counsel to Enron as to those claims.

BA2 #308936

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| (36-3) | 10/29/2001 | $22,995,272.22 | Goldman and MassMutual Life Ins. Co-GIA Pooled Short Term Investment |
| (36-4) | 10/29/2001 | $1,319,728.67 | Goldman and MassMutual Short Term Bond FD |
| (36-5) | 10/29/2001 | $889,849.19 | Goldman, MassMutual Diversified Bond FD (MMIFDB), and MassMutual Life Ins. |
| (36-6) | 10/29/2001 | $399,932.22 | Goldman and Wilmington Trust Company |
| (36-7) | 10/29/2001 | $7,998,644.44 | Goldman |
| (37) | 10/29/2001 | $2,659,556.67 | Inverban S.A., also known as Inverbank S.A. HIC (II), San Faustin N.V., Techint Financial Corporation Ltd., Techint Curacao, Techint Investments N.V., and Techint Limited |
| (38) | 10/29/2001 | $4,993,388.89 | Banco Provincial Over Seas N.V. |
| (39) | 10/29/2001 | $4,979,633.33 | Banco Espirito Santo, S.A., formerly known as Banco Espirito Santo & Commercial de Lisboa S.A., New York Branch |
| (40) | 10/29/2001 | $9,956,666.67 | Scott & White Memorial Hospital and Scott, Sherwood and Brindley Foundation |
| (41) | 10/29/2001 | $4,988,916.67 | Lehman |
| (42) | 10/29/2001 | $5,978,380.00 | Lehman and Banco National de Mexico |
| (43) | 10/30/2001 | $249,979.17 | Lehman, The Belo Company, and Blackwell Donaldson & Company. |
| (44) | 10/30/2001 | $24,997,986.11 | Goldman and Dell Computer Products Europe Ltd., also known as Dell Products Ireland |
| (45) | 10/30/2001 | $1,898,947.08 | Goldman, AXA Financial, Inc., MONY Life Insurance Company, formerly known as The Mutual Life Insurance Company of New York, Money Market Portfolio/Fund, MONY Series Fund, Inc., U.S. Financial Life Insurance Company (USFL), Enterprise Capital Management, Inc., Diversified Investment Advisors, Inc. and MONY Capital Management |

BA2 #308936

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| (46) | 10/30/2001 | $16,589,671.11 | Goldman, AXA Financial, Inc., MONY Life Insurance Company, formerly known as The Mutual Life Insurance Company of New York, Pooled Account #38, Intermediate Government Bond Portfolio, Value & Income Portfolio, MONY Closed Block, Pooled Account #7, U.S. Financial Life Insurance Company (USFL), Enterprise Capital Management, Inc., Diversified Investment Advisors, Inc., MONY Capital Management, and 1740 Advisors Inc. |
| (47) | 10/30/2001 | $3,841,956.04 | Lehman, Brown Forman Corp. and Longnorth Limited |
| (48) | 10/30/2001 | $899,002.50 | Goldman, AXA Financial, Inc., MONY Life Insurance Company, formerly known as The Mutual Life Insurance Company of New York, US Financial Life Insurance Co., Value & Income Portfolio, U.S. Financial Life Insurance Company (USFL), Enterprise Capital Management, Inc., Diversified Investment Advisors, Inc., MONY Capital Management, and 1740 Advisors Inc. |
| (49) | 10/30/2001 | $7,990,500.00 | Goldman, Citibank, Citi Institutional US Corporate & Mortgage Bond Fund, and Citicorp Investment Management (Luxembourg) S.A. |
| (50) | 10/30/2001 | $1,413,349.17 | Goldman, Lion Connecticut Holdings Inc., formerly known an Aetna Life & Casualty, and Health Plans of Arizona |
| (51) | 10/30/2001 | $17,977,600.00 | Goldman, UBS Global Asset Management (Americas) Inc., formerly known as Brinson Partners, Inc., Banco Centroamericano de Integracion Economica, also known as Central American Bank for Economic Integration and 148620 Cabei A, Banco de Guatemala, also known as 148520 Banco Guatemala and UBS AG |

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| (52) | 10/30/2001 | $1,781,556.91 | MONY Capital Management, Inc., AXA Financial, Inc., Enterprise Money Market Portfolio, Intermediate Term Bond Portfolio, MONY Series Fund, Inc., U.S. Financial Life Insurance Company (USFL), Enterprise Capital Management, Inc., Diversified Investment Advisors, Inc. and MONY Life Insurance Company, formerly known as The Mutual Life Insurance Company of New York. |
| (53) | 10/30/2001 | $4,018,308.44 | Goldman and Health and Life Ins. Co. Investment Group |
| (54) | 10/30/2001 | $1,870,236.98 | Goldman and Health and Life Ins. Co. Investment Group |
| (55) | 10/30/2001 | $4,996,111.11 | Lehman, and Kelly Properties, Inc. |
| (56) | 10/30/2001 | $6,991,833.33 | Lehman, Aetna Inc. and Aetna Services Inc. |
| (57) | 10/30/2001 | $5,485,933.75 | Lehman, Aetna Inc., U.S. Healthcare of PA and US Health Care (NY Health Care Plan Mid-Atlantic) |
| (58) | 10/30/2001 | $5,246,638.14 | Aetna Inc. and US Health Care (NY Health Care Plan Mid-Atlantic) |
| (59) | 10/31/2001 | $1,782,352.09 | Goldman, Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, and Health Plans of Texas |
| (60) | 10/31/2001 | $11,987,000.00 | Goldman, Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, and Short Term Pool |
| (61) | 10/31/2001 | $5,348,856.63 | Goldman, Aetna Inc. and Healthcare of Connecticut |
| (62) | 10/31/2001 | $9,988,333.33 | Goldman, Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, and Health Plans of Florida |
| (63) | 10/31/2001 | $549,690.14 | Goldman, Lion Connecticut Holdings Inc., formerly known as Aetna Life & Casualty, and Health Plans of Texas |
| (64) | 10/31/2001 | $747,525.00 | Goldman and Piper Jaffray & Co. |
| (65) | 10/31/2001 | $2,487,384.72 | Goldman, Trusco Capital Mgmt. and Earthlink, Inc. |
| (66) | 11/01/2001 | $13,415,175.00 | Goldman, AXA Court Terme, AXA IM Euro Liquidity, and AXA Investment Managers Paris, SA |

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| (67) | 11/02/2001 | $499,875.00 | UBS AG, Saltash Enterprises and Harald and Joann McPike |
| (68) | 11/02/2001 | $998,891.67 | Goldman |
| (69) | 11/06/2001 | $24,958,333.33 | Lehman, Merrill Lynch Investment Managers, L.P., Mitsubishi Trust and Banking Corporation, Merrill Lynch Tanchuki Bond Open Mother Fund, Merrill Lynch Investment Managers Co., Ltd., The Tokyotanshi Co., Ltd., Merrill Lynch Tan-Chuki-Sai-Fund, Sony Bank Incorporated, Merrill Lynch Japan Securities Co., Ltd., Nippon Investors Securities Co., Ltd., Shizuoka Bank, Limited and Shizugin TM Securities, Co., Ltd. |
| (70) | 11/06/2001 | $49,851,166.67 | Lehman, Merrill Lynch Investment Managers, L.P., Mitsubishi Trust and Banking Corporation, Merrill Lynch Tanchuki Bond Open Mother Fund, Merrill Lynch Investment Managers Co., Ltd., The Tokyotanshi Co., Ltd., Merrill Lynch Tan-Chuki-Sai-Fund, Sony Bank Incorporated, Merrill Lynch Japan Securities Co., Ltd., Nippon Investors Securities Co., Ltd., Shizuoka Bank, Limited and Shizugin TM Securities, Co., Ltd. |

138.    Upon information and belief, JPMSI, Goldman and/or Lehman informed some or all of the other defendants that the Early Redemption Transfers might be subject to avoidance as preferential transfers prior to the receipt of such Early Redemption Transfers.  Therefore, some or all of the defendants knew from JPMSI, Goldman and/or Lehman that the transfers might be subject to avoidance.

139.    The prepayment of the Enron commercial paper violated the very terms of its sale, which expressly prohibited any early redemption/prepayment of Enron commercial paper.

BA2 #308936

140.    Enron prepaid the commercial paper at approximate accrued par value, which was significantly more than the market value for such commercial paper.

## Count I

### Avoidance of the Early Redemption Transfers
### Pursuant to Section 547(b) of the Bankruptcy Code

141.    Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

142.    The Early Redemption Transfers constitute transfers of an interest of Enron in property.

143.    The Early Redemption Transfers were made to or for the benefit of the defendants, each of which was a creditor of Enron.

144.    The Early Redemption Transfers were made for or on account of antecedent debts owed by Enron before such payments were made.

145.    The Early Redemption Transfers were made within 90 days before the Petition Date.

146.    Enron was insolvent when the Early Redemption Transfers were made.

147.    The Early Redemption Transfers enabled each of the defendants to receive more than such defendant would have otherwise received if this case were a case under chapter 7 of the Bankruptcy Code, had the Early Redemption Transfers not been made, and such defendant had received payment of such antecedent debts to the extent provided by the Bankruptcy Code.

148.    Accordingly, pursuant to section 547(b) of the Bankruptcy Code, the Early Redemption Transfers, which are set forth in paragraphs 136 and 137, should be avoided so that Enron may recover from the defendants the full amount transferred of $870,108,723.68 plus interest from the transfer dates.

## Count II

### Recovery of Avoided Preferential Transfers
### Pursuant to Section 550 of the Bankruptcy Code

149.    Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

150.    The Early Redemption Transfers are avoidable as preferences pursuant to section 547(b) of the Bankruptcy Code and, accordingly, pursuant to section 550(a) of the Bankruptcy Code, Enron may recover from the defendants the value of the Early Redemption Transfers of $870,108,723.68 plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Enron's estate. Each defendant is jointly and severally liable for the entire amount of each Early Redemption Transfer with respect to which it is identified in paragraphs 136 or 137 of the Second Amended Complaint.

## Count III

### Avoidance of Fraudulent Transfers
### Pursuant to Section 548(a) of the Bankruptcy Code

151.    Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

152.    Within one year of the Petition Date, Enron made a series of transfers to the defendants, which are set forth in paragraphs 136 and 137, with respect to Enron commercial paper.

153.    The Early Redemption Transfers constitute transfers of interests of Enron in property.

154.    Each of the Early Redemption Transfers was made prior to the maturity date of the commercial paper. Even though the market value of the Enron commercial paper had plummeted precipitously after it was issued, Enron prepaid the Enron commercial paper at approximate accrued par value, not at its market value, which was significantly less.

-34-

BA2 #308936

155.   If the Enron commercial paper had been prepaid by Enron at market value (not approximate accrued par value), the total price Enron would have paid to defendants would have been a small fraction of the amount actually paid by Enron to defendants.

