VENABLE LLP
Special Litigation Counsel for Enron Creditors
Recovery Corp., Reorganized Debtor
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland  21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (MS-3109)

TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Enron Creditors
Recovery Corp., Reorganized Debtor
One Penn Plaza, Suite 3335
New York, New York  10119
(212) 594-5000
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                   :
ENRON CORP.,                                       :
                        Plaintiff,                 :
                                                   :
            v.                                     :     07 CIV. 10527 (SAS)
                                                   :
GOLDMAN SACHS & CO.,                               :
                                                   :
                        Defendant.                 :
                                                   :
---------------------------------------------------------------x
                                                   :
ENRON CORP.,                                       :
                                                   :
                        Plaintiff,                 :
                                                   :
            v.                                     :     07 CIV. 10530 (SAS)
                                                   :
GOLDMAN SACHS & CO.,                               :
                                                   :
                        Defendant.                 :
                                                   :
---------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION
## TO THE MOTION OF GOLDMAN SACHS & CO.
## TO WITHDRAW THE REFERENCE TO THE BANKRUPTCY COURT

## TABLE OF CONTENTS

Page

OVERVIEW .................................................................................................... 1

STATEMENT OF FACTS ................................................................................ 5

ARGUMENT ................................................................................................... 12

    I.     Goldman's Motion Fails to Satisfy the Tests for Mandatory
         Withdrawal of the Reference under 28 U.S.C. § 157(d)............................... 12

         A.     Legal Standard .................................................................. 12

         B.     Enron's Contention that Commercial Ratings Are Not
              Dispositive of Whether Commercial Paper is Prime Quality
              Is Not Novel..................................................................... 14

         C.     The Withdrawal Motion Rests on Speculation About a
              Secondary or Tertiary Issue that May Never Be Reached................ 19

         D.     The Mere Presence of Securities Issues in a Bankruptcy
              Case Does Not Warrant Mandatory Withdrawal of the
              Reference ......................................................................... 22

         E.     Enron's Claims Do Not Threaten the Marketplace............................ 23

    II.    Goldman's Collateral Attacks on Enron's Claims Are Wrong...................... 24

CONCLUSION................................................................................................ 25

BA2DOCS1/331164

# TABLE OF AUTHORITIES

Page

**Cases**

Adelphia Comm'ns Corp. v. Rigas, No. 02 Civ. 8495 GBD, 2003 WL 21297258
(S.D.N.Y. June 4, 2003) ................................................................................. 23

AFSCME v. FDIC (In re NBW Comm'l Paper Litig.), Civ. A. Nos. 90-1755, 91-
0626 (RCL) (D.D.C.) (Aug. 24, 1992) ........................................................... 15

AFSCME v. FDIC (In re NBW Comm'l Paper Litig.), 813 F. Supp. 7 (D.D.C.
1992) ............................................................................................................... 15

AT&T Co. v. Chateaugay Corp., 88 B.R. 581 (S.D.N.Y. 1988) ........................... 22

Bear, Stearns Sec. Corp. v. Gredd, No. 01 Civ. 4379 (NRB), 2001 WL 840187
(S.D.N.Y. July 25, 2001) ............................................................................ 2, 21

Cal. v. Enron Corp. (In re Enron Corp.), No. 05 Civ. 4079, 2005 WL 1185804
(S.D.N.Y. May 18, 2005) ............................................................................... 12

City of New York v. Exxon Corp., 932 F.2d 1020 (2d Cir. 1991) ....................... 12

Dow Jones/Group W Television Co. v. Nat'l Broad. Co., 127 B.R. 3 (S.D.N.Y.
1991) ......................................................................................................... 14, 18

Enron Corp. v. J.P. Morgan Secs. Inc. (In re Enron Corp.), 325 B.R. 671 (Bankr.
S.D.N.Y. 2005) ................................................................................................. 5

Enron Corp. v. JP Morgan Secs., Inc. (In re Enron Corp.), Bankr. No. 01 B
16034(AJG), Adv. No. 03-92677 A, 2005 WL 3873891 (Bankr. S.D.N.Y.
July 29, 2005) ................................................................................................... 8

Enron Corp. v. JP Morgan Secs., Inc. (In re Enron Corp.), No. 05-CV-7357, 2007
WL 120458 (S.D.N.Y. Jan. 17, 2007) .............................................................. 8

Enron Power Mktg., Inc. v. Cal. Power Exch. Corp., No. 04 Civ. 8177(RCC),
2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004) ................................................ 21

Enron Power Mktg., Inc. v. City of Santa Clara (In re Enron Power Mktg., Inc.),
No. 01 Civ. 7964, 2003 WL 68036 (S.D.N.Y. Jan. 8, 2003) ......................... 12

Franklin Savings Bank v. Levy, 406 F. Supp. 40 (S.D.N.Y. 1975), rev'd on other
grounds, 551 F.2d 521 (2d Cir. 1978) ............................................................ 16

Getty Oil Co. v. Goldman, Sachs & Co., Case No. 71 Civ. 574 ........................... 8

Hawaiian Airlines, Inc. v. Mesa Air Group, Inc., 355 B.R. 214 (D. Hawai'i 2006) ............. 18-19

In re Am. Solar King Corp., 92 B.R. 207 (W.D. Tex. 1988)................................... 22

In re Bd. of Dirs. of Telecom Argentina S.A., No. 05 Civ. 8803 (SAS), 2005 WL
    3098934 (S.D.N.Y. Nov. 18, 2005) ................................................... 18

In re Cablevision S.A., Debtor in a Foreign Proceeding, 315 B.R. 818 (S.D.N.Y.
    2004) ............................................................................... 22

In re Coe-Truman Techs., Inc., 214 B.R. 183 (N.D. Ill. 1997)............................... 19

In re Dana Corp., No. 07 Civ. 9160 (SAS), 2007 WL 4205823 (S.D.N.Y.
    Nov. 20, 2007)...................................................................... 13

In re E & S Facilities, Inc., 181 B.R. 369 (S.D. Ind. 1995) ................................ 20

In re Finley, Kumble, et al., 192 B.R. 342 (Bankr. S.D.N.Y. 1994)........................... 22

In re Recoton, No. 04 Civ. 2466 (DLC), 2004 WL 1497570 (S.D.N.Y. July 1,
    2004) .............................................................................. 22-23

In re Texaco Inc., 84 B.R. 911 (S.D.N.Y. 1988) .................................... 14, 21

In re Vicars Ins. Agency, Inc., 96 F.3d 949 (7th Cir. 1996) ...................... 18, 20-21

In re White Motor Corp., 42 B.R. 693 (N.D. Ohio 1984)...................................... 21

LTV Steel Co. v. City of Chicago (In re Chateaugay Corp.), No. 00 CIV 9429
    (SHS), 2002 WL 484950 (S.D.N.Y. Mar. 29, 2002) ..................................... 20

Mishkin v. Ageloff, 220 B.R. 784 (S.D.N.Y. 1998).......................................... 22

Mishkin v. Ageloff (In re Adler, Coleman), 270 B.R. 562 (S.D.N.Y. 2001) ........... 13, 22

O'Connell v. Terranova (In re Adelphi Inst., Inc.), 112 B.R. 534 (S.D.N.Y. 1990) ............. 21

Oneida Ltd. v. Pension Ben. Guar. Corp., 372 B.R. 107 (S.D.N.Y. 2007) ...................... 13

Pereira v. N.Y. Hotel & Motel Trades Council (In re Chadbourne Indus. Ltd.),
    100 B.R. 663 (S.D.N.Y. 1989)....................................................... 13

Sanders v. John Nuveen & Co., Inc., 463 F.2d 1075 (7th Cir. 1972)................................ 17

SEC v. Better Life Club of Am., Inc., D.C. Cir. Nos. 98-5079, 98-5143 (Dec. 23,
    1998) ............................................................................. 17

