VENABLE LLP
Special Litigation Counsel for Enron Creditors
Recovery Corp., Reorganized Debtor
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (MS-3109)

TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Enron Creditors
Recovery Corp., Reorganized Debtor
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                                           :
ENRON CORP.,                                               :
                              Plaintiff,                   :
                                                           :
              -against-                                    :     07 CIV. 10527 (SAS)
                                                           :
GOLDMAN SACHS & CO.,                                       :
                                                           :
                              Defendant.                   :
                                                           :
-----------------------------------------------------------x
                                                           :
ENRON CORP.,                                               :
                                                           :
                              Plaintiff,                   :
                                                           :
              -against-                                    :     07 CIV. 10530 (SAS)
                                                           :
GOLDMAN SACHS & CO.,                                       :
                                                           :
                              Defendant.                   :
                                                           :
-----------------------------------------------------------x

## DECLARATION OF MICHAEL SCHATZOW IN SUPPORT OF ENRON'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF GOLDMAN SACHS & CO. TO WITHDRAW THE REFERENCE TO THE BANKRUPTCY COURT

I, MICHAEL SCHATZOW, declare as follows:

1.    I am a member of the bar of this Court and a partner in Venable LLP, counsel for Plaintiff, Enron Creditors Recovery Corp., formerly known as Enron Corp. ("Enron"), in the Case No 07 CIV. 10527 (SAS), the first of the above-captioned adversary proceedings.    I respectfully submit this declaration in support of Enron's Memorandum of Law in Opposition to the Motion of Goldman Sachs & Co. to Withdraw the Reference to the Bankruptcy Court.

2.    Annexed hereto, at the tabs indicated, are true and correct copies of the following documents referred to in Enron's Memorandum of Law:

**Exhibit 1**:    Enron's Amended Answers to Goldman's Contention Interrogatories (excerpts).

**Exhibit 2**:    Enron's Reply Memorandum in Support of Motion to Compel Production of Documents regarding "Project Truman" (excerpts), filed June 12, 2007.

**Exhibit 3**:    Declaration of Colleen M. Mallon in support of Enron's Reply Memorandum in Support of Motion to Compel Production of Documents regarding "Project Truman," filed June 12, 2007 (excerpts).

**Exhibit 4**:    Robert J. Cole, A Suit Is Averted on Pennsy Notes, N.Y. Times, March 25, 1975, at 45, 47.

**Exhibit 5**:    SEC v. Goldman, Sachs & Co., No. 74-1916, 1974 WL 402, at (S.D.N.Y. May 2, 1974).

**Exhibit 6**:    August 14, 2007 Deposition Transcript of John Willian (excerpts).

**Exhibit 7**:    Goldman Sachs & Co., Money Market Securities (July 1996), GS Enron-CP 00269-75 (excerpts).

**Exhibit 8**:    August 3, 2007 Deposition Transcript of Craig Broderick (excerpts).

**Exhibit 9**:    Defendant's Post-Trial Memorandum, Univ. Hill Found. v. Goldman, Sachs & Co., 71 Civ. 1166 (MEL) (S.D.N.Y.), filed May 23, 1976 (excerpts).

**Exhibit 10**:    SEC Amicus Brief, AFSCME v. FDIC (In re NBW Comm'l Paper Litig.), Civ. A. Nos. 90-1755, 91-0626 (RCL) (D.D.C.), filed Aug. 24, 1992 (excerpts).

**Exhibit 11**:    Def. Mem. in Opp. to Mot. to Compel, at 22-23 (June 6, 2007)

**Exhibit 12:**    Janet McFarland, <u>Former SEC Chief Slams Raters</u>, Globe and Mail Update, Nov. 27, 2007)

**Exhibit 13:**    June 21, 2007 Transcript of Hearing on Motion to Compel Production of Documents regarding "Project Truman" (excerpts).

3.    All facts stated in Enron's Memorandum of Law are true to the best of my knowledge.

I DECLARE UNDER THE PENALTY OF PERJURY that the foregoing is true and correct.

Executed on December 17, 2007.

_____/s/ Michael Schatzow_____
Michael Schatzow (MS-3109)

BA2DOCS/331326

# Exhibit No. 1

VENABLE LLP
Special Litigation Counsel for Enron Corp., et al.,
Reorganized Debtors
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (MS-3109)
Robert L. Wilkins (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Enron Corp., et al.,
Reorganized Debtors
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                             :

In re:                              :
                             :
                             :     Chapter 11
ENRON CREDITORS RECOVERY CORP., *et al.*, :     Case No. 01-16034 (AJG)
                             :     Jointly Administered
            Reorganized Debtors.     :
-----------------------------------------------------------------x
                             :

ENRON CREDITORS RECOVERY CORP.,     :
                             :
          Plaintiff,            :     Adversary Proceeding
                             :     No. 03-92677 (AJG)
         v.                 :
                             :
GOLDMAN SACHS & CO., *et al.*         :
                             :
         Defendants.         :
-----------------------------------------------------------------x
                             :

ENRON CREDITORS RECOVERY CORP.,     :
                             :
          Plaintiff,            :     Adversary Proceeding
                             :     No. 03-92682 (AJG)
         v.                 :
                             :
MASSMUTUAL LIFE INSURANCE CO., *et al.*  :
                             :
         Defendants.         :
-----------------------------------------------------------------x

**ENRON CREDITORS RECOVERY CORP.'S FIRST AMENDED
ANSWERS TO DEFENDANT GOLDMAN, SACHS & CO.'S
SECOND SET OF INTERROGATORIES**

Plaintiff Enron Creditors Recovery Corp. ("Enron"), by its undersigned counsel
and pursuant to Fed. R. Civ. P. 26 and 33 and Fed. R. Bankr. P. 7026 and 7033, submits
the following First Amended Answers to Defendant Goldman, Sachs & Co.'s
("Goldman's") Second Set of Interrogatories and states as follows:

## ENRON'S DEFINITIONS

Enron is employing the following definitions herein:

1.    "Overly broad" means the Interrogatory seeks information that is
unreasonably general, vague, confusing, nonspecific, overreaching and harassing, and/or
not relevant to the issues involved in the pending action and not reasonably calculated to
lead to the discovery of admissible evidence relevant to those issues.

2.    "Unduly burdensome" means that it would be oppressive, harassing,
unduly time-consuming, and unduly expensive to locate, review, and produce the
requested information in view of the degree of relevance and materiality, if any.

## GENERAL OBJECTIONS

A.    The attorney who prepared these Answers chose the word usage and sentence
structure and said language does not purport to be the exact language of Enron or its
representatives.[1]

B.    These Answers reflect information presently available to Enron.  Discovery

---

[1]    To the extent an Interrogatory and/or Document Request asks for information or documents
concerning a Defendant that is named only in the companion adversary proceeding, *Enron Corp. v. MassMutual
Life Insurance Co.*, 03-92682 (AJG), Enron states that the gathering of such information and documents
responsive to such discovery requests shall be handled by Togut, Segal & Segal LLP.

negative news coming out on Enron" in October of 2001); Willian, 149:19-150:13 ("This company was clearly in distress"). These were extraordinary circumstances in the commercial paper market. See, e.g., Hennessy, 160:6-25 ("I believe the market at the time was literally in a panic and that investors were asking anybody that would listen to them whether or not we had heard what Enron was doing with respect to their CP program."). Accordingly, the Enron CP prepayments most certainly cannot be characterized as "commonly used."

Enron reserves the right to supplement or modify this Answer consistent with the requirements of Fed. R. Civ. P. 26(a) and Fed. R. Bankr. P. 7026 with additional or different information prior to trial, including any expert testimony or report that has not yet been provided.

2.    If you contend that Enron's claims against Goldman Sachs are not barred as to payments identified in paragraphs 136(3), 136(6), 136(9), 136(10) and 136(11) of Complaint I and paragraphs 97(b-k), 97(r) and 97(s) of Complaint II (which are all of the claims against Goldman Sachs except with respect to the payments identified in paragraphs 136(2) of Complaint I) because Goldman Sachs was acting as an agent of Enron and as a mere conduit for those payments, as set forth in Goldman Sachs' Fourth and Fifth Affirmative Defenses, identify with specificity the bases for your contentions, including without limitation each and every fact and legal ground that supports, or that you rely upon for, or intend to rely upon for, your position, including without limitation each and every document, witness, deposition citation, and any other evidence that supports, or that you rely upon, or intend to rely upon for, your position.

RESPONSE:

Enron objects to this Interrogatory as overly broad and unduly burdensome. Enron further objects to this Interrogatory insofar as it calls for legal conclusions. Enron will not and need not supply "legal grounds" supporting its contentions. Enron further objects to this Interrogatory to the extent that it attempts to place on Enron a burden of

15

production and/or proof that it does not bear. Subject to and without waiving these objections or the General Objections set forth above, Enron responds as follows:

Enron's claims against Goldman as set forth in this Interrogatory are not barred either by Goldman's defense that it was acting as an agent of Enron for the transfers identified in this Interrogatory or by Goldman's defense that it was acting as a mere conduit for these transfers. To the extent that Goldman and other defendants contend that the payments made by Goldman to or for the holders or beneficial owners of Enron CP constituted purchases and sales of the Enron CP, Goldman forfeited its defenses that it acted as an agent or as a mere conduit in receiving transfers from Enron or in making payments to or for the holders or beneficial owners of the Enron CP. Thus, Goldman's defenses must be viewed in the alternative: if Goldman acted as an agent and served as a mere conduit, such that the holders or beneficial owners of the Enron CP would have liability as initial transferees of Enron's payments to pay off and retire the Enron CP, and such that the holders or beneficial owners would not prevail on a defense that they sold the Enron CP to Goldman or to Enron, then Goldman's defenses could serve as a bar to Enron's claims as set forth in this Interrogatory, but only if Enron does not prevail on its claim that Goldman is liable as a beneficiary of the prepayments. If, on the other hand, Goldman did not act as an agent and did not serve as a mere conduit, such that beneficial owners or holders could prevail on a defense that they sold the Enron CP back to Goldman or to Enron and thus are not liable as initial transferees, then Goldman's defenses do not serve as a bar to Enron's claims as set forth in this Interrogatory. Either way, Enron is entitled to avoidance and full recovery of the transfers. Enron does not

16

need to elect at the present time between either of these alternative mechanisms for recovery.

The Goldman Agency Agreement supports this argument. Assuming, arguendo, that the Goldman Agency Agreement is valid, it called for Goldman to act as a conduit in making payments to the holders or beneficial owners of the Enron CP. The Goldman Agency Agreement states that Goldman's "duties" under the Goldman Agency Agreement "are completely ministerial, and [Goldman] shall have no duties but to act as a conduit between Enron and the holders of Enron 3(a)(3) Commercial Paper." Ex. 10,395. Thus, for Goldman to have acted as an agent under this document, it needed to have acted as a conduit between Enron and the holders of the Enron CP. Goldman cannot have acted as a conduit if the holders or beneficial owners of the Enron CP are not initial transferees. Numerous Defendants in this case have alleged that Goldman did not act as a conduit and that they instead sold the Enron CP directly to Goldman. If they are correct and prevail on those allegations, then Goldman did not act in accord with the Goldman Agency Agreement and cannot invoke its protections to avoid liability on its defenses that it acted as an agent or as a mere conduit. Goldman's status as an agent thus depends in significant part on its status as a mere conduit for the early redemptions of Enron CP.

In this regard, should the Court determine that in fact the holders or beneficial owners of the Enron CP are not liable to Enron as initial transferees because a purchase and sale of the Enron CP occurred, as opposed to an early redemption of the Enron CP, then Goldman would not have acted as a mere conduit. The evidence in support of

17

Goldman's failure to act as a mere conduit would include, but not be limited to, the following facts:

1.      Contrary to the requirement of the Goldman Agency Agreement that it act as a conduit for payments by Enron to the holders of the Enron CP, there is evidence that Goldman paid for some or all of the Enron CP with funds from its own account, prior to receiving any funds from Enron.  For example, Guido DeFalco, the Associate Manager and/or Section Manager for Goldman's Operations Group that handled commercial paper during the pertinent time period in 2001, testified that, prior to any payment having been made by Enron, Goldman would pay in cash to the holder of the CP and the holder would convey the CP to Goldman.  DeFalco (Vol. 1), 153:20-155:11.  At that point, according to Mr. DeFalco, once the DTC debited Goldman's account for payment to the holder, Goldman owned the Enron CP.  DeFalco (Vol. 2), 328:20-330:8.  As the owner, Goldman held the risk should Enron fail to make payment on the Enron CP.  DeFalco (Vol. 1), 264:2-6, 265:3-7.  Mr. DeFalco further explained that, in a separate and independent second step, Enron subsequently made payment to Goldman.  Id. at 156:19-22.  He testified that these were entirely separate transactions.  DeFalco (Vol. 2), 296:9-20.  Mr. DeFalco's supervisor, Edmund Matusiak, also testified that Goldman purchased the Enron CP from the holders prior to receiving funds from Enron later that day.  Matusiak, 102:25-103:9.  Mr. Matusiak added that Goldman was "free to use those funds for whatever purposes it saw fit."  Id. at 99:19-22.  If the Court were to find that these were separate transactions, such that a "buyback" (in Goldman's parlance) between Goldman and the customers preceded the Enron-Goldman return-to-company transaction and such that no customer (or other holder or beneficial holder of the Enron CP) is found

18

by the Court to be an initial transferee, then Goldman, as the new owner of the Enron CP, was the initial transferee of Enron's transfers. Goldman would not be a mere conduit, as it did not transfer Enron's payments to any other party. If the Court were to find that Goldman did not act as a mere conduit for Enron's prepayments, Goldman would be liable as an initial transferee under 11 U.S.C. § 550(a).

2.    An expert for Defendant Echostar Communications Corp., Edward S. Adams, has submitted an expert report stating that, under the standards and customs of the brokerage industry, when such separate and distinct transactions occur, first between a customer to a broker or dealer and then from the broker or dealer to the issuer, the broker or dealer is "the owner of the Enron commercial paper and the sole transferee of any payments related thereto." Expert Rep. of Edward S. Adams at 10. He also states that, in a situation where the broker or dealer first purchased Enron CP from a customer, it "became the owner of the commercial paper in question, however briefly." Id. at 8. Finally, he states that "from the moment" that a broker (or dealer) "purchased the Enron commercial paper from" its customer, it "bore the potential risk of non-payment from Enron[.]" Enron reserves the right to rely upon additional statements to this effect by other experts that the parties (including Enron) may offer in rebuttal to expert reports offered by Goldman or other parties.

