CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Attorneys for Defendant Goldman, Sachs & Co.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- X

In re:                                                              :

ENRON CREDITORS RECOVERY CORP., et al.,          :

                 Reorganized Debtors.          :

--------------------------------------------------------------------- X

ENRON CORP.,                                                  :

                 Plaintiff-Respondent,

                                         :

         v.                                                   :          Civ. No. 07-10527 (SAS)

GOLDMAN SACHS & CO.,                                    :

                 Defendant-Petitioner.

--------------------------------------------------------------------- X

ENRON CORP.,                                                  :

                 Plaintiff-Respondent,

                                         :

         v.                                                   :          Civ. No. 07-10530 (SAS)

GOLDMAN SACHS & CO.,                                    :          **ORAL ARGUMENT**
                                                                            **REQUESTED**
                 Defendant-Petitioner.

--------------------------------------------------------------------- X

**DECLARATION OF AVRAM E. LUFT IN SUPPORT OF THE REPLY
MEMORANDUM IN SUPPORT OF GOLDMAN SACHS & CO.'S MOTION TO
WITHDRAW THE REFERENCE OF THE ADVERSARY PROCEEDING TO THE
BANKRUPTCY COURT**

EXHIBIT 6 CONTAINS CONFIDENTIAL INFORMATION AND, PURSUANT TO ¶ 18 OF THE AMENDED
CONFIDENTIALITY PROTECTIVE ORDER ENTERED BY JUDGE GONZALEZ ON DECEMBER 5, 2006,
HAS BEEN FILED WITH THE COURT UNDER SEAL

I, AVRAM E. LUFT, declare as follows:

1.      I am a member of the bar of this Court and Counsel at the law firm of Cleary Gottlieb Steen & Hamilton LLP, counsel for defendant Goldman, Sachs & Co. in the above-captioned proceeding.  I respectfully submit this declaration in support of the Reply Memorandum Of Law In Support Of Goldman, Sachs & Co.'s Motion To Withdraw The Reference Of The Adversary Proceedings To The Bankruptcy Court.

2.      Annexed hereto, at the numbered tabs indicated, are true and correct copies of the following documents:

| | |
|---|---|
| **Exhibit 1** | Excerpt from Enron Corp.'s Memorandum In Opposition To Motions To Dismiss, Adv. No. 03-92677 (AJG), filed May 19, 2004, pp. 72-76 |
| **Exhibit 2** | Expert Report of Professor Donald C. Langevoort Submitted By Goldman, Sachs & Co. |
| **Exhibit 3** | Excerpt from Brief Of The Securities And Exchange Commission, Amicus Curiae, Civ. No. 90-1755 (RCL), (D.D.C., filed Aug. 24, 1992), pp. 33-46. |
| **Exhibit 4** | Excerpt from Expert Report of Professor Jonathan R. Macey Submitted By Goldman, Sachs & Co., pp. 38-45 |
| **Exhibit 5** | Excerpts from the deposition of James Newgard, pp. 326-327, 673-677 |
| **Exhibit 6** | Excerpt from Goldman, Sachs & Co.'s Response to Enron Creditors Recovery Corp.'s Supplemental Interrogatories, Adv. Nos. 03-92677 & 03-92682 (AJG), served Nov. 2, 2007, pp. 23-31 |
| **Exhibit 7** | Excerpts from June 14, 2007 Hearing Transcript, pp. 41:25-42:5, 53-54 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 4, 2008.

__/s/ Avram E. Luft_____
Avram E. Luft

# Exhibit 1

Reply Deadline: June 25, 2004
Hearing Date: To be determined

VENABLE LLP
Special Litigation Counsel for Enron Corp.
Debtors and Debtors in Possession
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Richard L. Wasserman (RW-8696)
Michael Schatzow (*pro hac vice*)
Robert L. Wilkins (*pro hac vice*)

TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Enron Corp.
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Frank A. Oswald (FAO-1223)
Scott E. Ratner (SER-0015)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------- x
                             :

In re                          :       **Chapter 11**
**ENRON CORP., et al.,**         :
                             :       **Case No. 01-16034 (AJG)**
           **Debtors.**      :
                             :       **Jointly Administered**
-------------------------------------------- x
                             :

**ENRON CORP.,**          :
                             :
           **Plaintiff,**      :
                             :       **Adversary Proceeding**
           **v.**            :
                             :       **No. 03-92677 (AJG)**
**J.P. MORGAN SECURITIES INC.,**  :
  **et al. ,**                :
                             :
           **Defendants.**   :
                             :
-------------------------------------------- x

## ENRON CORP.'S MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS

proceeded to adopt its own tests. That fact confirms that the Court did not see any applicability of <u>Bankers Trust</u> outside of the particular regulatory context of Glass-Steagall.

Amicus somehow manages not to cite <u>Reves</u>, even though it clearly is the critical Supreme Court decision in this area. Four dissenting Justices (Rehnquist, Scalia, O'Connor, and White) agreed that commercial paper was governed by the literal exclusion of notes of less than nine months maturity from the definition of a security under the 1934 Act. <u>See</u> 494 U.S. at 81 (Rehnquist, C.J., dissenting). In a concurring opinion, Justice Stevens wrote that the definitions of the 1933 and 1934 Acts should be construed as being identical, but with commercial paper constituting the only instrument excluded under both. <u>See id.</u> at 76 (Stevens, J., concurring). <u>Reves</u> therefore gives credence to the view that, in activities governed by the 1934 Act, any note of less than nine months duration is excluded from the definition of security. While that view has yet to be endorsed by the Second Circuit, <u>see</u> <u>Nat'l Bank of Yugoslavia v. Drexel Burnham Lambert</u>, 768 F. Supp. 1010, 1017 (S.D.N.Y. 1991) ("[w]hile the view of the dissenters in <u>Reves</u> may ultimately command a majority of the Supreme Court, at the present time this court is bound by the established precedent in this circuit" applying the exceptions under the 1933 Securities Act), it indicates, at a minimum, that the status of these short-term notes as a security is very much open to question.

        **2.**    **1933 Securities Act and SEC policy**. Section (3)(a)(3) of the 1933 Securities Act exempts commercial paper from registration (but not the anti-fraud provisions of the Act) if it is "'short term paper ... of a type which rarely is bought by private investors.'" <u>Anderson v. Francis I. duPont & Co.</u>, 291 F. Supp. 705, 708 (D. Minn. 1968) (quoting 1 L. Loss, <u>Securities Regulation</u> 566-68 (2d ed. 1961)). These "3(a)(3)" exceptions have been blended by

the SEC staff, which, by combining elements from House and Senate Reports for the 1933 Act, issued a Release in 1961 that establishes a widely used standard:

> The legislative history of the Act makes clear that section 3(a)(3) applies only to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks.

SEC Rel. No. 33-4412, 26 Fed. Reg. 9158 (Sept. 20, 1961). Release 4412 specifies six factors for consideration in determining whether commercial paper is exempt: the notes must be (a) prime quality; (b) negotiable (c) of a type not ordinarily purchased by the general public; (d) issued to facilitate well recognized types of current operational business requirements; (e) of a type eligible for discounting by the Federal Reserve banks; and (f) of a maturity of nine months or less. Id.

Defendants make no showing that Enron commercial paper did not satisfy the SEC test, nor could they on a motion to dismiss. Nevertheless, it should be noted that certain of their extrinsic evidence, while not properly before the Court on a motion to dismiss, suggests that the commercial paper satisfies the test: the commercial paper was highly rated, short term, and intended to finance current business operations, not to serve as an investment. See Montcalm County Bd. of Comm'rs v. McDonald & Co. Sec., 833 F. Supp. 1225, 1227, 1235 (W.D. Mich. 1993) (high rating considered conclusive evidence of the paper's prime quality). Enron, of course, is precluded by the preliminary nature of Defendants' motions to dismiss to state its evidence here, but, suffice it to say, Enron will adduce substantial evidence, including expert testimony, to support this position. Typically, the question of whether commercial paper satisfies Section 3(a)(3) is an issue of fact decided by trial. See generally Thomas Lee Hazen, The Law of Securities Regulation § 1.6, at 108 (4th ed. 2002) (applicability of Section 3(a)(3) is

-73-

highly factual and in many cases summary judgment is not appropriate); <u>UBS Asset Mgmt. Inc.</u> <u>v. Wood Gundy Corp.</u>, 914 F. Supp. 66, 70 (S.D.N.Y. 1996) (question of fact whether notes in question met exemption requirement); <u>Franklin Sav. Bank v. Levy</u>, 406 F. Supp. 40, 46-47 (S.D.N.Y. 1975) (finding of security rendered after nine-day bench trial), <u>rev'd on other grounds</u>, 551 F. 2d 521 (2d Cir. 1977).

> **3.     *<u>Reves</u> family resemblance test.*** The <u>Reves</u> plurality decision established a two-prong "family resemblance" test, drawn from Second Circuit precedent, with satisfaction of either prong deemed sufficient to exclude a short-term debt instrument from treatment as a security. <u>See</u> <u>Reves</u>, 494 U.S. at 65-67 (Marshall, J., plurality op.). The first test determines whether the instrument closely resembles certain types of notes that the plurality said were not securities. <u>See</u> <u>id.</u> at 65. The second determines whether the instrument satisfies four functional standards identified by the Court: (i) whether the seller and buyer are motivated to raise money for the general use of a business enterprise (not a security) or to finance substantial investments that would generate significant profits (more likely a security); (ii) the plan of distribution for the instrument and whether there is "'common trading for speculation or investment'"; (iii) the reasonable expectations of the investing public, and (iv), whether some factor, such as the existence of another regulatory scheme, reduces the risk to the investing public. <u>See</u> 494 U.S. at 66-67.

> Even at this initial stage of the proceedings, there are considerable grounds for finding that the Enron commercial paper satisfies <u>both</u> prongs of the <u>Reves</u> "family resemblance" tests of an exempt security (only one prong is necessary under <u>Reves</u>). *First*, it closely resembles two enumerated types of notes that the Supreme Court said were not securities: notes that formalize an open-account debt incurred in the ordinary course of business and notes evidencing

loans by commercial banks to fund current operations.  See 494 U.S. at 66-67; see also Banco Español de Credito v. Security Pac. Nat'l Bank, 763 F. Supp. 36, 42 (S.D.N.Y. 1991) (participations in short-term bank loans bore "a strong family resemblance to 'loans by commercial banks to customers for current operations'"), aff'd, 973 F.2d 51 (2d Cir. 1992). *Second*, although Enron cannot address definitively the pertinent facts here, as most are not set forth in the Amended Complaint, Defendants' allegations permit a preliminary analysis.

          a.     Enron readily satisfies the "motivation" test (Reves factor 1), as the main purpose of commercial paper is to fund current commercial operations, not to serve as an investment with an expectation of a return of profit.  See S.E.C. v. Wallenbrock, 313 F.3d 532, 538 (9th Cir. 2002) (distinguishing between commercial and investment uses of promissory notes); Stoiber v. SE.C., 161 F.3d 745, 749-50 (D.C. Cir. 1998) (same); Pollack v. Laidlaw Holdings, 27 F.3d 808, 811-13 (2d Cir. 1994); Banco Español, 763 F. Supp. at 43 ("overall motivation of the parties was the promotion of commercial purposes and not investments in a business enterprise").

          b.     It also satisfies the "distribution" test (Reves factor 2), as the commercial paper was not sold to individuals through common trading and instead was issued to sophisticated corporate holders and mutual funds.  See Wallenbrock, 313 F.3d at 538; Stoiber, 161 F.3d at 750-51, Pollack, 27 F.3d at 813-14 Banco Español, 973 F.2d at 46.

          c.     As for the third Reves factor (public expectation that these were securities), the holders here were all sophisticated and therefore knew well that these were exempt 3(a)(3), non-registered instruments.

          These numerous points of "family resemblance" are not surprising.  At least one commentator has concluded that, under Reves, Enron-type commercial paper is not a security.

See Marc I. Steinberg, Notes as Securities: *Reves* and Its Implications, 51 Ohio St. L. J. 675, 684 (1990) (following Reves, "the law is as it should be: short-term high quality commercial paper marketed to sophisticated purchasers for facilitating current operations is exempt from securities law coverage," whereas if "an instrument is called commercial paper but is in reality an investment security, the 'family resemblance test mandates that the instrument be deemed a 'security'"). While that proposition is not accepted by all courts, see NBW Comm'l Paper Litig., 813 F. Supp. 7, 18 (D.D.C. 1992), the issue clearly is a close one that requires extensive factual investigation. See Pollack v. Laidlaw Holdings, 27 F.3d 808, 811 (2d Cir. 1994) (complaining that case "require[d] [the court] to engage again in the difficult task of applying the legislative definition of 'security'").