156.   Thus, within one year of the Petition Date, Enron made transfers to defendants totaling $870,108,723.68 to prepay Enron commercial paper at a price far in excess of its fair market value.

157.   Enron received less than a reasonably equivalent value in exchange for the sums transferred to the defendants and was (i) insolvent on the date that such transfers were made or such obligations were incurred, or became insolvent as a result of such transfers or obligations, (ii) engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was an unreasonably small capital; or (iii) intended to incur, or believed it would incur, debts that would be beyond its ability to pay as they matured.

158.   Therefore, pursuant to section 548(a) of the Bankruptcy Code, the Early Redemption Transfers identified in paragraphs 136 and 137 should be avoided as fraudulent transfers such that Enron may recover from the defendants the full amount transferred of $870,108,723.68 plus interest from the transfer dates.

## Count IV

### Recovery of Fraudulent Transfers Pursuant to Section 550 of the Bankruptcy Code

159.   Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

160.   The transfers identified in paragraphs 136 and 137 are avoidable as fraudulent transfers pursuant to section 548(a) of the Bankruptcy Code, and, accordingly, pursuant to section 550(a) of the Bankruptcy Code, Enron may recover from the defendants the value of the

BA2 #308936

Early Redemption Transfers of $870,108,723.68, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Enron's estate. Each defendant is jointly and severally liable for the entire amount of each Early Redemption Transfer with respect to which it is identified in paragraph 136 or 137 of the Second Amended Complaint.

### Count V

### Avoidance of Fraudulent Transfers Pursuant to Section 544(b) of the Bankruptcy Code and State Fraudulent Conveyance or Transfer Law

161. Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

162. Enron did not receive fair consideration, or a fair equivalent, or reasonably equivalent value in exchange for the transfers and/or conveyances made to defendants identified above in paragraphs 136 and 137. The value of the Enron commercial paper prepaid by Enron was disproportionately small as compared to the transfers made by Enron.

163. The transfers and/or conveyances reflected in paragraphs 136 and 137 were made when Enron was insolvent.

164. The transfers and/or conveyances reflected in paragraphs 136 and 137 were made when Enron was insolvent on the date that such transfers were made or such obligations were incurred, or became insolvent as a result of such transfers or obligations and when Enron was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining assets were unreasonably small in relation to that business or transaction. In addition, when the transfers were made, Enron intended to incur, or believed it would incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as those debts became due and/or matured.

-36-

165.    The Early Redemption Transfers are avoidable under applicable state fraudulent

conveyance and/or fraudulent transfer law.  Therefore, pursuant to section 544(b) of the Bankruptcy

Code and applicable state fraudulent conveyance or transfer law, the transfers and/or conveyances

identified in paragraphs 136 and 137 should be avoided such that Enron may recover from

defendants the full amount transferred of $870,108,723.68, plus interest from the transfer and/or

conveyance dates.

## Count VI

### Recovery of Fraudulent Transfers Pursuant to
### Section 550 of the Bankruptcy Code

166.    Enron repeats, realleges and incorporates by reference the allegations contained in

the preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

167.    The transfers and/or conveyances identified in paragraphs 136 and 137 are

avoidable as fraudulent transfers and/or fraudulent conveyances pursuant to section 544(b) of the

Bankruptcy Code and applicable state law and, accordingly, pursuant to section 550(a) of the

Bankruptcy Code, Enron may recover from the defendants the value of the Early Redemption

Transfers of $870,108,723.68, plus interest from the transfer dates, and costs and fees to the

extent available, for the benefit of Enron's estate.  Each defendant is jointly and severally liable

for the entire amount of each Early Redemption Transfer with respect to which it is identified in

paragraph 136 or 137 of the Second Amended Complaint.

## Count VII

### Disallowance of Claims Pursuant to
### Section 502(d) of the Bankruptcy Code

**(against all Defendants except Fremont General Corporation, Scott & White Memorial
Hospital and Scott, Sherwood and Brindley Foundation, Banca Serfin S.A., Longnorth
Ltd., The Belo Company, AXA Financial, Inc., MONY Life Insurance Company, MONY
Closed Block, Pooled Account #7, Pooled Account #38, Money Market Portfolio/Fund,**

-37-

**Intermediate Term Bond Portfolio, U.S. Financial Life Insurance Company, US Financial Life Insurance Co., MONY Capital Management, Inc., Enterprise Capital Management, Inc., Enterprise Money Market Portfolio, Kamilche Company, Collective Short Term Investment Fund of The Northern Trust Company, WinCo Foods, Inc., Merrill Lynch Investment Managers, L.P., Kelly Properties, Inc., GMP Companies, Inc., Marlon Insurance Company Ltd., and Capital Assurance Company, Inc.)**

168.    Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

169.    By reason of the foregoing facts and pursuant to section 502(d) of the Bankruptcy Code, the claims of each defendant should be disallowed unless and until the defendant has turned over to Enron the property transferred, or paid Enron the value of such transferred property, for which the defendant is liable pursuant to section 550 of the Bankruptcy Code.

**WHEREFORE**, Enron requests judgment on its Second Amended Complaint as follows:

A.  On Counts I, III and V, avoiding and setting aside the Early Redemption Transfers;

B.  On Counts II, IV, and VI, directing defendants, and any other initial transferee or entity for whose benefit such transfer was made, or as further provided in §550(a) of the Bankruptcy Code, any immediate or mediate transferee of the Early Redemption Transfers, to pay to the estate of Enron the amount of $870,108,723.68 plus interest from the dates of transfer; each defendant to be jointly and severally liable for the entire amount of such Early Redemption Transfer with respect to which it is identified in paragraph 136 or 137, plus interest from the date of transfer;

C.  On Count VII, disallowing all claims of each defendant unless and until the defendant has turned over to Enron the property transferred, or paid Enron the value of such transferred property, for which the defendant is liable pursuant to § 550 of the Bankruptcy Code;

D.  Awarding Enron its attorneys' fees, costs and other expenses incurred in this action; and

BA2 #308936

E.  Awarding Enron such other and further relief as the nature of this cause may require

and this Court deems appropriate.

DATED:  Baltimore, Maryland
          February 14, 2007

ENRON CORP., *et al.*,
Reorganized Debtors
By its Special Litigation Counsel,
VENABLE LLP
By:

  /s/ Michael Schatzow
Richard L. Wasserman (RW 8696)
Michael Schatzow (MS-3109)
Robert L. Wilkins (*pro hac vice*)
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland  21201
(410) 244-7400
(410) 244-7742 (fax)

DATED: New York, New York
          February 14, 2007

        -and-
By its Bankruptcy Co-Counsel,
TOGUT, SEGAL & SEGAL LLP
By:

  /s/ Frank A. Oswald
Albert Togut (AT-9759)
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)
One Penn Plaza, Suite 3335
New York, New York  10119
(212) 594-5000

BA2 #308936

EXHIBIT 5

.

.

TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Enron Corp., et al.
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald (FAO-1223)
Scott E. Ratner (SER-0015)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| ENRON CORP., et al., | : Case No. 01-16034 (AJG) |
| | : |
| Debtors. | : Jointly Administered |
| | : Adversary Proceeding |
| | : No. 03- 92682 (AJG) |

---------------------------------------------------------------x

| | |
|---|---|
| ENRON CORP., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| MASS MUTUAL LIFE INSURANCE CO.; | : |
| J.P. MORGAN SECURITIES INC.; | : |
| GOLDMAN, SACHS & CO.;  DAVID L. | : |
| BABSON & COMPANY, INC.;  MTB | : |
| INVESTMENT ADVISORS, INC. f/k/a | : |
| ALLIED INVESTMENT ADVISORS INC.; | : |
| BANK ONE OHIO TRUST COMPANY; | : |
| MASS MUTUAL PRIME FUND; CM LIFE | : |
| SURPLUS INV. ACCOUNT;  MASS MUTUAL | : |
| HOLDING CO. – SEG. 83;  MASS MUTUAL | : |
| CORE BOND FUND;  CIA INTERNAL | : |
| HEDGE FUND;  MASS MUTUAL | : |
| BALANCED FUND;  MASS MUTUAL LIFE | : |
| INS. CO. GIA POOLED SHORT TERM INV.; | : |
| MASS MUTUAL;  INVESTORS BANK & | : |
| TRUST;  THE NORTHERN TRUST | : |
| COMPANY;  AMERICAN SOCIETY OF | : |
| ANESTHESIOLOGISTS;  AMERICAN BAR | : |
| ENDOWMENT;  AMERICAN DENTAL | : |
| HYGIENISTS ASSOCIATES;  THE ROCK | : |
| FOUNDATION;  ARTHUR ROCK, TRUSTEE | : |
| OF THE ROCK 1994 CHARITABLE | : |
| REMAINDER UNITRUST DTD 12/21/94; | : |
| THE ARAGON GROUP INC.; JAY H. BAKER | : |

– PERSONAL ACCOUNT;  RIDGESTONE                     :
CORPORATION; MERRILL LYNCH                          :
THE CENTER FOR RADIATION THERAPY;    :
CHICAGO ZOOLOGICAL SOCIETY-                         :
GENERAL FUND;  RICHARD & HELEN                      :
DEVOS FOUNDATION;  JERRY L. AND                     :
MARCIA D. TUBERGEN FOUNDATION;                     :
GUILFORD GLAZER, TRUSTEE OF THE                    :
GUILFORD GLAZER TRUST OF 1984 DATED :
MAY 15, 1984;  SENGAR;  BULC LIMITED                :
PARTNERSHIP;  NORTHERN TRUST BANK   :
OF TEXAS, AGENT FOR THE ESTATE OF                  :
RUTH RAY HUNT - MT. VERNON SP.                      :
AGENCY ADV. ACCOUNT;  WILLIAM I.                     :
KOCH - CASH ACCOUNT;  MICHAEL P.                     :
KRASNY, TRUSTEE OF THE MICHAEL P.                   :
KRASNY REVOCABLE TRUST DATED JULY  :
1, 1993;  EDWARD T. MCGOWAN, MID                     :
OAKS INVESTMENTS LLC, FURMAN C.                     :
MOSELEY & SUSAN R. MOSELEY, COLIN                   :
MOSELEY, ELEANOR M. POLLNOW AND                     :
FRANCISCA M. JOHNSON, CO-                             :
TRUSTEES OF THE QUALIFIED PERSONAL   :
RESIDENCE TRUST FOR FURMAN C.                       :
MOSELEY U/A DECEMBER 30, 1992;  NEAL  :
FAMILY FOUNDATION;  NEAL FAMILY                     :
REVOCABLE FAMILY TRUST; DOUGLAS C. :
ROBERTS TRUST, DAVID K. ROBERTS                    :
TRUST DTD 9/27/89;  STEVEN S. ROBERTS  :
TRUST DTD 9/27/89;  JEFFREY K. ROBERTS :
TRUST DTD 9/27/89;  SEATTLE CENTER                 :
FOUNDATION FOR McCAW HALL                           :
CAMPAIGN-KREIELSHEIMER;  S. YORK                     :
AND T. TORINO, CO-TRUSTEES OF THE                  :
FRANCIS P. TORINO LIVING TRUST;                     :
WALTON ENTERPRISES II, LP;  MARK                     :
WHITE AND DANA WHITE SHEA,                           :
TRUSTEES OF THE MARK WHITE EXEMPT  :
TRUST; VERISIGN, INC.;  UNIVERSITY OF  :
FLORIDA FOUNDATION;  NUCLEAR                        :
ELECTRIC    INSURANCE LTD.;                           :
COLLECTIVE SHORT TERM INVESTMENT   :
FUND OF THE NORTHERN TRUST                          :
COMPANY; MERRILL LYNCH                               :
INVESTMENT MANAGERS, L.P.,                            :
FORMERLY KNOWN AS MERRILL LYNCH   :
ASSET MANAGEMENT; 7ME4-GM                            :
CASH MGMT MASTER TRUST;  GMAM                       :