BA2DOCS1/331164

SEC v. Cont'l Commodities Corp., 497 F.2d 516 (5th Cir. 1974) ........................................ 17

SEC v. Goldman, Sachs & Co., No. 74-1916, 1974 WL 402 (S.D.N.Y. May 2, 1974) ...................................................................................................................... 9

Segal v. Cal. Energy Dev. Corp., 167 B.R. 667 (D. Utah 1994) .......................................... 22

Shugrue v. Airline Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.), 922 F.2d 984 (2d Cir. 1990) .............................................................................................12, 20, 21

UBS Asset Mgmt. (NY) Inc. v. Wood Gundy Corp., 914 F. Supp. 66 (S.D.N.Y. 1996) ........................................................................................................................ 16

Univ. Hill Found. v. Goldman, Sachs & Co., 71 Civ. 1166 (MEL) (S.D.N.Y.) (May 23, 1976) ........................................................................................................ 15

Welch Foods Inc. v. Goldman, Sachs & Co., 398 F. Supp. 1393 (S.D.N.Y. 1974).............. passim

## Statutes and Regulations

Securities Act of 1933, § 12(a)(1)........................................................................... passim

Securities Act of 1933, § 3(a)(3)............................................................................. 2, 15

Securities Exchange Act of 1934, § 3(a)(10)............................................................. 2

11 U.S.C. § 546(e) ................................................................................................2, 16, 24

11 U.S.C. § 550(a) ................................................................................................... 4, 7

28 U.S.C. § 157(d) ................................................................................................ passim

17 C.F.R. § 240.10b-10.............................................................................................. 25

## Publications

SEC Securities Release No. 4412 (1961), reprinted in 36 Fed. Reg. 9158 (1961)................ 15

Private Securities Litigation Reform Act of 1995 ("the PSLRA")........................................ 22

Janet MacFarland, Former SEC Chief Slams Raters, Globe and Mail Update, Nov. 27, 2007) ........................................................................................................ 23

Plaintiff below and Respondent here, Enron Creditors Recovery Corp., formerly known as Enron Corp. ("Enron"), by its undersigned counsel, respectfully submits this memorandum of law in opposition to the Motion to Withdraw the Reference to the Bankruptcy Court (the "Withdrawal Motion") and the reformatted Memorandum in Support ("GS Mem.") filed by Defendant below and Petitioner here, Goldman Sachs & Co. ("Goldman").

## <u>OVERVIEW</u>

In seeking mandatory withdrawal of the reference to the United States Bankruptcy Court for the Southern District (the "Bankruptcy Court"), Goldman contends that "significant issues of first impression involving novel or complicated theories concerning the federal securities laws" (GS Mem. at 1) have suddenly arisen in the two consolidated-for-discovery adversary proceedings below, eclipsing all other issues in the cases.  This, Goldman insists, is a "brand new theory of securities law liability," <u>id.</u> at 5, one in which Enron rests its entire claim of liability against Goldman (with the lone exception of $30 million that Enron paid Goldman to retire commercial paper held in inventory).  <u>See id.</u> at 3 ("Enron's theory of liability against Goldman Sachs … is that Goldman Sachs 'benefited'" from Enron's prepayments of its commercial paper by eliminating Goldman's potential liabilities as a statutory seller of unregistered securities).  Goldman goes so far as to proclaim that this purportedly novel claim "is hugely important to our economy," <u>id.</u> at 5, suggesting, as Goldman has argued with respect to other issues in these bankruptcy cases, that the commercial paper ("CP") market will collapse if a court were to find in Enron's favor.  To underscore the gravity of its motion, Goldman laces its brief with a series of collateral complaints about the purported inadequacy of Enron's claims under the bankruptcy laws, implying that Goldman is a victim of a baseless market-roiling effort to hold it liable for

acting as an innocent middleman.[1]

These arguments are wrong, and some of Goldman's more acidic charges are false or misleading. To cite just one example, the notion that Enron has "abandoned" its position that its CP was not a security under the securities laws merely because its expert opined that the CP was a security for his opinion that Goldman has potential liability as a statutory seller of unregistered securities – a point Goldman makes throughout its brief – is wrong. Enron has never abandoned that position. The expert addressed Goldman's potential liability under the 1933 Securities Act for *selling* unregistered securities; § 2(a)(1) of the 1933 Act defines security to include any note (and CP is a type of note), but § 3(a)(3) exempts prime quality CP from its registration requirements. Enron's assertions that its CP was not a security, by contrast, were made in the context of addressing Goldman's bankruptcy defense that Enron's payments to *retire or pay off* its CP (or, as Goldman puts it, to "buy back" or "repurchase" the CP) prior to maturity fall within a safe harbor for settlement payments commonly used in the securities trade. See 11 U.S.C. § 546(e). If Goldman's contention (which Enron disputes) that Enron "repurchased" the CP is correct, the 1934 Securities Exchange Act, not the 1933 Act, governs that transaction, and § 3(a)(10) of the 1934 Act expressly *excludes* certain CP from its definition of a security. Enron's theories thus are consistent, well-established, and not capricious in the least.

As shown below, Goldman's broadsides are wrong at virtually every level: legal, factual, and procedural. Many of these issues, however, are collateral to the securities law question that Goldman wants to place before the Court; these therefore are discussed in a final section of this

---

[1] In this regard, it is interesting to note that Goldman seeks withdrawal of the reference for both cases in their entirety, and not for just the securities law issue that Goldman wants this Court to decide. Goldman could have just sought withdrawal of the reference as to that issue only. See, e.g., Bear, Stearns Sec. Corp. v. Gredd, No. 01 Civ. 4379 (NRB), 2001 WL 840187, at *4 n.2 (S.D.N.Y. July 25, 2001) (explaining that mandatory withdrawal of the reference was granted only as to two identified non-bankruptcy issues).

brief.  For those issues that actually are material to the question before the Court, the Withdrawal Motion should be denied for at least four separate reasons:

1.    *The non-Bankruptcy federal securities issue raised by Goldman is not novel*. Enron's theory that Goldman could be liable to its customers under § 12(a)(1) as a statutory seller of unregistered securities for having sold Enron CP when Enron was insolvent is not new, as *Goldman itself* has litigated and lost a challenge to the critical element of Enron's claim, namely that CP of a distressed company is not prime quality just because it has a high commercial rating. See Welch Foods Inc. v. Goldman, Sachs & Co., 398 F. Supp. 1393, 1397 (S.D.N.Y. 1974) (expressly rejecting Goldman's argument that "paper was 'prime quality' because it was so rated").  In Welch Foods and other cases regarding its sale of Penn Central CP, Goldman argued that the court lacked subject matter jurisdiction over claims alleging violations of the 1934 Act because the CP was highly rated and thus of prime quality and not a security under the 1934 Act. It lost.  Goldman's lone distinction of these cases – that they are old and do not reflect the modern practices by which CP is rated by up to three ratings agencies – raises questions of fact or at most the application of law to new facts, not a novel issue of law.  Goldman, the defendant in the key precedents at issue, should know better than anyone that this issue is not novel.

2.    *The non-Bankruptcy federal securities issue at best is a secondary issue in the cases*.  Goldman's brief somehow fails to mention that mandatory withdrawal of the reference is appropriate only when a bankruptcy court necessarily must adjudicate novel issues of non-bankruptcy federal law.  That omission is critical here, where the securities law issue constitutes a secondary, if not tertiary theory of liability that the Bankruptcy Court very well may never have to adjudicate.  Goldman *never* discloses that the central basis for Enron's claims against Goldman is that Goldman was a direct recipient and "initial transferee" of Enron's CP prepayments, not

that Goldman is a "beneficiary" of the prepayments. As an initial transferee under 11 U.S.C. § 550(a), Goldman would be strictly liable for the prepayments even if the prepayments benefited other parties. It would be liable as a "beneficiary" *only* if the Bankruptcy Court rejects Enron's claim that Goldman is the initial transferee. Moreover, even as to the beneficiary claim, the securities theory is a secondary issue that the Bankruptcy Court might never reach. Goldman vigorously disputes that it is liable as a beneficiary under § 550(a) of the Bankruptcy Code under any theory, going so far as to argue in the Bankruptcy Court that Enron's claim is "wacky." If Goldman were to prevail on its interpretation of § 550(a), the federal securities law issue would disappear. Indeed, Enron's theories of recovery against Goldman as a beneficiary do not even depend upon Goldman's potential liability under federal securities law: Goldman could be liable to its customers under common law theories also, which may explain why Goldman itself listed all of the Enron CP that it had sold as a contingent risk.