3.    Testimony from some of Goldman's customers supports the alternative position that Goldman did not act as an agent and/or conduit for the transfers from Enron. Among the witnesses who testified that they never were told by their Goldman counterparts that Goldman was acting as Enron's agent and instead believed that they were dealing directly with Goldman as a principal were the following individuals: (a)

19

AXA's Philippe Berthelot, who testified that Goldman was the counterparty to AXA's "buyback" of Enron CP to Goldman (Berthelot, 42:11-43:24, 87:25-88:10, 101:7-13, 155:16-156:5, 169:15-25); (b) Cascade Investment LLC's Alan Heuberger repeatedly testified that Cascade sold the Enron CP to Goldman, not to Enron, that he did so because Goldman was a counterparty that he trusted, that Goldman told him that it could buy back the Enron CP from Cascade, and that Goldman never told him that it was acting as an agent for Enron; accordingly, he believed that Goldman had bought the Enron CP and taken it into its own account, as it always had done in the past (Heuberger, 129:4-134:25, 141:1-4, 142:23-143:8, 148:3-149:14, 255:13-22, 256:13-25, 257:21-258:5, 260:16-25, 261:1-263:20, 270:16-274:24, 284:12-23); (c) Dell's Deepali Sawlani testified that she asked Goldman to buy the Enron CP held by Dell and that she accordingly believed that Goldman had done so and then sold the Enron CP back to Enron; she was not told and did not know the capacity in which Goldman had acted (Sawlani, 79:11–81:8, 161:10-181:12, 226:4-229:22); (d) Banamex's Kevin Williams testified that he believed that the counterparty for the transaction was Goldman, not Enron, and that Goldman never told him that it was acting as Enron's agent (Williams, 122:21-123:17, 151:19-152:25, 206:21-208:5, 221:22-24); (e) Aetna's Stephen McCarthy testified that Aetna sold its Enron CP to Goldman and does not recall having been told that Goldman was acting as Enron's agent (McCarthy, 148:5-149:18); and (f) Wilmington Trust's Dominick D'Eramo testified that he was unaware of any instance where Goldman acted as agent for Wilmington Trust (D'Eramo, 206:21-24). These are just examples of non-dealer defendant witnesses who testified that Goldman never told them that it was acting as Enron's agent for the prepayments. See also, e.g., Andersen, 150:15-151:8 (does not

20

recall Randy Rogers of Goldman advising him that Goldman would be acting as agent in connection with Enron CP prepayment); Barrasso, 70:22-25 (does not recall being advised by Goldman that it was acting as agent); Caiazza, 110:7-18, 111:5-19, 125:21-129:20, 139:7-140:6 (Goldman did not say it was acting as agent, and he has no recollection of any dealer saying on Oct. 26, 2001 that it was acting as an agent); Colombi, 69:5-20, 128:7-11, 144:22-145:9 (did not discuss agency with Goldman and does not recall any conversations with Goldman on the issue); Galac, 152:20-156:10 (Goldman did not advise that it was acting as agent); Henderson, 165:24-167:1, 215:2-216:11 (does not recall Goldman saying it was acting as agent); Marinzel, 197:9-198:5 (no discussion regarding Goldman's role in the Enron CP prepayment); McNany, 181:19-184:8 (does not recall anyone from Goldman indicating it was acting as agent); Nelson, 277:6-278:3 (Goldman acted as principal); Piovano, 193:7-25, 196:5-197:15, 199:9-200:16 (Goldman, not Techint, had control over the procedure used in the Enron CP prepayment).

Their testimony is corroborated by internal documents from non-dealer defendants that do not mention that Goldman was acting in the capacity of Enron's agent. Examples include Ex. 10,307 (an internal Cascade spreadsheet that shows a sale of Cascade's Enron CP to Goldman) and Ex. 10,312 (an internal Freemont General document titled "Transaction Advice" that shows that the Enron CP transfer with Goldman without mentioning agency). Both the DTC and the Chase IPA had internal documents that either mentioned Goldman as the principal in the payments to the Enron CP holders or did not show that Goldman was acting as an agent. Examples include Ex. 20,194 (AETNA000138 – DTC document listing Goldman as principal for payment to

21

Aetna), and Ex. 20,195 (AETNA000154: same); Ex. 10,385 (Bloomberg trade ticket sent on 10/26/01 with no agency language); Ex. 10,489 (10/30/01 trade ticket with no agency language); Ex. 10,674 (Bloomberg trade ticket for Goldman's purchase of Enron CP from Dell that does not have any agency language); Ex. 10,642 (same); DELL3148 (same); and CASC00202 (Bloomberg trade ticket for Goldman's "buy" of Cascade's Enron CP lacking any agency language). Of course, if the prepayments are not found to have constituted separate purchase and sale transactions, Enron will be able to recover directly from the holders or beneficial owners as initial transferees, as set forth above.

 4. Securities laws required Goldman to disclose in writing that it was acting as an alleged agent. <u>See</u> 17 C.F.R. § 240.10b-10. To the extent that Goldman mailed its confirmation slips indicating its status as an agent after the fact to the holders' back rooms, and did not disclose its alleged agency status to its counterparts in advance or prior to the completion of the transaction, Goldman's confirmation notices might not have been legally effective, especially when many of its trade tickets made no such reference.

 5. Goldman's actions in facilitating Enron's prepayments were not consistent with its position that it acted as an agent or conduit for Enron. For example, Goldman contends that it told the holders or beneficial owners to consult their lawyers and to consider whether Enron's prepayments might constitute preference risks in the event of an Enron bankruptcy. It even prepared a script for its salespeople to read to the customers when discussing the prepayment option. These actions are not consistent with Goldman's asserted role and status as an agent and/or conduit for Enron. They were not set forth in the Goldman Agency Agreement, and they were not in Enron's best interest.

22

6.    Similarly, Goldman's actions after Enron filed for bankruptcy were not consistent with its position that it was Enron's agent for these prepayments. Enron asked Goldman to provide the names and addresses of the ultimate recipients for all prepayments of Enron CP made by Enron to Goldman. Goldman refused to provide this information, claiming that it was confidential information that could not be disclosed under Goldman's commercial relationships with its customers. Eventually, Goldman told Enron that, if Enron filed a Rule 2004 subpoena, Goldman would produce confirmation documents for its payments to its customers. Goldman refused, however, to provide specific names, phone numbers, or any other information not contained in the confirmation documents. Goldman's refusal to assist Enron in its efforts to pursue its claims for disallowance and recovery of the prepayments and its view that it had no duty to so assist Enron were not consistent with Goldman's contention that it was Enron's agent for those prepayments.

7.    One of Goldman's experts has taken the position that it did not receive consideration for the Goldman Agency Agreement. See Expert Report of Jonathan R. Macey, at pp. 45-48. Mr. Macey suggests that Goldman may have acted "for civic or altruistic reasons or reputational concerns that may or may not have [had] economic significance." Id. at 48. He further states that, even if Goldman did receive "some sort of benefit from acting as Enron's agent in this case, this benefit is insignificant, totally speculative, and as far as I can tell, incapable of being articulated with any sort of precision." Id. Mr. Macey concluded, "I do not believe that Goldman Sachs received a 'benefit' from acting as Enron's agent in any way that is meaningful to it as an economic matter." Id. In addition to Mr. Macey's view that Goldman did not receive economically

23

meaningful consideration for entering into or performing under the Goldman Agency Agreement, Goldman's in-house attorney responsible for negotiating the terms of the agreement testified that she was not aware of any compensation or consideration that Goldman received from Enron as a result of the agreement. See Huffman, 210:12-19.

8.      The Goldman Agency Agreement did not provide Enron with any ability to control Goldman's activities, as ordinarily would occur for an agency agreement. Instead, Goldman acted unilaterally and in its own interest in structuring the prepayment procedures. Goldman's expert Mr. Macey, for example, identifies numerous steps that Goldman took unilaterally to protect its interests that were not subject to Enron's control. See Macey Rep. at ¶¶ 59-60. To the extent that Goldman departed, by its own choice, from the Goldman Agency Agreement by failing to act as a conduit as required by that agreement, Goldman did not act as Enron's agent.

9.      Enron entered the Goldman Agency Agreement only because Goldman's actions left it no viable alternative. Indeed, Goldman abdicated its role as Enron's commercial paper dealer and took an adversarial position toward Enron when Enron was in no position to fight. After having received advice from Goldman to draw down on its revolver accounts, and after the Wall Street Journal had announced that Enron would proceed with the prepayments, Enron was forced as a business necessity to proceed and prepay for all of its CP as desired by the holders or beneficial owners. See Bonan (Vol. 2), 488:6-13 (affirming her contemporaneous comments that the wording of the Wall Street Journal statements was "stupid" and that Enron could not handle this on a customer-by-customer basis or otherwise avoid paying off its commercial paper as requested by customers given the expectations that had been created in the market); id. at

24

488:17-489:2 (same: "I mean, now [Enron] can't do anything. They're frozen out of the market. It's so stupid. It's bad. They shouldn't have said redeemed. They should have said pay off CP."). Goldman knew that Enron could not make the prepayments without its assistance. See Wall (Vol. 2), 379:6-10 ("We were all surprised, frankly, at the inability of Enron to settle their trades."). Indeed, Goldman has conceded this fact. See, e.g., Goldman Resp. to Enron Contention Interrogatory No. 7, at 25 ("Without further assistance, however, Enron was incapable of timely executing the commercial paper buybacks for those holders of Enron commercial paper that purchased the commercial paper through Goldman Sachs."); see also id. (stating that Enron lacked the infrastructure necessary to process the trades, did not know the identity of the holders, how much Enron CP they held, at what discount rate the Enron CP had been purchased, or how the payments could be wired to the holders). Goldman nonetheless insisted on the afternoon of October 26, 2001 that it would not participate unless Enron agreed to make Goldman as its agent. See id. at 25 (admitting that Goldman agreed to participate "only as Enron's agent"); see also Newgard (Vol. 2), 334:6-9; Wall (Vol. 1), 262:13-23, 263:10-16; Wall (Vol. 2), 376:18-23. In making this ultimatum, Goldman abandoned its duties as a dealer and took advantage of Enron's position of weakness; Enron could not refuse Goldman on this issue without suffering grave adverse consequences to its business reputation at a particularly precarious moment. See, e.g., Newgard (Vol. 1), 164:24-165:12. By contrast, as to those issues for which Enron was not dependent on Goldman, Enron terminated Goldman's investment banking services the very day before the Goldman Agency Agreement was executed.

25

# Exhibit No. 2

Hearing Date: June 14, 2007
Reply Deadline: June 12, 2007

VENABLE LLP
Special Litigation Counsel for Reorganized Debtors
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (MS-3109)
Robert L. Wilkins (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Reorganized Debtors
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:                                                 :
                                                       :      Chapter 11
ENRON CREDITORS RECOVERY CORP., *et al.*, :      Case No. 01-16034 (AJG)
                                                       :      Jointly Administered
                Reorganized Debtors.           :

------------------------------------------------------------x
                                                       :
ENRON CREDITORS RECOVERY CORP.,            :
                                                       :
                Plaintiff,                           :
        v.                                            :      Adversary Proceeding
                                                       :      No. 03-92677 (AJG)
                                                       :
GOLDMAN, SACHS & CO., *et al.*,               :
                                                       :
                Defendants.                         :

------------------------------------------------------------x
                                                       :
ENRON CREDITORS RECOVERY CORP.,            :
                                                       :
                Plaintiff,                           :
        v.                                            :      Adversary Proceeding
                                                       :      No. 03-92682 (AJG)
                                                       :
MASS MUTUAL LIFE INSURANCE CO., *et al.*, :
                                                       :
                Defendants.                         :

------------------------------------------------------------x

**ENRON CREDITORS RECOVERY CORP.'S REPLY MEMORANDUM IN SUPPORT
OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ITS JOINDER IN
MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY KELLY PROPERTIES,
INC., VERITAS SOFTWARE INVESTMENT CORP., AND THE UBS DEFENDANTS**

**undisputed** that Goldman Sachs never received any direct and tangible 'benefit'" from the buyback transactions for purposes of § 550(a)(1) (id. at 23 n.22) (emphasis added). It is hard to imagine a more hotly contested issue than this.

Goldman would have this Court conclude that, as a matter of incontrovertible fact, when Enron's situation nose-dived in mid to late October 2001, Goldman's commercial paper managers were absolutely oblivious to Goldman's own painful history in the Penn Central commercial paper litigation and the aftermath, when Goldman ended up in the crosshairs of both its customers, who were left holding defaulted commercial paper following the Penn Central bankruptcy, and the SEC, which ultimately forced Goldman to enter into a consent decree enjoining Goldman from, inter alia, selling commercial paper without regard to creditworthiness. See, e.g., Franklin Savings Bank v. Levy, 551 F.2d 521, 527 (2d Cir. 1977). While Goldman certainly is free to try to sell this tale to a trier of fact, it is preposterous for Goldman to suggest that no evidence possibly could exist to the contrary. The evidence of Goldman's potential liability to its customers had Enron defaulted on its commercial paper is overwhelming. It is virtually inconceivable that Goldman could not have been acutely cognizant of that risk during late October 2001, as Enron's plunge dominated the financial news of the day.

The record showing Goldman's potential liabilities to its customers is far from the "rubbish" theory mocked by Goldman (Mallon Decl., ¶ 4, Ex. 19, Pre-Motion Conf. Tr. at 11-12).

1.    The money that Goldman paid out to its customers in the Penn Central cases based on its liability for Penn Central's defaulted commercial paper was not fanciful. Enron is aware of roughly **twenty** cases where Goldman was sued by customers holding Penn Central commercial paper. Of those cases, several settled (in one of the settled cases,

Goldman paid the customer seventy cents on the dollar for $2 million in Penn Central commercial paper), and several went to trial, with verdicts in favor of plaintiffs against Goldman, for which Goldman ultimately paid out millions of dollars. (Mallon Decl., ¶ 6).

       2.     Some of the key allegations in the <u>Penn Central</u> case would have applied to an Enron commercial paper default as well. Plaintiffs alleged that Goldman repeatedly ignored red flags which signaled the deteriorating financial condition of Penn Central. They also alleged that, during a pivotal window of time (from September 1969 through May 1970), Goldman, in a series of private conferences with the top financial officers of Penn Central, obtained substantial adverse inside information about the financial condition of Penn Central that Goldman did not share with its salesmen and thus did not reveal to its customers. (Mallon Decl., ¶ 4, Ex. 30).

       3.     The <u>Penn Central</u> debacle figured prominently in Goldman's commercial paper manual published in August 1995, only six years prior to the Enron commercial paper prepayments (yet more than two decades after Penn Central). (Mallon Decl., ¶ 4, Ex. 29).