        **4.**    **The Bankruptcy Code**.  Instead of addressing the understanding of the securities trade as to what is a security, Defendants chose instead to focus on the Bankruptcy Code definition of the term "security," which includes a "note."  This emphasis is misplaced. The Bankruptcy Code definition, simply put, is not the applicable test.

        In enacting the § 546(e) safe harbor defense, Congress did not link the defense to the definition in § 101 of the Bankruptcy Code, which would have extended the defense to all payments with regard to a "security," but instead expressly limited the defense to settlement payments commonly used in the securities trade.  In other words, Congress deliberately chose the common securities trade understanding, per the 1934 and 1933 Acts, to define the scope of the § 546(e) safe harbor, as opposed to the definition in § 101 of the Code.

        Finally, the legislative history of the Bankruptcy Code definition is hardly as clear as Defendants contend. While it is true that in 1978 Congress did not adopt the House version of the definition, which excluded "commercial notes," it can hardly be argued that it did so for the

-76-

# Exhibit 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------X
In re:                                                            :
                                                                  :         Chapter 11
ENRON CREDITORS RECOVERY CORP., et al.,                           :
                                                                  :         Case No. 01-16034 (AJG)
                      Reorganized Debtors.                        :
                                                                  :         (Jointly Administered)
------------------------------------------------------------------X
ENRON CORP.,                                                      :
                      Plaintiff,                                  :
                                                                  :
              v.                                                  :         Adv. No. 03-92677 (AJG)
                                                                  :
J.P. MORGAN SECURITIES, INC., et al.,                            :
                                                                  :
                      Defendants.                                 :
------------------------------------------------------------------X
ENRON CORP.,                                                      :
                      Plaintiff,                                  :
                                                                  :
              v.                                                  :
                                                                  :         Adv. No. 03-92682 (AJG)
MASS MUTUAL LIFE INSURANCE CO., et al.,                          :
                                                                  :
                      Defendants.                                 :
------------------------------------------------------------------X
```

**EXPERT REPORT OF PROFESSOR DONALD C. LANGEVOORT**
**SUBMITTED BY GOLDMAN, SACHS & CO.**

Introduction

1. I have been asked by counsel for Goldman, Sachs & Co. ("Goldman Sachs") to prepare this Report in response to the legal opinion set forth in a report submitted by Professor Joseph A. Franco ("Franco Report") on behalf of Enron Creditors Recovery Corp. The essence of Professor Franco's opinion is that a dealer selling commercial paper normally exempt under Section 3(a)(3) of the Securities Act of 1933 bears strict liability under Section 12(a)(1) if that paper is later determined to have been not of "prime" quality at the time of issuance, even if the dealer did not know and could not practicably have discovered the facts that later call prime quality into doubt.

2. My understanding is that Professor Franco's opinion was prepared to support a claim by Enron Creditors Recovery Corp. against Goldman Sachs for being the alleged beneficiary of a transfer that is voidable under the bankruptcy laws. The claim is not that Goldman Sachs is liable under Section 12(a)(1) to holders of the Enron commercial paper, but rather that the repurchase of the commercial paper by Enron from those holders essentially extinguished the potential Section 12(a)(1) liability Goldman Sachs would have faced to those holders if the commercial paper was not otherwise paid, thereby bestowing a "benefit" that under the bankruptcy laws Enron claims it would be entitled to rescind. My Report is limited to the narrow issue raised in Professor Franco's opinion, and does not address any bankruptcy issues.

Summary of Opinion

3. The "prime quality" standard that Professor Franco relies on is not contained in the statutory text of 3(a)(3) but rather is a gloss derived from a 1961 SEC Release that expressed the SEC's view of the purpose of the exemption and the Securities Act's legislative history. Whether this gloss has any continuing application is thrown into doubt by the Supreme Court of the United States' modern approach to statutory interpretation, which is to not permit considerations of purpose and legislative history to alter or add to the plain meaning of a federal statute's text.

4. Even assuming, however, that the "prime quality" gloss has continued applicability, it has never been applied, and in my opinion would not be applied, in the manner Professor Franco suggests. Both the commercial paper market and the SEC's approach to what constitutes "prime quality" have substantially evolved in the almost half century since the SEC first issued its Release. Over that time period, the SEC has increasingly taken a market approach that defers to investment grade ratings by national rating agencies, the availability of backup credit facilities, and the sophisticated judgments of the institutional investors who have electronic access to detailed SEC filings concerning the issuer.

5. Accordingly, in my opinion Goldman Sachs would have been able to claim the Section 3(a)(3) exemption based on the facts of this case at the time of the sales at issue, including Enron's investment grade ratings, the existence of backup credit facilities, and the institutional market in which Enron's commercial paper was sold. Goldman Sachs faced no real risk of Section 12(a)(1) liability for selling Enron commercial paper. Professor Franco's opinion to the contrary is unsupportable as a matter of law. Moreover, were his conclusion that dealers are essentially insurers of

the quality of the paper to be accepted, it would substantially upset the efficient operation of the commercial paper market, which is a key segment of the U.S. financial marketplace.

### Personal Qualifications

6. I am the Thomas Aquinas Reynolds Professor of Law at the Georgetown University Law Center, Washington, D.C., where I specialize in corporate and securities law. Prior to joining the Georgetown faculty, I was the Lee S. & Charles A. Speir Professor of Law at Vanderbilt University. I have also been a Visiting Professor at Harvard Law School, the University of Michigan Law School and the University of Sydney in Australia. Before becoming a professor in 1981, I was on the staff of the United States Securities & Exchange Commission ("SEC") in Washington, D.C., as Special Counsel to the Associate General Counsel for Regulatory Policy. I was also briefly in private practice in Washington, D.C., at the law firm of Wilmer, Cutler & Pickering.

7. I have written and taught extensively on securities regulation. I am the co-author, with Professors James Cox and Robert Hillman, of *Securities Regulation: Cases and Materials* (New York: Aspen Publishers 5th ed. 2006), the most widely-adopted casebook on securities regulation in U.S. law schools, and the author of a treatise on insider trading, *Insider Trading: Regulation, Enforcement and Prevention* (St. Paul, Minn.: West Group 2007), as well as more than fifty law review articles and book chapters. I have served on the legal advisory boards of both the New York Stock Exchange and the National Association of Securities Dealers, and have testified numerous times before Congressional committees on issues of securities law reform. A copy of my c.v. is attached to this Report as Appendix A. My hourly fee for work as an expert witness in this case is $550, plus reasonable expenses, and is not contingent in any way on the substance of my opinions or the outcome of this litigation.

8. In forming my opinions, I have relied on the sources listed in Appendix C and the information referenced throughout this Report. I reserve the right to supplement my opinions in this matter in the event that additional information or arguments are provided in this case.

### Factual Background

9. Professor Franco's Report contains an extensive "factual matrix" [**Part III**] even though his analysis is essentially a legal one to which most of those purported facts have no relevance. For purposes of his Report, Professor Franco adopted the conclusions of Thomas Blake contained in Blake's Report submitted in another case, dealing with Enron's solvency. I have not read Blake's Report and do not opine as to whether it is proper for Franco to rely upon it. For purposes of my Report, I will simply assume for this limited purpose that Professor Franco's reliance on Blake's Report is justified and that Enron was insolvent before issuing the commercial paper in question [**3.5.1, 4.4.4**]. Beyond that, the key facts relevant to his opinion on

3

Section 12(a)(1) liability are simple and not in dispute. Enron's commercial paper had a duration of no longer than 270 days from the date of issue, and a minimum purchase requirement of $100,000. Goldman Sachs was one of three dealers through which Enron's commercial paper was sold during the time prior to its bankruptcy filing. At the time of the sale, the principal credit rating agencies, Moody's and Standard and Poor's, gave Enron's commercial paper a second-tier but nonetheless investment grade rating (A-2/P-2). These ratings reflected the existence of two "revolver" lines of credit totaling some $3 billion from which Enron could draw to pay off commercial paper, subject to commonplace terms and conditions.

10. Professor Franco makes no claim that Goldman Sachs was in possession of or had access to any information about Enron's financial difficulties at the time it sold the commercial paper that was not otherwise publicly available. In fact, he advocates that due care would not and should not protect Goldman Sachs from strict liability under Section 12(a)(1) **[4.6, 4.6.1]**.

## Commercial Paper Practices and Procedures

11. The structure of the commercial paper market is more fully described in two other Expert Reports submitted by Goldman Sachs, prepared by Professors Charles Calomiris and Jonathan Macey. My purpose here is simply to emphasize some key points that are important for the legal analysis that follows.

12. The commercial paper market is a multi-trillion dollar market, and a crucial part of the nation's financial structure. Non-financial companies often issue commercial paper to gain access to funds on a short-term basis on more favorable terms than available through bank loans. To gain marketplace acceptance, commercial paper must be perceived by buyers, who are largely sophisticated institutional investors, as low risk. By far, an investment grade credit rating assigned to the paper is the main indicator of its quality. To enhance quality and protect against liquidity risks, many issuers arrange backup lines of credit from which they can draw to pay off commercial paper if necessary, as Enron did here. Credit rating agencies consider such lines of credit as important factors in their ratings, and insist on full lines of credit if the issuer has anything less than the highest possible credit rating.

13. Conventional commercial paper is usually sold through dealers; Goldman Sachs, J.P. Morgan Securities Inc., and Lehman Commercial Paper Inc. are among the primary dealers. Although practices vary, commercial paper often is sold based exclusively on credit rating. Commonly, the only information dealers provide to buyers is a description of the terms of the paper, along with the ratings. Information about the issuer itself is available to buyers separately, through the issuer's 10-K, 10-Q and 8-K filings that are publicly available from the SEC and other sources. The normal practice, which was employed in the sale of the Enron paper by all three dealers, is to convey no information or analysis regarding the issuer's financial condition but instead simply to refer potential buyers to various external sources, including the SEC and the issuer itself, for such information. Dealers typically (and with respect to the Enron paper did in fact) state that they are making no warranties or representations as to the accuracy or completeness of the information they are providing, and direct

4

investors to rely on their own examinations of the terms and risks of the paper. See CHARLES JOHNSON & JOSEPH MCLAUGHLIN, CORPORATE FINANCE AND THE SECURITIES LAWS sec. 10.07[B][1] (2004, with 2007 supplementation). Although dealers consider financial information practicably available to them, they make no in-depth independent investigation into the financial condition of the issuer akin to what an underwriter would perform in a public offering of securities, and generally have no practical ability to do so. *Id.*

14. The sale of commercial paper has changed dramatically over the last fifty years. Until 1969, so far as I am aware, only one agency rated commercial paper, and the ratings process was less formal or independent. In addition, information about the issuer and its financial status was less readily available to buyers. As a result, dealers played an important role in conveying information, and buyers had reason to rely on the selling dealers with respect to the quality of the paper. Today, for the reasons described above, this informational role has largely disappeared with respect to the commercial paper of well-known issuers.

### Legal Background

15. Section 12(a)(1) provides a right on behalf of purchasers of securities to rescind their purchases (or receive a rescissionary measure of damages) as against their seller if the securities were offered or sold in violation of Section 5 of the Securities Act of 1933. In relevant part, Section 5 requires the registration with the SEC of offerings of non-exempt securities. Enron's sale of commercial paper was not registered. For the purpose of addressing Professor Franco's conclusions, I will assume that Goldman Sachs was a "seller" of the commercial paper within the meaning of Section 12(a)(1) and therefore could be liable to its direct purchasers were the sale to have violated Section 5.

16. The Securities Act contains a large number of exemptions from Section 5's registration requirement. Some of these are transactional, such as the non-public offering exemption found in Section 4(2) or the exemption for securities dealers in Section 4(3). At issue here is Section 3(a)(3) of the Act, which grants an exemption from the requirements of Section 5 for the offer and sale of "[a]ny note, draft, bill of exchange or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." Enron's short-term commercial paper met this definition by its terms, and Professor Franco does not contend otherwise.