2

INVESTMENT FUNDS TRUST, A                    :
SUCCESSOR TO GENERAL MOTORS                  :
EMPLOYEES GLOBAL GROUP PENSION               :
TRUST;  GENERAL MOTORS                        :
CORPORATION;  GENERAL MOTORS                  :
INVESTMENT MANAGEMENT                         :
CORPORATION;  THE GENERAL MOTORS             :
HOURLY-RATE EMPLOYEES PENSION                :
PLAN;  THE GENERAL MOTORS                     :
RETIREMENT PROGRAM FOR SALARIED              :
EMPLOYEES;  THE G.M. SPECIAL PENSION         :
PLAN;  PROMARK ENHANCED INCOME               :
FUND;  GENERAL MOTORS TRUST                   :
COMPANY;  STATE STREET BANK & TRUST          :
COMPANY;  NOMURA ASSET                        :
MANAGEMENT USA INC.;  NOMURA                  :
BOND SELECT TRUST L-BST;  GLOBAL             :
FUND MANAGEMENT S.A.;  NOMURA                :
BANK (LUXEMBOURG) S.A.;  THE BANK OF         :
NEW YORK COMPANY, INC.;  BLACKROCK           :
CAPITAL MANAGEMENT, INC.;                     :
DEUTSCHE BANK SECURITIES INC.,               :
FORMERLY KNOWN AS DEUTSCHE BANC              :
ALEX. BROWN INC.;  VERITAS SOFTWARE          :
INVESTMENT CORP.; WILMINGTON TRUST           :
COMPANY;  NEW CASTLE COUNTY;                 :
GENERAL MOTORS WELFARE BENEFIT               :
TRUST; ENHANCED LIBOR PLUS;                   :
THE ROCK 1994 CHARITABLE                      :
REMAINDER UNITRUST DATED                      :
12/21/94; THE GUILFORD GLAZER TRUST          :
OF 1984 DATED MAY 15, 1984; THE ESTATE       :
OF RUTH RAY HUNT; THE MICHAEL P.             :
KRASNY REVOCABLE TRUST DATED                 :
JULY 1, 1993; THE QUALIFIED PERSONAL         :
RESIDENCE TRUST FOR FURMAN C.                :
MOSELEY U/A DECEMBER 30, 1992;. THE          :
FRANCIS P. TORINO LIVING TRUST; THE          :
MARK WHITE EXEMPT TRUST;                      :
AELTUS INVESTMENT MANAGEMENT                  :
INC.;  AIAF EQUITY 31R-500;  ING VP          :
BALANCED PORTOFLIO, INC.;                     :
LEHMAN COMMERCIAL PAPER INC.;                :
and AETNA BOND VP (AIS),                      :
                                              :
                         Defendants.          :
                                              :
-------------------------------------------------------------x

3

## AMENDED COMPLAINT TO AVOID AND RECOVER
## PREFERENTIAL AND OTHER AVOIDABLE TRANSFERS

Plaintiff Enron Corp. ("Enron"), a debtor and debtor in possession and plaintiff in this adversary proceeding, by its undersigned counsel Togut, Segal & Segal LLP, for its complaint against the defendants identified below, alleges the following facts and claims:

### NATURE OF THE ACTION

1.      In the five weeks that immediately preceded its chapter 11 filing, Enron paid out more than one billion dollars to prepay and/or redeem certain commercial paper prior to its stated maturity. (The terms "prepayments" and "redemptions" are used herein interchangeably.) These extraordinary prepayments followed, among other things, Enron's announcement of a $1 billion charge against third quarter 2001 earnings, the announcement of an inquiry by the Securities and Exchange Commission into Enron's accounting practices, and announcements by rating agencies of the possible downgrading of Enron's debt ratings.

2.      Alarmed by these announcements, commercial paper holders urged Enron to prepay the commercial paper immediately, prior to maturity, at its "approximate accrued par value," i.e., the price originally paid for the Enron commercial paper plus accrued interest. Enron began making such payments during a 12-day period, commencing on October 26 and ending on November 6, 2001, to prepay certain previously issued commercial paper. Those prepayments, which totaled approximately $1.126 billion, were made irrespective of the paper's underlying stated maturity and the current market price.

3.      These early redemptions were directly contrary to the terms of the original issuing documents and depleted Enron's estate, unfairly preferring the holders

4

of commercial paper at the expense of other general unsecured creditors in derogation of the fundamental Bankruptcy Code principle of equality of distribution.

4.    Of the total amount transferred by Enron between October 26 and November 6, 2001, Enron seeks to avoid and recover $233,677,604.88 by this Complaint. For each of these transactions, Enron prepaid the commercial paper at accrued par value, not market value, which was significantly less.

5.    Enron has commenced this adversary proceeding to recover the early redemptions so that such funds may be shared equally and ratably by all similarly situated creditors of its estate.

## JURISDICTION AND VENUE

6.    On December 2, 2001 (the "Petition Date"), Enron filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"). Enron continues to operate its business and manage its property as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

7.    The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and (e). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The claims asserted are claims to determine, avoid and recover preferences and fraudulent transfers and/or conveyances. In addition, resolution of the claims asserted will have an effect upon Enron's reorganization, the value of its estate, and any distribution to its creditors.

8.    Pursuant to 28 U.S.C. §§ 157(a) and 157(b)(1) and the district court's reference of proceedings to the bankruptcy court, this Court may exercise subject matter jurisdiction. Venue in this district is proper in accordance with 28 U.S.C. § 1409(a).

9.    Enron brings this adversary proceeding pursuant to and under Rule 7001 of the Federal Rules of Bankruptcy Procedure and seeks relief under §§ 502(d) 544, 547, 548 and 550 of the Bankruptcy Code and applicable provisions of state law.

## THE PARTIES

10.    Plaintiff Enron is a corporation organized under the laws of Oregon with its principal place of business at 1400 Smith Street, Houston, Texas.

11.    The defendants identified in paragraphs 12 through 92 were all initial transferees of early redemptions of Enron commercial paper that were prepaid on or after October 29, 2001, prior to the stated maturity dates of such commercial paper, or were the entities for whose benefit such prepayments were made, or were immediate or mediate transferees of such prepayments.

12.    Defendant J.P. Morgan Securities Inc. ("JPMSI") is a wholly owned subsidiary of J.P. Morgan Chase & Co.  JPMSI's principal place of business is at 270 Park Avenue, New York, New York 10017.

13.    Defendant Goldman, Sachs & Co. ("Goldman") is a wholly owned subsidiary of the Goldman Sachs Group, Inc., with a principal place of business at 85 Broad Street, New York, New York 10004.

14.    Defendant Lehman Commercial Paper Inc. ("Lehman") is a wholly owned subsidiary of Lehman Brothers Holdings Inc.  Lehman's principal place of business is at Three World Financial Center, New York, New York 10285.

15.    Defendant David L. Babson & Company, Inc. ("DL Babson") is a corporation having its principal place of business at One Memorial Drive, Cambridge, MA 02142.

6

16.    Defendant Bank One Ohio Trust Company, N.A. is a national banking company having a principal place of business at 600 Superior Avenue, Mail Code OH2-5455, Cleveland, Ohio 44114.

17.    Defendant Mass Mutual Life Insurance Co. ("Mass Mutual Life Ins. Co.") is a corporation having its principal place of business at 1295 State Street, Springfield, MA 01111.

18.    Defendant Mass Mutual Prime Fund is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

19.    Defendant CM Life Surplus Inv. Account is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

20.    Defendant Mass Mutual Holding Co. – Seg. 83 is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

21.    Defendant Mass Mutual Core Bond Fund is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

22.    Defendant CIA Internal Hedge Fund is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

23.    Defendant Mass Mutual Balanced Fund is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

24.     Defendant Mass Mutual Life Ins. Co. GIA Pooled Short Term Inv. is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

25.     Defendant Mass Mutual c/o Investors Bank & Trust is an affiliate of Mass Mutual Life Ins. Co. and has its principal place of business at 1295 State Street, Springfield, MA 01111.

26.     Defendant Investors Bank & Trust is a wholly owned subsidiary of Investors Financial Services Corp. having its principal place of business at 200 Clarendon Street, Boston, MA 02116.

27.     Defendant MTB Investment Advisors, Inc., formerly known as Allied Investment Advisors, Inc., is a subsidiary of Manufacturers and Traders Trust Company.  Its principal place of business is at 100 E. Pratt Street, 17th Floor, Baltimore, Maryland 21202.

28.     Defendant The Northern Trust Company is a subsidiary of Northern Trust Corporation and has a place of business at 50 South LaSalle Street, Chicago, Illinois 60675.

29.     Defendant American Society of Anesthesiologists has a place of business at 520 N. Northwest Highway, Park Ridge, IL 60068.

30.     Defendant American Bar Endowment is a not-for-profit corporation with a place of business at 750 N. Lake Shore Drive, Chicago, IL 60611-3038.

31.     Defendant American Dental Hygienists Associates is a not-for-profit corporation with a place of business at 444 North Michigan Avenue, Suite 3400, Chicago, IL 60611-3980.

32.    Defendant The Rock Foundation has an address c/o Arthur Rock, Arthur Rock & Co., One Maritime Plaza, Suite 1220, San Francisco, CA 94111.

33.    Defendants Arthur Rock, Trustee of the Rock 1994 Charitable Remainder Unitrust Dated 12/21/94, and The Rock 1994 Charitable Remainder Unitrust Dated 12/21/94, have addresses c/o Arthur Rock, Arthur Rock & Co., One Maritime Plaza, Suite 1220, San Francisco, CA 94111.