     3.    *The mere presence of a federal securities law issue in a bankruptcy proceeding does not warrant withdrawal of the reference*. Relying upon two Southern District decisions that did not speak to the issue and a single case from the Western District of Texas, Goldman argues that *any* appearance of a security or comparable federal issue in a bankruptcy case requires mandatory withdrawal of the reference under 28 U.S.C. § 157(d). See GS Mem. at 11-12 & 12 n.9. If that extreme view were ever to become the law within this Circuit, this Court would be deluged (or worse) with motions to withdraw the reference. Section 157(d) does not so provide, and this Court, not surprisingly, has consistently denied motions for mandatory withdrawal of the reference where the asserted federal issue fails to meets the § 157(d) standards.

     4.    *The standards for mandatory motions to withdraw the reference under 28 U.S.C. § 157(d) to a bankruptcy court must be narrowly construed*. Perhaps recognizing the fact that the

Withdrawal Motion does not readily satisfy the § 157(d) standards, Goldman's brief fails to cite, let alone apply, this basic standard of review governing the Withdrawal Motion. Under a narrow construction of both the novelty and "necessary issue" requirements, the motion readily fails.

## STATEMENT OF FACTS

Goldman is one of 217 current or former defendants in two parallel and consolidated-for-discovery adversary proceedings pending in the Enron bankruptcy case in the Bankruptcy Court. Both proceedings involve preference and other avoidance and disallowance claims pertaining to Enron's early payoff of over $1.1 billion of CP, while insolvent, shortly before filing bankruptcy. Most defendants moved to dismiss the claims, and the Bankruptcy Court (Gonzalez, J.) denied the motions on June 15, 2005. See Enron Corp. v. J.P. Morgan Secs. Inc. (In re Enron Corp.), 325 B.R. 671, 687 (Bankr. S.D.N.Y. 2005). Ninety defendants remain in the cases (a majority have settled).

As amended, Enron's complaint alleges that, from October 26 to November 6, 2001, less than ninety days before filing its Chapter 11 case, Enron paid out more than $1.1 billion to retire certain of its unsecured CP prior to its stated maturity date, through approximately 98 separate prepayments to various defendants. The prepayments were made after announcements of a $1 billion charge against third quarter 2001 earnings, an S.E.C. inquiry, and a likely downgrade of Enron's debt ratings. (2d Am. Compl. ¶¶ 1-2). Reflecting the market's alarm at these announcements, the market for Enron CP had collapsed in late October 2001, and Enron was urged by Goldman and others to draw down its revolver lines of credit and pay off its CP. Enron elected to draw on its lines of credit on October 25, 2001, and, on the morning of October 26, the Wall Street Journal ran an article announcing that Enron had drawn on its lines of credit and would use part of the proceeds to redeem its outstanding CP, which the market understood to

-5-

mean a payment immediately, prior to maturity, at the price originally paid plus accrued interest ("accrued par"). Enron alleges that such sudden and massive prepayments at accrued par and not market prices were extraordinary events in the CP market. Id. ¶¶ 1-2.

As one of Enron's three CP dealers, Goldman played an instrumental role in the prepayments.[2] By reporting that Enron would redeem its outstanding CP, the Wall Street Journal article forced Enron, as a business necessity, to proceed as the article had announced. One dealer commented at the time that the wording of the article was "stupid" and that Enron was now stuck with market expectations. See Schatzow Decl., Ex. 1, Am. Ans. to Goldman Int. No. 2 at ¶ 9) ("I mean, now [Enron] can't do anything. They're frozen out of the market. It's so stupid. It's bad."). Goldman knew that Enron could not make the prepayments without its assistance, as Enron lacked the infrastructure necessary to process the payments, did not know the identity of the holders, nor how much Enron CP they held, nor the discount rate at which the Enron CP had been purchased, nor how the payments could be wired to the holders. Id. Nevertheless, on the afternoon of October 26, 2001, Goldman insisted that it would not participate unless Enron agreed to make Goldman its agent. Id. Enron alleges that, in making this ultimatum, Goldman abandoned its duties as a dealer and took advantage of Enron's position of weakness. Id.

Enron could not refuse Goldman's demand without suffering grave adverse consequences to its business reputation at a particularly precarious moment. Id. Accordingly, on the afternoon of Sunday, October 28, Enron entered into a written agency agreement purporting to authorize Goldman to act as its agent in transferring Enron's prepayments. Goldman already had informed some of its customers on Friday (October 26) that Enron would be making the prepayments and that the customers should consult with counsel regarding a preference risk – i.e., the risk that the

---

[2]  The remaining facts regarding the prepayments are supported by Enron's amended answers to Goldman's interrogatories, which set forth full deposition and document cites for the assertions. Excerpts of those answers are appended as Exhibit 1 to the Declaration of Michael Schatzow.

prepayment transfers would be recoverable by Enron in a bankruptcy proceeding.  Although Goldman is required by law to advise its customers that it is acting as an agent for a securities issuer at or before the time of a security transaction, many customers testified that Goldman never told them that it was acting as Enron's agent.  Id. at ¶¶ 3-4.

Goldman ultimately received a total of $382 million in prepayments from Enron.  Of that amount, Goldman received $30 million for Enron CP that Goldman had held in inventory.  See GS Mem. at 3 n.1.  Goldman concedes that it did not act as an agent for those transfers, see id. & id. at 9, and thus they are not at issue in the Withdrawal Motion.

Before Goldman received the prepayments from Enron, it already had used its own funds to pay off customers.  See Schatzow Decl., Ex. 1 at ¶ 1.  Such payments were contrary to the requirement of the purported agency agreement that Goldman act as a conduit by passing Enron's payments directly to the holders of the Enron CP.  Id.  Goldman witnesses testified that, by paying the customers from its own account, prior to receiving any funds from Enron, Goldman owned the Enron CP and was free to use the funds paid subsequently by Enron for any purpose that it wished.  Id.  This evidence supports Enron's claim that Goldman is liable as an initial transferee under 11 U.S.C. § 550(a), an issue that is independent of the securities law question at issue here.

On December 2, 2001, less than one month after the last prepayment, Enron filed for bankruptcy protection.  In November 2003, Enron brought the adversary proceedings below, suing Goldman for liability as both an initial transferee and as a beneficiary of the transfers. From the beginning, Goldman and other beneficiary-theory defendants challenged the viability of Enron's beneficiary claim under 11 U.S.C. § 550(a), but the Bankruptcy Court repeatedly rejected those arguments, denying various motions to dismiss for failure to state a claim, a pre-

discovery motion for summary judgment, and even an effort by Goldman to block pertinent discovery. See, e.g., Enron Corp. v. JP Morgan Secs., Inc. (In re Enron Corp.), Bankr. No. 01 B 16034(AJG), Adv. No. 03-92677 A, 2005 WL 3873891, at *3 (Bankr. S.D.N.Y. July 29, 2005). Judge Daniels denied a motion for leave to appeal the Bankruptcy Court's summary judgment ruling on the beneficiary issue. Enron Corp. v. JP Morgan Secs., Inc. (In re Enron Corp.), No. 05-CV-7357, 2007 WL 120458, at *1 (S.D.N.Y. Jan. 17, 2007). In fending off these challenges to its beneficiary theories, Enron repeatedly argued that Goldman (and others) could be liable under § 550(a) as a party for whose benefit the transfers were made if the transfers relieved it of potential liability from claims brought by customers. This, then, is far from a claim that has received short shrift from the Bankruptcy Court. Goldman and other defendants have repeatedly required Enron to set forth theories in support of its beneficiary claims, and Enron has done so, repeatedly obtaining rulings that it has the right to conduct discovery in support of those theories.