       4.     The SEC certainly does not consider Goldman's liabilities to its commercial paper customers to be fanciful. In the wake of the <u>Penn Central</u> lawsuits, the SEC brought its own action against Goldman, which resulted in the entry of a consent injunction requiring extensive measures to curb the practices that led to those claims. (Mallon Decl., ¶ 4, Ex. 29). That consent decree is mentioned in Goldman's manual. Moreover, the SEC has used the Penn Central experience as an example to dealers of their duties to avoid selling instruments that appear to be creditworthy when the facts may say otherwise. In one decision against a dealer for allegedly misrepresenting the creditworthiness of a securities issuer, the SEC cited the

Penn Central cases against Goldman as a leading example of how a dealer's implicit recommendation of creditworthiness will expose it to liability if that proves not to be the case:

> See, e.g., the series of cases arising from the sales of Penn Central Transportation Company commercial paper shortly before its bankruptcy filing: Alton Box Board Co. v. Goldman Sachs & Co., 560 F.2d 916, 922 (8th Cir.1977); Franklin Savings Bank v. Goldman, Sachs & Co., 551 F.2d 521, 527 (2d Cir. 1977); and University Hill Foundation v. Goldman, Sachs & Co., 422 F. Supp. 879, 893(S.D.N.Y. 1976). As the exclusive source for the purchase of the Penn Central notes, Goldman, Sachs was necessarily recommending them as creditworthy. Franklin Savings Bank, 551 F.2d at 527.

In re Everest Secs., Inc., Admin. Proc. File No. 3-8519 (S.E.C. Aug. 26, 1995), available at http://sec.gov/litigation/opinions/3437600.txt. Presumably, the SEC would not use Penn Central as the paradigm illustration of a dealer's liability to its customers for failing to assess or monitor for issuer creditworthiness if such a theory were "rubbish."

     5.    JP Morgan Securities Inc., a fellow dealer of Enron commercial paper, would not have asserted a proof of claim against Armstrong World Industries, a bankrupt former issuer of commercial paper for indemnification against liability to its customer, the State of Michigan, for having sold the instrument in the first place, nor would JP Morgan have purchased the claim of Michigan against Armstrong, if its fear of liability to its customer were fanciful. (Mallon Decl., ¶ 4, Ex. 21, Bonan Tr. 209, 211-13).

     6.    AMG Guaranty Trust, N.A. ("AMG"), a trust administrator acting on behalf of the Archdiocese of Denver Management Corp ("the Archdiocese"), would not have paid the Archdiocese to settle its claim that AMG failed to sell its $1.5 million piece of Enron commercial paper prior to default, when warnings of creditworthiness had appeared weeks earlier, see Mallon Decl., ¶ 4, Ex. 22, Wright Dep. Tr. at 40, 47-48, if its fear of liability were fanciful.

# Exhibit No. 3

VENABLE LLP
Special Litigation Counsel for Reorganized Debtors
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (MS-3109)
Robert L. Wilkins (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Reorganized Debtors
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| ENRON CREDITORS RECOVERY CORP., *et al.*, | : Case No. 01-16034 (AJG) |
| | : Jointly Administered |
| Reorganized Debtors. | : |

-------------------------------------------------------------------x

| | |
|---|---|
| | : |
| ENRON CREDITORS RECOVERY CORP., | : |
| | : |
| Plaintiff, | : Adversary Proceeding |
| v. | : No. 03-92677 (AJG) |
| | : |
| GOLDMAN, SACHS & CO., *et al.*, | : |
| | : |
| Defendants. | : : |

-------------------------------------------------------------------x

| | |
|---|---|
| | : |
| ENRON CREDITORS RECOVERY CORP., | : |
| | : |
| Plaintiff, | : Adversary Proceeding |
| v. | : No. 03-92682 (AJG) |
| | : |
| MASS MUTUAL LIFE INSURANCE CO., *et al.*, | : |
| | : |
| Defendants. | : |

-------------------------------------------------------------------x

## DECLARATION OF COLLEEN M. MALLON

**EXHIBITS 4, 6, 11, 20, 23, AND 24, AND EXCERPTS FROM EXHIBIT 26, CONTAIN CONFIDENTIAL
INFORMATION AND, PURSUANT TO ¶ 18 OF THE AMENDED CONFIDENTIALITY ORDER, ENTERED
DECEMBER 5, 2006, HAVE BEEN FILED WITH THE COURT UNDER SEAL.**

COLLEEN M. MALLON, pursuant to 28 U.S.C. § 1746, hereby declares:

1.     I am over 18 years of age and not a party to this action.

2.     I am an associate at Venable LLP, a law firm located at Two Hopkins Plaza, Suite 1800, Baltimore, Maryland 21201. I have been admitted to appear in this action *pro hac vice*. Venable LLP represents Enron Creditors Recovery Corp. ("Enron") in <u>Enron Corp. v. Goldman, Sachs & Co., et al.</u>, Adv. Pro. 03-92677 (AJG). Togut, Segal & Segal LLP serves as Venable LLP's co-counsel to Enron in the <u>Goldman</u> case and as sole counsel to Enron in <u>Enron Corp. v. MassMutual Life Insurance Co., et al.</u>, Adv. Pro. 03-92682 (AJG). Discovery in these two proceedings has been consolidated by the Court.

3.     Unless otherwise stated, I have personal knowledge of the facts set forth in this Declaration, which I submit in support of Enron's Reply Memorandum In Support of Motion to Compel Production of Documents and Its Joinder to the Motion to Compel Production of Documents filed by Defendants Kelly Properties, Inc., Veritas Software Investment Corp., and the UBS Defendants.

4.     Annexed hereto, at the number tabs indicated, are true and correct copies of the following documents:

| | |
|---|---|
| **Exhibit 1:** | May 1, 2007 Transcript of Court's Ruling Regarding Parties Request to File a Motion to Compel the production of Project Truman documents against Goldman, Sachs & Co. |
| **Exhibit 2:** | June 2, 2007 letter from counsel for Enron, Michael Schatzow, to counsel for Goldman, Sachs & Co., Thomas J. Moloney. |
| **Exhibit 3:** | Goldman's Response to Plaintiff's First Set of Interrogatories Nos. 1 & 5. |
| **Exhibit 4:** | Handwritten notes, produced by Goldman in discovery in this case, bates pp. GS ENRON-CP14423, GS ENRON-CP 14472-73, and GS ENRON-CP 14508. |

-2-

5.     Goldman produced approximately one hundred pages of handwritten notes with no indication of the author(s) or even the date(s) when they were created. Counsel for Enron asked Goldman and several deponents repeatedly to identify the handwriting, to no avail. In addition to the "GS ENRON-CP" bates stamp Goldman placed on these handwritten notes, most already contain a bates stamp of "GS/SEC___" thus suggesting that Goldman previously produced such handwritten notes to the Securities and Exchange Commission.

6.     Based on publicly available information, Enron is aware of roughly twenty cases where Goldman was sued by customers holding Penn Central commercial paper. Of those cases, several settled (in one of the settled cases, <u>Getty Oil Co. v. Goldman, Sachs & Co.</u>, 71 Civ. 574, Goldman paid the customer seventy cents on the dollar for $2 million in Penn Central commercial paper, <u>available at http://www.prrths.com/PRR_hagley_intro.htm</u>), and several went to trial, with verdicts in favor of plaintiffs against Goldman for which Goldman ultimately paid out millions of dollars. Attached hereto as **Exhibit 31** are true and correct copies of settlements involving Goldman and verdicts against Goldman as a result of the Penn Central bankruptcy.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Baltimore, Maryland
June 12, 2007

                                          _/s/ Colleen M. Mallon_____
                                          COLLEEN M. MALLON

BA2/319422

# EXHIBIT 31

United States District Court
Southern District of New York
------------------------------------x

Welch Foods Inc.,                    :
C. R. Anthony Company and
Younker Brothers, Inc.,              :     70 Civ. 4811 (CLB)

              Plaintiffs,   :

      -against-                :     <u>Judgment</u>

Goldman, Sachs & Co.,                :     # 74,814

            Defendant.    :

------------------------------------x

      This cause having proceeded to trial before

Hon. Charles L. Brieant, and a jury, on September 9, 1974,

and having concluded on October 9, 1974, and the jury having

returned a General Verdict in favor of the plaintiff Welch

Foods Inc. and against the defendant, Goldman, Sachs & Co.,

on the claims of the plaintiff Welch Foods Inc. for rescis-

sion under Section 12(2) of the Securities Act of 1933,

Rule 10b-5 promulgated pursuant to Section 10(b) of the

Securities Exchange Act of 1934, and Section 352-c of the

General Business Law of the State of New York, and in favor

of the plaintiff Younker Brothers, Inc. and against the

defendant, Goldman, Sachs & Co., on the claims of the

plaintiff Younker Brothers, Inc. for rescission under

Section 12(2) of the Securities Act of 1933 and Rule 10b-5

promulgated pursuant to Section 10(b) of the Securities

Exchange Act of 1934, and in favor of the plaintiff

C. R. Anthony Company and against the defendant, Goldman,

MICROFILM
OCT 17 1974

Sachs & Co., on the claims of the plaintiff C. R. Anthony
Company for rescission under Section 12(2) of the Securities
Act of 1933 and Rule 10b-5 promulgated pursuant to Section
10(b) of the Securities Exchange Act of 1934, it is

      1.  Ordered and Adjudged, that the sales to the
plaintiff Welch Foods Inc. by the defendant, Goldman, Sachs
& Co., of two promissory notes of Penn Central Transporta-
tion Company on March 31, 1970 and April 1, 1970 each in the
face amount of $500,000 be and the same hereby are rescinded
and

      (a)  that the plaintiff Welch Foods Inc. re-
cover of the defendant, Goldman, Sachs & Co., on the First,
Second and Third Counts of The Complaint $485,781.25,
together with interest thereon at the rate of 7.5 per cent
per annum from March 31, 1970, to and including August 31,
1972, and at the rate of 6 per cent per annum from
September 1, 1972, to and including the date of entry of
judgment herein, in the amount of $150,916.25, and also
recover of the defendant, Goldman, Sachs & Co., on the First,
Second and Third Counts of The Complaint $485,894.10, to-
gether with interest thereon at the rate of 7.5 per cent
per annum from April 1, 1970, to and including August 31,
1972, and at the rate of 6 per cent per annum from
September 1, 1972, to and including the date of entry of
judgment herein, in the amount of $150,850.00, for a total
principal amount of $971,675.35 and total interest of
$301,766.25, all totaling $1,273,441.60, and

(b)  that simultaneously with receipt of payment of the total amount set forth in paragraph 1(a) hereinabove, the plaintiff Welch Foods Inc. shall deliver to the defendant, Goldman, Sachs & Co., two promissory notes of Penn Central Transportation Company, each in the face amount of $500,000 purchased by the plaintiff Welch Foods Inc. from the defendant, Goldman, Sachs & Co., on March 31 and April 1, 1970; and it is further

2.  Ordered and Adjudged, that the sale to the plaintiff Younker Brothers, Inc. by the defendant, Goldman, Sachs & Co., of one promissory note of Penn Central Transportation Company on February 13, 1970 in the face amount of $500,000 be and the same hereby is rescinded and

(a)  that the plaintiff Younker Brothers, Inc. recover of the defendant, Goldman, Sachs & Co., on the First and Second Counts of The Complaint $468,973.96, together with interest thereon at the rate of 7.5 per cent per annum from February 13, 1970, to and including August 31, 1972, and at the rate of 6 per cent per annum from September 1, 1972, to and including the date of entry of judgment herein in the amount of $149,700.64, totaling $618,674.60, and

(b)  that simultaneously with receipt of payment of the total amount set forth in paragraph 2(a)

-3-

hereinabove, the plaintiff Younker Brothers, Inc. shall deliver to the defendant, Goldman, Sachs & Co., one promissory note of Penn Central Transportation Company in the face amount of $500,000 purchased by the plaintiff Younker Brothers, Inc. from the defendant, Goldman, Sachs & Co., on February 13, 1970; and it is further

3. Ordered and Adjudged, that the sales to the plaintiff C. R. Anthony Company by the defendant, Goldman, Sachs & Co., of three promissory notes of Penn Central Transportation Company on January 30, 1970 each in the face amount of $500,000 be and the same hereby are rescinded and

(a) that the plaintiff C. R. Anthony Company recover of the defendant, Goldman, Sachs & Co., on the First and Second Counts of The Complaint $1,444,284.73, together with interest thereon at the rate of 7.5 per cent per annum from January 30, 1970, to and including August 31, 1972, and at the rate of 6 per cent per annum from September 1, 1972, to and including the date of entry of judgment herein in the amount of $465,239.49, totaling $1,909,524.22, and

(b) that simultaneously with receipt of payment of the total amount set forth in paragraph 3(a) hereinabove, the plaintiff C. R. Anthony Company shall deliver to the defendant, Goldman, Sachs & Co., three promissory notes of Penn Central Transportation Company

-4-

each in the face amount of $500,000 purchased by the plaintiff C. R. Anthony Company from the defendant, Goldman, Sachs & Co., on January 30, 1970; and it is further

4.  Ordered and Adjudged, that execution upon the Judgment in favor of the plaintiffs Welch Foods Inc., Younker Brothers, Inc. and C. R. Anthony Company and against the defendant, Goldman, Sachs & Co., may issue; *upon expiration of ten (10) days pursuant to Rule 62(a)* and it is further

5.  Ordered and Adjudged, that the plaintiffs Welch Foods Inc., Younker Brothers, Inc. and C. R. Anthony Company recover of the defendant, Goldman, Sachs & Co., their costs and disbursements to be taxed herein at the foot of this Judgment by the Clerk.

Dated:  New York, New York
        October 17th, 1974

                                    *Charles L. Brieant Jr*
                                        U.S.D.J.

JUDGMENT ENTERED:— *10-17-74*

*Raimund J. Burghardt*
        Clerk .

-5-

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

GETTY OIL COMPANY,                  :

           Plaintiff,     :

    -against-                      :

GOLDMAN, SACHS & CO.,               :

           Defendant.     :

- - - - - - - - - - - - - - - - x

71 Civ. 547(HRT)

STIPULATION OF
SETTLEMENT AND
DISCONTINUANCE

         IT IS HEREBY STIPULATED that this action is

settled and discontinued with prejudice and without costs.