17. Professor Franco's claim is that as a matter of law Section 3(a)(3) is not to be read literally but rather by reference to certain SEC interpretations that I characterize as a "gloss" on the statutory text, limiting the exemption's scope to (among other things) "prime quality" commercial paper [4.4]. In Professor Franco's view, if in hindsight Enron's paper is established not to have been of prime quality based on Enron's assumed insolvency on the date of issuance, the Section 3(a)(3) exemption is lost, and thus Section 5 was violated [4.5, 4.7, 4.8].

5

18. The so-called gloss on Section 3(a)(3) comes from Securities Act Release No. 4412, issued by the SEC in September 1961. There, the Commission took the position that issuers of short-term debt securities could avail themselves of the exemption from registration only if, in addition to having a duration of less than nine months, (1) the paper was of prime quality, (2) it was of the type not ordinarily purchased by the general public, (3) it was used to finance current transactions, and (4) it was of a type eligible for discounting by Federal Reserve banks. Given that the SEC has abandoned the Federal Reserve discounting standard,[1] the net effect is to add two additional conditions ((1) and (2)) to the two found explicitly in the statute. The SEC's purpose was not to regulate the commercial paper market by means of the exemption but rather to exclude from the scope of the exemption the issuance of short-term debt by issuers who would not normally be able to access the commercial paper market. In other words, the Commission's position was that an issuer – a start-up, perhaps, or a struggling company – cannot avoid registering what would otherwise be a public offering of debt securities merely by keeping the duration short and claiming that the proceeds were being used for current transactions. The Commission derived the additional conditions from its reading of the legislative history of the exemption, although these factors were described in the legislative history as "ordinarily" associated with the conventional commercial paper that Congress sought to exempt, not necessarily a prerequisite.

19. Whether the SEC's "prime quality" gloss would withstand careful judicial scrutiny today is less clear than Professor Franco suggests. In *Reves v. Ernst & Young*, 494 U.S. 56 (1990), the Supreme Court of United States addressed the question of whether a particular demand note issued by an agricultural cooperative was a security, and if so, whether it was exempt with respect to a fraud claim because of Section 3(a)(10).[2] Plaintiffs argued, among other things, that the "gloss" on that section limited its applicability to true commercial paper, which this clearly was not. The majority held that the demand note was a security and that it had a duration longer than nine months, so that Section 3(a)(10) provided no exemption even if applied literally. The majority said that it was therefore not necessary to consider the gloss, but one concurring justice, Justice Stevens, embraced the judicial decisions endorsing a limited scope to the statutory exemptions. Four justices (Chief Justice Rehnquist and Justices White, O'Connor and Scalia) dissented, and criticized Justice Stevens' concurrence. The dissenting opinion expresses the modern view of statutory construction that when a statute by its terms grants an exemption, courts should not resort to purpose or legislative history to change its textual meaning. See, e.g., *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 167 (2004) (stating that to interpret the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), "[g]iven the clear meaning of the text, there is no

---

[1] See Paul Lowenstein, *The Commercial Paper Market and the Federal Securities Law*, 4 Corp. L. Rev. 128, 146 (1981) ("[T]he Commission's staff has retracted sub silentio the requirement that the note be eligible for discounting by a Federal Reserve Bank.").

[2] Section 3(a)(10) of the Securities Exchange Act of 1934 provides: "The term 'security' means any note … ; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

need to … consult the purpose of CERCLA at all"); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

20. Since *Reves*, there has been widespread recognition that the gloss on either Section 3(a)(3) or 3(a)(10) may be less supportable than theretofore assumed. See, e.g., JOHN C. COFFEE ET AL., SECURITIES REGULATION: CASES AND MATERIALS 327 (10th ed. 2007) ("The SEC has long taken the position that the language in Section 3(a)(10) applies only to investment grade commercial paper, but after *Reves*, this has become an open question."). In my opinion, any effort to push Section 12(a)(1) liability so as to create strict liability for dealers who sell investment grade commercial paper unaware that the issuer's financial condition might not really be prime, as Professor Franco does, would justify a strict textual response.

21. Even assuming that the gloss continues to apply as a matter of law, however, the "prime quality" standard has never been applied in the simplistic and mechanical way Professor Franco suggests, but has evolved over time to reflect the realities of the commercial paper market. As discussed more fully below, it has never been applied by the courts or the SEC in a way that would support the extreme conclusion that he reaches: that dealers face strict liability – i.e., regardless of what they know or even could know – for the sale of facially exempt commercial paper that later turns out to be non-prime with the benefit of hindsight. There is no discernible legal basis for such a conclusion, and such a disruption of the stable expectations on which the commercial paper market is built cannot be justified.

The Evolution of the Section 3(a)(3) Exemption: The SEC's Position and Judicial Interpretation

22. The "prime quality" language in the SEC's interpretation, like the requirement that the paper be discountable at the Federal Reserve window, is something of an anachronism. "Prime quality" was during the 1960's a rating designation used by national statistical organizations, the predecessors of today's rating agencies. In the 1970's, partly in response to issues arising out of the Penn Central Co. bankruptcy, rating agency procedures and independence were substantially enhanced and rating agencies adopted the more refined ratings utilized today. But because the phrase "prime quality" was used in the 1961 release, it continued to be used in SEC guidance and in the case law, discussed below.

23. The SEC's interpretation of "prime quality" has changed over time. Even by the late 1970's, the Division of Corporation Finance was treating prime quality as largely synonymous with highly-rated paper of the sort the largely institutional market for commercial paper found acceptable. In other words, it shifted largely to a market test for prime quality, with the rating being the most important factor. See, e.g., *Industrial Fuels Corp.*, no-action letter avail. Aug. 20, 1979 ("The prime quality of the Notes will be established by high ratings given by recognized commercial paper

rating services.").[3]  In the 1980's, the staff even relaxed this, allowing certain issuers of unrated securities to take advantage of the exemption upon a sufficient showing of the existence of revolving credit agreements or other risk-reducing mechanisms, or any other factor that would make it likely that the paper would find buyers in the conventional commercial paper marketplace. See, e.g., *The Black and Decker Corp.*, no-action letter avail. July 12, 1989 ("Numerous recent Division no-action letters indicate that unrated commercial paper backed by bank lines of credit or other revolving credit facilities is 'prime quality' commercial paper for purposes of the Section 3(a)(3) exemption if the amount of commercial paper outstanding at any given time does not exceed the amounts available under the lines of credit."); *Russell Corp.*, no-action letter avail. Sept. 22, 1988 ("The Division has on numerous occasions issued 'no-action' letters where unrated commercial paper was claimed to be 'prime quality' at least in part because the issuer would maintain lines of credit sufficient to repay the paper if necessary."); *Imperial Corp. of Am. and Imperial Savings Assoc.*, no-action letter avail. Sept. 21, 1988 ("It appears clear, however, from other no-action letters that prime quality commercial paper is not limited to commercial paper rated by a nationally recognized statistical rating organization.").

24. Then, in January 1990, the staff announced that it would no longer grant no-action guidance at all under Section 3(a)(3), pending consideration of whether to move away from open-ended "prime quality" analysis to a specific rating standard (a step that it has not subsequently taken).  Commenting on the guidance freeze, the leading commentary on SEC no-action letters notes that "[b]y reason of the relatively recent liberalizations of the definition of prime quality, such as the revolving credit agreement rule (which apparently does not require an irrevocable bank commitment) in the case of unrated notes, the staff may be now tending towards depriving the prime quality requirement of any significant substantive content." ROBERT HAFT & MICHELE HUDSON, ANALYSIS OF KEY SEC NO-ACTION LETTERS 107 (2007-08 edition).

25. While the SEC and its staff have taken the position that palpably insolvent issuers who sell to the public cannot avail themselves of Section 3(a)(3) regardless of whether they technically meet the requirements of the exemption, so far as I am aware, there is no instance where commercial paper rated "prime" by a major nationally-recognized credit agency or backed by a credible revolver facility at the time of issuance was found not to qualify for the exemption. Enforcement actions have been limited to circumstances where a seller (typically the issuer itself) knowingly sold a non-creditworthy instrument to unsophisticated buyers in a transaction outside the normal operation of the commercial paper markets.[4]

---

[3]  See also Lowenstein, *supra* note 1, at 141 (improvements in the credit rating process in the aftermath of Penn Central "obviated the need for the SEC to define 'prime' quality").

[4]  In an SEC enforcement action cited by Professor Franco [**4.5 n.29**], *SEC v  Donald Coleman et al.*, Lit. Rel. 13033, 1991 WL 294364 (Oct. 9, 1991) – an action growing out of the NBW bankruptcy, discussed earlier and more fully below – the SEC charged the chief financial officer of Washington Bancorporation with a Section 5 violation.  The Commission's complaint with respect to the registration violation emphasized that Coleman fully knew of WBC's precarious financial situation and thus "should have known" that no exemption was available from the registration requirement of Section 5.  The emphasis on

26. This brief history shows a number of things that belie Professor Franco's simple claims. First, there is no clear or fixed meaning of prime quality. Even Professor Franco, who draws a distinction between the "commercial" and the "legal" definitions of commercial paper, fails to provide any such legal definition except by opining as to what is not sufficient under the legal test [**4.4.1-4.4.3**]. Instead, the meaning of "prime quality" has shifted over time, moving in the direction of a market-based approach in which the reactions of the rating agencies and institutional buyers determine prime quality. Second, there is no hint in anything the Commission has said since 1961 of any strict liability risk to dealers or other market participants who sell commercial paper deemed to be prime at the time of its issuance but later viewed differently with the benefit of hindsight. The Commission's approach has always been limited to factors, such as ratings and available lines of credit, that are visible to those seeking the protection of the statutory exemption. Were the Commission to believe that dealers proceed at their peril should it turn out that the ratings and other objective indicia missed the "true" but hidden financial condition of the issuer, it presumably would have said so – and said so explicitly – long ago. It never has, and in my opinion, never would.

27. No court has ever adopted the interpretation of the SEC's "prime quality" gloss urged by Professor Franco in his Report. In fact, there have been relatively few modern cases discussing the gloss at all. Most of the case law is quite old. Soon after the SEC added its gloss to the 3(a)(3) exemptions in the 1960's, a number of courts followed its interpretation. For the most part, these cases involved public sales by thinly-capitalized issuers of short-term notes bearing no resemblance to the issuance of conventional commercial paper, and the courts agreed with the SEC that these poorly capitalized issuers should not be able to sell unregistered securities to the public. E.g., *United States v. Hill*, 298 F. Supp. 1221 (D. Conn. 1969) (criminal prosecution).

28. Of all the cases cited in Professor Franco's opinion, only one case both addresses and analyzes a Section 12(a)(1) claim and the "prime quality" gloss: *In re NBW Commercial Paper Litigation*, 813 F. Supp. 7 (D.D.C. 1992). That case involved claims against the FDIC as receiver for Washington Bancorporation (WBC), which issued commercial paper that was sold by its own subsidiary, National Bank of Washington (NBW). The court held that purchasers could assert a 12(a)(1) claim against NBW as seller, and that Section 3(a)(3) did not exempt the paper. The court in *NBW* said that any note of less than nine months duration used for current purposes creates a presumption that the exemption is available, which plaintiffs must rebut by showing both a) that the paper was non-prime and b) that it was sold to the public or otherwise unsophisticated investors.

29. With respect to the prime quality standard, the court found the exemption unavailable because WBC's commercial paper program had no "prime rating" and the issuer's own rating was way below investment grade, the issuer had no backup lines of credit to pay obligations coming due, and no liquid assets. 813 F. Supp. at 18. The

what was known and should have been known belies any effort to apply a strict liability approach to third parties reasonably relying on the Section 3(a)(3) exemption.

financial weakness was obvious and known to the seller of the commercial paper, NBW, which stood in the shoes of WBC with respect to its activities because WBC had no employees of its own. Id. at 14. Separately, the court found evidence of sales to unsophisticated public investors.

30. In essence, this was a single entity, a bank, selling bogus commercial paper on the eve of bankruptcy to anyone with $25,000 to invest, some of whom were the bank's own local customers. The *NBW* case specifically rejects Professor Franco's contention that it would be Goldman Sachs's burden to demonstrate the availability of the 3(a)(3) exemption for a program that met the textual requirements of the exemption [see 4.2] and proposes the two-part test for the availability of the exemption, which Professor Franco does not even purport to apply.[5] The factors which the Court relied on for its "prime quality" determination have no relevance here and provide no support for Professor Franco's conclusion with respect to the "prime quality" of Enron's commercial paper.[6]