34.    Defendant The Aragon Group Inc. has a place of business at 301 E. Dania Beach Blvd., Dania, FL 33004.

35.    Defendant Jay H. Baker – Personal Account has an address c/o Peter Sommerhauser, Godfrey & Kahn, S.C., 780 N. Water Street, Milwaukee, WI 53202.

36.    Defendant Ridgestone Corporation has an address at 10877 Wilshire Boulevard, Suite 2000, Los Angeles, CA 90024.

37.    Defendant The Center for Radiation Therapy has a place of business at 1251 Golf View Drive, Woodridge, IL 60517.

38.    Defendant Chicago Zoological Society – General Fund has an address at 3300 Golf Road, Brookfield, IL 60513-1060.

39.    Defendant Richard & Helen Devos Foundation has an address c/o Jerry L. Tubergen, RDV Corporation, 500 Grand Bank Building, 126 Ottawa Avenue NW, Grand Rapids, MI 49503.

40.    Defendant Jerry L. and Marcia D. Tuburgen Foundation has an address c/o Jerry L. Tubergen, RDV Corporation, 500 Grand Bank Building, 126 Ottawa Avenue NW, Grand Rapids, MI 49503.

9

41.    Defendants Guilford Glazer, Trustee of The Guilford Glazer Trust of 1984 Dated May 15, 1984, and The Guilford Glazer Trust of 1984 Dated May 15, 1984 have an address at 9440 Santa Monica Blvd., Suite 610, Beverly Hills, CA 90210-4619.

42.    Defendant Sengar has an address c/o Howard T. Rice, 451 St. Moritz Drive, Henderson, NV 89012.

43.    Defendant BULC Limited Partnership has an address c/o Howard T. Rice, 451 St. Moritz Drive, Henderson, NV 89012.

44.    Defendants Northern Trust Bank of Texas, Agent for the Estate of Ruth Ray Hunt , Mt. Vernon Sp. Agency Adv. Account, and the Estate of Ruth Ray Hunt have an address c/o Palette Investment Company, 1445 Ross Avenue, Suite 1500, Dallas, TX 75202-2751.

45.    Defendant Merrill Lynch is affiliated with Merrill Lynch Group, a Delaware corporation, with a principal place of business at 250 Vesey Street, New York, NY 10028.

46.    Defendant William I. Koch – Cash Account has an address c/o Zachary K. Shipley, Oxbow Corporation, 1601 Forum Place Suite P2, West Palm Beach, FL 33401.

47.    Defendants Michael P. Krasny, Trustee of the Michael P. Krasny Revocable Trust dated July 1, 1993, and The Michael P. Krasny Revocable Trust dated July 1, 1993 have an address at 812 Skokie Blvd., Northbrook, IL 60062.

48.    Defendant Edward T. McGowan has an address at 8220 South Nueport Drive, Willow Springs, IL 60480.

49.    Defendant Mid Oaks Investments LLC has an address c/o Wayne Kocourek, 750 Lake Cook Road, Suite 440, Buffalo Grove, IL 60089.

10

50.     Defendants Furman C. Moseley and Susan R. Moseley have an address c/o Kamilche Company, 1301 Fifth Avenue, Suite 2800, Seattle, WA 98101.

51.     Defendants Colin Moseley, Eleanor M. Pollnow and Francisca M. Johnson, Co-trustees of the Qualified Personal Residence Trust for Furman C. Moseley U/A December 30, 1992, and The Qualified Personal Residence Trust for Furman C. Moseley U/A December 30, 1992 have an address c/o Kamilche Company, 1301 Fifth Avenue, Suite 2800, Seattle, WA 98101.

52.     Defendant Neal Family Foundation has an address at 607 N. Old Litchfield Road, Litchfield Park, AZ 85340.

53.     Defendant Neal Family Revocable Family Trust has an address at 607 N. Old Litchfield Road, Litchfield Park, AZ 85340.

54.     Defendant Douglas C. Roberts Trust has an address c/o Douglas C. Roberts, Zea Mays Holdings, LLC, 308 W. State Street Suite 301, Sycamore, IL 60178.

55.     Defendant David K. Roberts Trust Dated 9/27/89 has an address c/o Douglas C. Roberts, Zea Mays Holdings, LLC, 308 W. State Street Suite 301, Sycamore, IL 60178.

56.     Defendant Steven S. Roberts Trust Dated 9/27/89 has an address c/o Douglas C. Roberts, Zea Mays Holdings, LLC, 308 W. State Street Suite 301, Sycamore, IL 60178.

57.     Defendant Jeffrey K. Roberts Trust Dated 9/27/89 has an address c/o Douglas C. Roberts, Zea Mays Holdings, LLC, 308 W. State Street Suite 301, Sycamore, IL 60178.

11

58.     Defendant Seattle Center Foundation for McCaw Hall Campaign – Kreielscheimer has an address c/o Tracy Robinson, Executive Director, Seattle Center Foundation, 305 Harrison Street, Seattle, WA 98109.

59.     Defendants S. York and T. Torino, co-trustees of the Francis P. Torino Living Trust, and The Francis P. Torino Living Trust, have addresses as follows: Tamara Torino, 6 Middleridge South, Rolling Hills, CA 90274; Sherri York, P.O. Box 1278, Hermosa Beach, CA 90254-1278; c/o U.S. Trust Company, N.A., Attn: Terri Gizzo, Account No. 75527109, Account Title: Francis P. Torino Residual Trust, 515 S. Flower St., Suite 2700, Los Angeles, CA 90071.

60.     Defendant Walton Enterprises II, LP has an address c/o Walton Enterprises, 125 West Central, Suite 218, Bentonville, AR 72712.

61.     Defendants Mark White and Dana White Shea, Trustees of the Mark White Exempt Trust, and The Mark White Exempt Trust, have an address c/o Mark K. White, 314 Pheasant Ln., Glenbrook, NV 89413.

62.     Defendant VeriSign, Inc. has an address at 487 E. Middlefield Road, Mountain View, CA 94043.

63.     Defendant University of Florida Foundation has an address at Emerson Alumni Hall, 1938 W. University Avenue, P.O. Box 14425, Gainesville, Florida 32604-2425.

64.     Defendant Nuclear Electric Insurance Ltd. has an address at 1201 Market Street, Wilmington, DE 19801.

65.     Defendant Collective Short Term Investment Fund of the Northern Trust Company has an address at 50 South LaSalle Street, Chicago, IL 60675.

12

66.     Defendant Merrill Lynch Investment Managers, L.P., f/k/a Merrill Lynch Asset Management has an address at Merrill Lynch Global Headquarters, 4 World Financial Center, 250 Vesey Street, New York, NY 10080.

67.     Defendant 7ME4-GM Cash Mgm't Master Trust has an address at The General Motors Building, 767 Fifth Avenue, New York, NY 10153.

68.     Defendant GMAM Investment Funds Trust, A Successor to General Motors Employees Global Group Pension Trust, has an address at The General Motors Building, 767 Fifth Avenue, New York, NY 10153.

69.     Defendant General Motors Corporation has a place of business at The General Motors Building, 767 Fifth Avenue, New York, NY 10153.

70.     Defendant General Motors Investment Management Corporation has an address at The General Motors Building, 767 Fifth Avenue, New York, NY 10153.

71.     Defendant The General Motors Hourly-Rate Employees Pension Plan has an address at The General Motors Building, 767 Fifth Avenue, New York, NY. 10153.

72.     Defendant The General Motors Retirement Program for Salaried Employees has an address at The General Motors Building, 767 Fifth Avenue, New York, NY 10153.

73.     Defendant The G.M. Special Pension Plan has an address at The General Motors Building, 767 Fifth Avenue, New York, NY 10153.

74.     Defendant Promark Enhanced Income Fund has an address at The General Motors Building, 767 Fifth Avenue, New York, NY 10153.

13

75.    Defendant General Motors Trust Company has an address at The General Motors Building, 767 Fifth Avenue, New York, NY 10153.

76.    Defendant State Street Bank & Trust Company has an address at One Enterprise Drive, North Quincy, MA 02171.

77.    Defendant Nomura Asset Management USA Inc. has an address at 180 Maiden Lane, 26th Floor, New York, NY 10038.

78.    Defendant Nomura Bond Select Trust L-BST has an address at 6 Avenue Emile Reuter, L-2420, Luxembourg.

79.    Defendant Global Fund Management S.A. has an address at 6 Avenue Emile Reuter, L-2420, Luxembourg.

80.    Defendant Nomura Bank (Luxembourg) S.A. has an address at 6 Avenue Emile Reuter, L-2420, Luxembourg.

81.    Defendant The Bank of New York Company, Inc. has a place of business at 1 Wall Street, New York, NY 10286.

82.    Defendant BlackRock Capital Management, Inc. has an address at 100 Bellevue Parkway, Wilmington, DE 19809.

83.    Defendant Deutsche Bank Securities Inc. f/k/a Deutsche Banc Alex Brown Inc. has a New York Office at 60 Wall Street, New York, NY 10005-2858.

84.    Defendant Veritas Software Investment Corp. has an agent at 350 Ellis Street, Mountainview, CA 94043.

85.    Defendant Wilmington Trust Company has places of business at 1100 North Market Street, Wilmington, DE 19890 and 520 Madison Avenue, 33rd Floor, New York, NY 10022.

14

86.    Defendant New Castle County has an address c/o Thomas P. Gordon, County Executive, Department of Administration, New Castle County Government Center, 87 Reads Way, New Castle, DE 19720.

87.    Defendant General Motors Welfare Benefit Trust has a place of business at The General Motors Building, 767 Fifth Avenue, New York, NY 10153.

88.    Defendant Enhanced Libor Plus has a place of business at The General Motors Building, 767 Fifth Avenue, New York, NY 10153.

89.    Defendant Aeltus Investment Management Inc. has a place of business at 10 State House Square, Hartford, CT 06103-3607.

90.    Defendant AIAF Equity 31R-500 has an address at 1 Court Street, Suite 996, Boston, MA 02108.

91.    Defendant ING VP Balanced Portfolio, Inc. has an address at 151 Farmington Avenue, Hartford, CT 06156.

92.    Defendant Aetna Bond VP (AIS) has an address at 8 Campus Drive, Parsippany, NJ 07054.

## FACTUAL ALLEGATIONS

93.    Prior to the Petition Date, Enron issued and sold unsecured commercial paper to various entities. This commercial paper was uncertificated and had maturities of up to 270 days.

94.    Pursuant to Issuing and Paying Agency Agreements between Enron and JP Morgan Chase Bank and its predecessors in interest (collectively the "Chase Paying Agent"), the Chase Paying Agent served as issuing and paying agent in connection with Enron's commercial paper.

15

95.     The purchase and sale of Enron's commercial paper, including each commercial paper note identified in this Complaint, was made pursuant to terms set forth in an Offering Memorandum dated September 14, 2001. The Offering Memorandum states that, "[t]he Notes are not redeemable or subject to voluntary prepayment by the Company prior to maturity."