In identifying its theories, Enron specifically pointed out that, inter alia, Goldman had previously been sued, successfully, in at least twenty separate cases by holders of Penn Central CP that Goldman had sold when Penn Central was insolvent, shortly before Penn Central petitioned for bankruptcy. See Schatzow Decl., Ex. 2, excerpts of 6/12/07 Enron Reply Mem. re: Project Truman discovery dispute, at 30-32; Ex. 3, excerpts of 6/12/07 C.M. Mallon Decl. re: Project Truman discovery dispute, at ¶ 6. The Penn Central CP had been highly rated by the National Credit Office, a subsidiary of Dun & Bradstreet. Of those cases, several settled, and, in one of those settled cases, Goldman paid its customer seventy cents on the dollar for $2 million in Penn Central commercial paper. See Schatzow Decl., Ex. 4, Robert J. Cole, A Suit Is Averted on Pennsy Notes, N.Y. Times, March 25, 1975, at 45, 47 (discussing settlement in Getty Oil Co. v. Goldman, Sachs & Co., Case No. 71 Civ. 574); see also Schatzow Decl., Ex. 3, Mallon Decl. at

-8-

¶ 6.  Several others went to trial, resulting in verdicts in favor of plaintiffs and against Goldman. Id.  Goldman ultimately paid out millions of dollars for those claims.  Id.

All of these claims had been brought against Goldman for violations of federal securities laws and accordingly were cited as relevant precedents for Enron's beneficiary theory.  See Schatzow Decl., Ex. 2, 6/12/07 Reply Mem. at 30-32.  Indeed, not only were these relevant precedents as to whether a CP dealer could face liability to its customers for potential securities violations for selling CP of an insolvent issuer, but they also addressed the key issue raised by Goldman here: whether a high rating of CP by a commercial rating agency necessarily meant that the CP was of "prime quality."  Goldman lost that argument in a series of reported decisions.

The SEC also litigated against Goldman for its role in selling Penn Central CP while Penn Central was insolvent.  In 1974, Goldman and the SEC entered into a consent decree and permanent injunction requiring Goldman to issue and maintain policies to conduct extensive due diligence for all CP that it sold.  Goldman accepted, inter alia, the following provisions:

> 1.      Before Goldman, Sachs makes its initial purchase of commercial paper from an issuer for the purchase of public resale as a dealer …. (i) Goldman, Sachs will conduct such investigation as may be required under the circumstances for it reasonably to conclude that such commercial paper is not required to be registered under the Securities Act of 1933 for the purpose of the public sale or resale thereof;
>
> *       *       *
>
> 3       So long as an issuer continues to sell commercial paper to or through Goldman, Sachs for possible sale or resale, Goldman, Sachs will use its best efforts to obtain the periodic reports [filed pursuant to § 13(a) of the Securities and Exchange Act of 1934] or comparable information …; will exercise reasonable care to obtain other current information in respect of such issues, and will make such a review of the reports and other information so obtained by it as may be required under the circumstances to permit Goldman, Sachs to conclude that, after the exercise of reasonable care, it has no reason to believe that such issuer will be unable to pay its commercial paper as it matures.

(Schatzow Decl., Ex. 5, SEC v. Goldman, Sachs & Co., No. 74-1916, 1974 WL 402, at **1-2, at (S.D.N.Y. May 2, 1974)).  By the time Goldman had entered into the consent decree, CP already

was rated by the three current ratings agencies (S&P, Moody's, and Fitch), see, e.g., GS Mem. at 14 (citing websites showing that S&P started rating CP in 1969 and Moody's in the 1970s), the very fact that Goldman insists distinguishes the Penn Central cases from Enron.

The Goldman-SEC consent decree remained in effect for twenty years, until it was lifted by mutual consent in 1995. To Enron's knowledge, at no time during this twenty year period did Goldman file a motion to terminate the consent decree because the law had changed, the facts had changed, or public policies had changed, such that Goldman no longer should be required upon penalty of contempt to conduct due diligence and not just rely upon the commercial ratings. Even after the decree was lifted, Goldman continued to adhere to its policy requiring due diligence for all CP issuers for whom it acted as a dealer, regardless of the strength of a commercial rating. See Schatzow Decl., Ex. 6, 8/14/07 J. Willian Dep. Tr. 115-16 (affirming that Goldman "consistently conducted due diligence" of CP issuances due to Goldman's "obligations to not sell commercial paper of an issuer about whom there were substantial concerns about their ability to pay the commercial paper when due"). This testimony, by the head of Goldman's Money Markets business division throughout the pertinent events in 2001, is uncontroverted.

To date, Goldman has failed to identify a single document produced in discovery indicating that Goldman, let alone the SEC or the general CP market, viewed the commercial ratings of CP as dispositive of whether the CP should be considered prime quality. Indeed, the evidence is starkly to the contrary. A Goldman manual for policies and procedures regarding CP and other instruments stated, for example, that "[t]he SEC has not defined what it considers to be prime quality commercial paper. However, commercial paper rated investment grade generally should qualify and non-investment grade commercial paper does not qualify." (Schatzow Decl., Ex. 7, excerpt of Goldman manual at 3). Even though the manual was issued sometime after the

-10-

SEC consent decree was lifted in 1995, the manual discussed the consent decree and the Penn Central CP defaults, noting that the consent decree enforced Goldman's "affirmative obligations to investigate the creditworthiness of a commercial paper issuer." Id. at 2. And, while the manual purportedly no longer was in effect in late 2001, Goldman has failed to identify any superseding replacement or contrary policy.

In fact, Goldman did not defer to the commercial ratings, even for the Enron CP. Instead, Goldman maintained its own internal credit scores for CP, in part because of Goldman's admitted concern that customers might sue Goldman in the case of a CP default. See Schatzow Decl., Ex. 8, excerpts of C. Broderick 8/3/07 Dep. Tr. at 104-07 (admitting that risk of customer claims was a factor). In Enron's case, Goldman determined that the Enron CP no longer was prime quality on October 24, 2001, more than a week before the first CP rating downgrade. See id. at 109-13.

Thus, Goldman's position that this Court should wrest jurisdiction of Enron's claims away from the Bankruptcy Court to decide whether, under the securities laws, the commercial ratings of Enron CP immunize Goldman from liability to its customers for selling non-prime quality CP, conflicts with the evidence provided by Goldman itself. Goldman documents and Goldman witnesses have repeatedly acknowledged a duty to Goldman customers to conduct due diligence far in excess of rote reliance on the commercial ratings, and, for twenty years, Goldman had agreed to a consent decree ordering it to take those steps.[3] Given that at one point *Goldman* had concluded that the Enron CP no longer was prime quality notwithstanding continued high ratings, Goldman's argument that, as a matter of law, it can avoid liability to its customers under § 12(a)(1) for selling CP that should have been registered because it no longer was of prime

---

[3]    Enron continues to seek discovery from Goldman regarding the Penn Central and Johns Manville bankruptcies, so these facts may be incomplete. As for the general status of the cases, expert depositions will begin next month, written discovery is not yet completed, and discovery disputes over document production (including discovery on the Penn Central matters), and other issues have not been resolved. Summary judgment motions are scheduled to be filed this spring.

quality, merely because of those same high ratings, is rather ironic, to say the least. As discussed below, numerous courts have rejected Goldman's position that a high rating is dispositive proof of prime quality.

## ARGUMENT

### I.    Goldman's Motion Fails to Satisfy the Tests for Mandatory Withdrawal of the Reference under 28 U.S.C. § 157(d).