Dated: New York, New York
       March 17, 1975

HAYS, LANDSMAN & HEAD

By _____
    C. Lansing Hays, Jr.
    Attorneys for Plaintiff,
    11 Broadway,
      New York, New York 10004.
      (212) 944-8260

      -and-

POLLACK & SINGER

By _____
    Daniel A. Pollack
    Trial Counsel for Plaintiff,
    61 Broadway,
      New York, New York 10006.
      (212) 952-0330

SULLIVAN & CROMWELL

By _____
    William Piel, Jr.

By _____
    Philip L. Graham, Jr.
    Attorneys for Defendant,
    48 Wall Street,
      New York, New York 10005
      (212) 952-8100

SO ORDERED: MARCH 17 1975

_____
U. S. D. J.

U.S. DISTRICT COURT
FILED
MAR 19 1975
S. D. OF N.Y.

MICROFILM
MAR 19 1975

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

OLYMPIA BREWING COMPANY,                :

           Plaintiff,                    :

   -against-                                :

GOLDMAN, SACHS & CO.,                    :

           Defendant.                   :

- - - - - - - - - - - - - - - x

RECEIVED
JUL 03 1975
JUDGE MOTLEY'S CHAMBERS

71 Civ. 1125(CBM)

**STIPULATION OF
SETTLEMENT AND
DISCONTINUANCE**

        IT IS HEREBY STIPULATED that this action is

settled and discontinued with prejudice and without costs.

Dated: New York, New York
      July 1, 1975

VALICENTI LEIGHTON REID & PINE

By _M. J. Valicenti_
    M. J. Valicenti
  Attorneys for Plaintiff,
    437 Madison Avenue,
    New York, N.Y. 10022
    (212) 593-3434

      -and-

POLLACK & SINGER

By _Daniel A. Pollack_
    Daniel A. Pollack
  Trial Counsel for Plaintiff,
    61 Broadway,
    New York, N.Y. 10006
    (212) 952-0330

SULLIVAN & CROMWELL

By _Michael M. Maney_
    Michael M. Maney
  Attorneys for Defendant,
    48 Wall Street,
    New York, N.Y. 10005
    (212) 952-8100

SO ORDERED: July 1, 1975

_Constance Baker Motley_
  Constance B. Motley
    U. S. D. J.

MICROFILM
JUL 09 1975

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

GOOD HOPE CORPORATION,                :        71 Civ. 191 (MEL)

                    Plaintiff,        :

        -against-                     :        STIPULATION OF
                                               SETTLEMENT AND
GOLDMAN, SACHS & CO.,                 :        DISCONTINUANCE

                    Defendant.        :

- - - - - - - - - - - - - - - - - x

            IT IS HEREBY STIPULATED that this action is

settled and discontinued with prejudice and without costs.

Dated:   New York, New York
         June 4, 1975


DAVIDSON, DAWSON & CLARK              SULLIVAN & CROMWELL

By _____           By _____
   Leslie D. Dawson                     Michael M. Maney
   Attorneys for Plaintiff,             Attorneys for Defendant,
   345 Park Avenue,                     48 Wall Street,
   New York, New York 10022             New York, New York 10005
   (212) 751-6065                       (212) 952-8100

            -and-

POLLACK & SINGER

By _____
   Daniel A. Pollack
   Trial Counsel for Plaintiff,
   61 Broadway,
   New York, New York 10006
   (212) 952-0330


SO ORDERED:

_____
   Morris E. Lasker
   U. S. D. J.

MICROFILM    JUN 16 1975

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

THE COLLEGE LIFE INSURANCE COMPANY    :
OF AMERICA,

              Plaintiff,    : ...

      -against-    : 71 Civ. 381 (TPG)

GOLDMAN, SACHS & CO.,    : STIPULATION OF
                            SETTLEMENT AND
           Defendant.    : DISCONTINUANCE

                              :

- - - - - - - - - - - - - - - - - - x



        IT IS HEREBY STIPULATED that this action is

settled and discontinued with prejudice and without costs.

Dated:  New York, New York
       January 20, 1976

GRAUBARD MOSKOVITZ, MCGOLDRICK    SULLIVAN & CROMWELL
DANNETT & HOROWITZ

By _____    By _____
    Everett A. Eisenberg        Michael A. Cooper
Attorneys for Plaintiff,
   345 Park Avenue
    New York, New York 10022.
    (212) 593-3000
                 Attorneys for Defendant,
                 48 Wall Street,
                  New York, New York 10005
                 (212) 952-8100

SO ORDERED:

_____
   Thomas P. Griesa
    U. S. D. J.

Jan. 20, 1976

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

PRATT INSTITUTE,                    :

              Plaintiff,    :

  -against-                         :

GOLDMAN, SACHS & CO.,               :

             Defendant.    :

- - - - - - - - - - - - - - - - x

71 Civ. 190 (MEL)

STIPULATION OF
SETTLEMENT AND
DISCONTINUANCE

U. S. DISTRICT COURT
FILED
JUN 16 1975
S. D. OF N.Y.

       IT IS HEREBY STIPULATED that this action is settled and discontinued with prejudice and without costs.

Dated:  New York, New York
       June 4, 1975

DAVIDSON, DAWSON & CLARK

By _Leslie D. Dawson_
    Leslie D. Dawson
  Attorneys for Plaintiff,
    345 Park Avenue,
  New York, New York 10022
    (212) 751-6065

SULLIVAN & CROMWELL

By _Michael M. Maney_
    Michael M. Maney
  Attorneys for Defendant,
    48 Wall Street,
  New York, New York 10005
    (212) 952-8100

-and-

POLLACK & SINGER

By _Daniel A. Pollack_
    Daniel A. Pollack
  Trial Counsel for Plaintiff,
    61 Broadway,
  New York, New York 10006.
    (212) 952-0330

MICROFILM
JUN 16 1975

SO ORDERED:

_Morris E. Lasker_
    Morris E. Lasker
    U. S. D. J.

# Exhibit No. 4

# A SUIT IS AVERTED ON PENNSY NOTES

## Goldman, Sachs Has Agreed to Pay Getty $1.4-Million, 70 Cents on the Dollar

**By ROBERT J. COLE**

The Getty Oil Company was disclosed yesterday to have won a $1.4-million settlement from the investment house of Goldman, Sachs & Co. for selling Getty $2-million of notes of the Penn Central Transportation Company only five months before the Pennsy went into bankruptcy.

The out-of-court settlement, reached shortly before the Getty suit was to go to trial in Federal District Court here, upset an earlier pattern established by Goldman, Sachs in which it had paid roughly 25 cents on the dollar to investors in Penn Central corporate I.O.U.'s—commercial paper.

The $1.4-million settlement, amounting to 70 cents on the dollar, was believed to have been agreed upon in the light of a jury decision last October that gave three other investors all of their money back ($3-million) plus interest. That award—to Welch Foods, Inc., the C. R. Anthony Company and Youncker Bros.—was not appealed by Goldman, Sachs.

### Papers Signed

Court papers in the Getty case, signed by Federal Judge Harold R. Tyler Jr. of the Southern District of New York, report the settlement but disclose no details.

Daniel A. Pollack of the New York law firm of Pollack & Singer, trial attorneys for Getty, refused to discuss the settlement. Michael M. Maney of Sullivan & Cromwell, attorneys for Goldman, Sachs, would neither confirm nor deny the amount involved.

However, executives familiar with the details said that Getty had purchased two Penn Central notes of $1-million each and, in exchange for $1.4-million in cash, had returned one of the notes to Goldman, Sachs and had kept the other to seek recovery in the Pennsy's reorganization. The value of the notes, presently undetermined, would depend on the outcome of the reorganization proceedings now under way in Philadelphia before Federal Judge John P. Fullam.

### Suit Filed in 1971

Getty purchased the notes in February, 1970, about five months before the railroad company went into bankruptcy. It sued Goldman, Sachs to recover $2-million plus interest in February, 1971.

Although Goldman, Sachs is known to have sold a substantial amount of Penn Central commercial paper, only $82.5-million was outstanding at the time of bankruptcy petition and only about $60-million of that has been involved in litigation.

About 20 lawsuits are still pending, with an estimated $20-million at stake. Goldman, Sachs reported earlier this year that it had "carefully prepared for any potential outcome of the remaining litigation to insure that these suits will not impair our capital."

### Chessie Weighs 7% Rate

Chessie System, Inc., has decided that the several railroads it owns and controls—the Chesapeake & Ohio, the Baltimore & Ohio and the Western Maryland—should put the 7 per cent

Continued on Page 47, Column 4

The New York Times
Published: March 27, 1975
Copyright © The New York Times

# A SUIT IS AVERTED
# ON PENNSY NOTES

### Continued From Page 41

freight rate increase the Inter-
state Commerce Commission
has approved into effect, even
though it was not a party to
the rate application.

The new tariffs, which are
expected to be effective April
12, should gross the Chessie's
lines an additional $60-million
a year.

Chessie contested the I.C.C.'s
authority to require its rail-
roads to use proceeds from
a 10 per cent freight rate in-
crease that became effective
last June, for clearing away
deferred maintenance and post-
poned capital improvements.

That case is still before the
courts and there had been some
speculation within the industry
that the Chessie lines might
not put the 7 per cent increase
into effect until a final decision
had been issued.

Chessie officials said yester-
day that since the I.C.C. this
time had not imposed any re-
strictions on the use of the
rates it would accept them and
funds derived from the higher
not complicate the industry
rate situation.

#### The New York Times

Published: March 27, 1975
Copyright © The New York Times

# Exhibit No. 5

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1974 WL 402 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,556
**(Cite as: Not Reported in F.Supp.)**

SEC v. Goldman, Sachs & Co.

United States District Court; S.D. New York.
**Securities and Exchange Commission**
v.
**Goldman, Sachs & Co.**
**No. 74-1916**

74-1916

May 2, 1974

TYLER, District Judge.

*1 The plaintiff, Securities and Exchange Commission ("Commission"), having filed its Complaint herein on May 2, 1974, and defendant, Goldman, Sachs & Co. ("Goldman, Sachs"), having acknowledged receipt of a copy of the Summons and Complaint filed herein and having appeared herein and admitted the jurisdiction of this Court over the subject matter of this action and over the person of defendant by the filing of an answer on May 2, 1974; and Goldman, Sachs, without admitting or denying any of the allegations of the Complaint and solely for the purposes of this lawsuit, having further consented by Stipulation of Settlement dated May 2, 1974, filed in this Court, to the entry of this Final Judgment of Permanent Injunction by Consent; and the parties having waived the entry of findings of fact and conclusions of law under the provisions of Rule 52 of the Federal Rules of Civil Procedure, and there being no just reason for delay in the entry of this Judgment, and it appearing further that no notice of hearing upon the entry of said Final Judgment of Permanent Injunction by Consent need be given;

NOW, THEREFORE, upon the abovementioned Stipulation of Settlement between the Commission and Goldman, Sachs, upon all prior proceedings had herein, and upon the consent of the parties hereto it is

ORDERED, ADJUDGED and DECREED that Goldman, Sachs be, and it hereby is, permanently restrained and enjoined, directly or indirectly by use of any means or instruments of transportation or communication in interstate commerce or of the mails, from effecting the sale, in violation of Section 17(a) of the Securities Act of 1933, 15 U. S. C. § 77q(a), of unsecured corporate promissory notes having a maturity at the time of issuance not exceeding nine months issued by Penn Central

Company, Penn Central Transportation Company (including the Trustees in Reorganization of Penn Central Transportation Company), or Pennsylvania Company;

ORDERED, ADJUDGED and DECREED that Goldman, Sachs shall implement as soon as practicable, but in no event later than 60 days from the date hereof, and thereafter supervise its employees' compliance with, a written statement of policy with respect to its activities as a broker or dealer in commercial paper, substantially in the form annexed hereto as Exhibit A, which policy shall not be amended in any material respect except with the prior approval of the Commission; and it is hereby further

ORDERED, ADJUDGED and DECREED that this Court shall retain jurisdiction of this matter.

*EXHIBIT A*

*GOLDMAN, SACHS & CO.*

*Statement of Policy With Respect to Acting As Broker or Dealer in Commercial Paper*

This statement represents the policy of Goldman, Sachs & Co. ("Goldman, Sachs") with regard to the procedures to be employed in connection with the sale to the public by it, as broker for the issuer or as dealer purchasing from the issuer for resale, of corporate unsecured promissory notes having a maturity at the time of issuance not exceeding nine months, other than notes which qualify for exemption from registration under Sections 3(a)(2), 3(a)(5) or 3(a)(10) of the Securities Act of 1933 ("commercial paper"). This statement has not been approved or disapproved by the Securities and Exchange Commission (the "Commission"), nor has the Commission passed upon the adequacy of the procedures set forth herein as constituting compliance with applicable federal securities laws.

*2 1. Before Goldman, Sachs makes its initial purchase of commercial paper from an issuer for the purpose of public resale as a dealer, or before Goldman, Sachs, as broker for the issuer, offers for the first time the commercial paper of an issuer to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 2
Not Reported in F.Supp., 1974 WL 402 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,556
**(Cite as: Not Reported in F.Supp.)**

public:

(i) Goldman, Sachs will conduct such investigation as may be required under the circumstances for it reasonably to conclude that the issuance of such commercial paper by such issuer has been duly authorized by all necessary corporate action and that such commercial paper is not required to be registered under the Securities Act of 1933 for the purpose of the public sale or resale thereof.

(ii) Goldman, Sachs will obtain such information, including copies of current reports filed by such issuer with the Commission, and will conduct such investigation as may be required under the circumstances to give Goldman, Sachs reasonable ground to believe that such issuer will have the ability to pay such commercial paper as it matures.

2. Goldman, Sachs will use its best efforts to obtain from each issuer selling commercial paper to Goldman, Sachs, as dealer, or through Goldman, Sachs, as broker, an agreement to furnish promptly to Goldman, Sachs, so long as such issuer continues to sell commercial paper to or through Goldman, Sachs, copies of all reports filed by such issuer with the Commission pursuant to Section 13(a) of the Securities Exchange Act of 1934 (or, if such issuer is not subject to such filing requirements, such information reasonably comparable to such reports as may be necessary under the circumstances to evaluate the commercial paper of such issuer) and of all reports (if any) mailed by such issuer to its public shareholders. If Goldman, Sachs is unable to obtain such an agreement it will use its best efforts to obtain such periodic reports or comparable information from other sources for so long as such issuer continues to sell commercial paper to or through Goldman, Sachs.

3. So long as an issuer continues to sell commercial paper to or through Goldman, Sachs for public sale or resale, goldman, Sachs will use its best efforts to obtain the periodic reports or comparable information described in paragraph 2 above, will exercise reasonable care to obtain other current information in respect of such issuer, and will make such review of the reports and other information so obtained by it as may be required under the circumstances to permit Goldman, Sachs to conclude that, after the exercise of reasonable care, it has no reason to believe that such issuer will be unable to pay its commercial paper as it matures.