31. Most of the cases relied on by Professor Franco in his Report do not arise under Section 3(a)(3) of the Securities Act, but are interpretations of a similar but significantly different exemption found in Section 3(a)(10) of the Exchange Act. Section 3(a)(10) removes notes of less than nine months duration out of the definition of "security" entirely for purposes of the Exchange Act. If read literally, it would mean that the entire Act (including its antifraud provisions) is inapplicable to commercial paper. As discussed below, based on similar considerations to those which led the SEC to adopt its 1961 Release with respect to 3(a)(3) of the Securities Act, a number of courts have added a "prime quality" gloss to the statute's requirements in order for short-term debt to qualify under Section 3(a)(10) of the Exchange Act as being outside of the Act's antifraud provisions.

32. In the late 1960's and early 1970's, a number of cases were brought arising from defaults by issuers on conventional commercial paper programs. The Penn Central

---

[5]  *NBW*'s approach to the burden of proof responded to *Reves* and the call for a more textualist approach to reading the statutory exemptions; it holds that a presumption of exempt status applies simply upon a determination that the textual conditions were satisfied. 813 F.Supp. at 18.

[6]  Professor Franco **[3.1.3 n.6]** also cites *Abbell v. Banc of America Securities LLC*, [2001-02] Fed. Sec. L. Rep. (CCH) par. 97,734 (N.D. Ill. 2002), and *UBS Asset Management v. Wood Gundy Corp.*, 914 F. Supp. 66 (S.D.N.Y 1996), both of which deal with Section 12(a)(1) claims but hold simply that there might be a fact question about whether the commercial paper required registration, with no further discussion of that issue and no meaningful application of the prime quality standard. *Abbell*, at least, does suggest that the burden of proof of establishing the 3(a)(3) exemption is fully on the defendants, contra *NBW*, and *UBS* can be read to say the same, but neither actually discusses the issue. The SEC has also brought a number of cases alleging violations of Section 5 involving short-term notes, though not against dealers selling commercial paper. In *SEC v. American Board of Trade*, 751 F.2d 529 (2d Cir. 1984), which is also cited by Professor Franco **[4.4]**, the court found that the "commercial paper" notes sold directly by the issuer were not used to raise funds for current transactions – thereby disqualifying it from 3(a)(3) exemption on statutory grounds – and then added that because the notes were sold to small investors, it also failed to satisfy the gloss in that respect. There is no discussion of "prime quality." In a case not cited by Professor Franco, *SEC v. J. T Wallenbrock & Assoc.*, 313 F.3d 532 (9th Cir. 2002), the court applied the gloss factors to disqualify notes from the 3(a)(3) exemption, mainly because the notes were sold by the issuer to small, unsophisticated investors. Again, prime quality was not the issue.

bankruptcy in 1970 generated a large number of these claims, which focused mainly on the dealers involved in the sale of the paper. In these cases, plaintiffs claimed that the dealers either fraudulently or negligently misled the buyers of the paper by concealing evidence of the issuer's deteriorating financial condition, in violation of Rule 10b-5 under the Securities Exchange Act and Section 12(a)(2) of the Securities Act. These cases, which Professor Franco cites extensively [**3.1.3, 4.4.3**], do not address any claim of a registration violation or liability under Section 12(a)(1), the only section Enron relies upon as a source of alleged benefit for Goldman Sachs.

33. As noted above, if a security qualifies under Section 3(a)(10) of the Securities Exchange Act, it falls outside all of the Exchange Act's provisions (including its antifraud provisions). As posed in cases such as *Sanders v. John Nuveen & Co.,* 463 F.2d 1075 (7th Cir. 1972) and *Zeller v. Bogue Electric Manufacturing Corp.*, 476 F.2d 795 (2d Cir.), cert. denied, 414 U.S. 908 (1973), the question faced by the courts was whether Congress really meant by enacting 3(a)(10) to leave investors in the short-term debt market without a federal remedy against securities fraud. The courts in *Zeller, Sanders* and similar fraud cases said no, and applied by analogy something similar to the SEC's gloss under 3(a)(3) to reach that result. Specifically, some of these cases concluded that Section 3(a)(10) would not include particular commercial paper – and therefore Rule 10b-5 would apply – if that paper was not of prime quality and was sold to the general public. E.g., *Sanders,* supra; *Welch Foods Inc. v. Goldman Sachs & Co.*, 398 F. Supp. 1393, 1398 (S.D.N.Y. 1974) (lack of prime quality is a fact question for the jury).[7] Some of these cases also suggest an investment grade rating will not assure a short-term debt instrument falls under 3(a)(10) if the seller knows the rating is unwarranted and acts with a culpable state of mind.[8]

34. None of these courts applied the "prime quality" gloss to impose a strict liability regime. Notably, in the principal cases on which Professor Franco relies, in which courts found that the 3(a)(10) exemption did not apply because of the lack of prime

---

[7] Contrary to Professor Franco's suggestion, however, even these holdings do not automatically equate insolvency with lack of prime quality, without regard to facts available to the dealer. In *Welch,* for example, the court said "[e]nough objective data was known [to Goldman] concerning Penn Central in early 1970 to lead a reasonable observer to conclude that the commercial paper was not prime . . ." 398 F. Supp. at 1398. In *Mallinkrodt Chemical Works v Goldman, Sachs & Co*, 420 F. Supp. 231 (S.D.N.Y. 1976), the court dismissed the action as against Dun & Bradstreet on grounds that the Penn Central commercial paper was apparently prime at the time of the rating. Id. at 242.

[8] Professor Franco stretches to fit *UBS Asset Mgt. v. Wood Gundy Corp.*, 914 F. Supp. 66 (S.D.N.Y. 1996) into this category by describing it as either rejecting or "at least express[ing] doubt that credit ratings in isolation constitute conclusive evidence of whether an issuer's commercial paper is prime." [**4.4.3**]. Even a quick reading of the case shows that it does no such thing. Holding merely that prime quality is a fact question not to be addressed in a motion to dismiss, id. at 69, the court cites a SEC no-action letter, *Mercury Finance Co*, 1989 WL 245554 (Jan. 20, 1989), which says that the Division of Corporation Finance "has relied on several factors to determine that commercial paper is of 'prime quality,' including the financial strength of the issuer, support of the commercial paper by a form of credit enhancement, or rating of the commercial paper by a national rating agency." How he concludes that this quote "expresses doubt" about reliance on ratings is unclear. As discussed earlier, the SEC considers ratings an important criterion, while allowing that even some unrated securities can be prime quality.

quality, the plaintiffs were ultimately unable to win their fraud claims on the merits. In *Franklin Savings Bank v. Levy*, 551 F.2d 521 (2d Cir. 1978), the Second Circuit ruled that there was insufficient evidence that Goldman Sachs acted with scienter in its sales of Penn Central commercial paper, thus foreclosing the only issue to which the prime quality standard was even relevant.[9] Contrary to Professor Franco's citation of *Levy* as supporting the prime quality standard [**4.4.1**], the court in fact expressed uneasiness at making outcomes in even fraud cases turn on whether the paper was sufficiently prime or not, observing that "[t]his circuit has never considered the meaning of the term 'prime quality', and even those engaged in the business of dealing in commercial paper have difficulty defining it. The legislative history of the 1933 Act from which the SEC derived the test is sparse and unenlightening." Id. at 528. This is hardly an endorsement of the prime quality gloss. The court found it unnecessary to interpret the issue further, or to apply it with respect to the Penn Central paper, because there was no evidence of fraud by Goldman Sachs in any event.

35. In cases like *Sanders* and *Levy*, plaintiffs also charged the dealers with violations of Section 12(a)(2) of the Securities Act, which provides a remedy for negligent misrepresentations in prospectuses and oral communications in the offer or sale of a security. After the Second Circuit's decision in *Levy*, dismissing the allegations of fraud against Goldman Sachs, Section 12(a)(2) was the only federal securities law claim that remained viable. Professor Franco cites these 12(a)(2) cases as if relevant to his opinion in some respect [**3.1.3**], but it is not clear why. Section 12(a)(2) claims have nothing to do with Section 5, the 3(a)(3) exemption, or the separate remedy under 12(a)(1). They are based on misrepresentations in prospectuses used in a public offering. See *Gustafson v. Alloyd Corp.*, 513 U.S. 561 (1995).

36. Professor Franco also cites the SEC's enforcement action against Goldman Sachs arising out of the sale of Penn Central commercial paper [**3.1.2**], which was settled by consent. It, however, charged Goldman only with misrepresentation under Section 17(a) of the Securities Act, to which the 3(a)(3) exemption is inapplicable. *SEC v. Goldman, Sachs & Co.*, Fed. Sec. L. Rep. (CCH) par. 94,556 (S.D.N.Y. 1974). The SEC's complaint did not claim a Section 5 violation.

37. In sum, the issues addressed in cases like *Sanders* and *Levy* are entirely different from the position Professor Franco takes. The relevant question for purposes of his opinion is whether there is any evidence that Congress intended strict liability to follow for securities dealers and other offering participants in the conventional commercial paper market from any failure on the part of the issuer to meet the prime quality standard. Nothing in the case law he cites addresses this or remotely suggests that the answer is in the affirmative.

38. Furthermore, care must be taken before relying in any respect on these cases, which are now more than thirty years old. As noted above, the commercial paper market

---

[9]    The same outcome occurred in the *Sanders* litigation. See *Sanders v. John Nuveen & Co.*, 554 F.2d 790 (7th Cir. 1977) (no evidence of fraud or recklessness by the dealers).

has changed considerably, as has the role of dealers in selling commercial paper.[10] Today, dealers usually play little if any role in conveying information about the issuer to their customers because that information is so readily available from publicly-available sources. The SEC's position has evolved as well, moving toward a simple market test for conventional commercial paper, where prime ratings, backup credit facilities, the public availability of SEC filings, and the acceptance of the credit quality of an instrument with these characteristics by sophisticated institutional purchasers who are active participants in the commercial paper market, establish the availability of the exemption.

39. In my opinion, were a court to apply the SEC's "prime quality" gloss to determine the availability of the 3(a)(3) exemption, it would look to the evolution of the SEC's approach to the exemption as discussed above and also adopt a market-based approach, which requires that the gloss be applied flexibly to reflect the realities of the commercial paper market and the information practicably available to the dealers who sell the paper in a fast-paced, sophisticated marketplace. Pursuant to that test, it would conclude that Goldman Sachs would be entitled to claim the Section 3(a)(3) exemption based on the information available to it at the time of the sales at issue. This is consistent with the view taken by the one well-respected treatise of which I am aware that has a full discussion of the Section 12(a)(1) issue as it relates to sales of commercial paper. CHARLES JOHNSON & JOSEPH MCLAUGHLIN, CORPORATE FINANCE AND THE SECURITIES LAWS sec. 10.07[A] (2004, with 2007 supplementation). The authors take note of the old case law discussed above, applying the prime quality standard to negate the Exchange Act exemption in fraud cases, which might be read to

> suggest a "Catch 22" outcome on this point: if an issuer of commercial paper defaults on the paper, then that paper could not have met the "prime quality" test at the time of its issuance.
> Whatever the validity of these cases for Rule 10b-5 purposes, they should not control the availability of the 1933 Act exemption. It should be sufficient for the latter purpose that the paper was rated "prime" at the time of its issuance by any of the major ratings agencies and that the dealer had no reason to question that rating.

This approach is fully consistent with the SEC's administrative position described earlier and the case law on Section 3(a)(3). Nothing in the SEC's position or the case law has ever suggested that the "Catch 22" is the right way to apply the statutory exemption in a strict liability regime.

40. As noted at the outset, Enron had a prime rating during the time in question from not one but the two most well-recognized rating agencies. Nor is there any evidence pointed to by Professor Franco showing Goldman Sachs was privy to any information not available to the ratings agencies that would lead it to question those ratings. Professor Franco describes numerous alleged misstatements by Enron officials to

---

[10] The cases against Goldman Sachs arising out of the Penn Central bankruptcy, for example, claimed a close relationship between Goldman and Penn Central, and emphasized Goldman's role as an intermediary in conveying financial information to potential buyers as the exclusive dealer for the paper. See *Levy*, *supra*. This bears no resemblance to the way Enron's commercial paper was apparently sold.

analysts, the credit rating agencies and the public [**3.2**], but makes no suggestion that Goldman Sachs was somehow privy to the truth. As to the so-called "storm clouds" that resulted from publicity regarding Enron's troubles – none of which indicated that the problems were as severe as they later turned out to be – these were as visible to commercial paper purchasers as to commercial paper dealers. The rating agencies were well aware of them as well (and did reconsider their long-term debt ratings for Enron), but chose to affirm the short-term commercial paper ratings, presumably in large part because of the presence of the revolver credit facilities. Nothing in Professor Franco's account suggests that Goldman Sachs was specially positioned at the time to second-guess the short-term commercial paper ratings.

Sales to the Public

41. The *NBW* case allocates a second burden to plaintiffs seeking to hold the seller liable under Section 12(a)(1) in a case involving commercial paper: in addition to showing that the investments were not prime, they must also prove that the sales were made "to the public (or other unsophisticated investors)." 813 F. Supp. at 18. Because I do not believe that the non-prime standard applies here so as to remove the 3(a)(3) exemption, for the reasons just given, for purposes of my opinion it is not essential to consider this second prong. However, Professor Franco addresses it indirectly early in his Report [**3.3.2**], when he distinguishes between the Section 3(a)(3) commercial paper sales by Enron and a separate program of "4(2)" commercial paper. He simply describes these as structurally different,[11] and makes no effort to identify public or other unsophisticated purchasers as is required by *NBW*, a case on which he otherwise relies, and he therefore fails to even present a case that could satisfy the court's two-part test.