96.     The terms of the Enron commercial paper notes identified in this Complaint contained no provisions allowing prepayment or early redemption of those commercial paper notes.

97.     In a series of transactions starting on October 26 and concluding on November 6, 2001, Enron, at the urging of defendants, transferred over one billion dollars for the purpose of prepaying commercial paper notes that had been sold to JPMSI, Goldman, Lehman and other entities when issued. Of the total amount transferred by Enron to prepay Enron commercial paper, Enron seeks to avoid and recover $233,677,604.88 by this Complaint. The transfers Enron seeks to avoid and recover from the defendants, hereinafter referred to as the "Early Redemption Transfers," are as follows:

(a)     $49,972,000.00 on October 26, 2001 to JPSMI, Lehman and The Northern Trust Company;

(b)     $1,939,655.11 on October 29, 2001 to Goldman, Mass Mutual Prime Fund and DL Babson;

(c)     $7,798,700.00 on October 29, 2001 to Goldman, Mass Mutual Prime Fund and DL Babson;

(d)     $2,699,145.00 on October 29, 2001 to Goldman and CM Life Surplus Inv. Account c/o Mass Mutual Life Ins. Co.;

(e)     $999,683.33 on October 29, 2001 to Goldman, Mass Mutual Holding Co. – Seg. 83 and DL Babson;

16

(f)   $3,216,283.54 on October 29, 2001 to Goldman, Mass Mutual Core Bond Fund and DL Babson;

(g)   $2,914,076.92 on October 29, 2001 to Goldman, CIA Internal Hedge Fund and DL Babson;

(h)   $3,148,254.38 on October 29, 2001 to Goldman, CIA Internal Hedge Fund and DL Babson;

(i)   $5,508,163.33 on October 29, 2001 to Goldman, Mass Mutual Balanced Fund and DL Babson;

(j)   $24,994,062.50 on October 29, 2001 to Goldman, Merrill Lynch Investment Managers, L.P., formerly known as Merrill Lynch Asset Management and 7ME4-GM Cash Management Master Trust;

(k)   $7,960,000.00 on October 29, 2001 to Goldman, Nomura Asset Management USA Inc. and Nomura Bond Select Trust L-BST;

(l)   $34,825,437.50 on October 29, 2001 to JPMSI and Mass Mutual Life Ins. Co. GIA Pooled Short Term Inv.;

(m)   $3,930,299.38 on October 29, 2001 to JPMSI and Mass Mutual c/o Investors Bank & Trust;

(n)   $23,181,756.40 on October 29, 2001 to JPMSI, Aeltus Investment Management Inc., AIAF Equity 31R-500 and ING VP Balanced Portfolio, Inc.;

(o)   $24,963,125.00 on October 29, 2001 to JPMSI, Aeltus Investment Management, Inc., Aetna Bond VP (AIS) and ING VP Balanced Portfolio, Inc.;

(p)   $12,923,083.33 on October 30, 2001 to JPMSI and MTB Investment Advisors, Inc. f/k/a Allied Investment Advisors, Inc.;

(q)   $999,483.33 on October 30, 2001 to JPMSI and MTB Investment Advisors, Inc. f/k/a Allied Investment Advisors, Inc.;

(r)   $3,737,258.33 on October 30, 2001 to Goldman and Bank One Ohio Trust Company;

17

(s)     $12,978,387.50 on October 30, 2001 to Goldman and Deutsche Bank Securities Inc., formerly known as Deutsche Banc Alex. Brown Inc.; and

(t)     $4,988,750.00 on October 30, 2001 to JPMSI, Lehman and Wilmington Trust Company.

98.     Each of the transfers comprising the aggregate $233,677,604.88 that Enron seeks to avoid and recover in this Complaint was made by Enron to prepay individual Enron commercial paper notes prior to the maturity date of those commercial paper notes and in violation of the terms of the sale of those commercial paper notes.  The initial transferees of each Early Redemption Transfer, or the entities for whose benefit such transfers were made, or the immediate or mediate transferees, are as follows:

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| (a) | 10/26/2001 | $49,972,000.00 | JPMSI; Lehman;  The Northern Trust Company;  American Society of Anesthesiologists;  American Bar Endowment;  American Dental Hygienists Associates;  The Rock Foundation;  Arthur Rock, Trustee of the Rock 1994 Charitable Remainder Unitrust dtd 12/21/94;  The Aragon Group Inc.;  Jay H. Baker – Personal Account;  Ridgestone Corporation; The Center for Radiation Therapy;  Chicago Zoological Society-General Fund;  Richard & Helen Devos Foundation;  Jerry L. and Marcia D. Tubergen Foundation;  Guilford Glazer,  Trustee of The Guilford Glazer Trust of 1984 Dated May 15, 1984; |

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| | | | Sengar; BULC Limited Partnership; Northern Trust Bank of Texas, Agent for the Estate of Ruth Ray Hunt – Mt. Vernon Sp. Agency Adv. Account; William I. Koch - Cash Account; Michael P. Krasny, Trustee of the Michael P. Krasny Revocable Trust Dated July 1, 1993; Edward T. McGowan; Mid Oaks Investments LLC; Furman C. Moseley & Susan R. Moseley, Colin Moseley, Eleanor M. Pollnow, and Francisca M. Johnson, Co-trustees of the Qualified Personal Residence Trust for Furman C. Moseley u/a December 30, 1992; Neal Family Foundation; Neal Family Revocable Family Trust; Douglas C. Roberts Trust; David K. Roberts Trust dtd 9/27/89; Steven S. Roberts Trust dtd 9/27/89; Jeffrey K. Roberts Trust dtd 9/27/89; Seattle Center Foundation for McCaw Hall Campaign- Kreielsheimer, S. York and T. Torino, co-trustees of the Francis P. Torino Living Trust; Walton Enterprises II, LP; Mark White and Dana White Shea, Trustees of the Mark White Exempt Trust; VeriSign, Inc.; University of Florida Foundation; Nuclear Electric Insurance Ltd.; Collective Short Term Investment Fund of The Northern Trust Company; The Rock 1994 Charitable Remainder Unitrust Dated 12/21/94; The |

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| | | | Guilford Glazer Trust of 1984 Dated May 15, 1984; the Estate of Ruth Ray Hunt; The Michael P. Krasny Revocable Trust dated July 1, 1993; The Qualified Personal Residence Trust for Furman C. Moseley U/A December 30, 1992; The Francis P. Torino Living Trust; and The Mark White Exempt Trust |
| (b) | 10/29/2001 | $1,939,655.11 | Goldman, Mass Mutual Prime Fund and DL Babson |
| (c) | 10/29/2001 | $7,798,700.00 | Goldman, Mass Mutual Prime Fund and DL Babson |
| (d) | 10/29/2001 | $2,699,145.00 | Goldman, CM Life Surplus Inv. Account and Mass Mutual Life Ins. Co. |
| (e) | 10/29/2001 | $999,683.33 | Goldman, Mass Mutual Holding Co. – Seg. 83, Mass Mutual Life Ins. Co. and DL Babson |
| (f) | 10/29/2001 | $3,216,283.54 | Goldman, Mass Mutual Core Bond Fund and DL Babson |
| (g) | 10/29/2001 | $2,914,076.92 | Goldman, CIA Internal Hedge Fund, Mass Mutual Life Ins. Co. and DL Babson |
| (h) | 10/29/2001 | $3,148,254.38 | Goldman, CIA Internal Hedge Fund, Mass Mutual Life Ins. Co. and DL Babson |
| (i) | 10/29/2001 | $5,508,163.33 | Goldman, Mass Mutual Balanced Fund and DL Babson |
| (j) | 10/29/2001 | $24,994,062.50 | Goldman; Merrill Lynch Investment Managers, L.P., formerly known as Merrill Lynch Asset Management; 7ME4-GM Cash Management Master Trust; GMAM Investment Funds Trust, a successor to General Motors Employees Global Group Pension Trust; General |

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| | | | Motors Corporation; General Motors Investment Management Corporation; The General Motors Hourly-Rate Employees Pension Plan; The General Motors Retirement Program for Salaried Employees; The G.M. Special Pension Plan; Promark Enhanced Income Fund, General Motors Trust Company and State Street Bank & Trust Company |
| (k) | 10/29/2001 | $7,960,000.00 | Goldman; Nomura Asset Management USA Inc.; Nomura Bond Select Trust L-BST; Global Fund Management S.A.; Nomura Bank (Luxembourg) S.A.; The Bank of New York Company, Inc. and BlackRock Capital Management, Inc. |
| (l) | 10/29/2001 | $34,825,437.50 | JPMSI and Mass Mutual Life Ins. Co. GIA Pooled Short Term Inv. |
| (m) | 10/29/2001 | $3,930,299.38 | JPMSI, Mass Mutual and Investors Bank & Trust |
| (n) | 10/29/2001 | $23,181,756.40 | JPMSI; Aeltus Investment Management, Inc.; AIAF Equity 31R-500 and ING VP Balanced Portfolio, Inc. |
| (o) | 10/29/2001 | $24,963,125.00 | JPMSI; Aeltus Investment Management, Inc.; Aetna Bond VP (AIS) and ING VP Balanced Portfolio, Inc. |
| (p) | 10/30/2001 | $12,923,083.33 | JPMSI and MTB Investment Advisors, Inc. f/k/a Allied Investment Advisors, Inc. |
| (q) | 10/30/2001 | $999,483.33 | JPMSI and MTB Investment Advisors, Inc. f/k/a Allied Investment Advisors, Inc. |

| SUB PARAGRAPH NUMBER | DATE | AMOUNT ($) | NAME OF DEFENDANT(S) |
|---|---|---|---|
| (r) | 10/30/2001 | $3,737,258.33 | Goldman and Bank One Ohio Trust Company |
| (s) | 10/30/2001 | $12,978,387.50 | Goldman, Deutsche Bank Securities Inc., formerly known as Deutsche Banc Alex. Brown Inc. and Veritas Software Investment Corp. |
| (t) | 10/30/2001 | $4,988,750.00 | JPMSI; Lehman; Wilmington Trust Company; New Castle County; Merrill Lynch; Merrill Lynch Investment Managers, L.P., formerly known as Merrill Lynch Asset Management; General Motors Welfare Benefit Trust; General Motors Corporation; General Motors Investment Management Corporation; Enhanced Libor Plus and State Street Bank & Trust Company |

99.    Upon information and belief, JPMSI, Goldman, Lehman and/or others informed some or all of the other defendants that the Early Redemption Transfers might be subject to avoidance as preferential transfers prior to the receipt of such Early Redemption Transfers. Therefore, some or all of the defendants knew from JPMSI, Goldman, Lehman and/or others that the transfers might be subject to avoidance.

100.    The prepayment of the Enron commercial paper violated the terms of its sale, which expressly prohibited any early redemption/prepayment of Enron commercial paper.