#### A.    Legal Standard.

The standard for mandatory withdrawal is quite stringent. 28 U.S.C. § 157(d) provides for mandatory withdrawal where the proceeding requires "consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). In the Second Circuit, § 157(d) must be "*construed narrowly*," Shugrue v. Airline Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.), 922 F.2d 984, 995 (2d Cir. 1990) (emphasis added), a directive that Goldman omits in its brief discussion of the law. Under this narrow construction, withdrawal of the reference is required for any proceeding "that would otherwise *require* a bankruptcy court judge *to engage in significant* interpretation[] of federal laws apart from the bankruptcy statutes." City of New York v. Exxon Corp., 932 F.2d 1020, 1026 (2d Cir. 1991) (emphasis added). As the Southern District of New York has explained, if the provision were read literally, it "would eviscerate much of the work of the bankruptcy courts." Enron Power Mktg., Inc. v. City of Santa Clara (In re Enron Power Mktg., Inc.), No. 01 Civ. 7964, 2003 WL 68036, at *5 (S.D.N.Y. Jan. 8, 2003). Therefore, the provision is construed narrowly "to prevent litigants [from] using it as an 'escape hatch' out of bankruptcy court." Cal. v. Enron Corp. (In re Enron Corp.), No. 05 Civ. 4079, 2005 WL 1185804, at *1 (S.D.N.Y. May 18, 2005).

-12-

Goldman does not acknowledge this strict rule and instead argues, without supporting authority from this Circuit, that courts "routinely recognize that issues arising under the securities laws raise important questions requiring significant interpretation" and thus necessarily "meet[] the standard for mandatory withdrawal." (GS Mem. at 11-12). This is not the law. Bankruptcy courts frequently address securities issues, and this Court has not hesitated to deny motions to withdraw the reference where the asserted federal securities law issue does not meet the statutory test. See, e.g., Mishkin v. Ageloff (In re Adler, Coleman), 270 B.R. 562, 566 (S.D.N.Y. 2001) ("Mishkin II") (denying motion to withdraw the reference to address federal questions involving RICO, the Securities Exchange Act, and the Sherman Act); see also Section I(E), infra.

The non-bankruptcy federal issue must be significant to the case and not routine:

> In order to ensure that it does not become an "escape hatch" for matters properly before [the bankruptcy] court, the Second Circuit has construed § 157(d) ***narrowly***, reserving withdrawal of the reference for cases or issues that would ***otherwise require*** a bankruptcy court judge to engage in *significant interpretation,* as opposed to *simple application,* of federal laws apart from the bankruptcy statutes.

Oneida Ltd. v. Pension Ben. Guar. Corp., 372 B.R. 107, 110 (S.D.N.Y. 2007) (bold emphasis added, internal quotes and cites omitted). Accord In re Dana Corp., No. 07 Civ 9160 (SAS), 2007 WL 4205823, at *3 (S.D.N.Y. Nov. 20, 2007) (approving withdrawal where it "would require the bankruptcy court to engage itself in the intricacies of non-Bankruptcy [CERCLA] law") (internal marks omitted). To order mandatory withdrawal, the district court must make an "affirmative determination that resolution" of the case "will ***require*** substantial and material consideration" of non-code statutes." Pereira v. N.Y. Hotel & Motel Trades Council (In re Chadbourne Indus. Ltd.), 100 B.R. 663, 667 (S.D.N.Y. 1989) (emphasis added). Goldman, the party seeking mandatory withdrawal, bears the burden of demonstrating that consideration of the

non-code federal law is required.  <u>See</u> <u>In re Texaco Inc.</u>, 84 B.R. 911, 921 (S.D.N.Y. 1988) (citing cases).  Its motion may not rest on speculation about potential outcomes.  <u>Id.</u>

Instead of addressing these standards, Goldman's brief focuses on its assertion that the securities law issue is a matter of first impression.  Yet even as to that issue, Goldman's presentation of the law is less than complete.  It is well settled that simply setting forth a new issue is not enough; to the contrary, courts have made clear that mandatory withdrawal is not warranted merely because the case involves "application of established [federal law] principles to new facts."  <u>Dow Jones/Group W Television Co. v. Nat'l Broad. Co.</u>, 127 B.R. 3, 5 (S.D.N.Y. 1991).  As shown below, this is a clear instance where the motion to withdraw the reference rests upon new facts, not upon a novel question of law.

> **B.      Enron's Contention that Commercial Ratings Are Not Dispositive of Whether Commercial Paper is Prime Quality Is Not Novel.**

For all of Goldman's complaints about the Bankruptcy Court's failure to apply a Bankruptcy Code safe harbor or the fact that Goldman faces potential liability despite the purported presence of an agency agreement, the gravamen of Goldman's motion is that Enron's alternate theory – that Goldman had a material risk of liability to its customers as a statutory seller under § 12(a)(1) for having sold unregistered CP of an insolvent company – is an issue of first impression.  In that regard, one reported case already has held a CP dealer liable under § 12(a)(1) for selling CP that was not prime quality.  Other reported cases – in which Goldman itself was a defendant – found that a high commercial rating is not dispositive of whether CP is prime quality.  Accordingly, Goldman obscures the applicable legal principles in contending that this is an issue of first impression.  Each component of Enron's theory is established under the law.

*First*, Goldman does not challenge the fact that § 12(a)(1) holds statutory sellers of non-exempt, unregistered securities strictly liable to their customers from any losses by those purchasers.  Back in the Penn Central litigation, Goldman admitted as much, stating, "[i]f the securities are not exempt from registration and were not registered, the seller is absolutely liable under Section 12(1)."  (Schatzow Decl., Ex. 9, excerpt of Def. Post-Trial Mem., at 122, filed in Univ. Hill Found. v. Goldman, Sachs & Co., 71 Civ. 1166 (MEL) (S.D.N.Y.) (May 23, 1976)).

*Second*, Goldman neither disputes that the Enron CP was not registered nor raises, as a novel issue of law, any serious question as to whether the Enron CP would need to be registered if it were not of prime quality.  Instead, Goldman cryptically states at the end of a footnote that there "is no issue whether Enron's CP met the literal requirement of §3(a)(3) to qualify for the exemption" because the Securities Act does not explicitly require CP to be of prime quality.  (GS Mem. at 14 n.13).  This point is buried in a footnote for good reason: the SEC has long required that CP must be of prime quality to qualify for the § 3(a)(3) exemption from the registration requirement.  See SEC Securities Release No. 4412 (1961), reprinted in 36 Fed. Reg. 9158 (1961) (listing prime quality as one of four requirements).  Since then, the SEC has scoffed at the suggestion that the courts have rejected the prime quality requirement:

> The defendant contends that "prime quality" is merely a non-statutory requirement that few courts have considered in determining whether notes are exempt from registration.  This is clearly incorrect.  Courts have widely endorsed the criteria in the Commission's release.

(Schatzow Decl., Ex. 10 excerpt of SEC Amicus Br., at 39, filed in AFSCME v. FDIC (In re NBW Comm'l Paper Litig.), Civ. A. Nos. 90-1755, 91-0626 (RCL) (D.D.C.) (Aug. 24, 1992) (citation omitted).  See also id. at 39-40 n.20 (citing cases); AFSCME v. FDIC (In re NBW Comm'l Paper Litig.), 813 F. Supp. 7, 17-18 (D.D.C. 1992) (adopting the SEC position).  Indeed, in NBW, summary judgment was granted against the FDIC as the receiver for a bank

-15-

that had sold non-prime quality unregistered CP, under § 12(a)(1) – the same claim that Enron

asserts here.  See id. at 18-19.  Although Goldman may distinguish NBW on the facts (e.g., the

CP had a very poor or no rating), it cannot colorably say that Enron's 12(a)(1) theory is novel.