4. Goldman, Sachs will furnish (unless the purchaser advises otherwise) to the purchaser of any commercial paper purchased by it from the issuer as dealer or sold by it as broker for the issuer, at or before the delivery of such commercial paper, information relating to the ability of the issuer to pay its commercial paper at maturity which is consistent with that on which Goldman, Sachs reached its conclusion as to the ability of the issuer to make such payment.

**\*3** 5. From time to time this statement of policy may be revised in the light of developments in the law, questions of interpretation and application, and practical experience with the procedures contemplated by the statement, but no material revision may be made except with the prior approval of the Commission, and all changes in this statement shall be promptly filed with the Staff of the Commission.

6. This statement shall be distributed to all personnel in the Commercial Paper Department, to all partners in the firm of Goldman, Sachs and to all officers in the New Business Department. At least quarterly a representative of the Legal Department will review with the partner in charge of the Commercial Paper Department and the vice president in charge of the credit department of the Commercial Paper Department the steps taken to implement this statement of policy and the records maintained by the Commercial Paper Department in connection therewith.

WHEREAS, the plaintiff Securities and Exchange Commission (the "Commission") commenced this action on May 2, 1974; and

WHEREAS, the Commission and defendant, Goldman, Sachs & Co. ("goldman, Sachs"), have agreed to settle this action without trial or adjudication of any issue of fact or law herein, and without this Stipulation constituting evidence or an admission with respect to any such issue; and

WHEREAS, defendant Goldman, Sachs hereby admits the jurisdiction of this Court with respect to the subject matter of this action and of the parties hereto and enters a general appearance;

NOW, THEREFORE, the parties to this Stipulation hereby agree as follows:

1. Plaintiff Commission and defendant Goldman,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1974 WL 402 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,556
**(Cite as: Not Reported in F.Supp.)**

Sachs hereby waive the entry of findings of fact and conclusions of law under the provisions of <u>Rule 52 of the Federal Rules of Civil Procedure</u> and consent to the entry by the Court of the Final Judgment of Permanent Injunction ("Judgment") in the form annexed hereto as Exhibit A, at any time on or after the date hereof upon motion of either party without notice or any further proceedings;

2. The Commission will not use this Stipulation or the Judgment against Goldman, Sachs as the basis for the institution of any administrative proceeding.

SEC v. Goldman, Sachs & Co.
Not Reported in F.Supp., 1974 WL 402 (S.D.N.Y.),
Fed. Sec. L. Rep. P 94,556

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit No. 6

1        UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

2        ----------------------------------------X In re:

3        ENRON CREDITORS RECOVERY CORP., et al.,

4              -against-

5              Reorganized Debtors. Chapter 11 Case No:    01-16034 (AJG)

6        ----------------------------------------X ENRON CREDITORS RECOVERY CORP.,

7                        Plaintiff,

8              -against-

9        GOLDMAN, SACHS & CO., et al.,

10                       Defendants. Adv Proceeding No.:   03-92677 (AJG)

11       ----------------------------------------X ENRON CREDITORS RECOVERY CORP.,

12                       Plaintiff,

13             -against-

14       MASSMUTUAL LIFE INSURANCE CO., et al.,

15                       Defendants.

16       Adv. Proceeding No.:   03-92682 (AJG) ----------------------------------------X

17                       One Liberty Plaza

18                       New York, New York

19                       August 14, 2007            9:38 a.m.

20                  VIDEOTAPED DEPOSITION of JOHN

21       WILLIAN, before Melissa Gilmore, a Notary Public of the State of New York.

22

23          ELLEN GRAUER COURT REPORTING CO. LLC      126 East 56th Street, Fifth

24             New York, New York 10022        212-750-6434

25             REF: 84930

          25          REF: 84930

1              WILLIAN

2      somehow involved as a -- in -- in the sale of

3      that CP.

4          Q.    During your entire tenure at Goldman

5      Sachs, have you ever been involved in a

6      conversation with anyone prior to yesterday

7      concerning Goldman Sachs' potential liability

8      to its investor customers as a dealer in

9      commercial paper?

10         A.    Yes.

11         Q.    And what -- what was discussed?

12     What was the subject of those conversations?

13             MR. MOLONEY:  First of all, will

14         they -- exclude any conversations you

15         might have had with lawyers from your

16         answer.

17         A.    Okay.  That's fine.  There is no

18     specific conversations I can refer you to, but

19     I would say that we consistently conducted due

20     diligence with respect to, you know, clients

21     that we issued CP for, understanding that as a

22     dealer, we had certain obligations with respect

23     to the investments we were selling.

24         Q.    And insofar as commercial paper is

25     concerned, were those obligations to not sell

        25    concerned, were those obligations to not sell

1          WILLIAN

2     commercial paper of an issuer about whom there

3     were substantial concerns about their ability

4     to pay the commercial paper when due?

5          A.   Yeah, I would say that's a fair

6     description.

7          Q.   Do you know whether this manual --

8     and by this manual, I mean Exhibit 10,369, was

9     in effect in October of 2001?

10          A.   I do not.

11          Q.   If you wanted to know whether this

12     manual was in effect in October of 2001, how

13     would you go about determining that?

14          A.   I would have asked -- I haven't read

15     through the whole manual so I don't -- I can't

16     tell that I would know the contents that would

17     direct me to one particular version, but it's

18     most likely that at that time, I would have

19     asked Chris Kersey.

20          Q.   Let's take a look at what we have

21     predesignated as 25, which has been previously

22     marked as Exhibit 10,368.

23          Prior to your meeting with your

24     attorneys yesterday, had you ever seen this

25     document?

      25    document?

# Exhibit No. 7



## MONEY MARKET SECURITIES

The following compliance policies and procedures address certain questions that may arise in connection with the trading of commercial paper, certificates of deposit, bank notes and bankers' acceptances.

I.    **TRADING THROUGH GOLDMAN SACHS MONEY MARKETS, L.P.**

**A.    General.**    Commercial paper (with the exception of tax-exempt commercial paper and certain high yield commercial paper) is traded in the United States only through Goldman Sachs Money Markets, L.P. ("GSMMLP"). In general, "commercial paper" within the scope of the consent decree (discussed in Part I.B below) is traded through GSMMLP. Accordingly, such "commercial paper" may be offered and sold in the United States only by GSMMLP salespersons or with a GSMMLP salesperson on the telephone (in which case the GSMMLP salesperson receives credit for the trade). GSMMLP's sole general partner, GSMM Corp., assists in the clearance and settlement of commercial paper for GSMMLP and of other money market instruments for Goldman, Sachs & Co. ("GS&Co.").

GSMMLP is separate from GS&Co. and The Goldman Sachs Group, L.P. ("GS Group") and should not be identified as a "part" or "division" of GS&Co. or GS Group. In dealings with investors, no reliance should be placed on the credit, reputation or business conduct of any entity other than GSMMLP. Neither GS&Co. nor GS Group "supports," "backs," "guarantees" or "stands behind" the obligations, transactions or other dealings of GSMMLP. Accordingly, under no condition should the balance sheets or annual reports of GS&Co. or GS Group be distributed for the purpose of representing the creditworthiness or business of GSMMLP.

**B.    Consent Decree.**    In May 1974, GS&Co. and the Securities and Exchange Commission (the "SEC") agreed to the entry of a permanent injunction arising out of the sale by GS&Co. of commercial paper of Penn Central Transportation Company ("Penn Central"). In August 1995, this injunction was removed and currently no longer applies to GS&Co. and GSMMLP. Penn Central went bankrupt in the early 1970s and defaulted on its commercial paper obligations, including commercial paper sold by GS&Co. The Penn Central bankruptcy affected the commercial paper market generally, and the Federal



Attorney's Eyes Only                                                                    GS ENRON-CP00269



Reserve Board had to intervene to restore confidence in that market. The injunction contained an undertaking by GS&Co. to implement a statement of policy concerning its activities as a commercial paper broker or dealer. These policies imposed upon employees of GSMMLP and GS&Co. certain affirmative obligations to investigate the creditworthiness of an issuer of commercial paper.

II.    **COMMERCIAL PAPER.**

A.    **Definition of Commercial Paper.**  In general, commercial paper refers to short-term promissory notes sold to institutional investors and, to a lesser extent, to high net worth individuals.  Commercial paper notes typically are sold in denominations ranging from $100,000 to $5,000,000 or more (depending on the exemption relied upon).  Maturities can vary from one to 270 days (non-Section 3(a)(3) commercial paper, discussed in Part II.B below, may have maturities of up to one year), but most commercial paper is issued for terms of 15 to 45 days.

Most commercial paper is settled on a book-entry basis through The Depository Trust Company ("DTC"), although some commercial paper is still physically settled.  Before the first issuance of book-entry commercial paper, the issuing and paying agent issues and holds in custody for DTC master notes which represent all the commercial paper to be issued by the issuer.  The master notes should contain all the information that a physical certificate would contain.  With entries by the issuing and paying agent on the master notes and onto DTC's electronic system representing new issuances and payments of maturing notes, the amount of commercial paper represented by the master notes will fluctuate as commercial paper is issued and matures.  The documentation required to qualify a commercial paper program for settlement through DTC includes an eligibility form, confirmation of rating and a "letter of representations" agreement among the issuer, the issuing and paying agent and DTC.

B.    **U.S. Securities Law Exemptions.**  No offer or sale of commercial paper may be made in the United States by an issuer or an affiliate of the issuer unless the commercial paper is registered under the Securities Act of 1933 (the "Securities Act") or an exemption from the registration requirements of the Securities Act is available.  *See* Policies and Procedures Memorandum entitled "Basic Legal Issues in SEC Registered Public Offerings."  Discussed below are certain exemptions that may be available for offers and sales of commercial paper.

Attorney's Eyes Only                                                           GS ENRON-CP00270



**1.     Section 3(a)(3).**  Section 3(a)(3) of the Securities Act exempts from the registration requirements of the Securities Act commercial paper "which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." Section 3(a)(3) applies only to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public -- that is, paper issued to facilitate well recognized types of current operational business requirements.  These elements are considered in turn:

> **a.     Prime Quality.**  The SEC has not defined what it considers to be prime quality commercial paper.  However, commercial paper rated investment grade generally should qualify and non-investment grade commercial paper does not qualify.
>
> **b.     Of a Type Not Ordinarily Purchased by the General Public.**  This requirement may be satisfied by issuing commercial paper in relatively large denominations, ordinarily $100,000 or more, and by avoiding any general advertising in the marketing of the notes.  Depending on their content, press releases and "tombstone" advertisements could therefore raise a legal concern, although tombstones simply announcing Section 3(a)(3) programs are commonly published and considered permissible. Salespeople and Credit Department personnel should consult with the Legal Department or Fixed Income Compliance before any press release or advertisement is used for any commercial paper program.
>
> **c.     Issued to Facilitate Current Operational Business Requirements.**  To satisfy this requirement, the proceeds of commercial paper sales must be used for interim commercial financing and not for permanent or long-term investment.  Current operational business requirements ordinarily would include, for example, the financing of sales and the provision of funds to carry accounts receivable and inventories, but would not include, for example, the financing of capital expenditures and investments (other than on an interim basis) or the repayment of debt incurred for such purposes (other than short-term maturities).

Attorney's Eyes Only                                                          GS ENRON-CP00271

Goldman
Sachs

Since money is fungible, the SEC staff has determined that it is not necessary to track the actual use of proceeds of commercial paper to specific permitted uses. Instead, it is generally sufficient to create a system that insures that at all times the outstanding amount of commercial paper issued in reliance upon Section 3(a)(3) does not exceed the amount of receivables and other assets of the issuer arising out of current transactions.

> **d.    Maturity Not Exceeding Nine Months.**  The SEC has interpreted the nine-month limit on maturity as excluding notes which are open-ended and payable upon demand or which provide for automatic roll-over.

A parent guarantee of a subsidiary's commercial paper issued in reliance on Section 3(a)(3) is also entitled to the Section 3(a)(3) exemption.

An investor may resell Section 3(a)(3) commercial paper without restriction.

**2.    Section 4(2) and Regulation D.**  Section 4(2) of the Securities Act exempts from the registration requirements of that Act "private placement" transactions by an issuer not involving any public offering. To qualify for the Section 4(2) exemption, offerees and purchasers of commercial paper must have available or be furnished with material information regarding the issuer (and any guarantor) and the commercial paper, must be qualified to evaluate the merits and risks of the proposed investment and must not purchase the commercial paper with a view to resale or other distribution (although resales under Rule 144A, discussed in Part II.B.3 below, are permitted). In addition, specific limitations on the number of offerees may be imposed in certain circumstances. The documentation for a particular program may contain specific limitations on the number of offerees. Where GSMMLP is a co-dealer for a commercial paper program and a limitation on the number of offerees is imposed, coordination with the other co-dealers as to compliance with the applicable limits will be required. Programs that have a limit on the number of offerees and that appear on the Money Market Portfolio System or Commercial Paper Trading System should be carefully reviewed with the Legal Department and Fixed Income Compliance.

---

Attorney's Eyes Only

GS ENRON-CP00272

# Exhibit No. 8

Broderick, Craig  8/3/2007  9:50:00 AM

1       UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

2       ----------------------------------------X In re:

3       ENRON CREDITORS RECOVERY CORP., et al.,

4            -against-

5            Reorganized Debtors. Chapter 11 Case No:    01-16034 (AJG)

6       ----------------------------------------X ENRON CREDITORS RECOVERY CORP.,

7                      Plaintiff,

8            -against-

9       GOLDMAN, SACHS & CO., et al.,

10                   Defendants. Adv Proceeding No.:  03-92677 (AJG)

11      ----------------------------------------X ENRON CREDITORS RECOVERY CORP.,

12                   Plaintiff,

13           -against-

14      MASSMUTUAL LIFE INSURANCE CO., et al.,

15                   Defendants. Adv. Proceeding No.:  03-92682 (AJG)

16      ----------------------------------------X

17                   One Liberty Plaza            New York, New York

18                   August 3, 2007

19                   9:50 a.m.

20           VIDEOTAPED DEPOSITION of CRAIG W.

21      BRODERICK, before Melissa Gilmore, a Notary Public of the State of New York.

22

23           ELLEN GRAUER COURT REPORTING CO. LLC    126 East 56th Street, Fifth

24           New York, New York 10022            212-750-6434

25           REF: 84925

        25       REF: 84925

1          BRODERICK

2     One, I'm not certain now, and two, I'm not

3     certain as of the date that this system was

4     queried.  I have no idea when that is.