42. So far as I am aware, this would not be an easy burden for Enron to meet. Commercial paper of the sort issued by Enron is sold to an institutional market, with a high degree of sophistication on the part of investors. The minimum denomination was $100,000. As Professor Franco stresses in a portion of his Report unrelated to claims against Goldman Sachs, purchasers of the Enron paper were often assisted by professional investment advisers. The list of buyers of commercial paper whose securities were repurchased by Enron, attached to Professor Franco's Report, strongly suggests that these were not members of the public but sophisticated investors.

---

[11]   Although the documentation and other procedures used on 4(2) programs do differ from what is typically done in a 3(a)(3) program, it is fairly common for 3(a)(3) programs to in fact satisfy 4(2) as well, because of the institutional character of the purchasers, the lack of a secondary market, and the absence of general advertising or solicitation. See JOHNSON & McLAUGHLIN, supra, at sec. 7.09[B][2]. It is not my point here that the Enron program was 4(2) exempt – I do not have all the facts to make such a legal determination, and such a determination is not necessary. Under *NBW*, the burden is on the plaintiffs to establish that the securities were sold to the public, i.e., unsophisticated investors, which overlaps with but is different from the 4(2) analysis.

Conclusion

43. Professor Franco's opinion rests on inferences, dicta and conclusions drawn mainly from cases dealing with legal issues – fraud and negligent misrepresentation in the sale of commercial paper – dramatically different from the one on which he bases his opinion, and dating from a time when the nature of the commercial paper market was dramatically different as well. The SEC has never said or even hinted that its interpretation of the commercial paper exemption under the Securities Act of 1933 is meant to put the securities dealers who place billions of dollars of commercial paper at risk of strict liability if it turns out, unbeknownst to them at the time of the sale, that the issuer had hidden or concealed financial troubles. Nor to my knowledge has any court. Stronger legal authority than that is necessary to conclude that Goldman Sachs' sale of Enron commercial paper violated Section 5 so as to trigger Section 12(a)(1) liability, a conclusion that would turn all commercial paper dealers into insurers of the financial quality of the issuer. In my opinion, Goldman Sachs would be able to claim the Section 3(a)(3) exemption based on the facts (the investment grade rating and the back-up line of credit) known or available to it at the time of the sales, and thus did not face a serious risk of Section 12(a)(1) liability for selling Enron's commercial paper.

Donald C. Langevoort
Date: January 4, 2008

Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE NBW COMMERCIAL          )
PAPER LITIGATION             )    Master File:
                             )    Civil Action No. 90-1755 (RCL)
_____)
                             )
AMERICAN FEDERATION OF STATE, )
COUNTY AND MUNICIPAL          )
EMPLOYEES,                   )
                             )
              Plaintiff,     )
                             )
         v.                  )    Civil Action No. 91-0626 (RCL)
                             )
FEDERAL DEPOSIT INSURANCE     )
CORPORATION, in its capacity  )
as receiver for THE NATIONAL  )
BANK OF WASHINGTON, N.A.,     )
                             )        FILED
              Defendant.     )
_____)    AUG 24 1992

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

BRIEF OF THE SECURITIES AND
EXCHANGE COMMISSION, <u>AMICUS</u> <u>CURIAE</u>

JAMES R. DOTY
General Counsel

JACOB H. STILLMAN
Associate General Counsel

LUCINDA O. McCONATHY
Assistant General Counsel
D.C. Bar # 278473

JOHN M. GANLEY
STUART T. REBISH
Attorneys

Of Counsel
   PAUL GONSON
   Solicitor

Securities and Exchange Commission
450 5th Street, N.W.
Washington, D.C.  20549
(202) 272-2508 (McConathy)

292

II.  WBC COMMERCIAL PAPER WAS NOT EXEMPT FROM REGISTRATION UNDER
     § 3(a)(3).

     A.  <u>The Exemption Covers Only Low-Risk Instruments That Are
         Not Sold To The General Public.</u>

     Section 3(a)(3) of the Securities Act, 15 U.S.C. 77c(a)(3),

exempts from registration:

> [a]ny note, draft, bill of exchange, or banker's
> acceptance * * * used for current transactions, and
> which has a maturity at the time of issuance of not
> exceeding nine months, exclusive of days of grace, or
> any renewal thereof the maturity of which is likewise
> limited.

Although by its terms the exemption covers any note of nine

months or less that is used to fund current transactions, every

court of appeal that has addressed interpretation of this

exemption, or its counterpart exclusion in the Exchange Act, has

concluded that the short-term note provision should not be read

literally.  <u>E.g.</u>, <u>Holloway II</u>, 900 F.2d 1485, 1489 (10th Cir.

1990); <u>SEC v. American Board of Trade, Inc.</u>, 751 F.2d 529, 539-

40 (2d Cir. 1984); <u>Baurer v. Planning Group, Inc.</u>, 669 F.2d 770,

775-77 (D.C. Cir. 1981); <u>Zabriskie v. Lewis</u>, 507 F.2d 546, 550-

52 (10th Cir. 1974); <u>Zeller v. Bogue Electric Mfg. Corp.</u>, 476

F.2d 795, 800 (2d Cir.), <u>cert. denied</u>, 414 U.S. 908 (1973);

<u>Sanders v. John Nuveen & Co.</u>, 463 F.2d 1075, 1078-79 (7th Cir.),

<u>cert. denied</u>, 409 U.S. 1009 (1972); <u>United States v. Rachal</u>, 473

F.2d 1338 (5th Cir.), <u>cert. denied</u>, 412 U.S. 927 (1973).  <u>See</u>

<u>also</u> <u>United States v. Hill</u>, 298 F. Supp. 1221, 1226-27 (D. Conn.

- 33 -

1969). **18**  For example, the Second Circuit's decision in <u>SEC v.</u>
<u>American Board of Trade, Inc.</u> ("<u>ABT</u>"), typifies the attitude on
the courts of appeals on this issue:

> It is inconceivable that Congress intended § 3(a)(3) to
> exempt from registration a periodic public offering of
> the issuer's own notes to small investors simply
> because their maturity was less than nine months.  It
> is almost equally unlikely that Congress meant that an
> issuer soliciting broad public investment in notes
> issued for general corporate purposes should be able to
> avoid the anti-fraud provisions of the 1934 Act simply
> by arranging that they should have "a maturity at the
> time of issuance of not exceeding nine months."

<u>ABT</u>, 751 F.2d at 539-40.

The Commission believes that it is important to understand
the legislative history of this exemption and the market context
in 1933, when it was placed in the proposed statute, in order to
determine Congress's original intent in enacting the exemption.
The <u>Reves</u> Court, in part II of its opinion, which was joined by

---

**18**   The Supreme Court has not ruled on the question whether
§ 3(a)(3) should be read literally to exempt all short-term
notes used to fund current transactions.  In <u>Reves</u>,
discussing the counterpart exclusion contained in the
Exchange Act, the majority suggested that it would be
inconsistent with Congress's purpose in enacting the statute
to read the exclusion literally, but it refrained from
deciding the question.  <u>Reves</u>, 110 S. Ct. at 954.  The
majority said that the argument that Congress intended to
exclude only "short-term, high quality instruments issued to
fund current operations and sold only to highly
sophisticated investors" had "some force."  <u>Reves</u>, 110 S.
Ct. at 954.  In a concurring opinion, Justice Stevens
strongly contended that § 3(a)(3) and its counterpart in the
Exchange Act should not be rigidly applied to all notes of
nine months or less.  <u>Reves</u>, 110 S. Ct. at 955-56.  The
<u>Reves</u> minority disagreed with Justice Stevens, concluding
both that the demand notes in issue in that case were short-
term instruments and that they were excluded from the
definition of a security contained in the Exchange Act.
<u>Reves</u>, 110 S. Ct. at 957-60.

the entire Court, endorsed a broad investigation of the
circumstances in which Congress defined the term "security" to
include "any note," stating, "[T]he phrase 'any note' should not
be interpreted to mean literally 'any note,' but must be
understood against the backdrop of what Congress was attempting
to accomplish in enacting the Securities Acts." Reves, 110 S.
Ct. at 950.  The exemption similarly should be read against the
backdrop of what Congress was attempting to do, which was to
exempt certain low-risk instruments almost all of which were
purchased by banks as part of their banking business, not by the
general public.

     The bill proposed in 1933 as the Securities Act initially
contained no exemption for short-term notes.  The bill simply
specified that "any note" was a security.  Federal Securities
Act, 1933:  Hearings on S. 875 before the Senate Committee on
Banking and Currency, 73d Cong., 1st Sess. 1-8 (1933) ("Hearings
on S. 875"); Federal Securities Act, 1933:  Hearings on H.R. 4314
before the House Comittee on Interstate and Foreign Commerce, 73d
Cong., 1st Sess. 1-9 (1933) ("Hearings on H.R. 4314").   The
language that became the exemption was provided by the Federal
Reserve Board, which urged Congress that a bill that appeared
directed to "investment securities" should not cover "bankers'
acceptances" or "short-time paper issued for the purpose of
obtaining funds for current transactions in commerce, industry,
or agriculture and purchased by banks and corporations."
Hearings on S. 875, p. 120 (letter of Chester Morrill, Secretary

of the Federal Reserve Board). In offering the Fed's language as
an amendment to the bill, Senator Glass, one of the bill's
sponsors, stated, "[We have] received various telegrams and
letters today from experienced bankers who very much fear that
your definitions there of securities will very radically
interfere with the ordinary commercial banking transactions."
Hearings on S. 875, pp. 98.

    Commercial paper dealers and representatives of the banking
industry explained in letters and witness statements received by
Congress that virtually all commercial paper was purchased by
banks, either directly or through commercial paper dealers, and
that the transactions giving rise to these notes held little risk
of non-payment. **19** For example, one dealer wrote the Chairman of

---

**19**  One commentator explained why commercial paper transactions
    were viewed as low-risk transactions:

> Funds received from the issuance of
> commercial paper have traditionally been used
> to finance current operational business
> expenditures of a well-defined seasonal or
> periodic nature. The underlying theory is
> that during the short period from the date of
> the paper's issuance to its maturity, the
> borrower will complete a cycle in which the
> cash obtained at the beginning of the
> transaction is transformed into commodities
> through the process of manufacture and sale
> and then converted back into cash at the end
> of the transaction through the collection of
> the proceeds of the sale. In a successful
> cycle, the completion of the operation that
> gave rise to the loan provides the funds for
> retiring the paper, thus rendering it self-
> liquidating.

Note, The Commercial Paper Market and the Securities Acts,
39 U. Chi. L. Rev. 362, 364 (1972) ("Chicago Note").

the Senate Committee considering the bill:

> If this bill should go through in its present
> form, it would make it impossible for dealers in
> commercial paper and bankers' acceptances to function.
> These are two types of obligations which have a record
> of safety only second to Government bonds * * *.
>
> Commercial paper and bankers' acceptances are
> based on self-liquidating transactions, and we cannot
> help but feel [that the Act is not intended to cover
> such instruments], but that the Act was to cover the
> marketing of securities that had to do with capital
> investment and which are bought by the investing
> public.  Commercial paper and bankers' acceptances are
> practically all bought by banks.

Hearings on S. 875, p. 94.  Similarly, another dealer wrote the

Chairman:

> Commercial paper such as we sell is, when of
> proper maturity, rediscountable with Federal reserve
> banks and has proven to be the prime secondary reserve
> for banks.
>
> * * * *
>
> To include commercial paper and bankers'
> acceptances in the securities bill would create a great
> hardship on many banks * * *.

Hearings on S. 875, p. 95.

William C. Breed, counsel for several banking associations,

testified at length before both the Senate and House committees,

explaining the unique nature of the commercial paper market at

that time and distinguishing it from the kind of investment

securities market that the bill was intended to affect:

> Now, if any of you gentlemen happen to be in any
> manufacturing, mercantile, or retail business of any
> form, you know that they have to issue promissory
> notes, and that they very frequently in the spring,
> when they do their large buying, which they have to get
> in and pay off in the fall, as they do, they have to go
> and arrange with a commercial-paper house, or a bank,
> to give them a line of credit, we will say, of

$500,000, because they had to pay the manufacturer for the goods.

Now, what is usually done there is that instead of giving one note of $500,000, they may give 20 notes of $25,000 * * *.

Now, what happens, if it is a commercial-paper house, is that the commercial-paper house takes these $10,000 notes and sells them to various banks, in lots of different amounts. A country bank may only take 5 or 10, and the larger banks may take more.

Now, commercial paper and promissory notes are not sold to the public. You and I are never going to lose any money nor is any of the public going to lose any money if that man should happen to default in those notes. * * *. They must be exempted unless you wish to stop the trade of the country in its ordinary rules.

Hearings on H.R. 4314, p. 179. He further commented:

Is this bill built to make it difficult for ordinary commerce * * *? For example you take the commercial paper of this type that matures in short periods, less than 12 months. There probably is not one case in one hundred thousand of the sale of that paper to an individual. It might be that a great big rich man would say, "Well, I will take some of this short-term paper," and he might buy it from his bank, but the ordinary public would have nothing whatever to do with it.

Hearings on H.R. 4314, p. 181. He concluded:

I do not think that there would be much market among the public for commercial short-term paper. It is almost wholly a banking proposition.

Hearings on H.R. 4314, p. 182.

Thus, when Congress enacted the exemption, it was understood by everyone involved to cover low-risk instruments purchased almost entirely by banks and commercial paper dealers. The commercial paper market, however, did not remain what it was in 1933. Chicago Note, supra p. 35, at 362-402. After passage of the Securities Act, nonfinancial corporations began to buy