22

101.    Enron prepaid the commercial paper at accrued par value, which was significantly more than the market value for such commercial paper.

<u>Count I</u>

**Avoidance of the Early Redemption Transfers
Pursuant to Section 547(b) of the Bankruptcy Code**

102.    Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

103.    The Early Redemption Transfers constitute transfers of interests of Enron in property.

104.    The Early Redemption Transfers were made to or for the benefit of the defendants, each of which was a creditor of Enron.

105.    The Early Redemption Transfers were made for or on account of antecedent debts owed by Enron before such payments were made.

106.    The Early Redemption Transfers were made within 90 days before the Petition Date.

107.    Enron was insolvent when the Early Redemption Transfers were made.

108.    The Early Redemption Transfers enabled each of the defendants to receive more than the defendant otherwise would have received if this case were a case under chapter 7 of the Bankruptcy Code, the Early Redemption Transfers had not been made, and the defendant had received payment of its antecedent debts to the extent provided by the Bankruptcy Code.

109.    Accordingly, pursuant to section 547(b) of the Bankruptcy Code, the Early Redemption Transfers should be avoided so that Enron may recover from the

23

defendants the full amount transferred of $233,677,604.88, plus interest from the
transfer dates.

## Count II

### Recovery of Avoided Preferential Transfers
### Pursuant to Section 550 of the Bankruptcy Code

110.   Enron repeats, realleges and incorporates by reference the
allegations contained in the preceding paragraphs of this Complaint as if fully set forth
herein.

111.   The Early Redemption Transfers are avoidable as preferences
pursuant to section 547(b) of the Bankruptcy Code and, accordingly, pursuant to section
550(a) of the Bankruptcy Code, Enron is entitled to recover from the defendants the
value of the Early Redemption Transfers of $233,677,604.88, plus interest from the
transfer dates, and costs and fees to the extent available, for the benefit of Enron's
estate. Each defendant is jointly and severally liable for the entire amount of each Early
Redemption Transfer with respect to which it is identified in paragraphs 97 or 98 of the
Complaint.

## Count III

### Avoidance of Fraudulent Transfers
### Pursuant to Section 548(a) of the Bankruptcy Code

112.   Enron repeats, realleges and incorporates by reference the
allegations contained in the preceding paragraphs of this Complaint as if fully set forth
herein.

113.   Within one year of the Petition Date, Enron made a series of
transfers to the defendants, which are set forth in paragraphs 97 and 98, with respect to
Enron commercial paper.

114.    The Early Redemption Transfers constitute transfers of interests of Enron in property.

115.    Each of the Early Redemption Transfers was made prior to the maturity date of the commercial paper. Even though the market value of the Enron commercial paper had plummeted precipitously after it was issued, Enron prepaid the Enron commercial paper at accrued par value, not at its market value, which was significantly less.

116.    If Enron had prepaid the Enron commercial paper at market value (not accrued par value), the total price Enron would have paid to defendants would have been a small fraction of the amount Enron actually paid to defendants.

117.    Thus, within one year of the Petition Date, Enron made transfers to defendants totaling $233,677,604.88 to prepay Enron commercial paper at a price far in excess of its fair market value.

118.    Enron received less than a reasonably equivalent value in exchange for the sums transferred to the defendants and, on the dates the transfers identified in paragraphs 97 and 98 were made or the obligations were incurred, Enron (i) was insolvent, or became insolvent as a result of such transfers or obligations, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was an unreasonably small capital; or (iii) intended to incur, or believed it would incur, debts that would be beyond its ability to pay as they matured.

119.    Therefore, pursuant to section 548(a) of the Bankruptcy Code, the Early Redemption Transfers identified in paragraphs 97 and 98 should be avoided as

25

fraudulent transfers such that Enron may recover from the defendants the full amount transferred of $233,677,604.88, plus interest from the transfer dates.

<u>Count IV</u>

Recovery of Fraudulent Transfers Pursuant<br>to Section 550 of the Bankruptcy Code

120.    Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

121.    The transfers identified in paragraphs 97 and 98 are avoidable as fraudulent transfers pursuant to section 548(a) of the Bankruptcy Code, and, accordingly, pursuant to section 550(a) of the Bankruptcy Code, Enron is entitled to recover from the defendants the value of the Early Redemption Transfers of $233,677,604.88, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Enron's estate.  Each defendant is jointly and severally liable for the entire amount of each Early Redemption Transfer with respect to which it is identified in paragraph 97 or 98 of the Complaint.

<u>Count V</u>

Avoidance of Fraudulent Transfers Pursuant<br>to Section 544(b) of the Bankruptcy Code and<br>State Fraudulent Conveyance or Transfer Law

122.    Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

123.    Enron did not receive fair consideration, or a fair equivalent, or reasonably equivalent value in exchange for the transfers and/or conveyances made to defendants identified above in paragraphs 97 and 98.  The value of the Enron

26

commercial paper prepaid by Enron was disproportionately small as compared to the transfers made by Enron.

124.    The transfers and/or conveyances identified in paragraphs 97 and 98 were made when Enron was insolvent.

125.    On the dates the transfers and/or conveyances identified in paragraphs 97 and 98 were made or the obligations were incurred, Enron (a) was insolvent, or became insolvent as a result of such transfers or obligations, (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining assets were unreasonably small capital in relation to that business or transaction, or (c) intended to incur, or believed it would incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as those debts became due and/or matured.

126.    The Early Redemption Transfers are avoidable under applicable state fraudulent conveyance and/or fraudulent transfer law.  Therefore, pursuant to section 544(b) of the Bankruptcy Code and applicable state fraudulent conveyance or transfer law, the transfers and/or conveyances identified in paragraphs 97 and 98 should be avoided such that Enron may recover from defendants the full amount transferred of $233,677,604.88, plus interest from the transfer and/or conveyance dates.

**Count VI**

**Recovery of Fraudulent Transfers Pursuant
to Section 550 of the Bankruptcy Code**

127.    Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

27

128.    The transfers and/or conveyances identified in paragraphs 97 and 98 are avoidable as fraudulent transfers and/or fraudulent conveyances pursuant to section 544(b) of the Bankruptcy Code and applicable state law and, accordingly, pursuant to section 550(a) of the Bankruptcy Code, Enron is entitled to recover from the defendants the value of the Early Redemption Transfers of $233,677,604.88, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Enron's estate.  Each defendant is jointly and severally liable for the entire amount of each Early Redemption Transfer with respect to which it is identified in paragraph 97 or 98 of the Complaint.

### Count VII

**Disallowance of Claims Pursuant to
Section 502(d) of the Bankruptcy Code**

129.    Enron repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

130.    By reason of the foregoing facts and pursuant to section 502(d) of the Bankruptcy Code, the claims of each defendant should be disallowed unless and until the defendant has turned over to Enron the property transferred, or paid Enron the value of such transferred property, for which the defendant is liable pursuant to section 550 of the Bankruptcy Code.

WHEREFORE, Enron requests judgment on its Complaint as follows:

A.    On Counts I, III and V, avoiding and setting aside the Early Redemption Transfers;

B.    On Counts II, IV, and VI, directing defendants, and any other initial transferee or entity for whose benefit such transfer was made, or as further provided in

§550(a) of the Bankruptcy Code, any immediate or mediate transferee of the Early

Redemption Transfers, to pay to the estate of Enron the amount of $233,677,604.88 plus

interest from the dates of transfer; each defendant to be jointly and severally liable for

the entire amount of such Early Redemption Transfer with respect to which it is

identified in paragraph 97 or 98, plus interest from the date of transfer;

        C.     On Count VII, disallowing all claims of each defendant unless and

until the defendant has turned over to Enron the property transferred, or paid Enron the

value of such transferred property, for which the defendant is liable pursuant to § 550 of

the Bankruptcy Code;

        D.     Awarding Enron its attorneys' fees, costs and other expenses

incurred in this action; and

        E.     Awarding Enron such other and further relief as the nature of this

cause may require and this Court deems appropriate.

DATED:  New York, New York
          December 1, 2003

                              ENRON CORP., et al.,
                              Debtors and Debtors in Possession
                              By its Co-Bankruptcy Counsel,
                              TOGUT, SEGAL & SEGAL LLP,
                              By:

                              /s/Frank A. Oswald
                              FRANK A. OSWALD (FAO-1223)
                              SCOTT E. RATNER (SER-0015)
                              Members of the Firm
                              One Penn Plaza, Suite 3335
                              New York, New York  10119
                              (212) 594-5000

# EXHIBIT 6

Max Gitter (MG-1312)
Lindsee P. Granfield (LG-3984)
CLEARY, GOTTLIEB, STEEN & HAMILTON
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

Attorneys for Defendant Goldman, Sachs & Co.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------ X | | |
| In re: | : | |
| ENRON CORP., et al., | : | Chapter 11 |
| Debtors. | : | Case No. 01-16034 (AJG) |
| | : | (Jointly Administered) |
| ------------------------------------------------------ X | : | |
| ENRON CORP., | : | |
| Plaintiff, | : | |
| v. | : | |
| J.P. MORGAN SECURITIES, INC., et al., | : | Adv. No. 03-92677 (AJG) |
| Defendants. | : | |
| ------------------------------------------------------ X | : | |
| ENRON CORP., | : | |
| Plaintiff, | : | |
| v. | : | |
| MASS MUTUAL LIFE INSURANCE CO., et al., | : | Adv. No. 03-92682 (AJG) |
| Defendants. | : | |
| ------------------------------------------------------ X | | |

**REPLY MEMORANDUM OF GOLDMAN, SACHS & CO. IN SUPPORT OF ITS**
**MOTION TO DISMISS THE AMENDED COMPLAINTS**

Page Intentionally Left Blank

Excerpt to Follow

Both arguments are without merit.

As a threshold matter — and despite the many pages that Enron devotes to its claim that the definitions raise factual issues — what constitutes a "security" or a "settlement payment" are strictly questions of law to be determined by the Court. See, e.g., Stoiber v. SEC, 161 F.3d 745, 749 (D.C. Cir. 1998) ("Whether a note is a security is a question of law ...."); Jonas v. Resolution Trust Corp. (In re Comark), 971 F.2d 322, 324-25 (9th Cir. 1992) ("Comark II") (rejecting debtor's argument that expert testimony was needed to determine the meaning of the term "settlement payment"); Biggs v. Smith Barney, Inc. (In re David), 193 B.R. 935, 940 (Bankr. C.D. Cal. 1996) ("[W]hether terms defined in a statute are broad or not obviously are questions of law."). See also Kaiser II, 952 F.2d at 1237 (10th Cir. 1991); Bevill, 878 F.2d at 745 (same).