*Third*, several court decisions, including a reported decision by this Court, have rejected

or at least impugned Goldman's position that the high ratings of Enron CP necessarily rendered

the CP of prime quality and thus exempt from registration under § 3(a)(3).  Some of these rulings

were entered against Goldman itself in the Penn Central CP cases.  See, e.g., Welch Foods Inc. v.

Goldman, Sachs & Co., 398 F. Supp. 1393, 1397 (S.D.N.Y. 1974) (expressly rejecting the

argument that "paper was 'prime quality' because it was so rated"); see also UBS Asset Mgmt.

(NY) Inc. v. Wood Gundy Corp., 914 F. Supp. 66, 69 (S.D.N.Y. 1996) (listing ratings as one of

several factors in determining whether paper is in fact prime); Franklin Sav. Bank v. Levy, 406

F. Supp. 40, 44 (S.D.N.Y. 1975) (holding that "prime rating" of Penn Central CP by the National

Credit Office "does not absolve Goldman, Sachs of its duty"), rev'd on other grounds, 551 F.2d

521, 527-28 (2d Cir. 1978) (discussing "serious" questions as to whether CP was a security,

including whether CP was not prime quality despite its prime rating).[4]  Insolvency therefore

weighs heavily against prime quality.  As the SEC has concluded, "Courts have consistently held

that paper is not prime quality where the issuer is insolvent or experiencing substantial liquidity

---

[4]  Other Penn Central CP cases against Goldman do not expressly address this issue, but, to the extent that they found Goldman liable or possibly liable under the 1934 Act for misrepresentations, they implicitly so ruled.  Goldman's goal in arguing that the CP was prime quality in Welch Foods was to try to show that the CP did not constitute a security under the 1934 Act and thus could not have triggered any liability for Goldman under those securities laws due to a lack of subject matter jurisdiction.  See Welch Foods, 398 F. Supp. at 1396-99.  Once the court ruled that the CP was not a security, Goldman was collaterally estopped from raising subsequent challenges.  This raises an interesting point: if Goldman were to succeed in demonstrating that the Enron CP was prime quality as a matter of law, all of the defendants below, including Goldman, would lose their settlement payment defense under 11 U.S.C. § 546(e), as the Enron CP no longer would be a security under the 1934 Act and thus would not even potentially be subject to the safe harbor.

-16-

problems."  (Schatzow Decl., Ex. 10 at 44).  See, e.g., Sanders v. John Nuveen & Co., Inc., 463

F.2d 1075, 1079 (7th Cir. 1972) ("because of the company's insolvency, it seems highly unlikely

that the paper purchased … is … prime quality"); SEC v. Cont'l Commodities Corp., 497 F.2d

516, 525 (5th Cir. 1974) ("it would appear that notes issued by a company in precarious financial

straits are not ... prime quality, issued to facilitate current transactions").

Goldman's response, that these decisions are old "and have no application in today's

world" (GS Mem. at 14), fails to make a legally or factually valid distinction.  This Court's

ruling in Welch Foods that the Penn Central CP was not prime quality despite its high rating has

never been reversed.  The SEC's 1992 amicus brief in the NBW litigation makes clear that the

insolvency cases still are good authority, and a D.C. Circuit brief filed by the SEC in 1998 makes

it even clearer that those cases and the Welch Foods ruling remain good law:

> They [the instruments] were not of "prime quality" because the Club was nearly
> insolvent when the Commission brought this action, and an investor's ability to
> collect depended on the ability of Taylor and the Club to ensnare additional
> investors.  See Welch Foods Inc. v. Goldman, Sachs & Co., 398 F. Supp. 1393,
> 1398 (S.D.N.Y. 1974) ("objective data" proved commercial paper of soon
> insolvent issuer was not prime); Sanders, 463 F.2d at 1079 ("highly unlikely" that
> paper purchased by plaintiff was "prime quality" since company's liabilities
> greatly exceeded assets).

(SEC Br. filed in SEC v. Better Life Club of Am., Inc., D.C. Cir. Nos. 98-5079, 98-5143, at 21-

22 (Dec. 23, 1998), available at 1998 WL 35240428).  Goldman does not suggest that the case

law cited in Enron's expert report has been overruled or called into doubt by another court.

Moreover, Goldman does not cite any contrary cases to support its own vague theory and instead

claims, without citation, that there have been "significant changes in the way that the Securities

Act has been interpreted by the courts."  (GS Mem. at 14).[5]  The lack of citation speaks volumes.

---

[5]  Goldman does cryptically cite no action letters by the SEC, but these letters (none of which date past 1990, when the SEC staff imposed a moratorium) merely indicate that, in the presence of high ratings and other evidence proffered by the issuer, SEC staff elected to take no action.

-17-

Lest there be any doubt, Goldman's own CP manual stated that the SEC had never defined prime quality and that ratings only "generally" constituted proof that CP was prime.

Goldman's argument thus devolves to a question of whether Enron's theory of liability is novel merely because "[i]n the 1970's, when most of the cases that Enron relies on were decided, ratings agencies had just begun rating CP" and since then "[t]he breadth of those ratings agencies and their influence on the market has greatly expanded" and "CP backup revolver lines" have become available.  Id.  In other words, Goldman wants the Court to decide whether the facts on the ground have changed, such that Goldman should not be collaterally estopped from trying to relitigate the ruling in Welch Foods, not that any significant change in the law has occurred. Given that the Goldman-SEC consent decree remained in effect for some *twenty years* following Welch Foods, it is doubtful, to say the least, that any material change in the facts occurred, either.  But that issue is secondary at this point.  In the context of a motion to withdraw the reference, old law is good law and its age provides no basis to withdraw the reference.  See In re Bd. of Dirs. of Telecom Argentina S.A., No. 05 Civ. 8803 (SAS), 2005 WL 3098934, at *2 n.29 (S.D.N.Y. Nov. 18, 2005) (denying withdrawal where, inter alia, "the issue no longer [is] one of first impression which must be decided by an Article III court").

The new facts proffered by Goldman do not provide a recognized basis for mandatory withdrawal under 28 U.S.C. § 157(d).  To the contrary, courts have made clear that mandatory withdrawal is not warranted merely because the case involves "application of established [federal law] principles to new facts."  Dow Jones/Group W Television Co. v. Nat'l Broad. Co., 127 B.R. 3, 4 (S.D.N.Y. 1991).  Accord In re Vicars Ins. Agency, Inc., 96 F.3d 949, 954 (7th Cir. 1996) (holding that the legal questions "must involve more than mere application of existing law to new facts"); Hawaiian Airlines, Inc. v. Mesa Air Group, Inc., 355 B.R. 214, 223 (D. Hawai'i

-18-

2006 ) (quoting <u>Dow Jones</u>); <u>In re Coe-Truman Techs., Inc.</u>, 214 B.R. 183, 186 (N.D. Ill. 1997) (denying mandatory withdrawal where "[a]t most the bankruptcy court will only be required to apply these well-settled regulations to a new factual setting").

At bottom, Goldman's motion rests upon speculation that federal courts might disregard the adverse precedents against it, based on the passage of time.  That is not a proper basis for mandatory withdrawal under the stringent standard applicable under 28 U.S.C. § 157(d).

### C.     The Withdrawal Motion Rests on Speculation About a Secondary or Tertiary Issue that May Never Be Reached.

Goldman frames Enron's claims against it by leaving out Enron's initial theory of recovery, <u>i.e.</u>, that Goldman is liable as the initial transferee, and instead focuses exclusively on a *component* of Enron's secondary position, <u>i.e.</u>, that Goldman is liable as beneficiary because the transfers reduced its exposure to clients on various claims (not just security claims).  Goldman goes so far as to imply that Enron's "beneficiary" theory is its "only argument" for liability for the $352 million for which Goldman asserts that it acted as an agent, and that, if this particular "theory fails, it cannot recover anything from Goldman Sachs of the $352 million[.]"  (GS Mem. at 11).  This is a grossly distorted portrait of Enron's claims against Goldman.  As shown below, Goldman bases its motion on a tertiary issue that may well never be reached.