5          I'm 99 percent certain that in --

6     99.9 percent certain that on October 16th, we

7     didn't have an ICR8.

8          Q.   And because if you had an ICR of 8,

9     you would have stopped -- you would have done

10    something different with Enron at that point?

11         A.   It would have reflected a credit

12    quality which was -- if that ICR8 was accurate,

13    it reflected a credit quality which was, you

14    know, not prime credit quality.

15         Q.   And as you understand it, it would

16    have not been appropriate if the ICR truly had

17    been 8 on October 16th, for Goldman Sachs

18    thereafter to have been issuing commercial

19    paper for Enron as its dealer?

20         A.   If the ICR8 really reflected our

21    credit thoughts, right.  So I'm not saying that

22    if, in fact, it's ultimately shown that we had

23    an ICR8 in here for whatever reason, we

24    wouldn't have been appropriately issuing

25    commercial paper because the fact is, on

     25   commercial paper because the fact is, on

1           BRODERICK

2     October 16th, we thought that we were still --

3     it was still a perfectly fine credit for

4     commercial paper issuance.

5          Q.    But if, in fact, the ICR was 8, and

6     the ICR of 8 reflected the considered judgment

7     of the senior, then Goldman should not have

8     continued to issue -- assisted the issuer in

9     placing commercial paper thereafter; is that

10    correct?

11         A.    At a minimum, we would have wanted

12    to have a very serious conversation with the

13    issuer.

14         Q.    And you wouldn't have wanted to be

15    in the position of putting that commercial

16    paper out in the marketplace for somebody who

17    you truly thought was an 8, if that's what you

18    truly thought?

19         A.    That's -- that's accurate.  Our

20    reputation is of paramount importance, and that

21    is something we would have considered very

22    carefully in that circumstance, reputation with

23    issuers and reputation with investors as well.

24         Q.    All of the contingent risk,

25    reputational and otherwise, were from placing

       25    reputational and otherwise, were from placing

1          BRODERICK

2     commercial paper, correct?

3          MR. MOLONEY:  Objection to the form

4        of the question.  You can answer.

5          A.    Madam, repeat the question.  I'm

6     sorry.

7          Q.    You would have been concerned about

8     your reputational injury, but you also would

9     have been con -- reputational risk, but you

10     would have been also concerned about all of

11     the -- what Goldman considers to be the

12     contingent risks associated with the placing of

13     commercial paper?

14          A.    Well, I think we would lump

15     reputational into contingent.  I wouldn't

16     distinguish the -- distinguish them.

17          Q.    Right.  And one of those risks, of

18     course, is the risk that arose out of Penn

19     Central, which is that an issuer -- that a

20     holder of commercial paper, who is one of your

21     investor customers, if you truly thought that

22     this company was -- was so lacking in

23     creditworthiness that it truly deserved an 8,

24     and yet, you were selling the commercial paper

25     to investor, one of the risks is that the

       25    to investor, one of the risks is that the

1          BRODERICK

2     investor would -- might sue Goldman Sachs?

3          A.    We certainly -- we certainly would

4     have been aware of that, of that risk, and

5     would have wanted to make sure the investor

6     knew what they were -- knew what they were

7     buying if they -- if they chose to -- to so

8     purchase.

9          Q.    Now, look at the products group

10    line, do you see that?

11         A.    Um-hum.

12         Q.    "FI-money markets-bill/notes-CD/B."

13    What is "CD/B" a reference to?

14         A.    I think that -- I don't -- I don't

15    know for sure, but I would surmise that this is

16    fixed income money

17    markets/bills/notes/certificates of

18    deposit/bankers acceptances, all of which are

19    short-term financing instruments of -- with

20    various -- with various differences.

21         Q.    Now, on October 23rd, Enron

22    conducted an investor call.

23         Did you participate -- did you

24    listen in on the call?

25         A.    No.

          25    A.    No.

1              BRODERICK

2          Do you see that?

3      A.    Um-hum.

4      Q.    And was this, in fact, an e-mail

5    that you sent?

6      A.    It looks like it.

7      Q.    Okay.  Now, the first sentence says,

8    "We should probably immediately terminate our

9    CP PGM."  Is that an abbreviation for program?

10     A.    Um-hum.

11     Q.    "With the CO," and the CO in this

12   case is Enron; is that right?

13     A.    Yes.

14     Q.    And by "immediately terminate," what

15   did you mean?

16     A.    Probably immediately terminate and

17   can you refresh my memory when did the investor

18   call take place?

19     Q.    I believe it was on the 23rd?

20     A.    So presumably what happened was, I

21   got briefed by Hilary or by someone else, but I

22   would surmise that it was Hilary, on the

23   results of the call and her conclusion that

24   this was no longer a prime quality counterpart

25   able to rely on the liquidity in the market for

        25   able to rely on the liquidity in the market for

1           BRODERICK

2      continued rolls and for -- and no longer prime

3      quality from our investors perspective.  And so

4      we should start discussions with -- with the

5      company about the lack of suitability for it in

6      the -- in this market, and that's what the

7      e-mail says.

8          Q.    Okay.  But "terminate our CP

9      program" means to stop acting as a dealer for

10     the issuance of Enron commercial paper?

11         A.    Yes, that's right.

12         Q.    "We should discuss this with IBD."

13     That's the investment banking division?

14         A.    Yes.

15         Q.    "And the CP desk and P. Gerhard" is

16     what it reads.  Why did you think it should be

17     discussed with the investment banking division?

18         A.    Enron was a big company.  We

19     undoubtedly had, although I certainly did not

20     know all of the aspects of -- I would have

21     expected that we would have had an investment

22     banking relationship with them.

23              And as part of good relationship

24     management, it would have been appropriate to

25     advise IBD that we did not think that this

        25    advise IBD that we did not think that this

1           BRODERICK

2      program was of prime quality, and therefore,

3      appropriate for the company or for investors.

4      And so we would like to discuss with them their

5      substitution of more suitable financing.

6           Q.   Who -- who in the investment banking

7      division did you discuss this with?

8           A.   I don't recall having any

9      conversations with investment banking, let

10     alone whom.

11          Q.   Did you ask somebody else from

12     credit to have the conversation with investment

13     banking?

14          A.   I don't specifically recall doing

15     so.

16          Q.   The CP desk was the commercial paper

17     desk?

18          A.   Yes.

19          Q.   And P. Gerhard was their -- why was

20     he listed?

21          A.   I think I recall that he was in

22     the -- that he was the person to whom the head

23     of the commercial paper desk reported.

24          Q.   It goes on to say, "As per risk

25     committee this AM, we should cut our inventory

       25   committee this AM, we should cut our inventory

1                    BRODERICK

2        line to zero and require each position to be

3        approved by credit."

4             So that was a decision of the risk

5        committee to cut the inventory line to zero?

6             A.    Well, I think what would have

7        happened in practice was the risk committee met

8        on Wednesday morning and by 8:00, it presumably

9        would have been over, and I would have

10        recommended, based on the fact that we were

11        uncomfortable, we did not believe the company

12        was of prime quality any further -- any longer

13        and were recommending that we commence

14        discussions to have them terminate their

15        program.

16             That we also reduce our inventory

17        line, and risk committee heard and accepted

18        that recommendation.  And so this reflects, not

19        so much their decision on an independent basis,

20        but rather, their agreement with my

21        recommendation in this regard.

22             Q.    And when you wrote, "We should cut

23        our inventory line to zero," that means we

24        should not hold any Enron commercial paper in

25        Goldman Sachs' inventory?

     25    Goldman Sachs' inventory?

1          BRODERICK

2          A.   No, it doesn't mean that because it

3     says "and require each position to be approved

4     by credit and managed to under 50 million."

5          So what that means is, we didn't

6     want as a matter of routine, for inventory to

7     be maintained, but we would in fact, continue

8     to make markets in the -- in the paper.  And

9     until we agreed conclusively to terminate the

10     program, we'd continue to deal, and our primary

11     the primary -- but we would not want to incur

12     more than $50 million of aggregate inventory,

13     even in the provision of this primary and

14     secondary issuance.

15          So it doesn't imply that we won't

16     take any risk at all.  It just means that we

17     want to specifically approve the -- the

18     occurrence of such risk.

19          Q.   What do you mean by "primary" and

20     "secondary" issuance?

21          A.   Primary issuance is what we refer to

22     as issuance directly by the company.  Secondary

23     is when we buy back from investors from time to

24     time for the purpose of making markets.

25          Q.   And you would still be willing to

          25     Q.   And you would still be willing to

# Exhibit No. 9

*Lawker, J.*

FILED
MAR 25  11 32 AM '76

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNIVERSITY HILL FOUNDATION,                     :

                Plaintiff,      :     71 Civ. 1166 (MEL)

      -against-                              :

GOLDMAN, SACHS & CO.,                           :

              Defendant.       :

- - - - - - - - - - - - - - - - - - x


## DEFENDANT'S POST-TRIAL MEMORANDUM


                     SULLIVAN & CROMWELL
                       48 Wall Street
                          New York, New York 10005
                     (212) 952-8100

                     Attorneys for Defendant


MICHAEL M. MANEY,
PHILIP L. GRAHAM, JR.,
CHARLES E. DORKEY III,

         Of Counsel.

\#13

ECggg001459208

definition of underwriter contained in the
statute;

-- If securities are not exempt from registra-
tion and were not registered, the seller is
absolutely liable under Section 12(1);*

-- If securities are required to be registered
and are registered, the obligations of those
participating in the offering, including an
underwriter, and specific defenses available
to them, are set forth in Section 11.**

In the context of Nuveen, then, the status of underwriter has
significance in terms of civil liability only under Section
11 of the Securities Act for material misstatements or omis-
sions made during a distribution of securities registered
under Section 5 of that Act.***  But because no registra-
tion statement was filed by WH, civil liabilities could not

---

\*     Penn Central was in any event exempt from Section 5 by
virtue of its exemption as a transportation company under
Section 3(a)(6).

\*\*    Theoretically they would also be subject to suit under
Section 12(2), but the burden on a plaintiff is less
under Section 11.

\*\*\*    In other contexts, whether securities are sold by an un-
derwriter has significance in terms of whether the secu-
rities must be registered under Section 5 (see Section
4(1): "transactions by any person other than an . . .
underwriter . . .").

ECggg001459334

# Exhibit No. 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE NBW COMMERCIAL                    )
PAPER LITIGATION                        )        Master File:
———————————————————                     )        Civil Action No. 90-1755 (RCL)
                                        )
AMERICAN FEDERATION OF STATE,           )
COUNTY AND MUNICIPAL                     )
EMPLOYEES,                              )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )        Civil Action No. 91-0626 (RCL)
                                        )
FEDERAL DEPOSIT INSURANCE               )
CORPORATION, in its capacity            )
as receiver for THE NATIONAL            )
BANK OF WASHINGTON, N.A.,               )
                                        )
                    Defendant.          )
———————————————————                     )

**FILED**

AUG 24 1992

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

BRIEF OF THE SECURITIES AND
EXCHANGE COMMISSION, AMICUS CURIAE

JAMES R. DOTY
General Counsel

JACOB H. STILLMAN
Associate General Counsel

LUCINDA O. McCONATHY
Assistant General Counsel
D.C. Bar # 278473

JOHN M. GANLEY
STUART T. REBISH
Attorneys

Of Counsel
PAUL GONSON
Solicitor

Securities and Exchange Commission
450 5th Street, N.W.
Washington, D.C. 20549
(202) 272-2508 (McConathy)

292

commercial paper and became an increasingly large portion of the market in the 1940s.  Id. at 368-69.  Bank holding companies and financial institutions began issuing, rather than buying, commercial paper.  Id. at 365-67; Stigum, supra p. 30, at 1029. Continuous rollover of commercial paper became common, so that funds for repayment were no longer guaranteed by production cycles.  Chicago Note, supra p. 36, at 379; Stigum, supra p. 30, at 1033.

Commission staff reviewed the legislative history of § 3(a)(3) in Securities Act Release No. 4412 (1961) in this changed market context.  In so doing, the staff developed four criteria for analyzing whether a given note has the underlying attributes of the instruments that Congress intended to exempt -- low-risk and not sold to the general public:

> Section 3(a)(3) applies only to [1] prime quality negotiable commercial paper [2] of a type not ordinarily purchased by the general public, that is, [3] paper issued to facilitate well recognized types of current operational business requirements and [4] of a type eligible for discounting by Federal Reserve banks.

26 Fed. Reg. 9158 (numerals added).

The defendant contends that "prime quality" is merely a non-statutory requirement that few courts have considered in determining whether notes are exempt from registration.  (Def. Opp. Br. at 23).  This is clearly incorrect.  Courts have widely endorsed the criteria in the Commission's Release. [20]  The term

---

[20]    Sanders v. John Nuveen & Co., 463 F.2d 1075, 1079 (7th Cir.), cert. denied, 409 U.S. 1009 (1972); Zabriskie v. Lewis, 507 F.2d 546, 550 (10th Cir. 1974); Zeller v. Bogue
                                                    (continued...)

"prime quality" in SEC Release 4412 reflects the notion that
Congress intended to exempt from registration only notes that
were among the safest investments.  As one court said, "prime"
refers to "first in value or excellence; of excellent quality;
first rate."  Welch Foods Inc. v. Goldman, Sachs & Co., 398 F.
Supp. 1393, 1398 (S.D.N.Y. 1974).  A commentator defined the term
as "referring to paper whose ability to bear interest and to
repay debt is extraordinarily reliable."  Chicago Note, supra
p. 36, at 386.  See also Sanders v. John Nuveen & Co., 463 F.2d
1075, 1079 n.12 (7th Cir.), cert. denied, 409 U.S. 1009
(1972). 21

---

20(...continued)
     Elec. Mfg. Corp., 476 F.2d 795, 800 (2d Cir.), cert. denied,
     414 U.S. 908 (1973) (short term notes must fit the "general
     notion" of commercial paper reflected in the Commission's
     Release); SEC v. Continental Commodities Corp., 497 F.2d
     516, 525 (5th Cir. 1974) (endorsing factors in Commission
     Release, but noting that court is not limited to factors set
     forth in the Release); see also Ruefenacht v. O'Halloran,
     737 F.2d 320, 327 n. 21 (3d Cir. 1984) (dicta), aff'd, 471
     U.S. 701 (1985). See also 3 L. Loss and J. Seligman,
     Securities Regulation, at 1189 n.135 (3d ed. 1989).