commercial paper and became an increasingly large portion of the
market in the 1940s.  Id. at 368-69.  Bank holding companies and
financial institutions began issuing, rather than buying,
commercial paper.  Id. at 365-67; Stigum, supra p. 30, at 1029.
Continuous rollover of commercial paper became common, so that
funds for repayment were no longer guaranteed by production
cycles.  Chicago Note, supra p. 36, at 379; Stigum, supra p. 30,
at 1033.

        Commission staff reviewed the legislative history of
§ 3(a)(3) in Securities Act Release No. 4412 (1961) in this
changed market context.  In so doing, the staff developed four
criteria for analyzing whether a given note has the underlying
attributes of the instruments that Congress intended to exempt
-- low-risk and not sold to the general public:

> Section 3(a)(3) applies only to [1] prime quality
> negotiable commercial paper [2] of a type not
> ordinarily purchased by the general public, that is,
> [3] paper issued to facilitate well recognized types of
> current operational business requirements and [4] of a
> type eligible for discounting by Federal Reserve banks.

26 Fed. Reg. 9158 (numerals added).

        The defendant contends that "prime quality" is merely a non-
statutory requirement that few courts have considered in
determining whether notes are exempt from registration.  (Def.
Opp. Br. at 23).  This is clearly incorrect.  Courts have widely
endorsed the criteria in the Commission's Release. 20  The term

---

20  Sanders v. John Nuveen & Co., 463 F.2d 1075, 1079 (7th
    Cir.), cert. denied, 409 U.S. 1009 (1972); Zabriskie v.
    Lewis, 507 F.2d 546, 550 (10th Cir. 1974); Zeller v. Bogue
                                              (continued...)

"prime quality" in SEC Release 4412 reflects the notion that
Congress intended to exempt from registration only notes that
were among the safest investments.  As one court said, "prime"
refers to "first in value or excellence; of excellent quality;
first rate."  Welch Foods Inc. v. Goldman, Sachs & Co., 398 F.
Supp. 1393, 1398 (S.D.N.Y. 1974).  A commentator defined the term
as "referring to paper whose ability to bear interest and to
repay debt is extraordinarily reliable."  Chicago Note, supra
p. 36, at 386.  See also Sanders v. John Nuveen & Co., 463 F.2d
1075, 1079 n.12 (7th Cir.), cert. denied, 409 U.S. 1009
(1972). **21**

---

20(...continued)
      Elec. Mfg. Corp., 476 F.2d 795, 800 (2d Cir.), cert. denied,
      414 U.S. 908 (1973) (short term notes must fit the "general
      notion" of commercial paper reflected in the Commission's
      Release); SEC v. Continental Commodities Corp., 497 F.2d
      516, 525 (5th Cir. 1974) (endorsing factors in Commission
      Release, but noting that court is not limited to factors set
      forth in the Release); see also Ruefenacht v. O'Halloran,
      737 F.2d 320, 327 n. 21 (3d Cir. 1984) (dicta), aff'd, 471
      U.S. 701 (1985).  See also 3 L. Loss and J. Seligman,
      Securities Regulation, at 1189 n.135 (3d ed. 1989).

      In fact, the defendant itself recognizes that note safety
      and risk are important to the availability of the exemption.
      The defendant argues that bank regulation by the Federal
      Reserve Board and the Office of the Comptroller of the
      Currency "enhance the safety of such paper" and that "[t]he
      very short term character of most of the paper also reduces
      risk." (Def. Opp. Br. 28).  Thus, the defendant
      inconsistently maintains that note "quality" is irrelevant,
      but that note "safety" or "risk" are important.  What
      defendant fails to recognize is that these terms all refer
      to the same thing, namely, the likelihood that the issuer
      will be able to pay the principal and interest on the
      commercial paper when it matures.

**21**   The requirement that commercial paper be of a type eligible
      for discounting by the Fed similarly was directed to the
                                            (continued...)

- 40 -

The requirement that commercial paper not be sold to the
general public reflects the fact that in 1933 almost no
commercial paper was sold to the general public, and Congress so
understood when it enacted the exemption; whereas, by the time of
the 1961 release, banks were not the only buyers of commercial
paper.  Congress exempted commercial paper in 1933 on the theory
that registration, requiring the disclosure of information
relating to the underlying transaction, was unnecessary for
transactions that only involved banks, because banks could gather
the information required for their credit analysis.  If, however,
commercial paper is offered to the general public, the
protections offered by registration become necessary.

---

**21**(...continued)
   instrument's risk.  During the early 1930s the Fed limited
   the availability of discounting to short-term, "self-
   liquidating commercial paper" in an attempt to achieve
   economic stability.  Chicago Note, supra p. 36, at 389-90
   and n.199.  After enactment of the Securities Act, however,
   the Fed first expanded the kind of commercial paper that was
   discountable, so that it was less of an assurance of high
   quality (Chicago Note, supra p. 36, at 390-91), and then
   stopped discounting commercial paper altogether.  3 L. Loss
   and J. Seligman, Securities Regulation, at 1187 (3d ed.
   1989).  Thus, the discountability requirement in the
   Commission staff's release has become an anachronism.  Id.

WBC commercial paper fails to meet at least these two criteria for the exemption.  The paper was not of "prime quality" <u>22</u> and it was offered and sold to the general public. <u>23</u>

_____

<u>22</u>    The defendant incorrectly argues that the Commission has "adopted a less stringent standard with respect to bank holding companies than other issuers of commercial paper." (Def. Opp. Br. 28 & n.28).  The no-action letters cited by defendant contain no indication that the bank holding companies planning to issue commercial paper were in the precarious financial condition that WBC was in.  In addition, the Commission's staff issued all of the no-action letters based on an opinion of the issuer's counsel that the commercial paper would be exempt from registration.

<u>23</u>    Section 3(a)(3) provides that the exemption applies to commercial paper which is used to fund "current transactions."  In Release 4412 the Commission interpreted the exemption to apply to "paper issued to facilitate well recognized types of current operational business requirements."  The concept of "current transactions" was borrowed from the banking laws.  In the Release the Commission noted that under Regulation A of the Fed's regulations, 12 C.F.R. Part 201, commercial paper could be discounted by the Fed if the proceeds of the notes were used:

> in producing, purchasing, carrying or marketing goods or in meeting current operating expenses of a commercial, agricultural or industrial business and which is <u>not</u> to be used for permanent or fixed investment, such as land, buildings, or machinery, <u>nor</u> for speculative transactions or transactions in securities * * *.

The defendant argues that WBC's subsidiary mortgage company, WMG, used the commercial paper proceeds "to finance and refinance the current operations of its mortgage subsidiary (WMG), and therefore meets the 'current transaction' requirement * * *."  Def. Opp. Br. 23.

While an argument could be made that the practice of "warehousing" mortgages (the practice of originating mortgage loans, then holding the mortgages in inventory until they can be packaged and sold) may be an activity for which exempt commercial paper proceeds may be used, holding mortgages indefinitely or for long periods of time would be inconsistent with the current transaction requirement.
                                                        (continued...)

- 42 -

B.    WBC Notes Were Not "Prime Quality" Or Low-Risk
      Instruments.

Certainly by the spring of 1990, if not before, WBC
commercial paper bore no resemblance to the high quality, low
risk instruments that Congress intended to exempt from
registration under § 3(a)(3).  WBC commercial paper was unrated,
even though almost 100% of the commercial paper in the market is
rated by one of three rating agencies:  Standard & Poor's,
Moody's, or Fitch.  Stigum, supra p. 30, at 1038.  Most issuers
are willing to pay such services to be rated because a good
rating makes it easier and cheaper for them to sell their paper.
Id.  These ratings provide a convenient measure of "prime
quality," according to the leading commentator on the securities
laws.  3 L. Loss and J. Seligman, Securities Regulation, at 1191
(3d ed. 1989).  The lack of rating for WBC commercial paper is
one indication that it was less than "prime quality."

Analysis of WBC's situation in spring of 1990 only confirms
that its commercial paper was far from "prime quality."
Generally, rating services examine the issuer's management,
earnings, and balance sheet.  A top rating requires a strong
management, a good position in a well-established industry, an
upward trend in earnings, adequate liquidity, and the ability to

---

23(...continued)
      Release 4412 provides that commercial paper must be used for
      "assets easily convertible into cash and are comparable to
      liquid inventories of an industrial or mercantile company."
      In this case, it is not clear that WMG, WBC's mortgage
      subsidiary, could convert its "warehoused" loans to cash.

- 43 -

borrow to meet expected or unexpected cash needs.  Stigum, supra
p. 30, at 1038.  WBC had none of these.

As noted by an officer of one of the banks that withdrew its
line of credit, WBC's management was in turmoil, and its earning
trend was in a downward direction.  AFSCME ex. 28.  Profits fell
from $13 million in 1988, to $9 million in 1989.  AFSCME ex. 4 at
10.  In the first quarter of 1990, WBC lost $5.7 million.  AFSCME
ex. 28.  WBC's position in the industry was very poor.  A bank
rating agency downgraded WBC's credit rating twice in April 1990,
first from a "C/D" rating to a "D" rating, then to a "D/E"
rating.  AFSCME exs. 27, 29.  And, two days before AFSCME made
its last purchase of WBC commercial paper, banking regulators
prohibited NBW, the subsidiary bank, from making unapproved
transfers of funds to WBC to repay the commercial paper and
placed the bank in a category of banks subject to imminent
failure.  Most importantly, however, by mid-April 1990, WBC had
lost all $35 million in backup lines of credit for its commercial
paper program.  AFSCME exs. 19, 22, 25 and 26.

Courts have consistently held that paper is not prime
quality where the issuer is insolvent or experiencing substantial
liquidity problems.  **24**  Given WBC's severely limited liquid

---

**24**   See Sanders v. John Nuveen & Co., 463 F.2d 1075, 1079 (7th
      Cir.), cert. denied, 409 U.S. 1009 (1972) ("[B]ecause of the
      company's insolvency, it seems highly unlikely that the
      paper purchased * * * is * * * prime quality * * *."); SEC
      v. Continental Commodities Corporation, 497 F.2d 516, 525
      (5th Cir. 1974) ("it would appear that notes issued by a
      company or individual in precarious financial straits are
                                                    (continued...)

assets and its lack of backup lines of credit, any paper sold in
late April and early May was certainly not the high-quality, low-
risk type of instrument that Congress intended to exempt from
registration.

> C.    NBW Offered and Sold WBC Commercial Paper To The
>       General Public.

SEC Release 4412 provides that the exemption in § 3(a)(3)
applies to commercial paper "of a type not ordinarily purchased
by the general public." As discussed above, the legislative
history of § 3(a)(3) shows that Congress intended to exempt short
term paper "of a type which rarely is bought by private
investors." H.R. Rep. No. 85, 73d Cong., 1st Sess. 181-84
(1933).   One court considering the commercial paper exemption
noted:

> The definition of the term "general public" should
> not be narrowly construed. Large as well as small
> investors are protected by the Securities Acts.

Welch Food Inc. v. Goldman, Sachs & Co., 398 F. Supp. 1393, 1398-
99 (S.D.N.Y. 1974).  Concerning corporations which purchased
commercial paper the court stated:

> [W]e cannot rank their financial expertise or
> their ability to generate a meaningful credit file

---

24(...continued)
    not either prime quality, issued to facilitate current
    transactions, or eligible for discounting by Federal Reserve
    Banks"); United States v. Hill, 298 F. Supp. 1221, 1227 (D.
    Conn. 1969) ("[t]he 3(a)(3) exemption was not intended, and
    does not extend, to cover financing by an insolvent company
    in its speculative attempt to launch an enterprise"); see
    also 3 L. Loss and J. Seligman, Securities Regulation, at
    1191 (3d ed. 1989).

> equivalent to that specialized knowledge possessed
> by the banks, who for many years were practically
> the sole purchasers of this class of investment.

Id. at 1399 n.1.

In the instant case, NBW did not limits sales of WBC
commercial paper to wealthy or sophisticated investors, but
offered and sold it to anyone who had $25,000 to invest.   In
selling the commercial paper, the NBW staff did not consider the
income, net worth or investment experience of the investor.   FDIC
Ex. 4 at 18-19.  According to Stephen Binder, the supervisor of
the NBW sales staff, "if a customer had 25,000 to invest then a
25,000 investment for that person would mean that he knew * * *
what they were buying and they had the means to make an
investment and a means to analyze [the investment]."  FDIC Ex. 8
at 47.  Although the means to invest $25,000 may have at one time
suggested a certain level of wealth or investment sophistication,
today that is no longer so.  Today, a broad range of persons may
have $25,000 in savings that they would want to keep in a safe,
liquid investment.  Congress did not intend that the commercial
paper exemption would be available for programs offered and sold
to such persons.

In sum, the defendant construes the commercial paper
exemption in a manner that would completely undermine Congress's
intent in passing the Securities Act.  Under its construction,
banks near financial ruin would be allowed to sell short-term
notes while concealing from investors their poor financial
condition and any loss of backup lines of credit.

- 46 -

Exhibit 4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

In re:                        :

ENRON CREDITORS RECOVERY CORP., et al.,     :      Chapter 11

                 Reorganized Debtors.     :      Case No. 01-16034 (AJG)

                       :

                       (Jointly Administered)

-------------------------------------------------------------------- X

ENRON CORP.,                   :

                Plaintiff,

                       :

                 v.             :      Adv. No. 03-92677 (AJG)

J.P. MORGAN SECURITIES, INC., et al.,                        :

                Defendants.                        :

-------------------------------------------------------------------- X

ENRON CORP.,                   :

                Plaintiff,

                       :

                 v.             :      Adv. No. 03-92682 (AJG)

MASS MUTUAL LIFE INSURANCE CO., et al.,                      :

                Defendants.                        :