A.    **Commercial Paper Is a "Security" Within the Protection of Section 546(e)**

1.    **The Bankruptcy Code's Definition of "Security" Is Controlling**

Arguing that commercial paper is not a "security" coming within the safe harbor of section 546(e), Enron urges the Court to ignore the unambiguous definition of "security" in section 101(49) of the Bankruptcy Code itself — in favor of the special definition of "security" contained in the Securities Exchange Act of 1934 (which, in a proviso, exempts short-term notes), or, alternatively "whether the commercial paper would be commonly viewed as a security by the securities trade." Ven. Mem. at 69; Togut Mem. at 64.

Enron's contentions, born of desperation, are wrong.

First, the plain language of the Bankruptcy Code definition of security so clearly includes commercial paper that Enron never once, in 190 pages of briefs, contends otherwise. Section 101(49)(A) defines "security" to include a "note." 11 U.S.C. § 101(49). Commercial

21

paper indisputably is a "note," as the complaints concede. See Compl. I, ¶ 136 (referring to

commercial paper as "Enron commercial paper notes"); Compl. II, ¶ 96 (same); Initial Mem. at

13; Enron Corp. Commercial Paper Offering Mem., dated as of Sept. 14, 2001 (Declaration of

Martin Krolewski, Ex. A) (describing Enron as the issuer of commercial paper "notes" offered

under registration exemption under the Securities Act of 1933). And commercial paper is not

one of the enumerated types of notes specifically exempted from the definition in section

101(49)(B).

        Second, the definitional section in the Bankruptcy Code begins by declaring that

all the definitions apply "[i]n this title." 11 U.S.C. § 101. Accordingly, "[t]he definitional

sections, absent a clear indication to the contrary, are applicable to all provisions of the

Bankruptcy Code." Allstate Fabricators Corp. v. Flagstaff Foodservice Corp. (In re Flagstaff

Foodservice Corp.), 56 B.R. 899, 905 (Bankr. S.D.N.Y. 1986) (emphasis added). See also

Southeastern Bank v. Brown, 266 B.R. 900, 905 (S.D. Ga. 2001) (same); In re Brashers, 216

B.R. 59, 60 (Bankr. N.D. Okla. 1998) (same).

        Congress never gave any, let alone a clear, indication to the contrary, and so the

definition of "security" in section 101(49) controls with respect to section 546(e) (and section

741(8) (defining "settlement payment" as incorporated into section 546(e)). There is no

suggestion anywhere that Congress intended any method for construing sections 546(e) or 741(8)

other than by reference to the Bankruptcy Code's definitions. Neither section of the Bankruptcy

Code mentions, for example, the Securities Exchange Act of 1934. Such textual silence stands in

stark contrast to other provisions of the Bankruptcy Code in which Congress, when it so desired,

expressly directed the application of other definitions other statutes. See, e.g., 11 U.S.C.

§ 523(a)(13) (addressing "restitution issued under title 18, United States Code"); 11 U.S.C.

§§ 761(5), (7), (8) ("commodity option," "contract market," "contract of sale" and other definitions cross-referenced with Commodity Exchange Act definitions); 11 U.S.C. § 101(41)(C) (referencing Internal Revenue Code definition of "employee pension benefit plan that is a governmental plan" and "eligible deferred compensation plan); 11 U.S.C. § 346(g)(1)(C) (referencing Internal Revenue Code use of "gain or loss"). Absent such language in sections 546(e), 741(8) or 548(d)(2)(B), no such cross-identity of "security" may be presumed. See United States v. Reorganized CF & I Fabricators, Inc., 518 U.S. 213, 219-224 (1996) (refusing to apply Internal Revenue Code "tax" definition with respect to 11 U.S.C. § 507(a)(7)(e) where no statutory indication of different interpretive method); Lawrence Pharm., Inc. v. Best Buy Drugs, Inc. (In re Best Buy Drugs, Inc.), 89 B.R. 997, 998 (Bankr. S.D. Fla. 1988) (refusing to apply Uniform Commercial Code definition of "insolvency" in lieu of Bankruptcy Code definition); Flagstaff Foodservice Corp., 56 B.R. at 905 (same).[14]

Thus, commercial paper is clearly a security under section 101(49); Enron's only recourse therefore is to avoid the Bankruptcy Code altogether. But "when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms." Lamie v. U.S. Trustee, __ U.S. __, 124 S. Ct. 1023, 1030 (2004). See also Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (citation omitted).

---

[14]    Citing no authority, Enron argues that a contrary presumption should apply; because "Congress did not link the [section 546(e) safe harbor] defense to the definition in § 101 of the Bankruptcy Code." Congress intended for courts to ignore the Bankruptcy Code definition of security in favor of some fact-intensive "securities trade understanding, per the 1934 and 1933 Acts." Ven. Mem. at 76 (emphasis added); Togut Mem. at 70 (emphasis added). There is not the slightest basis for adopting Enron's proposed presumption.

Accordingly, no further inquiry into whether commercial paper is a "security" under section 101(49) and, hence, within the safe harbor of section 546(e), is necessary or appropriate.

### 2. Commercial Paper Is a Security Even Under the Federal Securities Laws

Although the Court need never reach this point, the fact is that the inclusion of commercial paper in the Bankruptcy Code's definition of "security" is <u>consistent</u> with federal securities laws. As the Supreme Court recognized, Congress understood that the term "note" in the federal securities laws includes commercial paper, and thus it crafted <u>express</u> exceptions where it intended for commercial paper to be exempt from the requirements of those laws (such as the definition under the 1934 Act or the registration requirement under the 1933 Act):

> There is ... considerable evidence to indicate that the <u>ordinary meaning of the terms "security" and "note" as used by the 1933 Congress encompasses commercial paper.</u> Congress enacted the Glass-Steagall Act as one of several pieces of legislation collectively designed to restore public confidence in financial markets. <u>See</u> the Banking Act of 1933, ch. 89, 48 Stat. 162 (codified as amended in scattered sections of 12 U.S.C.); the <u>Securities Act of 1933</u>, 48 Stat. 74, 15 U.S.C. § 77a et seq.; the <u>Securities Exchange Act of 1934</u>, 48 Stat. 881, 15 U.S.C. § 78a et seq.; and the Public Utility Holding Company Act of 1935, 49 Stat. 803, 15 U.S.C. § 79a et seq. <u>In each of these other statutes, the definition of the term "security" includes commercial paper</u>, and each statute contains explicit exceptions where Congress meant for the provisions of an Act not to apply to commercial paper. <u>These explicit exceptions demonstrate congressional cognizance of commercial paper and Congress' understanding that, unless modified, the use of the term "security" encompasses it.</u>

<u>Sec. Indus. Ass'n v. Bd. of Governors of the Fed. Res. Sys.</u>, 468 U.S. 137, 150-51 (1984) (emphasis added). <u>See also</u> <u>Gen. Elec. Co. v. S. Constr. Co.</u>, 383 F.2d 135, 139 n.4 (5th Cir. 1967) ("'Where a statute with respect to one subject contains a given provision, the omission of such provisions from a similar statute is significant to show a different intention existed.'") (citations omitted); <u>Richerson v. Jones</u>, 551 F.2d 918, 928 (3d Cir. 1977) (same).

24

EXHIBIT 7

| | |
|---|---|
| **From:** | Huffman, Robyn [robyn.huffman@gs.com] |
| **Sent:** | Monday, October 29, 2001 8:15 AM |
| **To:** | Ephross, Joel |
| **Subject:** | cp agency letter |



10292001_091229_
ETFXNODE8_2.ti...

          Joel -

Attached is the version fully exectued by Goldman Sachs.


Robyn A. Huffman
Vice President and Associate General Counsel
Goldman, Sachs & Co.
One New York Plaza
37th Floor
New York, New York 10004

Phone:  (212) 902-9957
Fax:  (212) 428 1134


email:  robyn.huffman@gs.com


-----Original Message-----
From: GS Open Fax New York
Sent: Monday, October 29, 2001 9:11 AM
To: Huffman, Robyn
Subject: Fax message

1

ECd029068282

ENR0290068283

OCT-28-2001  18:26            ENRON                                    713  646  5330    P.02/02

October 28, 2001

Enron Corp.
1400 Smith Street
Houston, TX 77702

                        Re: Enron Corp. 3(a)(3) Commercial Paper

Ladies and Gentlemen:

This letter will serve as the agency agreement between Enron Corp. as principal ("Enron") and
Goldman, Sachs & Co. as agent ("agent") with respect to Enron's 3(a)(3) Commercial Paper. Enron
hereby appoints the agent to act on Enron's behalf to buy Enron's 3(a)(3) Commercial Paper from the
holders of such paper, which tender such paper to Enron. Agent's duties in this regard are completely
ministerial, and agent shall have no duties but to act as a conduit between Enron and the holders of
Enron's 3(a)(3) Commercial Paper. Agent shall not be responsible for fronting any payments in this
regard, but shall simply disperse funds, which shall be provided to the agent by Enron specifically for
such purpose.

Enron agrees to indemnify and hold agent harmless against any and all costs, losses and expenses
(including, but not by way of limitation, attorney's fees) incurred in connection with its actions as agent in
connection herewith. Enron grants agent a security interest in and a right of setoff against, any cash,
securities or other property held by or due from agent to or for Enron or any other obligation or claim
owing from agent to Enron. Such security interest and right of setoff shall be in respect of the
indemnification obligation set forth herein and for no other purpose.   Enron agrees that Agent shall
have no liability under this Agreement except as a result of its gross negligence or willful misconduct.

This agreement, other than the provisions of the preceding paragraph, may be terminated by either
party on one business day written notice provided to the other. This agreement shall be governed by
the laws of the State of New York without regard to any conflict of law principles.

This agreement may be executed in counterparts and by facsimile signatures.

Very truly yours,

By: _Robert P. Wall_
    VICE PRESIDENT, GS&Co

AGREED AND ACCEPTED: Enron Corp.

By: _____
Ben F. Glisan, Jr.
Managing Director, Finance and Treasurer

                                                                    TOTAL P.02

November 9, 2001

Enron Corp.
1400 Smith Street
Houston, Texas 77002

Re: Enron Corp. 3(a)(3) Commercial Paper

Ladies and Gentlemen:

This letter will serve as the agency agreement between Enron Corp. as principal ("Enron") and Goldman, Sachs & Co. as agent ("agent") with respect to Enron's 3(a)(3) Commercial Paper. Enron hereby appoints the agent to act on Enron's behalf to buy Enron's 3(a)(3) Commercial Paper from the holders of such paper, which tender such paper to Enron. Agent's duties in this regard are completely ministerial, and agent shall have no duties but to act as a conduit between Enron and the holders of Enron's 3(a)(3) Commercial Paper. Agent shall not be responsible for fronting any payments in this regard, but shall simply disperse funds, which shall be provided to the agent by Enron specifically for such purpose.