Enron's theories of liability are multi-tiered and argued in the alternative.  <u>See</u> Schatzow Decl., Ex. 1, at 16-17.  Only after the Bankruptcy Court first decides which defendants were the initial transferees and that Goldman was not one of them would it need to consider whether Goldman could be liable as a beneficiary through reduction in Goldman's exposure to its customers, and only after that determination would the court need to decide the alternative issue of strict liability under § 12(a)(1).  If Goldman were found to be the initial transferee of the funds, then Enron's second argument, that Goldman was the beneficiary of the transfers, is moot.

-19-

As a result, it is highly possible that the Bankruptcy Court will decide Enron's claims against Goldman without ever reaching the securities law issue. Goldman could be found to be the initial transferee, rendering the beneficiary issue moot. The Bankruptcy Court could grant Goldman summary judgment, rejecting Enron's "beneficiary" theory as a matter of bankruptcy law (and indeed, long before Enron ever raised its § 12(a)(1) theory, Goldman had argued in court that Enron's beneficiary claim was "wacky" and a "frolic and a detour" that did not justify discovery; see Schatzow Decl., Ex. 13, June 21, 2007 Hr'g Tr. at 40, 41.[6] The Bankruptcy Court could grant Goldman summary judgment on its other defenses, such as the settlement payment safe harbor, or it could recognize Enron's "beneficiary theory" but hold that Goldman's main exposure was on state law fiduciary duty claims by its customers and not under § 12(a)(1). It is only at this tertiary level that Enron's theory of Section 12(a)(1) liability arises at all.

As discussed above and as Goldman's own cites show, mandatory withdrawal is warranted only when the non-bankruptcy federal law issue is a threshold question that is "*necessary* for the resolution of the proceeding." Ionosphere Clubs, 922 F.2d at 995; accord LTV Steel Co. v. City of Chicago (In re Chateaugay Corp.), No. 00 CIV. 9429 (SHS), 2002 WL 484950, at *4 (S.D.N.Y. Mar. 29, 2002) (mandatory withdrawal is appropriate "only when" consideration of non-code law "'is necessary for the resolution of the proceeding'"). Courts consistently reject motions to withdraw that purport to predict the outcome of contingent theories of liability. See In re E & S Facilities, Inc., 181 B.R. 369, 373 (S.D. Ind. 1995) (denying mandatory withdrawal because arguments that novel RICO claims would be decided by the bankruptcy court were at best "speculative" and at worst "completely hypothetical"), aff'd, In re

---

[6] Indeed, when Goldman opposed motions to compel discovery on an aspect of the beneficiary theory, Goldman claimed that the theory rested on "multiple speculative assumptions" such that the issue might never be reached. (Schatzow Decl., Ex. 11, excerpt of Def. Mem. in Opp. to Mot. to Compel, at 22-23 (June 6, 2007)). Now, by contrast, Goldman conflates the steps for deciding the "beneficiary theory" to argue that the securities issue necessarily will be reached.

-20-

<u>Vicars</u>, 96 F.3d at 954; <u>O'Connell v. Terranova (In re Adelphi Inst., Inc.)</u>, 112 B.R. 534, 537 (S.D.N.Y. 1990) ("More important, the Bankruptcy Court may not necessarily address the issue, as the defendant's constitutional challenge is an 'as applied' attack that is contingent upon their prior success" on threshold issues); <u>In re White Motor Corp.</u>, 42 B.R. 693, 700-05 (N.D. Ohio 1984) (reviewing legislative history of 28 U.S.C. § 157(d) and holding that withdrawing the reference "based on speculation about [non-Code] issues which may or may not arise and may or not be germane to resolution of core Code proceedings" is inconsistent "with the purposes underlying the very existence of the Bankruptcy Court and would encourage forum shopping in a manner Congress disdained"), <u>cited with approval</u>, <u>Ionosphere Clubs</u>, 922 F.2d at 995.

The decision in <u>In re Texaco</u>, 84 B.R. 911, 921 (S.D.N.Y. 1988), is instructive. In denying the motion to withdraw, the court reviewed the debtor's multi-tiered claims and arguments and found that "threshold issues" could preclude consideration of the federal law question raised by the defendant. <u>See id.</u> at 914, 922-23. It concluded that, while the non-code federal "issues <u>may</u> arise," <u>id.</u> at 923 (emphasis in original), the purported "required interpretation" of non-code federal law was "speculative and may not be germane to the resolution of these proceedings, thereby failing to satisfy the requirements of 28 U.S.C. § 157(d)[.]" <u>Id.</u> at 925. As in <u>Texaco</u>, Goldman can only speculate about whether the securities law issue will ever require resolution. Because the Withdrawal Motion rests on an issue that the Bankruptcy Court might never address, much less resolve, the motion must be denied.[7]

---

[7] Goldman's authorities are not to the contrary. In <u>Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.</u>, No. 04 Civ. 81777 (RCC), 2004 WL 2711101, at *4 (S.D.N.Y. Nov. 23, 2004), the "threshold issue" was a statutory <i>jurisdictional</i> issue of whether, under the Federal Power Act, the claimed funds were within the FERC's exclusive jurisdiction. Similarly, in <u>Bear, Stearns Sec. Corp. v. Gredd</u>, 2001 WL 840187, at **2-4 (S.D.N.Y. July 25, 2001), the reference was withdrawn to address an unresolved "threshold question" of law.

D.    **The Mere Presence of Securities Issues in a Bankruptcy Case Does Not Warrant Mandatory Withdrawal of the Reference.**

Goldman's contention that its mere assertion of the securities law issue itself requires the Court to withdraw the reference also fails. Strangely, Goldman relies principally on Mishkin v. Ageloff, 220 B.R. 784, 796-97 (S.D.N.Y. 1998) ("Mishkin I"). The motion in that case involved securities fraud claims subject to recently enacted statutory laws, namely the novel pleading provisions and discovery stay provisions of the Private Securities Litigation Reform Act of 1995 ("the PSLRA"). See id. at 796-97. In granting the motion to withdraw, the Court pointed out that the PSLRA's novel statutory provisions were "an area of unsettled and developing law," and that courts in the Circuit had recently "struggle[d]" with those provisions. Id. at 797. By contrast, later in the *same bankruptcy proceedings*, the Court denied another motion to withdraw the reference by rejecting essentially the same "complexity" argument made by Goldman here. See Mishkin II, 270 B.R. at 566 (explaining that "complexity of issues is almost always present in cases involving RICO, the federal antitrust laws and the Securities Exchange Act" but that does not equate to a substantial legal issue of first impression).[8] Other cases involving the application of the securities laws also have rejected motions to withdraw the reference. See In re

---

[8] Goldman's other Southern District cases, like Mishkin I, presented clear unresolved issues of law. See In re Cablevision S.A., Debtor in a Foreign Proceeding, 315 B.R. 818, 821-22 (S.D.N.Y. 2004) (granting motion to address a new extrajudicial procedure of Argentine law, which raised important issues of comity and where no Article III court had ever resolved "tension" between the Trust Indenture Act and foreign insolvency proceedings under § 304); AT&T Co. v. Chateaugay Corp., 88 B.R. 581, 586 (S.D.N.Y. 1988) (finding that the bankruptcy court would have had to decide an unresolved statutory legal question of when a CERCLA claim accrues). The only case supporting Goldman's sweeping assertion that the reference should be withdrawn for all securities issues is In re Am. Solar King Corp., 92 B.R. 207, 210-11 (W.D. Tex. 1988), which no court in this Circuit has ever cited, much less adopted. Instead, the bankruptcy courts of this District have long decided federal securities issues. See, e.g., Mishkin II, 207 B.R. at 566 (denying motion to withdraw reference for issue under the 1934 Act); In re Finley, Kumble, et al., 192 B.R. 342, 352 (Bankr. S.D.N.Y. 1994) (applying § 12(2)); see also Segal v. Cal. Energy Dev. Corp., 167 B.R. 667, 671 (D. Utah 1994) (rejecting Solar King).