     In fact, the defendant itself recognizes that note safety
     and risk are important to the availability of the exemption.
     The defendant argues that bank regulation by the Federal
     Reserve Board and the Office of the Comptroller of the
     Currency "enhance the safety of such paper" and that "[t]he
     very short term character of most of the paper also reduces
     risk." (Def. Opp. Br. 28).  Thus, the defendant
     inconsistently maintains that note "quality" is irrelevant,
     but that note "safety" or "risk" are important.  What
     defendant fails to recognize is that these terms all refer
     to the same thing, namely, the likelihood that the issuer
     will be able to pay the principal and interest on the
     commercial paper when it matures.

21   The requirement that commercial paper be of a type eligible
     for discounting by the Fed similarly was directed to the
                                                 (continued...)

- 40 -

borrow to meet expected or unexpected cash needs. Stigum, supra p. 30, at 1038. WBC had none of these.

As noted by an officer of one of the banks that withdrew its line of credit, WBC's management was in turmoil, and its earning trend was in a downward direction. AFSCME ex. 28. Profits fell from $13 million in 1988, to $9 million in 1989. AFSCME ex. 4 at 10. In the first quarter of 1990, WBC lost $5.7 million. AFSCME ex. 28. WBC's position in the industry was very poor. A bank rating agency downgraded WBC's credit rating twice in April 1990, first from a "C/D" rating to a "D" rating, then to a "D/E" rating. AFSCME exs. 27, 29. And, two days before AFSCME made its last purchase of WBC commercial paper, banking regulators prohibited NBW, the subsidiary bank, from making unapproved transfers of funds to WBC to repay the commercial paper and placed the bank in a category of banks subject to imminent failure. Most importantly, however, by mid-April 1990, WBC had lost all $35 million in backup lines of credit for its commercial paper program. AFSCME exs. 19, 22, 25 and 26.

Courts have consistently held that paper is not prime quality where the issuer is insolvent or experiencing substantial liquidity problems. 24 Given WBC's severely limited liquid

---

24    See Sanders v. John Nuveen & Co., 463 F.2d 1075, 1079 (7th Cir.), cert. denied, 409 U.S. 1009 (1972) ("[B]ecause of the company's insolvency, it seems highly unlikely that the paper purchased * * * is * * * prime quality * * *."); SEC v. Continental Commodities Corporation, 497 F.2d 516, 525 (5th Cir. 1974) ("it would appear that notes issued by a company or individual in precarious financial straits are (continued...)

- 44 -

assets and its lack of backup lines of credit, any paper sold in late April and early May was certainly not the high-quality, low-risk type of instrument that Congress intended to exempt from registration.

C.    NBW Offered and Sold WBC Commercial Paper To The General Public.

SEC Release 4412 provides that the exemption in § 3(a)(3) applies to commercial paper "of a type not ordinarily purchased by the general public." As discussed above, the legislative history of § 3(a)(3) shows that Congress intended to exempt short term paper "of a type which rarely is bought by private investors." H.R. Rep. No. 85, 73d Cong., 1st Sess. 181-84 (1933). One court considering the commercial paper exemption noted:

> The definition of the term "general public" should not be narrowly construed. Large as well as small investors are protected by the Securities Acts.

Welch Food Inc. v. Goldman, Sachs & Co., 398 F. Supp. 1393, 1398-99 (S.D.N.Y. 1974). Concerning corporations which purchased commercial paper the court stated:

> [W]e cannot rank their financial expertise or their ability to generate a meaningful credit file

---

**24**(...continued)
not either prime quality, issued to facilitate current transactions, or eligible for discounting by Federal Reserve Banks"); United States v. Hill, 298 F. Supp. 1221, 1227 (D. Conn. 1969) ("[t]he 3(a)(3) exemption was not intended, and does not extend, to cover financing by an insolvent company in its speculative attempt to launch an enterprise"); see also 3 L. Loss and J. Seligman, Securities Regulation, at 1191 (3d ed. 1989).

# Exhibit No. 11

**Hearing Date: June 14, 2007, 2 p.m.**
**Reply Deadline: June 12, 2007**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

Attorneys for Defendant Goldman, Sachs & Co.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------- X

In re:                                                              :

ENRON CREDITORS RECOVERY CORP., et al.,      :          Chapter 11

                                 Reorganized Debtors.      :          Case No. 01-16034 (AJG)

                                                                     :          (Jointly Administered)

---------------------------------------------------------------------- X

ENRON CORP.,                                                     :
                                 Plaintiff,
                                                                     :
                                 v.                                    :          Adv. No. 03-92677 (AJG)

J.P. MORGAN SECURITIES, INC., et al.,                :

                                 Defendants.                    :
---------------------------------------------------------------------- X
ENRON CORP.,                                                     :
                                 Plaintiff,
                                                                     :
                                 v.                                    :          Adv. No. 03-92682 (AJG)

MASS MUTUAL LIFE INSURANCE CO., et al.,       :

                                 Defendants.                    :
---------------------------------------------------------------------- X

**DEFENDANT GOLDMAN, SACHS & CO.'S MEMORANDUM OF**
**LAW IN OPPOSITION TO THE MOTIONS TO COMPEL**
**PRODUCTION OF ADDITIONAL PROJECT TRUMAN DOCUMENTS**

references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds"); Lowry v. Sec. Pac. Bus. Credit, Inc. (In re Columbia Data Prods., Inc.), 892 F.2d 26, 29 (4th Cir. 1989) ("[T]he entity for whose benefit the transfer is made is a guarantor or debtor — someone who receives the benefit but not the money.") (citation omitted).

The Movants do not (and cannot) argue that Goldman Sachs received any real tangible "benefit" that it could disgorge.[20]  See In re McCook Metals, LLC, 319 B.R. 570 (N.D. Ill. 2005). Nor is there any evidence that anyone at Goldman Sachs believed there was a possibility of any such liability.[21]  Rather, the benefit theory advanced here rests upon multiple speculative assumptions that have no support in the record and no basis in fact. In essence, Movants argue that

- if Enron had not bought back its commercial paper from investors in October and November 2001 (hypothetical), and

- if Enron would have defaulted on its commercial paper prior to December 2, 2001 if not for the buyback (speculative, illogical and counterfactual), and

- if in the event of default commercial paper holders would have been able to prevail on a claim against Goldman Sachs like the claim resolved 33 years ago in Franklin

---

[20]  While there is a document routinely produced by the Credit Department at Goldman Sachs that automatically listed all outstanding commercial paper sold by Goldman Sachs as a "contingent risk," Moloney Decl. Ex. 38 (GS ENRON-CP08076-86), that document does not represent any legal judgment and all of the Goldman Sachs decision makers involved in the decision by Goldman Sachs to assist Enron in the buyback transactions – including Mr. Wall, who signed the agency agreement for Goldman Sachs, and Ms. Huffman, who was the lawyer on the transaction – have testified that no consideration whatsoever was given to avoiding any contingent liability Goldman Sachs might have to commercial paper holders. Id. Ex. 20 (Huffman Dep. Tr. 156:21-167:2); Ex. 18 (Wall Dep. Tr.360:6-361:18).

[21]  In fact, no Goldman Sachs witness could even recall a single instance when Goldman Sachs had, in its capacity as a commercial paper dealer, been sued or paid any money as a result of a commercial paper default. See, e.g., Moloney Decl. Ex. 20 (Huffman Dep. Tr. 167:3-12); Ex. 15 (MacDonald Dep. Tr. 94:4-95:5); Ex. 30 (Buckingham Dep. Tr. 181:9-18).

Sav. Bank v. Levy, 406 F. Supp. 40 (S.D.N.Y. 1975), for losses arising from Enron's
default (speculative),

- then Goldman Sachs would have benefited indirectly from Enron's buyback.

As a matter of law, this attenuated theory of liability lies well outside the field of
direct, concrete "benefits" recognized under § 550(a)(1).[22] See Mack, 737 F.2d at 1359-60
(rejecting as too broad a trustee's allegation that the principals in a partnership had received an
incidental benefit from auctioning off cattle and using the proceeds to operate their dairy
enterprise); Telesphere Liquidating Trust, 246 B.R. at 322-23 ("benefit of potentially being able
to recognize value in an equity contribution" was "too uncertain to place [party] within the reach
of Code § 550(a)"). Indeed, Movants are asking the Court to engage in wholesale speculation,
including whether Enron would have defaulted on its commercial paper in October or November
2001 if the buyback had not occurred, whether the holders of the paper would have subsequently
brought securities claims against Goldman Sachs, and whether those claims would have
prevailed.[23]

Moreover, even assuming, arguendo, that § 550(a)(1) covers this novel "benefit"
theory, Enron still cannot satisfy its burden to show that Goldman Sachs actually received the

---

[22] It is also undisputed that Goldman Sachs never received any direct and tangible "benefit" from the buyback
transactions for purposes of § 550(a)(1). Acting as Enron's agent, Goldman Sachs did not take Enron's buyback
funds onto its own books and did not receive any fee or commission for its services. Compare Moloney Decl. Ex.
23 (GS ENRON-CP00096) and Ex. 7 (GS ENRON-CP00097) (confirmations sent to investors for sales of Enron
commercial paper on November 1, 2001 totaling $13,415,175.00 ($4,471,725.00 + $8,943,450.00)), with Ex. 24
(ECd021192029) (e-mail requesting that Enron wire to Goldman Sachs exactly $13,415,175.00, the amount that is
to be paid to the sellers). Indeed, Goldman Sachs did not receive any compensation of any kind from Enron or any
other entity in exchange for its services as Enron's agent in the buyback transactions.

[23] Notably, a total of $329,109,088.87 of the commercial paper for which Enron has sued Goldman Sachs was
scheduled to mature before November 30, 2001, the day Enron stopped paying on its maturing outstanding
commercial paper. Moloney Decl. Exs. 39, 24 (ECd021191447-49, ECd021186677-78, ECd021186944-45,
ECd021192029, ECd021192199 (E-mails from MacDonald to Newgard listing the pieces bought back and their
maturity dates)); Ex. 40 (JPMC-CP-04250-51 (DTC message indicating that Enron commercial paper would not be
paid)); Ex. 41 (EC004005633-34); Ex. 10 (Newgard Dep. Tr. 316:8-20).

# Exhibit No. 12

# Former SEC chief slams credit raters

**JANET MCFARLAND**
GLOBE AND MAIL UPDATE
NOVEMBER 27, 2007 AT 4:42 PM EST

Credit rating agencies have lost the trust of investors following the recent worldwide meltdown in commercial paper marks, leading to a "systemic shock" in capital markets, a former chairman of the U.S. Securities and Exchange Commission said Tuesday.

Arthur Levitt, who headed the SEC between 1993 and 2001, told a conference in Toronto the rating agencies have a deeply conflicted business model because they take money from companies to rate their securities, and also offer consulting services to companies.

"The agencies have become both coach and referee," he said. "While credit rating agencies have missed the mark in the past, this time I am afraid investors are losing faith. Indeed, I believe we're facing the prospect of a systemic shock directly as a result of investors' loss of confidence in the ratings that they have relied upon so long to evaluate risk."

Since the subprime mortgage crisis began in the United States, he noted, one rating agency has downgraded more than half of all subprime-backed securities issued in 2006. And 97 per cent of those securities with a rating single-A rating or lower have been downgraded, he said.



Former U.S. Securities and Exchange Commission chairman Arthur Levitt



In his hard-hitting analysis of the roots of the credit crisis, Mr. Levitt said the growing doubts of investors "threaten the stability of the financial system as a whole."

He said the time has come to take a careful look at credit rating agencies and the conflicts of interest that "plague" them. It is not enough, he added, to simply prohibit rating agencies from doing additional consulting work for companies they rate.

He said he supports other measures, such as giving the SEC more authority to regulate credit rating agencies and improving disclosure of services a rating agency may provide a debt issuer.

"If an agency is charging for consulting services, investors should know about it," he said.

He said companies' audit committees should also have the direct responsibility for selecting, monitoring and paying credit rating agencies.

Mr. Levitt also pointed a finger at money market fund managers who were supposed to run "the safest of safe" investments, but invested in subprime securities without performing adequate due diligence.

And he said consumers have to take part of the blame for the borrowing greed that fuelled the subprime crisis, noting they must take more responsibility for evaluating the products they invest in.

"None of this takes place in a vacuum," he said. "A prospering society in the United States gave way to a gluttony of debt. New businesses developed to pander to unsophisticated appetites for the good life. A starter home became a mansion. A 60-per-cent mortgage became a total borrowing. Incentives created by banks and intermediaries were as obscene and as addictive as narcotics, while radio, television and newspapers, lured by a new source of advertising revenue, stoked the flames."