-------------------------------------------------------------------- X

 

**EXPERT REPORT OF PROFESSOR JONATHAN R. MACEY**
**SUBMITTED BY GOLDMAN, SACHS & CO.**

flow into the Commercial Paper Account "at different times of the day, the IPA may at its discretion advance funds on behalf of the (issuer) on an intraday basis" (a daylight advance).[91]

100.  As a practical matter, parties agreeing to enter into agency relationships can reach an oral agreement and/or have a written agreement. It is understood in the business world that agents have a right to indemnification when acting for their principal within the scope of their delegated authority.

      B.    The Business Agreement Between Enron And Goldman Sachs Created An Agency Relationship

101.  It is my understanding of the facts that, after Enron offered to repurchase its commercial paper, it asked its dealers to help with the trades.[92] For logistical reasons, Enron wanted the holders of its commercial paper to sell their paper back through the dealers, rather than directly to Enron.[93]

102.  Goldman Sachs refused to participate in the transactions in this way and directed interested investors to contact Enron directly on October 26, 2001.[94] Enron, however, could not handle the repurchases by itself.[95]

103.  Enron therefore came back to Goldman Sachs in the afternoon of October 26 to ask again for help. After further discussions, Goldman Sachs agreed to assist Enron with the transactions, but only as Enron's agent.[96]

104.  Enron orally appointed Goldman Sachs as its agent for the repurchases on October 26, 2001, and Goldman Sachs agreed to act as Enron's agent on that date.[97] Enron and

---

[91] Id.
[92] James Newgard Dep., Feb. 5-7, 2007, Vol. I 112:15-22; 118:6-22.
[93] Id., Feb. 5-7 Vol. I 117:19-118:22.
[94] Id., Feb. 5-7, 2007, Vol. II 282:18-23; 333:11-16.
[95] Id., Feb. 5-7, 2007, Vol. II 285:18-286:20.
[96] Id., Feb. 5-7, 2007, Vol. II 287:16-288:20.

Goldman Sachs then memorialized their understanding in a letter agreement from Enron

to Goldman Sachs, executed on October 28, 2001, which was subsequently re-executed

on November 9, 2001 after the departure from Enron of the original Enron signatory, Ben

Glisan.[98]  The letters are less than a single page in length and each contains the following

identical language:

> [t]his letter will serve as the agency agreement between Enron
> Corp. as principal ("Enron") and Goldman, Sachs & Co., as agent
> ("agent") with respect to Enron's 3(a)(3) Commercial Paper.
> Enron hereby appoints the agent to act on Enron's behalf to buy
> Enron's 3(a)(3) Commercial Paper from the holders of such paper,
> which tender such paper to Enron.  Agent's duties in this regard
> are completely ministerial, and agent shall have no duties but to act
> as a conduit between Enron and the holders of Enron's 3(a)(3)
> Commercial Paper.  Agent shall not be responsible for fronting any
> payments in this regard, but shall simply disperse funds, which
> shall be provided to the agent by Enron specifically for such
> purpose.[99]

105.    Goldman Sachs arranged for repurchases with holders of Enron paper and then purchased

the commercial paper from the holder on behalf of Enron through the DTC.[100]  Once the

investors had indicated that they wanted to sell back their paper, Goldman Sachs would

send Enron an email stating the pieces of commercial paper that would be bought back

that day so that Enron could wire the money to Goldman Sachs' account at Chase bank

and provide the Chase Paying Agent with the necessary information.[101]  The same day,

Goldman Sachs would receive the paper from the holder through DTC by a deliver order

with "delivery versus payment."[102]  By midafternoon, before the day's trades were

finalized in DTC's end-of-day net settlement, Enron's Treasury Department wired to

---

[97] Ex. 30,487; Robert Wall Dep., Apr. 17-19, 2007, Vol. II 376:14-23; James Newgard Dep., Feb. 5-7, 2007, Vol. II 289:16-290:8.
[98] Ex. 10, 477; Ex. 10,478; Ex. 10,479.
[99] Ex. 10, 477; Ex. 10,478; Ex. 10,479.
[100] Guido Defalco Dep., May 23, 2007, Vol II 415:23-416:20.
[101] See, e.g., Exs. 10,032, 40,201 & 40,202.
[102] Edmund Matusiak Dep., July 20, 2007, Vol. I 96:5-9.

Goldman Sachs' account the money needed for the transactions.[103]  Goldman Sachs

delivered the commercial paper using deliver orders with "free delivery" to Enron

through the DTC.[104]

106.    Goldman Sachs did not receive a commission or fee for any of the repurchase

transactions.[105]

107.    Goldman Sachs acted as agent in all but two of the transactions in the Complaints in

which it allegedly was involved: Goldman Sachs held those two pieces for its own

account.[106]  Enron has sued Goldman Sachs for the amount Enron paid for the

commercial paper that Goldman Sachs purchased on behalf of Enron as agent

(approximately $340 million) and for the amount of commercial paper that Goldman

Sachs sold back from its own account (approximately $31 million).[107]

C.    Enron And Goldman Sachs' Business Arrangement Resulted In Goldman Acting
As A Conduit And Not As A Transferee For The Transfers That Are At Issue

108.    It simply is not possible to imagine a clearer, more unambiguous articulation of an

agency relationship than the letter agreement defining the business relationship between

Enron and Goldman Sachs in this case.  Moreover, from a business perspective, Goldman

Sachs did exactly what Enron asked it to do and acted as the epitome of a mere conduit.

109.    Goldman Sachs' agency relationship was very limited.  Goldman Sachs' activities on

behalf of Enron were restricted to purchasing Enron's previously issued commercial

paper from investors with Enron's money, solely on Enron's account and solely pursuant

to its instructions.  Enron gave Goldman Sachs the authority as its agent to transfer

---

[103] Ex. 40,046.
[104] See, e.g., Ex. 40,199.
[105] James Newgard Dep., Feb. 5-7, 2007, Vol. I 185:3-7.
[106] Guido Defalco Dep., May 22, 2007, Vol. I 267:7-11.
[107] Enron Corp. v. J.P. Morgan Sec., Inc., No. 03-92677 (AJG) 2d Am. Compl., Feb. 14, 2007, ¶ 137 (Second
Amended Complaint); Enron Corp. v. Mass Mut. Life Ins. Co., No. 01-16034 (AJG) Am. Compl., Dec. 1, 2003,
¶ 98 (Amended Complaint).

Enron's funds to holders of Enron's commercial paper who wanted to sell the

commercial paper back to Enron. Thus, from a business perspective, the payments went

from Enron through Goldman Sachs as Enron's agent to the holders of the commercial

paper and not from Goldman Sachs to the holders of the commercial paper.

110.    Goldman Sachs' activities as Enron's agent consisted of it receiving funds from Enron

for the limited and specific purpose of repurchasing Enron's outstanding commercial

paper. In other words, in the commercial relationship between Enron and Goldman

Sachs, Goldman Sachs' role was confined to that of custodian of Enron's funds. In

essence, Goldman Sachs served as a remitting agent in that Goldman Sachs remitted

funds received from Enron to certain institutions that were creditors of Enron by virtue of

their investments in Enron's commercial paper.

111.    It is clear from even a cursory understanding of the agency relationship between

Goldman Sachs and Enron that Goldman Sachs upon receipt of the funds from Enron did

not have any right to put such funds to its own use. Rather, pursuant to clear commercial

understandings in the securities industry, Goldman Sachs, because it was Enron's agent,

was required to transmit the Enron funds in its custody to the companies that were selling

the Enron commercial paper being repurchased by the Company. In fact, as Enron's

agent, Goldman Sachs had no discretion in the use of funds. The funds had to be used for

the express purpose for which Goldman Sachs, as agent, was instructed to use them by

Enron, Goldman Sachs' principal in these transactions.

112.    Goldman Sachs did not advance funds on behalf of Enron or pay any expenses on

Enron's behalf. Both parts of the transaction were effectively simultaneous because

41

Goldman Sachs retained the ability not to complete any purchase if Enron failed to fund its leg of the transaction.

113.    In instances when Goldman Sachs received Enron funds after a transaction with the selling company was processed, or "made," at DTC, Goldman Sachs was not risking its own capital in any way because, if Goldman Sachs had not received Enron funds to pay for the commercial paper in its account at Chase Bank by the DTC daily cutoff time of 3:20 PM, Goldman Sachs simply would have "dk'd" the trade with the selling customer.

114.    Critically, there was no time limit imposed on when these commercial paper trades could be dk'd. Thus, regardless of whether Goldman Sachs had received cash from Enron prior to taking delivery of commercial paper at the DTC, Goldman Sachs could, and, I understand, would have dk'd any trade for which it did not receive cash payment from Enron on the same day as the commercial paper was tendered. I further understand that, in fact, Goldman Sachs did receive payment from Enron on the same day that it received delivery of the commercial paper from each and every seller in this case. Thus, because of Goldman Sachs' ability to dk trades, the fact that some transactions may have involved Goldman Sachs receiving commercial paper in advance of receiving payment from Enron is not in any way inconsistent with Goldman Sachs' role as Enron's agent in these transactions. Enron knew that Goldman Sachs was acting as its agent and that it was responsible at all times for paying for the commercial paper repurchases. Enron was not looking for Goldman Sachs to finance its repurchases in any way.

115.    Goldman Sachs did not have dominion or control over the funds advanced by Enron to repurchase its commercial paper, because Enron dictated precisely how those funds were to be used. A clear demonstration of Goldman Sachs' lack of control over the funds is

42

provided by Goldman Sachs' dealings with Trusco Capital Management on October 30,
2001. Trusco had mistakenly sent to the Chase IPA, rather than to Goldman Sachs, the
commercial paper it was selling back to Enron, which led to a failure to settle the trade.[108]
As a result, that day Goldman Sachs wired back to Enron the money that Enron had
advanced to complete the trade.[109] The next day, Enron wired funds back to Goldman
Sachs and the repurchases from Trusco settled. This is a clear illustration of Enron's
acknowledged understanding of the relationship, which was that the funds Enron
advanced were to be used exclusively to accomplish the buybacks.[110]

116. Goldman Sachs also did not have dominion or control over the commercial paper being
resold to Enron because Goldman Sachs was obligated to provide this paper to Enron.

117. I am advised that Enron contends that Goldman Sachs was a "transferee." Goldman
Sachs was not a "transferee" of any kind because no funds were transferred to it for its
benefit. A transferee must be able to use the money being transferred for its own
purposes. Goldman Sachs clearly could not use this money for its own purposes. The
term "transferee" is used both in law and in business parlance to mean a person to whom
a conveyance is made. It is someone to whom a transfer is made. Goldman Sachs,
however, did not receive by means of transfer (or in any other way) commercial paper or
cash. Similarly, a transferee is someone who acquires rights in an assignment or receives
title in a conveyance of title. Goldman Sachs did not acquire any rights or title. Thus,
Goldman Sachs did not act as transferee in these transactions: it acted solely as agent.

118. Instead of being a transferee, Goldman Sachs was a classic conduit. In light of the nature
and structure of the relationship between Enron and Goldman Sachs, like other conduits,

---

[108] George McManus Dep., Mar. 21, 2007, Vol. I 188:8-189:5; Ex. 10,428.
[109] Ex. 10,350.
[110] James Newgard Dep., Feb. 5-7, 2007, Vol. II 327:6-20.

# Exhibit 5

1              J. NEWGARD

2    now is 11:44 a.m.

3         (There is a recess from the record.)

4         VIDEOGRAPHER:  We're back on the record.  The

5    time now is 11:51 a.m.

6    BY MR. MOLONEY:

7      Q   Mr. Newgard, did Goldman, Sachs fail in any

8    way to carry out the contractual undertaking it made

9    to act as Enron's agent in connection with the

10   buyback?

11        MR. JONES:  Objection.

12        MR. SCHATZOW:  Objection.  Calls for a legal

13   conclusion.

14     **A   Not that I'm aware of.**

15     Q   And I'll ask it in a nonlegal way.  Did they

16   fail to do, from your business perspective, anything

17   you thought they had committed to do with the buyback?

18     **A   At the end of the day they helped us get the**

19   **paper rounded up.**

20     Q   Okay.  And was it your understanding that for

21   some reason you had sent money to Goldman, Sachs and

22   the paper hadn't been delivered, was it your

23   understanding that Goldman, Sachs could have kept that

24   money for some other purpose or would it have been

25   required to give it back to Enron?

1              J. NEWGARD

2          MR. KEMPINSKY:  Objection.

3      **A    Yes.**

4      Q    J.P. Morgan did the exact same thing, right?

5      **A    Yes.**

6      Q    That's exactly what Enron told J.P. Morgan

7   that Enron wanted it to do from the very initial call

8   with J.P. Morgan on October 25th, right?

9      **A    Yes.**

10      Q    And Lehman did the exact same thing also,

11   right?

12      **A    Yes.**

13      Q    And that's exactly what Enron told Lehman

14   Enron wanted it to do from the very initial call with

15   Lehman on October 25th, right?

16      **A    Yes.**

17          MR. MURPHY:  Object to the form.

18          MR. FELDMAN:  You didn't get my objection to

19   the earlier question.

20          MR. ROSENTHAL:  As long as it's one objection,

21   it's okay.

22          MR. FELDMAN:  But it was the earlier question,

23   line 22 and line 23.

24      **A    Yes.**

25      Q    Another important issue for Enron was price,

| | |
|---|---|
| 1 | J. NEWGARD |
| 2 | **A  Yes.** |
| 3 | Q    All three dealers carried out that direction, |
| 4 | right? |
| 5 | **A    Yes.** |
| 6 | Q    By doing the buyback in the manner that you |
| 7 | directed, Enron was able to make one settlement |
| 8 | payment each day to Goldman for the benefit of |
| 9 | Goldman's customers who sold their commercial paper to |
| 10 | Enron, one settlement payment each day to J.P. Morgan |
| 11 | for the benefit of J.P. Morgan's customers who sold |
| 12 | their commercial paper to Enron, and one settlement |
| 13 | payment each day to Lehman for the benefit of Lehman's |
| 14 | customers who sold their commercial paper to Enron, |
| 15 | right? |
| 16 | MR. MURPHY:  Objection.  Lot of objections to |
| 17 | the form of that question. |
| 18 | MR. MAGALIFF:  Objection to the form of |
| 19 | counsel's testimony. |
| 20 | Q    Is that correct? |
| 21 | **A    Yes.  The -- you had said, made a payment to** |
| 22 | **Lehman for the payment of Lehman's customers.  It was** |
| 23 | **actually a payment to the settlement account at the** |
| 24 | **Chase IPA group for the benefit of Lehman's customers.** |
| 25 | Q    Just so I have that clear, by doing the |

Exhibit 6

**Pursuant to the Amended Confidentiality Protective Order, Exhibit 6 has been filed under seal.**

Exhibit 7