Enron agrees to indemnify and hold agent harmless against any and all costs, losses and expenses (including, but not by way of limitation, attorney's fees) incurred in connection with its actions as agent in connection herewith. Enron grants agent a security interest in and a right of setoff against, any cash, securities or other property held by or due from agent to or for Enron or any other obligation or claim owing from agent to Enron. Such security interest and right of setoff shall be in respect of the indemnification obligation set forth herein and for no other purpose. Enron agrees that Agent shall have no liability under this Agreement except as a result of its gross negligence or willful misconduct.

This agreement, other than the provisions of the preceding paragraph, may be terminated by either party on one business day written notice provided to the other. This agreement shall be governed by the laws of the State of New York without regard to any conflict of law principles.

This agreement may be executed in counterparts and by facsimile signatures.

Very truly yours,

By: _Robert P Wall_
        VP G SeCo

AGREED AND ACCEPTED: Enron Corp.

By: _Raymund M. Bowen_
        EVP - Finance & Treasurer -

ja/agreements/commercial paper letter.doc

EXHIBIT 8

04/04/06   16:39 FAX 202 772 9280         SEC OGC                                    ☒012

Mark J. Kreitman (MK 8935)
Assistant Director
Division of Enforcement
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Telephone: (202) 551-4484
Facsimile: (202) 772-9236

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ·In re | Chapter 11 |
| | Case No. 01-16034 (AJG) |
| **ENRON CORP.,** *et al.,* | Jointly Administered |
| Debtors. | |
| **ENRON CORP.,** | |
| Plaintiff, | |
| v. | |
| **J.P. MORGAN SECURITIES, INC.,** *et al.,* | Miscellaneous Docket M47 |
| Defendants. | |
| **ENRON CORP.,** | |
| Plaintiff, | |
| v. | |
| **MASS MUTUAL LIFE INSURANCE CO.,** *et al.,* | Miscellaneous Docket M47 |
| Defendants. | |

**MEMORANDUM OF SECURITIES AND EXCHANGE COMMISSION**
**IN SUPPORT OF DEFENDANTS' MOTIONS**
**FOR LEAVE TO BRING INTERLOCUTORY APPEAL**

The Securities and Exchange Commission submits this memorandum, pursuant to Section 1109(a) of the Bankruptcy Code, 11 U.S.C. 1109(a), in support of the pending motions for leave to appeal from the orders of the Bankruptcy Court for the Southern District of New York denying the defendants' motions to dismiss the amended complaints. [1]

One of the Commission's primary goals is to protect investors by maintaining the integrity of the securities markets. Settlement finality, a key component of market integrity, means that a transaction will not be reversed or unwound once complete. Settlement finality is essential to a strong, liquid securities market and reduces the possibility of a systemic crisis, which could occur when disruption at a firm or in a market segment causes widespread difficulties at other firms, in other market segments, or in the financial system as a whole. Investors are harmed if they rely upon payments received in settled transactions and must return those payments when the transactions are subsequently reversed. The markets and investors need assurance that securities transactions will not, except in limited circumstances, be subject to reversal in times of financial distress.

Accordingly, the Commission believes that it is essential that the bankruptcy laws promote settlement finality. This is the concern that underlies the protections of Section 546(e) of the Bankruptcy Code, 11 U.S.C. 546(e). Section 546(e) shields settlement payments from reversal through avoidance actions, except in cases involving a payment made with actual intent

---

[1] Under Section 1109(a), the Commission "may raise and may appear and be heard on any issue" but "may not appeal from any judgment, order, or decree entered in the case." 11 U.S.C. 1109(a). Although precluded from itself taking an appeal when appearing in this capacity, the Commission may otherwise participate in Chapter 11 proceedings. *Manville Corp. v. Equity Securities Holders Comm.*, 801 F.2d 60, 61 n.2 (2d Cir. 1986).

by the debtor to defraud other creditors, which has not been alleged in this action. The bankruptcy court's ruling that an evidentiary hearing is required before there can be a determination of whether the payments Enron made to the holders of its commercial paper are settlement payments undermines this important protection for the securities markets. Settlement finality is especially important in the commercial paper market, which has been designated a "critical financial market" by the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, and the Securities and Exchange Commission. [2]

An avoidance action is different from actions that can be brought under the antifraud provisions of the federal securities laws or under other appropriate civil or criminal laws. It is important for investors and the markets that those involved in the fraudulent conduct that led to Enron's collapse be held accountable for their actions. The Commission's position that Section 546 shields transactions from bankruptcy avoidance actions does <u>not</u> restrict the availability of actions brought by debtors alleging violations of the antifraud provisions. The Commission also expresses no views on any factual matters at issue in these cases. The Commission is concerned only with the proper interpretation of Section 546(e) and related provisions.

---

[2] <u>Interagency Paper on Sound Practices To Strengthen the Resilience of the U.S. Financial System</u>. Securities Exchange Act Rel. No. 47638 (April 11, 2003). The Interagency Paper was prepared in response to the September 11 attacks to address clearance and settlement practices "to ensure the resilience of the U.S. financial system" by "minimizing the immediate systemic effects of a wide-scale disruption on critical financial markets."

3

## BACKGROUND

**A.    Section 546(e)**

Section 546(e) of the Bankruptcy Code, 11 U.S.C. 546(e), provides a safe harbor from the

powers the Code gives bankruptcy trustees to bring avoidance actions. [3] The protection of

Section 546 – entitled "Limitations on Avoidance Actions" – applies only to avoidance actions

and does not affect other actions a debtor might bring under federal and state laws, including

actions under the antifraud provisions of the federal securities laws.

In enacting this protection, Congress weighed the need for settlement finality against

fundamental bankruptcy principles allowing trustees to bring avoidance actions to recover

settlement payments made prior to the bankruptcy for equitable distribution to creditors.

Congress determined that because of the importance of preventing disruption and uncertainty in

the nation's securities, financial, and commodities markets, settlement payments should not be

subject to avoidance except in cases where payments are made with actual intent by the debtor to

defraud other creditors.

Because the clearance and settlement system for securities transactions depends upon

guarantees by all participants that they will perform their obligations, reversal of a payment to

one participant could destabilize the system by exposing other participants to losses.  In addition,

uncertainty about the legal status of payments could lead participants to not engage in certain

types of transactions or to require changes in the way obligations are collateralized, imposing

---

[3] Section 546(e) provides: "Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and
548(b) of this title, the trustee cannot avoid a transfer that is a margin payment * * * or
settlement payment * * * made by or to a commodity broker, forward contract merchant,
stockbroker, financial institution, or securities clearing agency, that is made before the
commencement of the case, except under section 548(a)(1)(A) of this title."

4

additional costs on the securities markets. Finally, confidence in the securities markets is diminished when investors and others rely upon funds and securities received in settled transactions that are subsequently undone in a bankruptcy.

**B.    This Litigation**

Plaintiffs Enron Corporation and certain affiliated entities are seeking to avoid and recover $1.1 billion in transfers Enron made to the defendants with respect to its commercial paper notes prior to filing its Chapter 11 petition. The defendants include the three investment banks that served as dealers and market makers for the commercial paper as well as some 180 investors that held the notes – investment companies, pension funds, insurance companies, and other institutional and corporate investors.

Enron's complaint alleges that the payments were preferential transfers under Section 547 of the Bankruptcy Code, 11 U.S.C. 547, and fraudulent transfers under Section 548(a)(1)(B), 11 U.S.C. 548(a)(1)(B). The complaint also seeks to avoid the payments pursuant to Section 544(b), 11 U.S.C. 544(b), which authorizes actions under state avoidance statutes.

The defendants moved to dismiss the complaint, arguing that the payments were "settlement payments" made "by or to" entities enumerated in Section 546(e) – "stockbrokers" (the investment banking firms that handled the transactions), "financial institutions" (the banks that handled the payments), and a "securities clearing agency" (the Depository Trust Company, which clears and settles commercial paper transactions) – and thus qualify for the safe harbor. Enron opposed the motion to dismiss, arguing that an evidentiary hearing must be held on its allegations of unusual circumstances surrounding the payments before there can be a determination of whether they are protected settlement payments. The bankruptcy court,

5

agreeing with Enron, held that whether the payments qualify as settlement payments is a factual issue requiring a trial.

## ARGUMENT

**I.    The Bankruptcy Court's Erroneous Ruling Jeopardizes the Protections Afforded Securities Markets by Section 546(e).**

The bankruptcy court's ruling is based upon the erroneous view that the unusual circumstances of a transaction are pertinent to the determination of what constitutes a "settlement payment" under the definition of Section 741(8) of the Bankruptcy Code, 11 U.S.C. 741(8). A proper interpretation focuses upon the common understanding of the term "settlement" in the securities industry – the delivery and receipt of funds and securities. Thus, whether a particular transfer qualifies as a settlement payment depends upon whether it involves an exchange of consideration and securities in connection with the completion of a securities transaction. Other circumstances of the transfer have no bearing on whether it is a settlement payment that qualifies for the Section 546(e) safe harbor. This is an easily applied test, consistent with the statutory purpose of providing broad protection for securities transactions.

The court rejected this view of what constitutes a settlement payment, ruling that there must be an evidentiary hearing into the circumstances of the transaction in order to determine whether a payment is common in the securities trade and thus qualifies as a settlement payment. It would defeat the purpose of the Section 546(e) safe harbor if there must be such a hearing before there can be a determination of whether a particular payment qualifies as a "settlement payment," replacing the statutory safe harbor with the prospect of protracted litigation.

6

The Commission is concerned that the bankruptcy court's interpretation would frustrate the fundamental purpose of Section 546(e) of promoting settlement finality and protecting the securities markets from uncertainty and disruption.

## II.    An Immediate Interlocutory Appeal Is Necessary.

We urge the District Court to grant an interlocutory appeal of the bankruptcy court's decision. Without an interlocutory appeal, it will be several years before a final judgment is entered and the legal issues raised can be reviewed on appeal. During that time there will be uncertainty in the securities, commodities, and financial markets about the proper interpretation and application of the settlement payment definition. It is important that the bankruptcy court's decision, which the Commission believes seriously undermines the protections Congress enacted for the markets, be subject to immediate review by the District Court.

7

## CONCLUSION

For the foregoing reasons, the Commission urges that the motions for leave to appeal be

granted.

Respectfully Submitted,

Mark J. Kreitman (MK 8935)
Assistant Director
Division of Enforcement
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
Telephone:  (202) 551-4484
Facsimile: (202) 772-9236
kreitmanm@sec.gov

Katharine B. Gresham (*pro hac vice* pending)
Assistant General Counsel
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
Telephone: (202) 551-5148
Facsimile: (202) 772-9370
greshamk@sec.gov

8

## CERTIFICATE OF SERVICE

I, Katharine B. Gresham, an attorney, hereby certify that on April 4, 2006, copies

of the Memorandum of Securities and Exchange Commission in Support of Interlocutory

Appeals are being served by Federal Express and by U.S. Mail to the persons listed on the

attached service list.

Katharine B. Gresham

9