<u>Recoton</u>, No. 04 Civ. 2466 (DLC), 2004 WL 1497570, at *3 (S.D.N.Y. July 1, 2004) ("By applying the unambiguous and plain language of the federal non-bankruptcy statutes at issue here, Judge Gropper correctly concluded that the Discovery Motion is not governed by and not in conflict with either the PSLRA or SLUSA."); <u>Adelphia Comm'ns Corp. v. Rigas</u>, No. 02 Civ. 8495 GBD, 2003 WL 21297258, at *4 (S.D.N.Y. June 4, 2003) ("There exists a substantial body of case law discussing ... the Exchange Act to guide the bankruptcy court and therefore, the bankruptcy court, at this stage, can more than adequately handle any pre-trial issues relating to these claims.").

### E.    Enron's Claims Do Not Threaten the Marketplace.

Finally, Goldman's apocalyptic view that the mere suggestion that it could *possibly* bear liability under § 12(a)(1) for having sold Enron CP will transform CP markets, <u>see</u> GS Mem. at 5, is overblown and provides no basis for withdrawal of the reference.  Goldman witnesses already have admitted in discovery that Goldman accepts the duty to conduct full due diligence as to the creditworthiness of CP issuers and the quality of their CP, irrespective of the commercial rating of the CP.  And its witnesses have further testified that they do so, in part, due to the possible exposure to customers for a failure to act.  If anything, the market has moved even further away from a strict dependence on the ratings agencies.  For example, within the past month, former SEC Chairman Arthur Levitt made scathing comments regarding the ratings agencies, which had lost the trust of the public:

> While credit ratings agencies have missed the mark in the past, this time I am afraid investors are losing faith.  Indeed, I believe we are facing the prospect of a systemic shock directly as a result of investors' loss of confidence in the ratings that they have relied upon so long to evaluate risk.

(Schatzow Decl., Ex. 12, Janet McFarland, <u>Former SEC Chief Slams Raters</u>, Globe and Mail Update, Nov. 27, 2007).  With an authority like Arthur Levitt pointing out the unreliability of the

ratings system, Goldman's contention that the CP market will suffer if dealers bear a possible risk of liability as statutory sellers of highly rated CP is difficult to take seriously.

## II.    Goldman's Collateral Attacks on Enron's Claims Are Wrong.

Throughout its brief, Goldman makes assertions about the merits of Enron's claims that are wrong or misleading. While it is neither possible nor appropriate to address each and every aspersion here, Enron briefly addresses some of the most egregious:

- Goldman's assertion (pg. 6) that the ratings agencies require that all CP must be backed up with "equal liquidity sources to be rated" is wrong. Goldman's own experts cite to reports by the ratings agencies which indicate that a commercial paper issuer does not have to have backup liquidity for 100% of the commercial paper that it issues.

- Goldman's assertion (pg. 6) that it was not an underwriter or guarantor of the commercial paper conflicts with the basic theory of § 12(a)(1) that a statutory seller of a security is deemed by statute to be an underwriter and thus bears strict liability. Goldman's own documents listed the amount of Enron CP that Goldman had sold as a contingent risk and a potential liability to Goldman, which confirms that Goldman understood that it could potentially be held liable to customers in the event of default.

- Goldman's assertion that Enron has taken inconsistent positions as to whether its CP was a security is wrong. Enron contends that the CP is a security for purposes of the 1933 Act (which is all that the expert said) but is not a security under the 1934 Act – just as Goldman argued in the Welch Foods case. Enron agrees that, in a May 2007 hearing in the Bankruptcy Court, counsel may have misspoken when describing Enron's position to that court, making it appear that Enron took the position that, for all purposes, its CP was not a security. This is not Enron's position.

- Goldman's contention (pg. 3 n.2) that Enron "uncovered no support" for its theory that there could be a practice of dealers to voluntarily make their customers whole following a CP default is wrong. Following the Penn Central collapse, Goldman paid millions of dollars to its smaller customers who had invested in Penn Central CP. Moreover, another dealer (and former defendant in this case), J.P. Morgan Securities, Inc., paid several million dollars in settlement to a holder of Armstrong CP following Armstrong's default and litigation by the holder.

- Goldman's assertion that the bankruptcy safe harbor of 11 U.S.C. § 546(e) protects "any type of settlement payment" (pg. 7 & n.7) also is wrong. The provision protects only those settlement payments that are commonly used in the securities trade. It does not protect the mere repayment of a debt reflected in a security or other written instrument. And it does not protect the extraordinary prepayments that Enron made at accrued par to retire its outstanding CP. Indeed, contrary to Goldman's inference that

-24-

avoiding these transfers could somehow roil the settled expectations of the securities markets, numerous Goldman witnesses and customer witnesses testified that Goldman warned many of its customers that there was a preference risk before they accepted the prepayments, and that Goldman specifically designed its role in the transfers to try to avoid such a preference risk. Goldman has made that argument for years, and it has failed to show any evidence of a "chain reaction" which would spread and damage the markets if Enron recovered in this case. Furthermore, certain defendants in these cases have paid Enron more than $170 million to settle Enron's claims without any impact on the CP market.

- Goldman's assertion (pg. 9) that not a single piece of Goldman or Enron evidence disputes that Goldman was acting as Enron's agent also is wrong: some evidence indicates that Goldman failed to act as a conduit for the prepayments as required by the agency agreement. Moreover, many customers testified that Goldman never told them that it was acting as Enron's agent. Contrary to Goldman's argument that that fact is immaterial (pg. 9 n.8), 17 C.F.R. § 240.10b-10 specifically required Goldman to make written disclosure to its customers of its status as an agent no later than the time of the transfers, which did not occur in many instances.

- The suggestion that expert opinions concluding that Enron was insolvent when the CP was issued are suspect (pg. 10) is meritless: Goldman had an opportunity to present its own expert testimony on this issue or to otherwise dispute the insolvency opinion of Enron's expert and failed to do so.

Again, none of these collateral issues, or the others raised by Goldman, are necessary for resolution of this motion and thus none should be considered by the Court.

As for the issues that are relevant and material to the 28 U.S.C. § 157(d) analysis, the facts and law are clear that this case does not warrant mandatory withdrawal of the reference.

-25-

## CONCLUSION

For the foregoing reasons, Goldman's Motion to Withdraw the Reference should be denied.

VENABLE LLP                                           TOGUT, SEGAL & SEGAL LLP

_____/s/ Michael Schatzow_____         __/s/ Frank A. Oswald_____
Richard L. Wasserman (RW-8696)            Frank A. Oswald (FAO-1223)
Michael Schatzow (MS-3109)                     Howard P. Magaliff (HPM-2189)
1800 Mercantile Bank & Trust Building       One Penn Plaza, Suite 3335
Two Hopkins Plaza                                     New York, New York 10119
Baltimore, Maryland  21201                        (212) 594-5000
(410) 244-7400                                          *Bankruptcy Co-Counsel for Enron*
*Special Litigation Counsel for Enron*        *Creditors Recovery Corp. in*
*Creditors Recovery Corp. in No. 07 CIV 10527*   *Nos. 07 CIV 10527 & 07 CIV 10530*

-26-

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY THAT on this 17th day of December 2007, a copy of the foregoing Memorandum of Law in Opposition to the Motion of Goldman, Sachs & Co. to Withdraw the Reference to the Bankruptcy Court was served, via electronic and UPS mail, on Thomas J. Moloney, Esq., counsel for Goldman, Sachs & Co., at the following address:

Thomas J. Moloney
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
212 225-2460
tmoloney@cgsh.com

                                         __/s/ Michael Schatzow_____
                                         Michael Schatzow

BA2DOCS1/331164