Recommend this article? 48 votes

View the most recommended

**SPONSORED LINKS**

**Hot Stock Alert - GFET**
BioFuels, Ethanol, Green Energy. Alternative
Energy Growth Stock.
www.GulfEthanolCorp.com

**Understand Business VoIP Telephony - Free Guide**
Get your free 80 page Business IP Telephony
Guide now. Ideal solution for a 50+ ...
ShoreTel.com/BusinessVoIPGuide

© Copyright 2007 CTVglobemedia Publishing Inc. All Rights Reserved.          **CTVglobemedia**

globeandmail.com and The Globe and Mail are divisions of CTVglobemedia Publishing Inc., 444 Front St. W., Toronto, ON  Canada M5V 2S9
Phillip Crawley, Publisher

# Exhibit No. 13

Motion to Compel Production of Truman Documents  6/21/2007  4:27:00 PM

1

```
1    UNITED STATES BANKRUPTCY COURT
2    SOUTHERN DISTRICT OF NEW YORK
     -----------------------x   Case No.
3    in re                       01-16034(AJG)
                                 (03-92677)(03-92682)
4    ENRON CREDITORS RECOVERY CORP.,
     et al,                      New York, New York
5                                June 21, 2007
        Reorganized Debtors.     4:27 p.m.
6    -----------------------x
        DIGITALLY RECORDED PROCEEDINGS
7       (Excerpt - Goldman, Sachs, et al)
     03-92677 and 03-92682 Enron Creditors Recovery Corp. v.
8    Goldman, Sachs & Co., et al, and Enron Creditors Recovery
     Corp. v. Mass Mutual Life Insurance Company, et al:
9
     Motion to compel production of documents.
10
     B E F O R E:
11
        THE HONORABLE ARTHUR J. GONZALEZ
12      United States Bankruptcy Judge
13   A P P E A R A N C E S:
14   VENABLE LLP
        Special Litigation Counsel for Reorganized Debtors
15      Two Hopkins Plaza, Suite 1800
        Baltimore, Maryland 21291
16
     BY: MICHAEL SCHATZOW, ESQ.
17       RICHARD WASSERMAN, ESQ. (via telephone)
         ROBERT L. WILKINS, ESQ. (via telephone)
18       -and-
         405 Lexington Avenue, 56th Floor
19       New York, New York 10017
20   BY: MICHAEL K. MADDEN, ESQ.
21   (appearances continued on page 2)
22
23      DEBORAH HUNTSMAN, Court Reporter
        (212) 608-9053  (718) 774-2551  (917) 723-9898
24   Proceedings Recorded by Electronic Sound Recording,
        Transcript Produced by Court Reporter
25
```

2

```
1    A P P E A R A N C E S: (continued)
2    CLEARY, GOTTLIEB, STEEN & HAMILTON LLP
        Attorneys for Goldman Sachs & Co.
3       One Liberty Plaza
        New York, New York 10006
4
     BY: THOMAS J. MOLONEY, ESQ.
5       -and-
         ROGER COOPER, ESQ.
6
     HANDLER & GOODMAN LLP
7       Attorneys for UBS Defendants
        805 Third Avenue
8       New York, New York 10022
9    BY: ARTHUR M. HANDLER, ESQ.
         -and-
10       ROBERT S. GOODMAN, ESQ.
11   PEPPER HAMILTON LLP
        Attorneys for Kelly Property, Inc.
12      100 Renaissance Center, Suite 3600
        Detroit, Michigan 48243
13
     BY: DAVID MURPHY, ESQ.
14
     BIALSON, BERGEN & SCHWAB
15      Attorneys for Veritas Software Investment Corp.
        2600 El Camino Real, Suite 300
16      Palo Alto, California 94306
17   BY: MICHAEL KLINGLER, ESQ. (via telephone)
18   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        Attorneys for Citigroup and Affiliates
19      1285 Avenue of the Americas
        New York, New York 10019-6064
20
     BY: MICHAEL HALBERSTAM, ESQ. (via telephone)
21
     PEITZMAN WEG KEMPINSKY LLP
22      Attorneys for Cascade
        10100 Santa Monica Blvd., Suite 1450
23      Los Angeles, California 90067
24   BY: SHIVA S. DELRAHIM, ESQ. (via telephone)
25
```

3

```
1    (Whereupon, the following is an excerpt from the proceedings
2    taken on 6/14/2007 in re Enron Creditors Recovery Corp., et
3    al, Case No. 01-16034.)
4       JUDGE GONZALEZ: Please be seated.
5       Who is going to take the lead for the Movants?
6       MR. SCHATZOW: Your Honor, if the Court has no
7    objection, Enron will?
8       JUDGE GONZALEZ: All right. Go ahead.
9       MR. SCHATZOW: Thank you, Your Honor.
10      Michael Schatzow from Venable LLP, here with Michael
11   Madden of Venable LLP on behalf of Enron.
12      Your Honor, we are here on our motion as well as the
13   motion of the moving Defendants to compel Goldman Sachs to
14   produce documents relating to and concerning Project Truman.
15   In reviewing the papers that all of the parties submitted to
16   Your Honor, I thought that it might be helpful for me to just
17   take a couple of minutes at the outset to put this in context
18   by referring to what I believe to be are undisputed facts
19   relating to Enron's stock price and certain significant events
20   that took place during 2001, some of which took place around
21   the time of the Project Truman activity.
22      In the calendar year 2001 -- and these are all going
23   to be closing stock prices, Your Honor -- some of the events
24   that happened on these days didn't take place until after the
25   market closed, but the point is not the precise stock price,
```

4

```
1    but to see how much trouble Enron was getting itself into.
2       On January 25th and 26th of 2001, Enron hit its 2001
3    closing high of $82, that is $82 per share. On August 14th,
4    the CEO of Enron, Jeff Skilling, resigned after the market
5    closed, and the closing price that day was $42.93, almost half
6    of high in January. On September 21st, when the
7    Confidentiality Agreement was executed between Goldman Sach
8    and Enron relating to the provision of documents for Project
9    Truman, the stock was at $28.3. On October 16th of 2001, when
10   Enron announced a $1 billion after-tax charge to third quarter
11   earnings, the stock was at $33.84, and that same day Moody's
12   placed Enron's long-term debt rating under review for possible
13   downgrade.
14      Then as we move to the week of the Commercial Paper
15   activity, Monday, October 22nd, the SEC upgraded its inquiry
16   into Enron into a formal investigation, and the stock closed
17   at $20.65. On Wednesday, October 24th, Enron's CFO Andy
18   Fastow was fired, and the stock closed at $16.41. On
19   Thursday, October 25th, Enron drew down its committed bank
20   lines to the tune of about $3 billion. The stock closed at
21   $16.35. The next day, Friday, October 26th, is the day that
22   the Commercial Paper prepayments began. It is also the day
23   that you have seen referenced in the papers that Gary
24   Hickerson, who was in charge of the prepayment program for
25   Enron, and Pat Bonan, of J.P. Morgan, had a conversation,
```

37

1  making the notations?
2      MR. MOLONEY:  Your Honor, if they had wanted that
3  information in a reasonable way, there are ways they could
4  have asked for it.  Frankly, last Saturday to fax that request
5  to my office on a Saturday, with a demand that we provide it
6  prior to the deposition this is occurring that Monday, that
7  was not exactly the reasonable way to ask for it.
8      We looked at the date of that demand to find that
9  information.  It was last Saturday.  I was defending Hilary
10  Ackermann at a deposition on Monday.  He faxed that to my
11  office in the middle of the day on Saturday, and then he
12  didn't even mention it again.  So I figured, "Okay.  This is
13  now moot."  He could have said to me at the deposition, "Tom,
14  I am sorry I sent that to you on Saturday.  I realize you are
15  not going to get it to me today, but get me this information.
16  Can you find out for me the stuff?"  We would have found them
17  out.  We have answered lots of questions.  To respond to it
18  that way is kind of -- if you look at the date of this letter
19  and you just look at the calendar, and you will see that he
20  sent it to my office by fax on a Saturday for a demand on
21  Monday.  He could have served an interrogatory, and we would
22  have had answer that question, or he could have just made a
23  regular request and have said, "Look, find it for me," and I
24  would say, "it is going to take me a while to track it down,"
25  and we would have tried to do it.  But he didn't ask for it in

38

1  a way that was appropriate.  So if he didn't get a response,
2  it is not our fault.
3      In any event, he can show it to Mr. Hurst and
4  Mr. Gieselman, and they will indicate whether it is their
5  handwriting or the handwriting of somebody else they know.  If
6  they didn't know, we will let them know who they are, if we
7  can figure it out.  We will undertake to find out, Your Honor,
8  who they are and let them know whose handwriting it is.
9      The second theory, which is the one that concerns us
10  the most, is the so-called "benefit theory," Your Honor,
11  because that is the theory we think gets us into, not only
12  just in this discovery, but in going down the line in terms of
13  how this case is going to become manageable for either a
14  summary judgment motion or just a reasonable trial maybe on a
15  written record, so that we don't have to be here for months
16  taking up your time and ours.  If they are really thinking
17  they are going to try a securities case against Goldman and
18  they really think that they are going to try a 10(b)(5) case
19  against Goldman and show that we would have lost that case and
20  then say, therefore, because Goldman would have lost this
21  10(b)(5) case, they are going to benefit here?  If they are
22  going to do that, then we would have to have the same panoply
23  of defenses we would in a 10(b)(5) case, which is to find out
24  whether or not the people who we sold this paper to reasonably
25  relied, whether or not the information was public, whether or

39

1  not there are other defenses.
2      There is no case yet.  We challenged them to find the
3  case where somebody basically said "to benefit is a tort
4  liability -- a tort liability that has never been asserted,
5  and that is the benefit.  Because if you eliminated a
6  contingent unasserted, speculative tort liability and,
7  therefore you are entitled to recover a preference."
8  (inaudible) they found no cases.  Every one of the cases they
9  found fall under one of two paradigms, which are totally
10  distinct from the paradigm here.
11      Every benefit case falls under one of two paradigms.
12  Either it is a situation where there is a contractual
13  obligation that the debtor satisfies, a debt that the debtor
14  satisfies, and, but for the debtor satisfying that contractual
15  obligation, somebody else would have gone afloat for that
16  contract.
17      For example, a major case they cite In re Attaway is a
18  case where there are recourse notes, and basically the person
19  whom the debtor actually sells the notes to, sells them to
20  someone else with recourse back to them.  When the debtor pays
21  off the transferee in full on the notes, the court said,
22  "Well, sorry.  That was for your benefit, because if the
23  debtor did not satisfy that contractual obligation, you would
24  have had to."
25      The more typical case is the Deprizio situation, where

40

1  there is a guaranty, where a guarantor actually backstops the
2  obligation.  We cited you a bunch of cases that say that is
3  the paradigm, and courts have been very reluctant to move very
4  far off from that paradigm, with one other exception.  There
5  clearly are cases where someone got a tangible economic
6  benefit from a fraudulent transfer or a preference.
7      I think they cite one example, which is a pretty good
8  one, which is a circumstance where four guys owned a closely
9  held corporation.  The corporation is worth $2 million, but
10  they realize they are going to go out of business.  So they
11  say, "Gee, this is a bad deal selling the assets for
12  $2 million.  It will all go to our creditors.  We will sell it
13  to you for $800,000, and you, new company, you offer the four
14  of us long-term employment contracts that would be worth the
15  $1.2 million that should have gone to the creditors."
16      Under those circumstances, the Court says, "Okay.
17  There is a tangible, real economic benefit you got from this
18  transaction, and also parenthetically this transaction fits
19  within the meaning and the literal words of 550, because it
20  was really done for your benefit.  The reason why you did this
21  transaction for those people was for your benefit."
22      Nothing in the record possibly supports those theories
23  against us, and this Project Truman discovery exercise is a
24  trip to nowhere.  It is a frolic and a detour.  What are they
25  going to do?  They are going to show they could have had a

Motion to Compel Production of Truman Documents  6/21/2007  4:27:00 PM

41

1  securities lawsuit against us? What are you going to do then?
2  You are going to try that case? Among other things, if we get
3  to that stage, this case would be subject to mandatory
4  removal, because it would involve a statute other than the
5  Bankruptcy Code. There is no reason. It is not like they
6  need this theory. It is not like they don't have deep
7  pockets. Who actually got the money were Defendants sitting
8  here -- UBS; and Kelly Properties a $5 billion revenue
9  company. It is not like they need to come up with this wacky
10  theory, which no court has ever espoused, because they are
11  dealing with bankrupt people who got the money.
12       When Goldman entered into an Agency Agreement where
13  they said they would hold us harmless, when they go there and
14  say, "Please help us," and when they are going to get legal
15  advice so as exactly not to be here, to drag us in just
16  gratuitously is crazy.
17       Just as a last point I want to make, Your Honor, I
18  know early on in the case we moved to dismiss on 546(e)
19  grounds and safe harbor grounds. You will recall that we
20  didn't convince you yet on that, but I want another shot at
21  that. I wasn't around then. I want another shot at that.
22  You probably already know that on the appeal -- you didn't get
23  the benefit of this, but the SEC and the Treasury Department
24  of the United States both agree with our position --
25       JUDGE GONZALEZ: But you didn't get the benefit of

43

1  Honor's decision very carefully -- part of what you relied on,
2  was Enron's position that these were not securities at all.
3  Then there was a factual question, Enron took the position
4  that these were not securities at all.
5       So the idea that they now want to take discovery for a
6  securities lawsuits, after having argued to you and actually
7  has us embarking on these one hundred depositions, and 13
8  depositions on their theory that these are not securities at
9  all, I think, indicates, their belief that they
10  realize they were really barking up the wrong tree on the
11  securities question; and they now would like a fresh attempt
12  at a new theory in the case, a year into it. That is just not
13  fair.
14       The second point I wanted to make is, if you were to
15  accept findings that these were securities transactions, and,
16  therefore, this was a paradigm of the question of whether an
17  issuer of debt securities is automatically liable whenever
18  anyone, an underwriting of debt securities or anyone involved
19  in the underwriting chain, would be automatically liable
20  whenever any recipient of a debt security pays something,
21  which could be a preference, because they are thereby relieved
22  of a theoretical securities law liability, we cannot believe
23  Congress intended that.
24       If Congress has made anything clear -- perfectly
25  clear -- they intend to protect the securities industry.

42

1  what I had to say about that.
2       MR. MOLONEY: I am sorry?
3       JUDGE GONZALEZ: You didn't get the benefit about what
4  I had to say, I believe, at least about the SEC, and the
5  Department of Treasury, and in one of the cases a member of
6  the Federal Reserve Board. I believe, if I am correct, it may
7  have been the discovery in the Lehman case in which there was
8  an interlocutory appeal, and there was a request to stay
9  discovery with respect to -- it may have been the equity
10  swaps, or it was this with respect to Lehman. I think I am
11  getting that indication from counsel for Enron, that it was
12  this case. I believe the motion for leave to appeal may still
13  be pending in the district court. I am not sure. It denied
14  the stay. If procedurally I am correct, I think it was
15  affirmed on my denial of staying discovery.
16       There was also an interlocutory appeal that was before
17  Judge Sand in the equity swaps, in which, I believe, as well
18  there were letters submitted by, I think, the Department of
19  Treasury, as well as the SEC, and I am not sure about the
20  Federal Reserve Board. I think I commented on that, and when
21  they came in, and what relevance they have, or how one could
22  look at them one way or another.
23       MR. MOLONEY: I will have to go back and study that.
24  I wish to say that it is actually a prelude to two little
25  points that I wanted to make. One is -- and I did read Your

44

1  Whether or not we fall under that protection under 546(e), as
2  I said, I would like another chance on my own to talk to you
3  about that at an appropriate time. You cannot believe that
4  they believe that 550(a) was imposing this liability on every
5  single person in the securities industry for every single debt
6  security issued in the United States.
7       So this very (inaudible) doesn't technically make
8  sense, and no court in 30 years ever suggested anything like
9  it; but, also, it is contrary to the policy -- the clear
10  policy -- of the Congress in connection with the Bankruptcy
11  Code.
12       JUDGE GONZALEZ: Thank you.
13       All right. Enron?
14       MR. SCHATZOW: Your Honor, if I might, let me just
15  start where he ended. The case law says "a beneficiary is
16  someone who receives a tangible economic benefit." That is
17  what it says. There is no case that says "it doesn't apply to
18  tort liability"; and just because Mr. Moloney says "the only
19  way we could establish liability is through a securities
20  lawsuit," doesn't mean that that is the case.
21       There are so many red herrings that have been dragged
22  across the courtroom, Your Honor, it is hard to know where to
23  begin, so let me sort of start at the end and work up.
24       Your recollection is correct. It was in this very
25  case that both Lehman and Goldman, and virtually all other