```
 1
 2   UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
     -----------------------------x      Case No.
 3   In re                               01-16034(AJG)
                                         (03-92677)(03-92682)
 4   ENRON CREDITORS RECOVERY CORP.,
     et al,                              New York, New York
 5                                       June 14, 2007
           Reorganized Debtors.         2:09 p.m.
 6   -----------------------------x
                   DIGITALLY RECORDED PROCEEDINGS
 7         (Excerpt - J.P. Morgan, et al./Mass Mutual, et al.)
     02:00 (03-92677) Enron Creditors Recovery Corp. v. J.P. Morgan
 8   Securities Inc., et al.:
     Motion to compel production of documents by Kelly Properties,
 9   Inc., Veritas Software Corp., and the UBS Defendants.
     Oppositions filed.
10   (calendar continued on page 3)

11   B E F O R E:

12       THE HONORABLE ARTHUR J. GONZALEZ
         United States Bankruptcy Judge
13
     A P P E A R A N C E S:
14
         VENABLE LLP
15       Special Litigation Counsel for Reorganized Debtors
             Two Hopkins Plaza, Suite 1800
16           Baltimore, Maryland    21291

17       BY:  MICHAEL SCHATZOW, ESQ.
              RICHARD WASSERMAN, ESQ. (via telephone)
18            ROBERT L. WILKINS, ESQ.  (via telephone)
                    -and-
19            The Chrysler Building
              405 Lexington Avenue, 56th Floor
20            New York, New York    10017

21       BY:  MICHAEL K. MADDEN, ESQ.

22   (appearances continued on page 2 and 3)

23               DEBORAH HUNTSMAN, Court Reporter
         (212) 608-9053   (718) 774-2551   (917) 723-9898
24       Proceedings Recorded by Electronic Sound Recording,
             Transcript Produced by Court Reporter
25
```

1    there is a guaranty, where a guarantor actually backstops the

2    obligation.  We cited you a bunch of cases that say that is

3    the paradigm, and courts have been very reluctant to move very

4    far off from that paradigm, with one other exception.  There

5    clearly are cases where someone got a tangible economic

6    benefit from a fraudulent transfer or a preference.

7         I think they cite one example, which is a pretty good

8    one, which is a circumstance where four guys owned a closely

9    held corporation.  The corporation is worth $2 million, but

10   they realize they are going to go out of business.  So they

11   say, "Gee, this is a bad deal selling the assets for

12   $2 million.  It will all go to our creditors.  We will sell it

13   to you for $800,000, and you, new company, you offer the four

14   of us long-term employment contracts that would be worth the

15   $1.2 million that should have gone to the creditors."

16        Under those circumstances, the Court says, "Okay.

17   There is a tangible, real economic benefit you got from this

18   transaction, and also parenthetically this transaction fits

19   within the meaning and the literal words of 550, because it

20   was really done for your benefit.  The reason why you did this

21   transaction for those people was for your benefit."

22        Nothing in the record possibly supports those theories

23   against us, and this Project Truman discovery exercise is a

24   trip to nowhere.  It is a frolic and a detour.  What are they

25   going to do?  They are going to show they could have had a

Proceedings                                    42

1    securities lawsuit against us?  What are you going to do then?
2    You are going to try that case?  Among other things, if we get
3    to that stage, this case would be subject to mandatory
4    removal, because it would involve a statute other than the
5    Bankruptcy Code.  There is no reason.  It is not like they
6    need this theory.  It is not like they don't have deep
7    pockets.  Who actually got the money were Defendants sitting
8    here -- UBS; and Kelly Properties a $5 billion revenue
9    company.  It is not like they need to come up with this wacky
10   theory, which no court has ever espoused, because they are
11   dealing with bankrupt people who got the money.

12          When Goldman entered into an Agency Agreement where
13   they said they would hold us harmless, when they go there and
14   say, "Please help us," and when they are going to get legal
15   advice so as exactly not to be here, to drag us in just
16   gratuitously is crazy.

17          Just as a last point I want to make, Your Honor, I
18   know early on in the case we moved to dismiss on 546(e)
19   grounds and safe harbor grounds.  You will recall that we
20   didn't convince you yet on that, but I want another shot at
21   that.  I wasn't around then.  I want another shot at that.
22   You probably already know that on the appeal -- you didn't get
23   the benefit of this, but the SEC and the Treasury Department
24   of the United States both agree with our position --
25          JUDGE GONZALEZ:  But you didn't get the benefit of

1          So the notion that there is something fancifully or

2    made up or wacky or dishonest about the notion that there

3    could be liability there is just not so.

4          JUDGE GONZALEZ:   What about the issue about whether or

5    not the Commercial Paper are securities or is a security?

6          MR. SCHATZOW:   Judge, we have never conceded that they

7    are securities, and we don't believe that they are, if you

8    apply the Reeves test and all the various other tests for

9    whether they are securities or not.  We don't think that the

10   liability of Goldman Sachs is dependent on whether they are

11   securities or not.

12         The questions are going to be what were the duties

13   that Goldman Sachs had to its customers, based on the

14   relationship between the customers.  Were they tort duties?

15   Were they contractual duties?  Were they custom and usage

16   duties?  What were the duties?

17         Even if the Commercial Paper ultimately is determined

18   to be a security, Judge, then we get back to all of our common

19   in the trade?  What does it mean under the Bankruptcy Code?

20   Was this actually a purchase and sale or was this merely the

21   payoff of Enron's debt?  And we get back into all of those

22   questions.

23         It is not an either/or.  It is not, "Gee, if Goldman

24   has liability to its customers, because it had non-public

25   information and didn't make them aware of it, and they were

Proceedings                                      54

1    trying to protect against it."  They monitored that as

2    contingent risk, but the only basis to make a claim for that

3    is securities; therefore, Enron has to lose its case against

4    Goldman Sachs.

5           As you well know, Judge, from the thousands of pages

6    of briefing, there are a lot of issues and the case doesn't

7    rise or fall on that particular issue.  It is our position it

8    wasn't a security, Judge.  But the case doesn't rise or fall.

9    If it is a security, there is still liability out there.

10          The notion that we have been given full discovery --

11   we have had "full discovery of the credit department" -- we

12   have taken the discovery deposition of one person, Hilary

13   Ackermann.  We have another scheduled one coming up.  We have

14   other people who aren't even scheduled.  They say, "Well, we

15   have made Hurst available and we have made this one

16   available."  Judge, we had to have a pre-motion conference

17   with you to get Mr. Hurst's deposition.  That is what we had

18   to do, because they wouldn't make him available.  "You made

19   him available."  They didn't make him available.

20          We are entitled to get the relevant documents before

21   we question Mr. Hurst or anyone else, so that the depositions

22   will be a productive exercise, Judge, and not just a question

23   of I don't remember, I don't recall, or I don't know, when

24   there are documents that people have authored that you can use

25   to refresh their recollection or to jar their memory.